IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Morton S. Bouchard, III, Individually and as Co-Trustee for the Morton S. Bouchard III 2017 Family Trust | Civil Action File No. _____ |
| Plaintiff, | |
| v. | Jury Trial Demanded |
| David R. Jones, Elizabeth Carol Freeman, Jackson Walker, LLP, Kirkland & Ellis, LLP, Kirkland & Ellis International, LLP, Portage Point Partners, LLC, and Matthew Ray, | |
| Defendants, | |

To the Honorable Alia Moses,
Chief United States District Judge:

## PLAINTIFF'S ORIGINAL COMPLAINT

Comes now, Plaintiff, Morton S. Bouchard, III, individually and as co-trustee, (collectively, the "Bouchard Parties"), by and through counsel, and in support of his claims against the above-named Defendants, David R. Jones ("Judge Jones"), Elizabeth Carol Freeman ("Freeman"), Jackson Walker, LLP ("Jackson Walker"), Kirkland & Ellis, LLP, and Kirkland & Ellis International, LLP (collectively the RICO

Defendants),[1] Portage Point Partners, LLC ("Portage Point") and Matthew Ray

("Ray")[2] (collectively, "Defendants") and respectfully state:

## **INTRODUCTION**

1.      This lawsuit follows perhaps the most significant bankruptcy scandal in U.S. history, as recently documented by the Fifth Circuit.[3] For years, the (recently resigned) Chief Judge of the Bankruptcy Court for the Southern District of Texas, Judge David R. Jones, awarded Jackson Walker, the law firm where his live-in girlfriend and former clerk, Elizabeth Freeman, was a partner, millions of dollars in attorneys' fees. Neither Judge Jones, nor Freeman, nor any law firm disclosed this long-term and ongoing relationship in any bankruptcy proceeding.

2.      In fact, Freeman, Jackson Walker and Kirkland Ellis used this secret relationship to bolster prestige and collect tens of millions of dollars or more in fees at the expense of those affected by the bankruptcies. In this case, the Jones-Freeman-Jackson Walker-Kirkland Ellis Enterprise, working together with restructuring advisor Portage Point Partners and its founder Matthew Ray, dismantled Bouchard Transportation Company

---

[1] Defendants Kirkland & Ellis, LLP and Kirkland & Ellis International, LLP are referred to collectively herein as "Kirkland & Ellis".

[2] Defendants Portage Point Partners, LLC and Matthew Ray are referred to collectively as the "Portage Point Parties."

[3] Exhibit 1, Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones, Southern District of Texas, Under the Judicial Improvement Act of 2002.

("BTC"),[4] a generational ocean-going barge company worth nearly three quarters of a billion dollars, for pennies on the dollar.

3.      With the presiding judge working in concert, they orchestrated a coup to remove BTC's longtime CEO, Mr. Bouchard, when he began scrutinizing professional fees. The Defendants then proceeded to hold a fire sale of the company's assets. In the process, Plaintiff lost tens of millions of dollars which he had invested personally to help keep the company afloat.

4.      Judge Jones previously noted that "due to the sheer volume of cases and the issues involved, the bankruptcy process in the Southern District of Texas is heavily dependent upon the honesty and integrity of the lawyers that participate in the process."[5] It is critical then to "protect[] the integrity of the bankruptcy process itself against those who seek to take advantage through deception or nondisclosure."[6]

5.      Unfortunately, Judge Jones did not live up to his own words. Judge Jones and Freeman deceived the public and interested parties in bankruptcies, including Plaintiff here, by failing to disclose their relationship. But they did not deceive Jackson Walker or Kirkland & Ellis. Both firms knew of the relationship and used it to profit. They

---

[4] BTC, as referenced herein, includes Bouchard Transportation Co., Inc. and its affiliated entities. The chapter 11 cases were jointly administered under Case No. 20-34682 in the Bankruptcy Court for the Southern District of Texas; however, the Chapter 11 affiliate cases were closed on September 28, 2021. *See BTC*, 20-34682, Dkt. 1389 (Bankr. S.D. Tex. Sept. 28, 2021) (J. Jones).
[5] *In re Decloutte*, No14-35557, 2018 Bankr. LEXIS 1869, *1 (Bankr. S.D. Tex. June 20, 2018) (J. Jones).
[6] *In re Edwards*, 510 B.R. 554, 558 (Bankr. S.D. Tex. Apr. 9, 2014) (J. Jones).

brought in tens of millions of dollars (or more) through the Jones-Freeman conduit and said nothing of it. In fact, they affirmatively held themselves out as disinterested, leaving creditors and others who might object in the dark.

6.    These are not mere ethical lapses, nor are they omissions that can be fully redressed by the U.S. Trustee's efforts to claw back attorneys' fees in some of the bankruptcy proceedings. As described herein, Jackson Walker, and even Kirkland & Ellis, who oversaw the bankruptcies as lead counsel, filed numerous misleading and dishonest federal court papers without disclosing the Jones-Freeman relationship, amounting to bankruptcy fraud, honest services fraud, mail and wire fraud, and obstruction of justice—actionable under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Further, Jackson Walker, Kirkland & Ellis, Freeman, and Judge Jones breached their fiduciary duties to the creditors and other interested parties in the bankruptcies, committed fraud, and were unjustly enriched. As to the RICO Defendants, Plaintiff seeks the forfeiture of attorneys' fees, statutory damages, compensatory damages including mental anguish, and other damages in connection with Defendants' violations of RICO and breaches of fiduciary duty, among other cause of action.

7.    Additionally, the RICO Defendants in this case worked in concert with Defendants Portage Point Partners, restructuring advisor, and Matthew Ray, founder

and managing partner of Portage Point, to accomplish their illicit ends.[7] As detailed below, Portage Point and Ray, through their acts and omissions at various points during and subsequent to the Chapter 11 BTC bankruptcy cases, engaged in a course of reckless, intentional, and/or grossly negligent conduct, by, among other things, acting with self-serving and competing interests and compromised loyalties in various conflicting roles, whereby they took actions beneficial to themselves rather than those they served, including the Bouchard Parties, without sufficient disclosure of such compromised interests and/or conflicts, all to the serious detriment of the Bouchard Parties.

8.      The improper actions taken by Portage Point and Ray include, among other things: (i) wrongfully orchestrating the removal of Mr. Bouchard as chief executive officer of BTC and appointing Portage Point in his place, through Mr. Ray;  this was done despite the Portage Point Parties lacking the necessary experience to successfully operate and manage the business (a complex business and the largest independent ocean going petroleum barging company in the U.S. under the Jones Act as detailed below); (ii) prematurely causing the wind-down of BTC's business through its acts and omissions which ultimately resulted in a "fire-sale" of BTC's assets at well-under the

_____

[7] Plaintiff reserves the right to amend their pleadings to add Portage Point Partners, LLC and Matthew Ray as RICO Defendants to the extent it is revealed they had knowledge of the secret Jones-Freeman relationship. Ray submitted a declaration of disinterestedness without disclosing the relationship. *See In re Bouchard Transportation Co., Inc., et al.*, No. 20-34682, Dkt. 165, Ex. B.

pre-bankruptcy market value; (iii) acting with conflicting loyalty by entering an agreement with the ultimate purchaser of BTC's assets which compromised the Portage Point Parties' independence and was in dereliction of their fiduciarily duties; (iv) acting for the purchaser, post-sale, to oversee the very assets they were charged with protecting and selling, including, for their own benefit; and (v) entering into a Settlement Agreement (described below) with the Bouchard Parties, whereby, among other things, the Bouchard Parties' claims were to be allowed in full in the Chapter 11 Cases along with a partial payment, and then breaching that Settlement Agreement by refusing to properly seek approval by the Bankruptcy Court, as required — which served to delay and to hold the Bouchard Parties at bay.  The foregoing constitutes, among other things, improper self-dealing, tortious interference with employment, waste, mismanagement, breach of fiduciary duty, breach of contract, retaliation, wrongful termination, and conspiracy, which resulted in millions of dollars in damages to the Bouchard Parties, as well as vitiation of Mr. Bouchard's equity stake in BTC, previously valued prior to the bankruptcy into the hundreds of millions of dollars (which valuation was supported by a nationally known and recognized independent valuation company as discussed below).

9.     As a result of Defendants' conduct, as detailed more fully below, Plaintiff has sustained significant damages. Specifically, the Bouchard Parties withdrew proceeds from various life insurance policies they held and Mr. Bouchard's personal investment account, using those proceeds to make loans to BTC prior to the Chapter 11 Cases to

fund its operations. As a result of Defendants' misconduct, the loans taken out against such policies remain unpaid and certain policies terminated, resulting in over $40 million in losses, as well as adverse tax consequences to the Bouchard Parties given BTC's status as a sub chapter "s" corporation and the failure to repay the loans on the life insurance policies. In addition, the Bouchard Parties have been denied any recovery on their claims against BTC, including the amounts provided for under the Settlement Agreement. Further, Mr. Bouchard suffered reputational harm and has been unable to obtain new employment as a result of Defendants' misconduct. Similarly, the foregoing resulted in Mr. Bouchard's equity stake in BTC being vitiated, resulting in losses of hundreds of millions of dollars in value. Such conduct by the Portage Point Parties and RICO Defendants was intentional, grossly negligent and/or reckless, and directly harmed the Bouchard Parties (in addition to other damage to BTC and its creditors), resulting millions of dollars in damages as detailed herein, plus such other damages as determined after trial, including interest and legal fees. Plaintiff also seeks an accounting of Defendants' ill-gotten gains.

**PARTIES**

10.    Plaintiff Morton S. Bouchard, III is the 100% shareholder and founder of non-party BTC and was a resident of New York at the time of the original loans at issue herein. Mr. Bouchard presently is a citizen and resident of the State of Florida.

11.    Nonparty Plaintiff Morton S. Bouchard III 2017 Family Trust is the successor to a certain 2010 Trust, and is an irrevocable trust established by Mr. Bouchard. The

2010 Trust was formed in New York. The Bouchard Family Trust was organized under and governed by the laws of the State of New York. Morton S. Bouchard, III, serves as Co-Trustee for the Morton S. Bouchard III 2017 Family Trust.

12.     Defendant David R. Jones is a natural person. Jones is the former Chief Judge of the Bankruptcy Court for the Southern District of Texas. He can be served with process at ████████████████████████ Additionally, the United States government can be served by certified mail upon the civil process clerk at the U.S. Attorney's Office and by certified mail to the Attorney General of the United States in Washington D.C.

13.     Defendant Elizabeth Carol Freeman is a natural person, licensed Texas attorney, former partner at Jackson Walker, LLP, and owner of The Liz Freeman Law Firm, PLLC in Houston, Texas. Freeman is an individual and a citizen and resident of Harris County, Texas, and may be served with process at ████████████

14.     Defendant Jackson Walker, LLP is a limited liability partnership incorporated and existing under the laws of the State of Texas with its principal place of business at 2323 Ross Avenue, Suite 600, Dallas, Texas 75201. It may be served through any of its general partners, including C. Wade Cooper, at 2323 Ross Avenue, Suite 600, Dallas, Texas 75201.

15.     Defendant Kirkland & Ellis, LLP is a limited liability partnership incorporated and existing under the laws of the State of Illinois with its principal place of business at

300 North LaSalle, Chicago, Illinois 60654. It may be served through its registered agent, C T Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

16.     Defendant Kirkland & Ellis International, LLP, is a limited liability partnership incorporated and existing under the laws of the State of Delaware with its principal place of business at 300 North LaSalle, Chicago, Illinois 60654. It may be served through its registered agent, National Registered Agents, Inc., at 1209 Orange Street, Wilmington, Delaware 19801.

17.     Defendant Portage Point is a Delaware limited liability corporation formed and existing under the laws of the State of Delaware with offices around the nation, and its principal place of business at 300 North La Salle, Suite 1420, Chicago, Illinois 60654. It may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

18.     Defendant Matthew Ray is a natural person, and founder and managing partner of Portage Point who ran BTC following his appointment as CEO after Mr. Bouchard's termination described herein. Mr. Ray is an individual and a citizen and resident of the State of Illinois and may be served with process at his regular place of business at 300 North La Salle. Suite 1420, Chicago, Illinois 60654.

19.     Upon information and belief, certain individuals, or entities other than the listed Defendants may have been involved in the misconduct alleged herein. Those Defendants, being currently unknown to Plaintiff, are designated as John Does.

## JURISDICTION AND VENUE

20.    This Court has original federal question jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff brings claims under RICO, which is a federal statute. 18 U.S.C. §§ 1961, *et seq.*

21.    The Court also has subject matter jurisdiction pursuant to 18 U.S.C. § 1964(c), which provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court." Plaintiff seeks recovery for injuries to business or property caused by violations of RICO (18 U.S.C. §§ 1961, *et seq.*); he suffered "economic injur[ies]" that as described *infra*, are "concrete and particular and not speculative." *Soto v. Vanderbilt Mortg. & Fin., Inc.*, No. C-10-66, 2010 LEXIS 87951, at *43 (S.D. Tex. 2010).

22.    Additionally, this Court has jurisdiction under 28 U.S.C. § 1332(a)(1), based upon diversity of citizenship. Because Plaintiff is a citizens of Florida, Defendants are citizens of other states, and the amount in controversy (exclusive of interest and costs) exceeds $75,000, diversity jurisdiction exists in this Court.

23.    This Court also has jurisdiction over this action under 28 U.S.C. § 1331 because it is a civil action arising under the Constitution.

24.    This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. §1367. Plaintiff's state law claims are so related to their claims under RICO (18 U.S.C. §§ 1961, *et seq*) that they form part of the same case or controversy.

25.     Venue is proper in this District under 18 U.S.C. 1965(a) because it is where Defendants Jones, Freeman, and Jackson Walker reside, are found, and transact their affairs.

26.     In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District. Venue is proper because Defendants do business in this District and the causes of action arose, in substantial part, in this District.

27.     Venue is additionally proper in this District under 28 U.S.C. § 1391 because Judge Jones and Freeman are residents of this District for venue purposes and conduct business in this District. Additionally, Jackson Walker, LLP is a corporation organized under the laws of this State.

## FACTUAL ALLEGATIONS

### I.     David Jones makes himself the nation's leading mega-bankruptcy judge.

28.     In 2015, Judge Jones was appointed Chief Judge of the Bankruptcy Court for the Southern District of Texas. In a few years, he transformed it into the nationwide center for high-dollar[8] complex Chapter 11 bankruptcies.[9]  Judge Jones signed a General Order in 2018 directing all complex Chapter 11 cases filed in the Southern District, across all

---

[8] Sujeet Indap, The downfall of the judge who dominated bankruptcy in America, THE FINANCIAL TIMES (Nov. 21, 2023), accessible at https://www.ft.com/content/574f0940-d82e-4e4a-98bd-271058cce434 (last visited Feb. 26, 2024).
[9] See Adam J. Levitin, Judge Shopping in Chapter 11 Bankruptcy, 323 ILL. L. REV. 351, 372 (2013).

11

divisions, to two judges—himself and Judge Marvin Isgur.[10]  He also set up a "complex advisory" committee of bankruptcy attorneys, including the head of Kirkland & Ellis LLP's bankruptcy practice, who is not admitted to practice in Texas.[11]

29.     "In the years after the creation of the complex case system, Houston quickly attracted large bankruptcies that previously might have landed in Delaware or New York."[12] Thanks to Judge Jones' efforts, "Houston went from being a bankruptcy backwater to becoming the single most popular destination for large, public company bankruptcy filings."[13] Just in 2023, for example, "of the 54 large Chapter 11 cases filed, twenty-five landed in SDTX, where only two judges, including Jones, oversaw large restructurings. This near majority was more than those total bankruptcy filings in the traditional stalwarts, Delaware and New York, combined."[14]

30.     Judge Jones executed his plan with the "guaranty of case assignment to one of two judges who want to attract mega-cases and understand the need to 'sell' the venue to debtors."[15]

---

[10] *See* General Order 2018-1 (Jan. 29, 2018).
[11] *See* General Order 2018-6, (Bankr. S.D. Tex. June 29, 2018) (listing James Sprayregen on the committee).
[12] Indap, *supra* note 5.
[13] Levitin, *supra* note 6 at 374.
[14] Indap, *supra* note 5.
[15] Levitin, *supra* note 5 at 373.

## II.      By at least 2017, Judge Jones and his clerk, Elizabeth Freeman, start an intimate relationship and live together in a jointly-owned home.

31.      Elizabeth Freeman clerked for Judge Jones in the bankruptcy court for the Southern District of Texas for six years[16]—sometime between 2011 and 2018. At some point, the two started a romantic relationship.

32.      By 2017, the two were living together.[17] On June 26, 2017, they executed a survivorship agreement as co-owners of a million dollar-plus home in Houston.[18]

33.      The relationship may have begun earlier. Judge Jones purchased another million-dollar home in Coldspring, Texas, on September 1, 2016.[19] On information and belief, Freeman had been living in that house since 2007.[20]

34.      Further, on information and belief, Freeman's parents moved into the house in Coldspring in approximately 2020.[21] Judge Jones still owns that house as well.[22] Freeman also formed the Freeman Family Coldspring Real Estate Holdings, LLC in

---

[16] https://lizfreemanlaw.com/about.html, last visited February 26, 2024.
[17] Exhibit 1, Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones, Southern District of Texas, Under the Judicial Improvement Act of 2002.
[18] *See* Exhibit 2, June 26, 2017 Survivorship Agreement executed by Freeman and Jones; e-filed and e-recorded by the Harris County Clerk on June 27, 2017.
[19] *See* Complaint, No. 23-cv-3729, Dkt. 1-1, App. A, at 5—6.
[20] *See id* at 6.
[21] *See id.*
[22] *See id.* at 5.

February 2023, and lists herself as registered agent at ███████████████████ ██████████ less than two miles from the home purchased by Judge Jones.[23]

### III. Freeman joins Jackson Walker and the firm's bankruptcy practice before Judge Jones skyrockets.

35.     As Judge Jones became "the busiest bankruptcy judge in the United States,"[24] Freeman left her six-year clerkship[25] to join the bankruptcy section at Jackson Walker, LLP's Houston office.[26] Jackson Walker announced Freeman as a partner in 2018, highlighting her former position as "permanent law clerk to the Chief Bankruptcy Judge for the U.S. Bankruptcy Court for the Southern District of Texas."[27]

36.     With Freeman's arrival, Jackson Walker began securing appointments in myriad large Chapter 11 cases, serving as local counsel with Kirkland & Ellis as lead.[28] The

---

[23] *See* Exhibit 3, Franchise Tax Account Status for Freeman Family Coldspring Real Estate Holdings, LLC. To the extent Freeman directed funds obtained through the Jones-Freeman-Jackson Walker-Kirkland & Ellis Enterprise to Coldspring Real Estate Holdings, LLC, Plaintiff reserves the right to amend his complaint to add the entity as a defendant.

[24] Tom Hals, Exclusive-Law Firm Tied to Bankruptcy Judge Resignation Did Not Make Conflict Disclosures-Data Analysis, Reuters (Oct. 30, 2023), https://www.usnews.com/news/top-news/articles/2023-10-30/exclusive-law-firm-tied-to-bankruptcy-judge-resignation-did-not-make-conflict-disclosures-data-analysis, last visited Feb. 26, 2023.

[25] https://lizfreemanlaw.com/about.html, last visited February 26, 2024.

[26] Chief Judge Priscilla Richman of the Fifth Circuit stated in her written order that Freeman "was a partner in the Jackson Walker LLP law firm, it appears from at least 2017 until December 2022." Ex. 1 at 1.

[27]  https://www.jw.com/news/jackson-walker-expands-bankruptcy-reorganization-wealth-planning-and-white-collar-defense-practices/, last visited Feb. 26, 2024.

[28] *See* Brenda Sapino Jeffries, Kirkland's Bankruptcy Partnership With Jackson Walker Could Be a Sign of Things to Come, The American Lawyer (Online) (Aug. 25, 2020), accessible at https://www.law.com/americanlawyer/2020/08/25/kirklands-bankruptcy-partnership-with-jackson-walker-could-be-a-sign-of-things-to-come/, last visited Feb. 26, 2024.

relationship goes back to 2018, when "the firms represented Colorado's Westmoreland Coal in its Chapter 11 filed in Houston" before Judge Jones.[29]

37.     By 2019, Jackson Walker was "the leading counsel firm for corporate debtors filing for bankruptcy in Houston."[30] And by 2022 and in 2023, Jackson Walker was number one in the nation in local counsel appointments in large bankruptcies.[31] "Kirkland & Ellis [led] large debtor-side representations … by a significant margin, while Jackson Walker, Kirkland's preferred local counsel in the Southern District of Texas, picked up more local debtor's representations than any other firm."[32] "Kirkland & Ellis, the dominant US debtor law firm, had tapped Jackson as co-counsel in at least 46 large cases since 2018, according to data collected by bankruptcydata.com."[33]

38.     With 200 lawyers in its Houston office, it might be questioned why Kirkland & Ellis would need local counsel at all. One commentator remarked that "[t]he relationship between the world's only $4 billion firm (Kirkland Ellis) and Jackson

---

[29] Brenda Sapino Jeffreys, *Jackson Walker Reaps Benefits of Evolving Big Law Collaborations*, Law.com (Aug. 17, 2023), 1 https://www.law.com/texaslawyer/2023/08/17/jackson-walker-reaps-the-benefits-of-evolving-big-law-collaborations/, last visited Feb. 26, 2024.

[30] Hals, *supra* note 21.

[31] The American Lawyer: Jackson Walker is Nation's Top Local Counsel in Large Bankruptcies, as Bankruptcy and Restructuring Filings Rebound (Aug. 4, 2023) https://www.jw.com/news/mention-bankruptcy-top-local-counsel-american-lawyer/, last visited Feb. 26, 2024.

[32] Dan Roe, Law.com, *Kirkland & Ellis, Jackson Walker Dominate Debtor-Side Bankruptcy as Restructuring Market Heats Up* (Aug. 3, 2023), accessible at https://www.law.com/americanlawyer/2023/08/03/kirkland-ellis-jackson-walker-dominate-debtor-side-bankruptcy-as-restructuring-market-heats-up/, last visited Feb. 26, 2024.

[33] Indap, *supra* note 5.

Walker … shows that two firms can build a working relationship that goes beyond a traditional referral arrangement."[34]

39.     Indeed, Jackson Walker managing partner Wade Cooper explained that "[i]n an awful lot of the [Chapter 11] cases Kirkland filed, we are either local counsel or co-counsel to help with conflicts[.]"[35] Among other attributes of the Firm, Cooper boasted, "[w]e know a lot about the local politics[.]"[36] In fact, the Financial Times reported that a lawyer from a large bankruptcy firm stated that "Jackson Walker was useful as a back channel to Houston's two judges; Freeman had previously been a clerk to Jones while another bankruptcy partner, Matthew Cavenaugh, had clerked for Isgur."[37]

## IV.   Jackson Walker, Freeman, and Kirkland & Ellis collect millions of dollars in cases before Judge Jones without anyone disclosing the intimate relationship.

40.     Judge Jones presided over at least 26 cases in which he awarded Jackson Walker more than $12 million in attorneys' fees and expenses while Freeman was a partner at Jackson Walker and while Freeman and Jones were living together and having an intimate relationship.[38] This includes approximately $1 million in fees billed directly by Freeman herself.[39] Meanwhile, Kirkland & Ellis was awarded over $162 million in

---

[34] Jeffries, *supra* note 25.
[35] *Id.*
[36] *Id.*
[37] Indap, *supra* note 5.
[38] Motion for Relief for Judgment in *In re 4E Brands NorthAmerica LLC*, filed on November 3, 2023, No. 22-50009, Dkt. 517 at Ex. 6A–B. Plaintiff respectfully moves for this Court to take judicial notice of all federal court filings referenced in this amended complaint.
[39] *Id.*

attorneys' fees as lead counsel in cases in which Jackson Walker served as co-counsel before Judge Jones.

41.     Of course, "at all times when Elizabeth Freeman was a Jackson Walker LLP partner, and regardless of whether she provided services or advice in a case, there is a reasonable probability that [she], as a partner in that firm, obtained a financial benefit from, or had a financial interest in, fees approved by Judge Jones."[40] As co-owner of a shared home with Freeman, there is reasonable probability that Judge Jones benefitted from the fees he awarded to her as well.

42.     Judge Jones did not recuse himself in any of these cases, nor did he disclose his relationship with Freeman to the parties, their counsel, or those otherwise affected by the bankruptcies.[41] Under the rules governing bankruptcy proceedings, for a firm to be employed by a debtor or debtor-in-possession, it must show that it is *disinterested* and must disclose all "connections[.]" 11 U.S.C. § 101(14), 327; Fed. R. Bankr. P. 2014 (requiring "a verified statement of the person to be employed setting forth the person's connections with the debtor, creditor, or any other party of interest"). Neither Freeman, nor Jackson Walker, nor Kirkland & Ellis as lead counsel disclosed the relationship in any of the cases.[42]

---

[40] Ex. 1 at 2.
[41] *Id.*
[42] Hals, *supra* note 21.

**V.    Jackson Walker files bankruptcy for BTC, the case is assigned to Judge Jones, the Firm files a declaration of disinterestedness, and Jones awards the Firm attorneys' fees without anyone disclosing the Jones-Freeman relationship.**

43.    The Jones-Freeman-Jackson Walker-Kirkland & Ellis Enterprise followed its pattern in the BTC bankruptcy. Jackson Walker partner Cavenaugh filed Chapter 11 bankruptcy petitions on September 28th and 29th, 2020 for BTC[43] and its affiliate, Tug Robert J. Bouchard Corporation (owned entirely by BTC),[44] and Judge Jones presided over the cases.

44.    On October 28, 2020, Jackson Walker partner Cavenaugh filed an application for Jackson Walker to be appointed co-counsel and conflicts counsel for debtors and debtors in possession.[45] In the engagement letter attached to the application, Cavenaugh referenced Jackson Walker's representation of BTC "as local and conflicts counsel to assist … primary reorganization counsel Kirkland & Ellis LLP and Kirkland & Ellis International LLP…."[46]

45.    Cavenaugh e-filed a declaration of "disinterestedness,"[47] under penalty of perjury, disclosing potential conflicts of interest in Jackson Walker's application for appointment.[48] He did not disclose the intimate, domestic relationship between a

---

[43] *Id.* Dkt. 1.
[44] *In re Tug Robert J. Bouchard Corp.*, 20-34758, Dkt. 1.
[45] *Id.* at Dkt. 173.
[46] *Id.* at Ex. A, p. 2.
[47] *Id.* at Ex. B., p. 1 (Cavenaugh submitting a "verified statement of disinterestedness pursuant to Bankruptcy Rule 2014(a)").
[48] *Id.* Dkt. 173 and exhibits.

Jackson Walker partner and the bankruptcy judge overseeing the case.[49] Nor did Freeman disclose the relationship between her and the judge, even though she actively worked on and billed in the case.[50]

46.    Cavenaugh also e-filed the application for Kirkland & Ellis to serve as lead counsel for the debtors and debtors in possession, including a declaration of disinterestedness completed by Kirkland & Ellis partner Ryan Bennett that did not identify the relationship between Judge Jones and Freeman.[51] Bennett failed to disclose the relationship even while listing Judge Jones among the individuals for whom a conflicts search was conducted.[52]

47.    On November 23, 2020, Judge Jones entered an order appointing Jackson Walker, never mentioning his relationship with a partner from the Firm.[53] Nevertheless, he ordered Jackson Walker to "review its files periodically during the pendency of these chapter 11 cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, Jackson Walker LLP will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration, as required by Bankruptcy Rule 2014(a)[.]"[54]

---

[49] *Id.*
[50] *Id.* Dkt. 686 at 11, & Ex. 4, at PDF p. 81.
[51] *Id.* Dkt. 167 & Ex. A.
[52] *Id.* Dkt. 167 Ex. A at 8–11 & Schedule 1(d).
[53] *Id.*  Dkt. 245.
[54] *Id.* Dkt. 245 at 2.

Judge Jones entered an order on the same date authorizing the retention of Kirkland &
Ellis.[55]

48.     On August 26, 2021, Judge Jones entered orders confirming the first amended
joint plan of organization.[56] Before that, on March 19 and May 5, 2021, Cavenaugh filed
two interim fee applications requesting $148,101 and $97,075 in attorneys' fees and
$1,161.75 and $1,011 in expenses.[57] Those amounts included $15,614.50[58] and
$7,765.50[59] in fees billed by Freeman. Her time specifically included attending hearings
before Judge Jones.[60] On October 18, 2021, Cavenaugh also filed a third interim
application for attorneys' fees in the Tug Robert J. Bouchard Corp. bankruptcy, which
entity was owned by BTC, requesting an additional $191,614 in fees.[61] While petitioning
for these fees, neither Cavenaugh, Freeman, nor any attorney at Jackson Walker
disclosed the intimate relationship between Judge Jones and the Jackson Walker
partner.

49.     On February 13, 2021, Kirkland & Ellis's e-filed an application for $3.4 million
in attorneys' fees and $168,840.51 in expenses.[62] Kirkland & Ellis partner, Bennett,

---

[55] *Id.* Dkt. 242.
[56] *Id.* Dkt. 1319.
[57] *Id.* Dkts. 686, 856.
[58] *Id.* Dkt. 686 at Ex. 4, p. 81 of PDF.
[59] *Id.* Dkt. 856 Ex. 4 at p. 76 of PDF.
[60] *BTC*, 20-34682, Dkt. 686 at p. 51 of PDF (Freeman billing for "attend[ing] the status conference"
on November 17, 2020), at p. 69 of PDF (Freeman billing for "attend[ing] the sale hearing" on
December 2, 2020)
[61]  *In re Tug Robert J. Bouchard, Corporation*, No. 20-34758, Dkt. 29 at Ex. 6, p. 120 of PDF.
[62] *Id.* Dkt. 529 at 3.

submitted a supporting declaration without disclosing the Jones-Freeman relationship.[63]
And on May 12, 2021, the firm e-filed an application for $3.2 million in attorneys' fees
and $47,894.03 in expenses, with Bennett again providing a declaration without
disclosing the relationship.[64]

50.     Judge Jones awarded Kirkland & Ellis their full fee requests on March 15 and
June 10, 2021.[65] He also awarded Jackson Walker their full fee requests in orders dated
April 20,[66] June 10,[67] and November 12, 2021.[68] The awards included Freeman's $23,380
in billing. In the orders, Judge Jones failed to disclose he was awarding fees to the law
firm where his girlfriend, with whom he shared a home, was a partner. The firms
accepted the funds without ever disclosing the relationship or amending their
disclosures.

51.     Judge Jones' failure to disclose his intimate relationship with Freeman was a non-
judicial, administrative matter required of all individuals and parties to the bankruptcy
proceeding. His participation in the enterprise consisted of other non-judicial acts,
including maintaining the intimate relationship with Freeman, which allowed him,
Jackson Walker, Freeman, and Kirkland & Ellis to profit and cement their place as

---

[63] *Id.* Dkt. 529 at Ex. A.
[64] *Id.* Dkt. 882 at 1 & Ex. A.
[65] *Id.* at Dkt. 658 (Order Granting Kirland & Eliis' first interim fee award); Dkt. 967 (order granting Kirkland & Ellis' second interim fee award).
[66] *Id.* Dkt. 810 (order granting Jackson Walker's first interim fee award).
[67] *Id.* Dkt. 966 (order granting Jackson Walker's second interim fee award).
[68] *In re Tug Robert J. Bouchard, Corporation*, No. 20-34758, Dkt. 63 (order granting Jackson Walker's third interim fee award)

stalwarts in mega-bankruptcy practice. Judge Jones acted in the absence of jurisdiction by presiding over this case when circumstances required his dismissal.

**VI.    Jackson Walker claims it learned of the relationship in March 2021, but as with Freeman and Kirkland & Ellis, continues hiding the relationship in ongoing bankruptcies.**

52.    Jackson Walker claims it first learned of the Jones-Freeman relationship in March 2021[69] even though, on information and belief, Freeman had been in the relationship and living with Jones during her entire employment at the Firm, and the Firm's increased appointments in Judge Jones' court coincided precisely with her arrival. According to the Firm, after it made the discovery, it conducted an inquiry, consulted outside ethics counsel, and instructed Freeman to stop working and billing on any case assigned to Jones.[70]

53.    What Jackson Walker (and Freeman and Kirkland & Ellis) indisputably did not do for the period between March 2021, when Jackson Walker supposedly first learned of the relationship and informed Kirkland & Ellis, and December 2022, when Freeman

---

[69] Alexander Gladstone, *Justice Department Watchdog Disputes Texas Firm's Fees Over Lawyer's Relationship with Judge*, Wall Street Journal (Nov. 3, 2023), accessible at https://www.wsj.com/articles/doj-watchdog-seeks-to-reverse-some-fees-paid-to-law-firm-jackson-walker-7b50a000?tpl=br, last visited Feb. 26, 2024.

[70] Alexander Gladstone, et al., *Bankruptcy Judge Jones to Stop Handling Major Cases After Relationship with Lawyer Revealed*, Wall Street Journal (Oct. 14, 2023), https://www.wsj.com/articles/bankruptcy-judge-jones-to-stop-handling-complex-cases-after-relationship-with-lawyer-revealed-fad88b0c?tpl=br, last visited Feb. 26, 2024.

left the firm,[71] is disclose the relationship in the bankruptcy proceedings or correct any of its declarations of disinterestedness omitting the relationship.

54.     "The Fifth Circuit has uniformly held that under Rule 2014(a), full disclosure is a continuing responsibility, and an attorney is under a duty to promptly notify the court if any potential for conflict arises." *Beirne, Maynard & Parson, L.L.P. v. Cypresswood Land Partners*, 2010 U.S. Dist. LEXIS 146549, *25-26 (citing *In re W. Delta Oil Co.*, 432 F.3d 347, 355 (5th Cir. 2005)). The BTC bankruptcy remained pending for more than five months after Jackson Walker's claimed discovery of the relationship, yet neither it, nor Freeman, nor Kirkland & Ellis ever disclosed the intimate relationship between Freeman and Judge Jones. On September 24, 2021, Cavenaugh filed a motion for final decree in the Chapter 11 affiliate cases for Jackson Walker and Kirkland & Ellis, still never disclosing the relationship or amending the declarations of disinterestedness.[72] Judge Jones entered a final decree closing the affiliate Chapter 11 cases on September 28, 2021, again not disclosing the relationship.[73]

55.     Notwithstanding Jackson Walker's representations, on information and belief, Freeman continued to work on cases assigned to Judge Jones behind the scenes between March 2021 and December 2022. During this time, Jackson Walker and

---

[71] Freeman ultimately left Jackson Walker in December 2022 and opened her own firm, the Law Office of Liz Freeman. *See* Ex. 1 at 1–2.
[72] *BTC*, 20-34682, Dkt. 1379.
[73] *Id.* at Dkt. 1389.

Kirkland & Ellis continued to benefit from the Jones-Freeman relationship, filing at least nine applications to be appointed counsel in bankruptcy cases before Jones, with Kirkland & Ellis joining in at least three.[74] In two of those cases, Jackson Walker listed Jones as a potential party in interest, but affirmatively represented that it searched his name against internal records and did not find any connections involving him.[75]

56.     Kirkland and Ellis joined Jackson Walker in at least three cases in that period, and while applying as lead counsel, failed to disclose the Jones-Freeman relationship even while identifying Judge Jones in the schedule of bankruptcy judges searched for a potential conflict and listing none.[76]

---

[74] *Seadrill Limited*, No. 21-30427, Dkt. 250 (Mar. 8, 2021) (application to employ Jackson Walker as Co-Counsel and Conflicts Counsel); *Brilliant Energy, LLC*, No. 21-30936, Dkt. 68 (Apr. 13, 2021) (application to employ Jackson Walker LLP as special counsel); *Katerra Inc.*, No. 21-31861, Dkt. 289 (Jun. 29, 2021) (application to employ Jackson Walker as co-counsel and conflicts counsel for the debtors and debtors in possession); *Basic Energy Services, Inc.*, No. 21-90002, Dkt. 809 (Dec. 13, 2021) (Jackson Walker's application as counsel for the debtors); *Strike LLC*, No. 21-90054, Dkt. 363 (Jan. 6, 2022) (Jackson Walker's application as co-counsel and conflicts counsel); *Seadrill New Finance Limited*, No. 22-90001, Dkt. 94 (Feb. 8, 2022) (Jackson Walker application for co-counsel and conflicts counsel); *4E Brands Northamerica LLC*, No. 22-50009, Dkt. 72 (Mar. 24, 2022) (Jackson Walker application as counsel for debtor and debtor in possession); *Sungard AS New Holdings*, No. 22-90018, Dkt. 211 (May 10, 2022) (Jackson Walker application for co-counsel and conflicts counsel to the debtors); *LaForta Gestao e Investments*, No. 22-90126, Dkt. 67 (Jul. 15, 2022) (Jackson Walker application for counsel for debtor and debtor in possession); *see also* Alexander Gladstone, Texas Law Firm Didn't Disclose Possible Conflict Involving Bankruptcy Judge, The Wall Street Journal (Oct. 27, 2023), accessible at https://www.wsj.com/articles/texas-law-firm-didnt-disclose-possible-conflict-involving-bankruptcy-judge-3761ffe0, last visited Feb. 26, 2024.

[75] *See In re Strike, LLC, et al.*, 21-90054, Dkt. 363 Ex. B at ¶¶ 4–5, 15, Schedule 1 (Jan. 6, 2022); *In re Katerra Inc., et al.*, 21-31861, Dkt. 289 Ex. B at ¶¶ 4–5, 15, Schedule 1 (June 29, 2021).

[76] *Seadrill Limited*, No. 21-30427, Dkt. 242 (Mar. 8, 2021) (application to employ Kirkland & Ellis LLP and Kirkland & Ellis International LLP as attorneys for debtors e-filed by Cavenaugh; listing Judge Jones in the schedule of bankruptcy judges searched for a potential conflict, and listing none); *Katerra Inc.*, No. 21-31861, Dkt. 244 & 244-1 (Jun. 25, 2021) (application for retention of Kirkland & Ellis as attorneys for debtors and debtors in possession; listing Judge Jones in the schedule of bankruptcy

57.    Additionally, while Freeman was a partner at Jackson Walker, the firm also represented parties in cases mediated by Judge Jones, and Freeman worked and billed on many of those cases, with Jackson Walker, Freeman, and Judge Jones again keeping the relationship a secret.[77] In fact, even after Freeman left the Firm in December 2022, Jackson Walker continued to retain and bill for her as a contract attorney before Judge Jones, again without anyone disclosing the Jones-Freeman domestic partnership.[78]

58.    In a bankruptcy before Judge Isgur involving GWG Holdings, Jackson Walker moved to have Judge Jones appointed as mediator in November 2022, the month before Freeman left the Firm.[79] According to Harvard bankruptcy professor Jared Ellias, this conflict should have been disclosed "to protect the integrity of the mediation process."[80] Neither Freeman nor the Firm disclosed the relationship. Judge Isgur then appointed Judge Jones on January 5, 2023.[81]

---

judges searched for a potential conflict, and listing none); *Seadrill New Finance Limited*, No. 22-90001, Dkt. 92 & 92-1 (Feb. 8, 2022) (Kirkland & Ellis application as counsel for debtors; listing Judge Jones in the schedule of bankruptcy judges searched for a potential conflict, and listing none).

[77] *See e.g. In re Sanchez Energy Corp., et al.*, No. 19-34508, Dkt. 1093 (Mar. 26, 2020) (order appointing Jones as mediator), Dkt. 1432 (Jul 2, 2020) (Jackson Walker application for compensation filed by Elizabeth Freeman).

[78] Ex. 1 at 1–2; *see In re GWG Holdings, Inc., et al.*, Dkt. 2158 at PDF p. 273.

[79] *Id.* at Dkt. 1128.

[80] Gladstone, *supra* note 69.

[81] *In re GWG Holdings, Inc., et al.*, 22-90032, Dkt. 1323 at 2.

59.     Freeman appeared at the mediation[82] and was appointed trustee for the post-confirmation Wind Down Trust.[83] In this role, Freeman "was expected to be paid $100,000 a month for the first six months, then $50,000 a month after that[.]"[84]

60.     Again, neither Jackson Walker, nor Freeman, nor Judge Jones disclosed the intimate relationship. Nor did Jackson Walker amend its declaration of disinterestedness supporting appointment, which in the schedule of searched parties, listed "N/A" for the section concerning Bankruptcy Judges for the Southern District of Texas.[85]

61.     On August 21, 2023, Jackson Walker moved for $1.3 million in attorneys' fees in the GWG Holdings bankruptcy, including $23,415 for time billed by Freeman while a partner at Jackson Walker.[86] The firm also sought costs of $205,157.81 billed by The Law Office of Liz Freeman.[87] Judge Isgur postponed ruling on these fees pending an

---

[82] Freeman's billing records indicate she participated in the mediation before Judge Jones in January and February 2023. *GWG Holdings,* No. 22-90032, Dkt. 2158 at PDF pp. 179–80, 195.
[83] *Id.* at Dkt. 2246 at 5.
[84] Hals, *supra* note 21.
[85] *GWG Holdings*, 22-90032, Dkt. 828 at schedule 1(n) (pdf p. 20).
[86] *Id.* at Dkt. 2158 at PDF pp. 1, 135, 137, 139–40, 144–45, 275.
[87] *Id.* at Dkt. 2158 at PDF p. 273. Similarly, "[o]n November 11, a month after her relationship with Jones was [publicly] revealed, Freeman submitted a fee request for $257,000 for work on IEH Auto Parts' bankruptcy. [Judge] Isgur, overseeing the case, assigned Jones to lead a New York City mediation session in April for which she billed her time at $750 per hour, plus travel expenses. Her application attested to her 'disinterestedness' — and still made no mention of her relationship with David R. Jones." Indap, *supra* note 5; *In re IEH Auto Parts Holding LLC, et al.*, No. 23-90054, Dkt. 181 (application to appoint Jackson Walker as counsel); Dkt. 183 (application to employ the Law Office of Liz Freeman, PLLC as Co-Counsel and Conflicts Counsel); Dkt. 356 (order appointing Judge Jones as mediator); Dkt. 991 (final fee application for The Law Office of Liz Freeman seeking $255,150 in fees, including fees and expenses from mediation before her intimate partner).

objection raised by the U.S. Trustee. Freeman continues to work and bill in the GWG Holdings case.

### VII. Mr. Bouchard approaches Kirkland & Ellis and is advised to file Chapter 11 in the Southern District of Texas.

62.     Mr. Morton approached Kirkland & Ellis in about BTC's financial concerns in 2020, during the height of the Jones-Freeman-Jackson Walker-Kirkland & Ellis Enterprise. When Mr. Bouchard met with Kirkland & Ellis, Bennett told him they needed to file Chapter 11 in Houston because they had a friendly judge.

63.     BTC had been one of the nation's largest independently owned ocean-going petroleum barge companies under the U.S. "Jones Act," with over 50 vessels. According to a 2019 Management Planning, Inc., ("MPI") appraisal, the pre-bankruptcy value of BTC approached three-quarters of a billion dollars.

64.     Mr. Bouchard was the fourth-generation owner and 100% shareholder, through various trusts.  Mr. Bouchard is also the former CEO of BTC. He had over 45 years' experience at BTC and understood the size and complexity of its business. During that time, he worked a variety of jobs within the company—including as a deckhand on tugs, a night dispatcher, and a truck driver—before working side-by-side with his father until he was promoted to President in 1992. Since then, Mr. Bouchard has been responsible for various key management functions including finance, sales, marketing, shipbuilding, legal matters, dealing with customers, negotiating all maritime insurance, and sitting on protection and indemnity club boards. Because of his extensive

experience and understanding of the petroleum barge industry and BTC's operations, the 2019 MPI appraisal noted that Mr. Bouchard was a key figure at BTC and the company would suffer significant adverse impacts if he left the company.

## VIII.  The Bouchard Parties loan millions to BTC.

65.     Ahead of the bankruptcy (between 2019–2020), the Bouchard Parties loaned more than $40 million to BTC pursuant to two promissory notes to help support its operating expenses, including payroll, insurance, fuel and oil, and port and pilot costs, and to safeguard, support and maintain its fleet of vessels to the highest standards in the industry. These loans were listed as outstanding debts of BTC in sworn declarations filed by Ray and in BTC's tax returns signed by Ray under penalty of perjury.

66.     The Bouchard Parties funded the loans by borrowing and withdrawing from life insurance policies held by Mr. Bouchard and the Bouchard Trust, as well as from other assets of the Bouchard Parties. Under the terms of the life insurance policies, the borrowed proceeds were required to be repaid; failure to do so would trigger, among other things, penalties, adverse tax consequences, and termination of the policies. Notably, BTC was a subchapter "s" corporation, with any tax consequences and related attributes flowing directly to Mr. Bouchard personally.

## IX.     Mr. Bouchard is improperly removed as CEO.

67.     BTC filed the Chapter 11 cases in September 2020. As part of the filing, and at the recommendation of Kirkland & Ellis partner Bennett, Portage Point, through Ray,

was appointed as chief restructuring advisor to assist with accounting, reporting, management, developing strategies for the go forward business, and general bankruptcy services, with Mr. Bouchard continuing to serve as the CEO.

68.     After the Chapter 11 cases were filed and with costs of the proceedings mounting, Mr. Bouchard sought to compel Portage Point (and BTC's other professionals) to submit supporting invoices for his review prior to payment to manage costs, which were spiraling out of control. This request was rejected out of hand by Bennett of Kirkland & Ellis.   Thereafter, in February 2021, in what can best be described as a coup to keep the gravy train rolling without additional internal oversight, the Portage Point Parties, in conjunction with Kirland & Ellis, Jackson Walker, Elizabeth Freeman, and Judge Jones, effectuated the removal of Mr. Bouchard as CEO.

69.     The removal of Mr. Bouchard from his position as CEO was done despite overwhelming support for Mr. Bouchard as CEO among BTC employees and despite his critical importance to BTC. Mr. Bouchard had over 40 years of experience at BTC, and the MPI  2019 appraisal identified Mr. Bouchard as a key man within the company; observing that should he become disassociated from BTC for any reasons, the consequences would be significant and adverse.[88] Mr. Bouchard was responsible for various key management functions, including finance, sales, and marketing, and was

BTC's primary executive representative in dealing with customers, shipbuilding, and legal matters, amongst other things.

70.     Unfortunately, the Portage Point Parties had no maritime ocean-going barging experience whatsoever, and no background in managing and operating a U.S. ocean-going petroleum barging company subject to strict regulations. While they did previously represent Hornbeck Offshore Services, Inc., an offshore supply vessel and tugboat company, petroleum ocean-going barging is a distinctly unique industry that is highly regulated.

71.     Nevertheless, Judge Jones issued a *sua sponte* order removing Mr. Bouchard after a status hearing on a separate matter.[89] No motion to remove Mr. Bouchard was ever filed. Portage Point and Ray then took control of BTC's functions—including the management of professionals such as themselves, Jackson Walker, and Kirkland & Ellis.

X.      **The Portage Point Parties, in concert with the RICO Defendants, effectuate a fire sale liquidation to their own benefit.**

72.     The Portage Point Parties' takeover of BTC's operation (without experience or knowledge of the industry) quickly transitioned into the closing down of BTC's business.  BTC was forced into liquidation, largely for the Portage Point Parties' own benefit.  All meaningful ties with Mr. Bouchard were cut, with no transition or succession plan.

---

[89] *BTC*, 20-34682, Dkt. 569; Dkt. 591 at 7.

73.     As described above, BTC constituted the largest independently owned vessel fleet in the business. Its state-of-the-art vessels were valued prior to the Chapter 11 Cases at just under a billion dollars. BTC's vessels were extremely diversified to carry all products and service a wide range of customers and maintained a modern tug fleet with the majority intercon and matched to BTC barges. At the time of the bankruptcy filing, 85%-90% of the fleet was chartered out. Further, Mr. Bouchard maintained close relationships with the oil industry executives and chartering departments (as well as a loyal and long-standing group of employees).

74.     In 2019, MPI valued Mr. Bouchard's equity stake at nearly $300 million. It also determined that BTC has significant value, fueled by its reputation and willingness to embrace cutting edge technology in building the fleet that was the envy of the industry.

75.     While COVID negatively impacted the industry, BTC had a state-of-the-art fleet, and positioned itself to capitalize on the subsequent uptick in demand. Upon the bankruptcy filing, Mr. Bouchard prepared a detailed business plan, working with his relationships, to position the fleet to be fully operational—the surest way to preserve and enhance value (rather than embark on the Portage Point Parties' fire sale).

76.     Under the control of the Portage Point Parties, however, BTC's operations abruptly halted, and liquidation commenced. The Portage Point Parties, who lacked chartering or relevant management experience, could not and would not operate the fleet, and failed to engage appropriate management level employees in this regard. They did so despite the court and even Portage Point Parties themselves acknowledging the

need to keep the fleet in operation to maintain the business and preserve value. The shuttering of operations was particularly damaging given that the vessels needed to be kept operating and properly maintained to preserve value.

77.     Portage Point Parties feigned an effort to operate by entering into so-called "bareboat contracts."[90] This did little to nothing to protect the value of the business with Portage Point unable and/or unwilling to carry out normal operations. Indeed, it was a death knell as the petroleum transportation industry is small and when word got out that Portage Point could not or would not operate and was shutting down normal operations following Mr. Bouchard's dismissal, value plummeted.

78.     As described in more detail below, the business was ultimately sold for a fraction of its pre-bankruptcy value which approached three quarters of a billion dollars or more. Upon information and belief, the sale closed in or about August 2021 (per order of the Bankruptcy Court entered on or about August 5, 2021).

79.     In addition, the removal and replacement of Mr. Bouchard immediately tanked the company's value.  As a result, the ultimate sale of the assets resulted in little, if any, excess funds for distribution to unsecured creditors after covering the secured debt and staggering professional fees, all but wiping out nearly three quarters of a billion dollars of value.

---

[90] A bareboat charter is an agreement where the owner rents out his vessel. The charterer is responsible for all costs of operation.

XI.   **Underscoring the questionable sale and inherent conflicts, the Portage Point Parties are immediately retained as consultants to the purchaser.**

80.    While forcing BTC into free fall and a resulting fire sale, Portage Point Parties solidified their control over BTC.   Portage Point Parties took questionable and undisclosed steps in conflicting roles for BTC and the successful purchaser of the assets, which benefited Portage Point Parties to the determinant of the Bouchard Parties.

81.    The sale divided BTC's fleet and business among two separate purchasers, JMB Capital Partners Lending LLC, the DIP lender in the Chapter 11 Cases, and a group led by Rose Cay and funded by Wells Fargo, the pre-petition lender on the balance of the fleet. In this regard, JMB credit bid its secured claim, together with approximately $20.8 million cash.[91] Notably, as the DIP Lender, JMB was intimately involved in the Chapter 11 Cases and worked closely with Portage Point and Mr. Ray in their roles as CRO and CEO of BTC.

82.    Upon information and belief, prior to approval or closing on the Sale, a non-debtor third party listed certain of the vessels owned by BTC (and property of its estates in the Chapter 11 Cases) for sale though a broker, Macron International. The subject vessels included tugs Robert J. Bouchard, J. George Betz, Ralph Bouchard, Marion C. Bouchard, and Buster Bouchard. While it is unclear the extent to which the Portage Point Parties and/or JMB played a role in such unauthorized sale efforts outside of the

---

[91]   Upon information and belief, the majority of the payment for the Rose Cay transition was paid as a credit against debt due to Wells Fargo.

approved Chapter 11 process, it is hard to imagine how or why the Portage Point Parties would not have knowledge of such transgressions or why such actions were left unabated.

83.     Further, upon information and belief, after the closing of the Sale, Portage Point Parties was immediately hired by JMB as a consultant to assist in running the purchased business, and potentially, selling off the very vessels and other assets acquired from BTC during the Chapter 11 Cases. Indeed, while the Portage Point Parties left open the possibility that it might provide "transition services" for JMB after the Sale (which was stated in the Plan and orders approving the Sale), the Portage Point Parties failed to file any disclosures regarding the details of such. Further, upon information and belief, Portage Point was engaged by JMB in a role well beyond "transition services," without full disclosure or transparency and without regard for any inherent conflicts of interest.

## XII.   Portage Point assumes various conflicting roles to the detriment of Plaintiff.

84.     As detailed above, Portage Point and Ray simultaneously served as both CRO and CEO of BTC and consultant to the secured creditor and purchaser JMB immediately following the Sale (and potentially prior to the sale). Ray was also appointed as plan administrator to oversee the post-confirmation winddown of BTC following confirmation of BTC's Chapter 11 plan (through an order entered August 26, 2021). This was carried out with limited oversight, as under the Plan, the official

creditors' committee was dissolved with limited carveout for certain discrete tasks. The Plan went effective in or about September 2021.

85.     In addition, upon information and belief, as Plan Administrator, the Portage Point Parties continued to draw fees after the Plan went effective.   In such position, the Plan Administrator sold, among other things, a certain pier property purportedly located in New York, and owned through an affiliate of BTC, B No 57 Corporation, to Allied Properties for $1.5 million with little if any marketing efforts or disclosures. Further, this sale failed to take into account potentially valuable air rights, and that New York City was looking to build and/or acquire piers.   Despite the Bouchard Parties requesting information from Portage Point Parties to confirm they had no connection with the purchaser, and that fair consideration was paid for such property, Portage Point Parties provided little if any transparency regarding such. This was particularly concerning, given certain of Portage Point Parties' other undisclosed activities, and given the location of the property in New York, in an area where adjacent piers were sold for significantly higher valuations.

86.     Here, Ray served competing masters with duties (including fiduciary duties) to, among others: (i) BTC and its shareholders including the Bouchard Parties; (ii) BTC's estates and creditors including the Bouchard Parties; and (iii) JMB – a secured creditor in the Chapter 11 Cases and ultimate purchaser of BTC's assets. This made the lack of disclosures more concerning. The effect of such was to continue Portage Point's gravy

train from multiple and competing sources. And importantly, Portage Point took on these competing roles without proper disclosures and transparency.

87.     As described above, while the Portage Point Parties generally advised that they may be employed by JMB, disclosures were wholly deficient where the Portage Point Parties did not provide any details of the employment including the terms, consideration, etc., or otherwise obtain authorization to act with conflicting interests for the benefit of JMB at the expense of other interested parties, including the Bouchard Parties. In this regard, while disclosures were utterly lacking, a review of Portage Point's website indicates that its Senior Director, Steven Shenker, "is currently responsible for the day-to-day leadership of JMB Shipping with a primary focus on vessel strategy, charterer relations and commercial opportunities."[92] Upon information and belief, JMB Shipping is an affiliate of JMB. According to Steven Shenker's LinkedIn, he has held his position since the September 2021 Sale.

88.     These vague and deficient disclosures are particularly concerning given the potential conflicts of interest and Portage Point Parties' prior history of questionable disclosures. For example, in connection with Portage Point's appointment in another bankruptcy case, Mining Project Wind Down Holdings, Inc., Bankruptcy Judge Isgur entered an order providing that Portage Point made statements with careless disregard for the truth, and consequently, suspended Portage Point from filing further

---

[92] https://portagepointpartners.com/experts/steven-shenker/.

declarations in the case pending further review.[93] This is particularly troubling with Portage Point Parties' course of conduct as described herein. Further, when Mr. Bouchard advised lead bankruptcy counsel, Bennett, that he wanted to terminate the Portage Point Parties due to their lack of experience in the ocean-going petroleum barge industry, Mr. Bennet strongly discouraged it and indicated he would resign if that happened and notify Judge Jones accordingly.

89.    Also troubling, Mr. Bennet sold his vacation house located in Michigan to Mr. Ray during the pendency of the bankruptcy (on March 30, 2021) and just one month after the orchestrated coup to remove Mr. Bouchard as CEO.[94] It is unclear what the specific terms of such transaction were, as they were not provided in the Chapter 11 disclosures. However, in conjunction with the incident described above, this incestuous dealing raises serious red flags about the relationships among the parties involved and potential (undisclosed) conflicts of interest.

## XIII. The Portage Point Parties orchestrated a settlement agreement that they ultimately refused to consummate.

90.    In or about February 2023, as part of a purported effort to resolve the Bouchard Parties' claims in the Chapter 11 Cases—including both secured and unsecured claims totaling in excess of $40 million, the Portage Point Parties entered into a settlement

---

[93] *In re Mining Project Wind Down Holdings, Inc.*, 22-90273, Dkt. 861 (Bankr. S.D. Tex. Jan. 25, 2023).
[94] *See BTC*, 20-34682, Dkt. 778 at 4 ¶ 10.

agreement with the Bouchard Parties on behalf of BTC. The Settlement Agreement provides for, among other things, allowance of the Bouchard Claims along with payment to the Bouchard Parties of certain amounts from the BTC estates.

91.     Importantly, the Settlement Agreement, executed by Mr. Ray in his capacity as Plan Administrator, required that the parties seek prompt approval of the Settlement Agreement from the Bankruptcy Court. Nevertheless, the Portage Point Parties failed to properly proceed with seeking the required approvals and as a result, the Settlement Agreement was never consummated, severely prejudicing the Bouchard Parties.

92.     In particular, Ray refused to appear and testify at the hearing to approve the settlement agreement, despite filing papers with the Bankruptcy Court stating that the settlement was in the best interests of BTC's estates and creditors, which motion for approval necessarily involved his specific judgment. His lack of effort was reflected in his unwillingness to appear and testify in support of his purported judgment.   When Judge Jones, who presided over the matter, raised the issue of Ray's failure to appear as the estate fiduciary, the hearing was adjourned to allow Ray to appear and testify.

93.     Specifically, at the March 28, 2023 hearing on BTC's motion to approve the settlement agreement, Judge Jones raised his concerns with Ray's failure to appear and questioned whether he was satisfying his fiduciary duty as Plan Administrator:

> I would have expected to have seen the Plan Administrator here . . . The Plan Administrator is responsible for everything that happens, and it's his business judgment that matters because he's the fiduciary that I appointed. The fact that he hired somebody, totally irrelevant. The Plan Administrator answers to me.

. . .

I'll just tell you it really bothers me that he's not here. It – because you know what that says to me? It says he delegated his fiduciary duty. That's what that says to me, and that's a problem.[95]

94.     The court refused to approve the settlement without Ray' testimony, and Ray failed to appear as directed by the court.  BTC and the Portage Point Parties apparently abandoned the agreement, failing to schedule a further hearing on the motion despite a series of letters from the Bouchard Parties, and two emails from Bouchard to Judge Jones requesting that BTC proceed with the motion to obtain approvals.

95.     The delay in seeking approvals cost the Bouchard Parties significant monies and time, including legal fees in appearing at a court-directed mediation and in negotiating and executing the settlement, and ultimately, its benefits, including certain payments and allowance of the Bouchard claims. The foregoing also resulted in delays in moving the Chapter 11 cases to conclusion, appears designed to hinder and delay the Bouchard Parties from prosecuting claims against the Portage Point Parties, and puts the Bouchard Parties' ability to recover amounts owed by BTC and its estates at serious risk.

### XIV.   Reversal of plan exculpation and injunctions.

96.     As noted above, on or about August 26, 2021, the Bankruptcy Court entered an order confirming the Plan. The Plan included an exculpation provision that releases and exculpates each "Exculpated Party" from any claim in connection with, relating to, or

---

[95] *In re Tug Robert J. Bouchard Corp.*, 20-34758, Dkt. 328 at 27–28.

arising out of the Exculpated Party's pre- or post-petition bankruptcy actions with certain exceptions for gross negligence and/or intentional conduct.

97.     The Plan also contained an injunction provision that "implement, preserve, and enforce . . . the Exculpation [Provision]", designed to bar any claims that were covered by the Exculpation.

98.     On August 12, 2021, prior to confirmation of the Plan, the Bouchard Parties timely filed a limited objection to the Plan. The objection asserted that these provisions were overly broad and extended protections beyond the debtors and creditors' committee and purported to eliminate claims of the Bouchard Parties non-consensually in violation of Circuit law. Specifically, the Bouchard Parties argued that the definition of "Exculpated Party," as defined in the Plan, improperly included the Plan Administrator (Portage Point Partners) and each "Related Party" of an Exculpated Party. The objection urged Judge Jones not to approve the Plan unless and until the exculpation and injunction provisions were removed or modified.

99.     Judge Jones overruled the objection, and the Bouchard Parties appealed to the district court. On February 7, 2023, the district court reversed Confirmation of the Plan to the extent that it approved the Exculpation Provision releasing a broad range of third parties and entered the related Injunction Provision.

100.   The Bouchard Parties were previously limited in bringing claims against the Portage Point Parties. Those limitations were lifted by the district court's reversal. Even then, the Portage Point Parties sought to hinder and delay the Bouchard Parties from

commencing action through their bad faith entry into the Settlement Agreement, which they since abandoned.

## XV.   Judge Jones finally admits to the intimate relationship with Freeman.

101.   In October 2023, Judge Jones finally admitted to the press that he had an intimate relationship with Freeman and that he has shared a home with her for years.[96] Remarkably, Judge Jones maintained that he had no duty to disclose the relationship because the couple was unmarried and no economic benefit flowed to him from her legal work.[97] According to Judge Jones, he and Freeman agreed years ago that she would never appear in his courtroom.[98] In actuality, Freeman billed for appearances before him.[99] Otherwise, Judge Jones excused misconduct by saying,  "I just simply think I'm entitled to a certain degree of privacy."[100]

## XVI.   Judge Jones resigns after the Fifth Circuit finds "probable cause to believe [he] engaged in misconduct[.]"

102.   On October 13, 2023, Chief Judge Priscilla Richman of the Fifth Circuit entered a written order identifying a complaint against Judge Jones.[101] Chief Judge Richman found "probable cause to believe that misconduct by Judge Jones has occurred."[102]

---

[96] Alexander Gladstone & Andrew Scurria, Bankruptcy Judge Jones Named in Lawsuit Over Romantic Relationship with Local Lawyer, Wall Street Journal Pro, (Oct. 7, 2023).
[97] *Id.*
[98] *Id.*
[99] *Bouchard*, 20-34682, Dkt. 686 at p. 51 of PDF (Freeman billing for "attend[ing] the status conference" on November 17, 2020), at p. 69 of PDF (Freeman billing for "attend[ing] the sale hearing" on December 2, 2020)
[100] *Id.*
[101] Ex. 1.
[102] *Id.* at 1.

103.    Chief Judge Richman observed that "Judge Jones is in an intimate relationship with Elizabeth Freeman. It appears that they have cohabited (living in the same house or home) since approximately 2017."[103] She further recognized that Judge Jones had awarded substantial attorneys' fees payable to Jackson Walker for services performed by Freeman.[104] Even in cases in which it does not appear Freeman provided legal services or advice, "there is a reasonable probability that Elizabeth Freeman, as a partner in that firm, obtained a financial benefit from, or had a financial interest in, fees approved by Judge Jones.[105]

104.    As Chief Judge Richman noted, Judge Jones' failure to apprise the courts of the relationship during the motion to recuse likely changed the outcome of the motion.[106] Further, "[b]ecause the motion was denied, and Judge Jones did not voluntarily recuse, Judge Jones presided in the case and approved Jackson Walker LLP's attorneys' fees. Court records appear to reflect that those fees included amounts for services Elizabeth Freeman performed in connection with the case."[107]

105.    Chief Judge Richman found unpersuasive the argument that disclosure was unnecessary because Jones and Freeman were not married. Considerations for recusal "applicable to a judge's spouse should also be considered with respect to a person other

---

[103] *Id.*
[104] *Id.* at 2.
[105] *Id.*
[106] *Id.* at 3.
[107] *Id.*

than a spouse with whom the judge maintains both a household and an intimate relationship."[108]

106.   On October 15, 2023, two days after the Fifth Circuit's written order finding probable cause of misconduct, Judge Jones submitted his resignation, effective November 15, 2023.

### XVII. The U.S. Trustee files Rule 60(b)(6) motions asking for vacatur of orders awarding Jackson Walker fees and expenses.

107.   On November 3, 2023, the U.S. Trustee began filing motions under Fed. R. Civ. P. 60(b)(6) requesting that orders awarding fees and expenses be set aside.[109] As the U.S. Trustee observed "all orders awarding fees and expenses are tainted" in light of "Judge Jones's failure to recuse himself from presiding over cases where Jackson Walker was counsel for the debtor-in-possession while Freeman was both living with him and a partner at Jackson Walker[.]"[110]

### XVIII.   In response to the U.S. Trustee's filings, Jackson Walker claims it learned of the intimate relationship in March 2021 and again sometime in 2022, informed Kirkland & Ellis, but never disclosed the relationship in bankruptcy proceedings.

108.   On November 13, 2023, Jackson Walker responded to the U.S. Trustee, claiming it learned of the relationship after receiving an email on March 6, 2021 from Michael Van Deelen in relation to a bankruptcy involving McDermott International, Inc.,

---

[108] *Id.* at 4 (citing Commentary to Canon 3C of the Code of Conduct for United States).
[109] *See e.g., 4E Brands*, 22-50009, Dkt. 517.
[110] *Id.* at Dkt. 517 at 3.

Jackson Walker stated that Freeman then "confirmed that there had been a romantic relationship."[111] According to Jackson Walker, Freeman indicated her intimate relationship with Judge Jones was in the past,[112] that it ended "prior to March 2020,"[113] and that they "each own their own homes" and "do not and have not lived together."[114] Jackson Walker then "disclosed these matters to our Kirkland co-counsel, who disclosed them to the client."[115]

109.    However, "[m]ultiple Kirkland partners told the [Financial Times] that they were *long aware* of the romantic relationship between the pair, though [they] did not know how advanced it was."[116] Rather than believing the relationship had ended, "[t]he Kirland lawyers assumed the pair had received clearance from a superior court or decided that it was not Kirland's place to intervene in Jackson's retention applications."[117]

110.    Although both firms then knew the allegations concerning the intimate relationship between Jones and Freeman were true, at least in the past, neither firm disclosed the relationship in the BTC bankruptcy. In fact, neither firm disclosed the relationship in *any* of the bankruptcies before Judge Jones. For example, Jackson Walker

---

[111] *Id.* at Dkt. 526-1 at 4.
[112] *Id.* at Dkt. 526 at 1, 4.
[113] *Id.* at 4.
[114] *Id.* at 4.
[115] *Id.* at Dkt. 526-1 at 3–4.
[116] Indap, *supra* note 5.
[117] *Id.*

and Kirkland & Ellis failed to disclose the relationship in a declaration of disinterestedness filed in the Seadrill Limited bankruptcy on March 8, 2021,[118] immediately after Jackson Walker admitted to learning of the relationship.

111.    Jackson Walker claims it believed disclosure was unnecessary because it had been told the relationship ended. Even if true, Jackson Walker still had an obligation to disclose the recent relationship between the presiding judge and its partner.[119] That is particularly the case because the Firm's application and supporting declaration of disinterestedness in this case and others were filed while the relationship *was* ongoing. At the very least, the Firm had a duty to correct the disclosure once it learned of the relationship. Nevertheless, the Firm decided not to disclose the relationship (other than to Kirkland & Ellis) or to amend its declaration of disinterestedness.

112.    Further, had Jackson Walker or Kirkland & Ellis performed even a cursory check of real property records instead of relying on the say-so of Freeman, who they knew had already been dishonest with them about a longstanding relationship with a judge

---

[118] *Seadrill Limited*, No. 21-30427, Dkt. 250 (Mar. 8, 2021) (application to employ Jackson Walker as Co-Counsel and Conflicts Counsel); Dkt. 242 (Mar. 8, 2021) (application to employ Kirkland & Ellis LLP and Kirkland & Ellis International LLP as attorneys for debtors e-filed by Cavenaugh; listing Judge Jones in the schedule of bankruptcy judges searched for a potential conflict, and listing none).

[119] Other firms disclose much lesser connections to court personnel in applications to be retained. For example, Gray Reed disclosed that while Judge Jones "was attending law school, he worked on a part-time basis for Gray Reed assisting with Gray Reed's IT systems." *In re Whiting Petroleum Corp., et al.*, No. 20-32021, Dkt. 308-2, Schedule 2 (May 8, 2020); Hals, *supra* note 21 ("disclosing connections to judges appears to be a standard practice. In the court filings Reuters reviewed, the larger national law firms that worked for the debtor alongside Jackson Walker always indicated that they had searched for connections to the judges on the bankruptcy court").

they regularly practiced before, they would have discovered not only that Freeman and Judge Jones co-owned a house, but also that Jones purchased another home in Coldspring, Texas where Freeman previously resided and where Freeman's parents began residing in 2020.[120] Jackson Walker and Kirkland & Ellis instead accepted Freeman's flimsy denial, which could have been easily debunked with minimal investigation or by talking with other partners, including those from Kirkland & Ellis. It can be reasonably inferred that Jackson Walker and Kirkland & Ellis did not take appropriate steps to confirm the Jones-Freeman relationship because it wanted to continue profiting from the relationship.

113. Regardless, Freeman, a partner at Jackson Walker, unquestionably knew of her ongoing intimate relationship with Judge Jones, that they lived together, and co-owned a home. As an attorney and partner in Jackson Walker, Freeman's "[k]nowledge and actions are said to be imputed to all members of a firm[.]"[121] Freeman's actions benefitted the Firm with coveted appointments and millions of dollars in attorneys'

---

[120] *See* Alexander Gladstone & Akiko Matsuda, *Texas Law Firm Sys Former Partner Lied About Relationship With Judge*, WSJ.COM (Nov. 13, 2023) at https://www.wsj.com/articles/texas-law-firm-says-former-partner-lied-about-relationship-with-judge-9a62a69f (last visited on Feb. 25, 2023) ("'They're throwing her under the bus,' said Nancy Rapoport, a law professor at the William S. Boyd School of Law at the University of Nevada, Las Vegas, who specializes in bankruptcy ethics, adding she thinks Jackson Walker still has more questions to answer. 'Didn't they know from any independent means that she might be lying?'").

[121] *In re Bradley*, 495 B.R. 747, 791 (Bankr. S.D. Tex. 2013) (citing *In re Depugh*, 409 B.R. 125, 141 (Bankr. S.D. Tex. 2009); *In re Anderson*, 330 B.R. 180, 187 (Bankr. S.D. Tex. 2005) (finding that knowledge and actions impute from one attorney at a firm to all other attorneys with whom they work)); *see also In re Corrugated Container Antitrust Litigation*, 659 F.2d 1341, 1346 (5th Cir. 1981) ("knowledge is imputed to partners of the lawyer disqualified, even if the partnership is later dissolved") (citations omitted).

fees, meaning the Firm and its partners are charged with knowledge of the intimate relationship and their shared home even if the Firm's leadership continues to claim ignorance.[122]

### XIX.  Jackson Walker "rediscovers" the Jones-Freeman relationship in 2022, and although Freeman leaves the Firm, the parties continue to profit from the arrangement without disclosing it.

114.   On information and belief, the Jones-Freeman relationship continued ongoing through 2021 and into 2022, when Jackson Walker claims (at some point) it once again learned of the intimate relationship, this time through an unidentified "credible third party[.]"[123] Jackson Walker again failed to make proper disclosures to affected parties and chose not to amend its declaration of disinterestedness in either the Bouchard case or any of the other pending bankruptcies in which Jackson Walker had been appointed counsel before Judge Jones. Further, although partners at Kirkland & Ellis long knew of the relationship as well, Kirkland & Ellis also continued not to disclose it.

115.   Jackson Walker claimed it deducted from Freeman's compensation as an equity partner any profits associated with work performed by the Firm in cases before Judge

---

[122] "[I]mputation turns on whether the agent was acting for or against the principal's interest; knowledge acquired by an agent acting adversely to his principal is not attributable to the principal." *Reneker v. Offill*, 2012 U.S. Dist. LEXIS 83017, 2012 WL 2158733, at *11 (N.D. Tex. June 14, 2012) (citing *Askanase v. Fatjo*, 828 F. Supp. 465, 470 (S.D. Tex. 1993)); *see also Askanase v. Fatjo*, 130 F.3d 657, 666 (5th Cir. 1997) ("[c]ourts will impute knowledge to the corporation as long as the officer/director is acting on the corporation's behalf") (citing *FDIC v. Ernst & Young*, 967 F.2d 166, 171 (5th Cir. 1992)); *FDIC v. Shrader & York*, 991 F.2d 216 (5th Cir. 1993) (describing the "adverse interest" exception to imputation, and noting that that "an agent's knowledge falls within this exception only if the agent acts 'entirely for his own or another's purposes.'") (quoting the Restatement (Second) of Agency § 282(1) (1957)).
[123] *4E Brands*, 21-30936, Dkt. 258 at 4.

Jones. But the Firm did not return the $12.6 million in fees it collected from Judge Jones while its partner was in an intimate relationship with him.

116.   Jackson Freeman claims Freeman "separated" from the firm in 2022 after the firm learned for a second time that she was in an intimate relationship with Judge Jones. However, Freeman continued to work as co-counsel with Jackson Walker on matters before Jones—again, without proper disclosures or remedial steps.[124]

117.   On information and belief, this "separation" was window-dressing to create an appearance of propriety; a fig-leaf for an improper relationship that Jackson Walker knew about and wanted to continue for its own profit. Freeman's firm website does not identify a physical address, listing a P.O. Box in downtown Houston at a U.S. Post Office location.[125] On information and belief, even after the so-called "separation," Freeman continued to use Jackson Walker offices to conduct work, collaborate with Jackson Walker lawyers, and even held mediations there through at least March 2023.[126]

118.   The only reasonable inference is Jackson Walker knew of the Jones-Freeman relationship the entire time, collected huge profits from the relationship, and only took steps to improve the "optics" of the situation, but never actually did anything to remedy

---

[124] *GWG Holdings*, 22-90032, Dkt. 1128, Dkt. 1323 at 2, Dkt. 2158 at PDF pp. 179–80, 195, Dkt. 2246 at 5.

[125] https://lizfreemanlaw.com/contact.html, last visited February 26, 2024.

[126] Indap, *supra* note 5 ("After leaving Jackson Walker, Freeman established the Law Office of Liz Freeman. Business was immediately brisk; Jackson Walker has hired her as a contract attorney or co-counsel on multiple occasions in 2023, even letting her occasionally use a conference room, according to a person familiar with the matter.").

it, including making the required disclosures to the court or affected parties. Freeman, Jackson Walker, Kirkland & Ellis, and Judge Jones all profited from their secret, all at the expense of creditors, shareholders, and others, not to mention the integrity of the United States bankruptcy system.

## XX.   The RICO Defendants failed to satisfy their obligations to disclose the Jones-Freeman relationship and disqualify Judge Jones.

119.   Bankruptcy Rule 5004(a) provides that a "bankruptcy judge shall be governed by 28 U.S.C. § 455," which mandates disqualification of a judge "in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. §455(a); *see also* Cannon 3(C)(1) for United States Judges ("[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned"). Bankruptcy Rule 5004(a) further provides that a "bankruptcy judge shall be...disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstance arises." In addition, Rule 5004(b) specifically rendered Judge Jones disqualified from awarding compensation "to a person...with whom the judge is so connected as to render it improper for the judge to authorize such compensation."

120.   That Judge Jones and Freeman were unmarried is irrelevant. As Chief Judge of the Fifth Circuit observed, "[r]ecusal considerations applicable to a judge's spouse should also be considered with respect to a person other than a spouse with whom the

judge maintains both a household and an intimate relationship."[127] Judge Jones was obligated to recuse himself from presiding over this case and awarding attorneys' fees to the law firm in which his live-in girlfriend was a partner and actively worked on and billed in the case.

121.    These proceedings and malfeasance by the RICO Defendants and Portage Point Parties caused Plaintiff significant damages. As a result of Defendants' misconduct, the loans taken out against such policies remain unpaid and certain policies terminated, resulting in over $40 million in losses, as well as adverse tax consequences to the Bouchard Parties given BTC's status as a sub chapter "s" corporation and the failure to repay the loans on the life insurance policies. In addition, the Bouchard Parties have been denied any recovery on their claims against BTC, including the amounts provided for under the Settlement Agreement. Further, Mr. Bouchard suffered reputational harm and has been unable to obtain new employment as a result of Defendants' misconduct. In addition, Mr. Bouchard's equity stake in BTC was vitiated, resulting in losses of hundreds of millions of dollars in value.  Further, these proceedings caused emotional trauma for Mr. Bouchard, who lost the generational family business he had dedicated his life to, due to the malfeasance of the RICO Defendants and the Portage Point Parties.  Mr. Bouchard also suffered mental anguish as a result of the harsh treatment he received in court, including the *sua sponte* removal of Mr. Bouchard as CEO, and as

---

[127] Ex. 1 at 4 (quoting Commentary to Cannon 3C of the Code of Conduct for United States Judges).

a result of learning his case was litigated in a courtroom corrupted by fraud, in which the law firms, Freeman, and the judge conspired to enrich themselves, with no level playing field for any litigant who did not fall in line with the plan or who dared question professional fees.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF TITLE 18 US.C. § 1962(C):  CONDUCTING THE AFFAIRS OF THE ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY
*(Against Defendants Judge Jones, Jackson Walker, Kirkland & Ellis, LLP, Kirkland & Ellis International, LLP, Elizabeth Freeman)*

122.    Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

123.    Plaintiff asserts this claim against Defendants Jones, Freeman, Jackson Walker, and Kirkland & Ellis (the "RICO Defendants") for violation of the RICO Act. Plaintiff specifically claims that Defendants violated 18 U.S.C. § 1962(c).

124.    From the point that Freeman joined Jackson Walker (either in 2017 or 2018)[128] and continuing until October 2023, in the State of Texas and elsewhere, the RICO Defendants did unlawfully, knowingly, and intentionally conduct and participate, directly and indirectly, in the conduct, management, and operation of the affairs of the Enterprise (otherwise referred to herein as the "Jones-Freeman-Jackson Walker-Kirkland & Ellis Enterprise"), which was engaged in and affected interstate commerce through a pattern of racketeering activity consisting of numerous acts of racketeering in the State of Texas and elsewhere, indictable under Title 18 U.S.C. § 1503 (obstruction

---

[128] It is unclear precisely when Freeman joined Jackson Walker. The Ethics Complaint filed by the chief judge of the 5th U.S. Circuit Court of Appeals at New Orleans on October 13, 2023 states that Freeman was a partner in Jackson Walker "from at least 2017." Ex. 1 at 1. Jackson Walker recently claimed it hired her "on May 14, 2018, as an income partner in the bankruptcy group. She was later promoted to equity partner effective January 1, 2021." *4E Brands*, No. 22-50009, Dkt. 526 at 2.

of justice), § 1341 (mail fraud), § 1343 (wire fraud), § 152 (bankruptcy fraud) and § 1346 (honest services fraud).

125.   At all relevant times, Defendants Jones, Freeman, Jackson Walker, and Kirkland & Ellis were "persons" within the meaning of 18 U.S.C. § 1962(c) and as defined by the statute. 18 U.S.C. § 1961 (defining a culpable "person" to include "an entity capable of holding a legal or beneficial interest in property"). Defendants are each "persons" capable of holding legal or beneficial interests in property. *See* 18 U.S.C. § 1961.

126.   Defendants constitute an association-in-fact enterprise with a clear common purpose, clear relationships between them and a longevity sufficient to permit Defendants to pursue the purpose of the Enterprise. Specifically, the purpose of the Jones-Freeman-Jackson Walker-Kirkland & Ellis Enterprise was to increase the prestige and influence of each actor in bankruptcy practice, while enriching the respective law firms and attorney Freeman. This purpose was accomplished through multiple predicate acts, and without disclosing the Jones-Freeman intimate relationship to affected parties and creditors. The Enterprise carried out this purpose through bankruptcy fraud, mail fraud, wire fraud, obstruction of justice, and theft of honest services mail/wire fraud.

127.   Defendants are a group of business entities and individuals associated in fact, which were engaged in, and the activities of which affected, interstate commerce. Each Defendant participated in the operation and management of the Enterprise. As such,

Defendants collectively have constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961 (4).

128.   Judge Jones, Jackson Walker, Freeman and Kirkland & Ellis, formed an ongoing structure of persons and entities that continually associated over an extended period of time for the shared purpose of enriching themselves and increasing their prestige and influence among bankruptcy lawyers and courts. Upon information and belief, Judge Jones, Jackson Walker, Freeman and Kirkland & Ellis, were in regular contact with one another via email, phone and in-person communications for the purposes of securing appointments in and making decisions regarding bankruptcy cases, getting cases filed in the "friendly" court of Judge Jones, and obtaining favorable decisions and lucrative fee awards from Judge Jones in those cases. The enterprise was organized in a manner amenable to consensual decision-making between the Defendants and hierarchical decisions handed down by Judge Jones to the other members of the Enterprise.

129.   The Jones-Freeman-Jackson Walker-Kirkland & Ellis Enterprise functioned as a continuing association-in-fact enterprise from approximately 2017 to approximately October 2023,[129] when Judge Jones resigned. Plaintiff alleges closed-ended continuity

---

[129] While the existence of the Enterprise and the predicate acts overlap in time, "evidence establishing the enterprise and the pattern of racketeering may 'coalesce.'" *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 673–74 (th Cir. 2015) (quoting *Boyle v. U.S.*, 556 U.S., 938, 947 (2009)); *see Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 738 (5th Cir. 2019) (same). "The linchpin of enterprise status is the continuity or ongoing nature of the association." *Allstate*, 802 F.3d at 673 (citing *Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453, 1462 (5th Cir. 1991)).

based on a series of related predicates extending over a substantial period—at least five years.

130.   The Jones-Freeman-Jackson Walker-Kirkland & Ellis Enterprise consists of Defendants Jones, Freeman, Jackson Walker, and Kirkland & Ellis, who again associated together in fact and carried out their common purpose by committing bankruptcy fraud, mail fraud, wire fraud, and theft of honest services mail/wire fraud.

131.   The Enterprise functioned to achieve the shared goals of increasing prestige and enriching Defendants, which they accomplished both directly through approval of improper attorneys' fee awards and indirectly by elevating the status and demand for Defendants Jackson Walker, Freeman, and Kirkland & Ellis as bankruptcy attorneys, and by securing favorable bankruptcy court appointments and rulings – including millions of dollars, if not tens of millions of dollars, awarded to Jackson Walker and Kirkland & Ellis as attorneys' fees - that were influenced by intimate relationships and self-interest and not based exclusively on the merits.

132.   Defendants carried out the Enterprise through improper and unlawful acts including, but not limited to, the following:

   a.   securing the appointment of Jackson Walker, Freeman, and/or Kirkland & Ellis on bankruptcy cases before Judge Jones despite Jones having a personal and financial interest in the outcome of the case;

b.   influencing the assignment of bankruptcy cases involving clients of Jackson Walker, Freeman, and Kirkland & Ellis to Judge Jones, despite Jones having a personal and financial interest in the outcome of the case;

c.   failing to recuse, or seek the recusal of Judge Jones;

d.   failing to inform the court, creditors, opposing parties, and others of the intimate relationship between Judge Jones and Freeman;

e.   failing to remove Freeman from cases before Judge Jones;

f.   deceiving the public, the judiciary, and bankruptcy creditors such as Plaintiff;

g.   withholding from Plaintiff and the public facts material to federal bankruptcy court decisions;

h.   defrauding creditors such as Plaintiff;

i.   influencing the orders issued in bankruptcy proceedings for the benefit of Defendants (and clients represented by Defendants) and to the detriment of creditors such as Plaintiff;

j.   influencing the orders issued in bankruptcy proceedings, and railroading any litigant who opposed the designs of the Enterprise or protested professional fees;

k.   enhancing the status, reputation and demand for the services of Defendants Jackson Walker, Freeman, and Kirkland & Ellis as bankruptcy attorneys by

issuing rulings favorable to Defendants Jackson Walker, Freeman, and Kirkland & Ellis;

l.   profiting from the issuance of bankruptcy court rulings favoring Defendants that were issued in violation of law;

m.   securing large awards of attorneys' fees that directly benefitted Jackson Walker, Freeman, and Kirkland & Ellis and indirectly benefitted Judge Jones himself without disclosing the Jones-Freeman relationship;

n.   shielding themselves from public, judicial and governmental scrutiny of wrongful acts;

o.   covering up the existence, purpose, and acts of the Enterprise by denying the existence of an intimate relationship between Freeman and Judge Jones;

p.   covering up the existence, purpose, and acts of the Jones-Freeman-Jackson Walker-Kirkland & Ellis Enterprise by failing to disclose the existence of the intimate relationship when disclosure was required.

133.   The Enterprise has pursued a course of conduct of deceit, misrepresentation, and conspiracy to deceive and defraud Plaintiff and the public, to withhold from Plaintiff and the public facts material to federal bankruptcy court decisions, and to influence, issue, and secure favorable bankruptcy court rulings in violation of law.

134.   The participants in this Enterprise have repeatedly and continuously engaged in a pattern of racketeering activities from approximately 2017 or 2018 to 2023. During that time, Judge Jones presided over at least 26 cases, and perhaps more, in which he

awarded Defendant Jackson Walker at least $12.6 million in attorneys' fees under 11 U.S.C. § 330 and § 331. The compensation awards from Judge Jones to Jackson Walker occurred while Freeman was both a Jackson Walker partner and living with Judge Jones in an intimate relationship. This includes approximately $1 million in fees billed by Freeman in 17 of those cases:

| Bankruptcy Debtor | Jackson Walker Application for Appointment | Fees Awarded to Jackson Walker by Judge Jones | Fees Awarded to Freeman by Judge Jones | Date of Final Fee Award |
|---|---|---|---|---|
| Westmoreland Coal Company | 11/8/2018[130] | $678,806[131] | $129,629.50 | 08/14/2019 |
| Jones Energy | 4/3/2019[132] | $92,854[133] | $10,582 | 07/23/2019 |
| McDermott International Inc. | 2/19/2020[134] | $391,655[135] | $114,002.50 | 09/08/2020 |
| Sheridan Holding Company I, LLC | 4/2/2020[136] | $11,779.50[137] | $3,565 | 07/13/2020 |
| Whiting Petroleum Corporation | 4/17/2020[138] | $695,091.50[139] | $36,115 | 11/06/2020 |

---

[130] *In re Westmoreland Coal Company, et al.*, No. 18-35672, Dkt. 376.

[131] *Id.* at Dkt. 2162 (Jackson Walker application for fees) 2249 (order awarding fees).

[132] *In re Jones Energy, Inc., et al.*, No. 19-32112, Dkt. 125.

[133] *Id.* at Dkt. 242 (Jackson Walker application for fees); Dkt. 251 (order awarding fees).

[134] *McDermott*, No. 20-30336, Dkt. 424.

[135] *Id.* at Dkt. 991 (Jackson Walker application for fees); Dkt. 1021 (order awarding fees).

[136] *In re Sheridan Holding Company, I, LLC*, No. 20-31884, Dkt. 130.

[137] *Id.* at Dkt. 162 (Jackson Walker application for fees); Dkt. 213 (order awarding fees).

[138] *Whiting*, No. 20-32021, Dkt. 173

[139] *Id.* at Dkt. 796 (Jackson Walker application for fees); Dkt. 840 (order awarding fees).

| Hornbeck Offshore Services, Inc. | 6/1/2020[140] | $61,428[141] | $4,727.50 | 08/11/2020 |
|---|---|---|---|---|
| Stage Stores Inc. | 6/4/2020[142] | $182,655.50[143] | $29,295 | 12/16/2020 |
| Neiman Marcus Group LTD, LLC | 6/3/2020[144] | $380,573.50[145] | $49,910 | 12/10/2020 |
| J.C. Penny Company, Inc. | 6/11/2020[146] | $1,087,263[147] | $286,159 | 04/08/2021 |
| Chesapeake Energy Corporation | 7/16/2020[148] | $912,742[149] | $192,258 | 04/20/2021 |
| Covia Holdings Corporation | 7/21/2020[150] | $325,181[151] | $51,021 | 04/07/2021 |
| Volusion, LLC | 8/26/2020[152] | $339,428[153] | $62,897 | 02/26/2021 |
| Denbury Resources Inc. | 8/28/2020[154] | $124,321.50[155] | $37,122.50 | 11/25/2020 |
| iQor Holdings Inc. | 9/28/2020[156] | $63,842[157] | $1,670 | 12/30/2020 |

---

[140] *In re Hornbeck Offshore Services, Inc., et al.*, No. 20-32679, Dkt. 132.

[141] *Id.* at Dkt. 270 (Jackson Walker application for fees); Dkt. 283 (order awarding fees).

[142] *In re Stage Stores,* Inc., et al., No. 20-32564, Dkt. 385.

[143] *Id.* at Dkt. 931 (Jackson Walker application for fees); Dkt. 983 (order awarding fees).

[144] *In re Neiman Marcus Group LTD, LLC., et al.*, No. 20-32519, Dkt. 750.

[145] *Id.* at Dkt. 2046 (Jackson Walker application for fees); Dkt. 2147 (order awarding fees).

[146] *In re JC Penny, Company Inc.*, No. 20-20182, Dkt. 685.

[147] *Id.* at Dkt. 2739 (Jackson Walker application for fees); Dkt. 2874 (order awarding fees).

[148] *In re Chesapeake Energy Corporation*, No. 20-33233, Dkt. 370.

[149] *Id.* at Dkt. 3303 (Jackson Walker application for fees); Dkt. 3509 (order awarding fees).

[150] *In re Covia Holdings Corporation, et al.*, No. 20-33295, Dkt. 195.

[151] *Id.* at Dkt. 1205 (Jackson Walker application for fees); Dkt. 1304 (order awarding fees).

[152] *In re Volusion, LLC*, No. 20-50082, Dkt. 74.

[153] *Id.* at Dkt. 166 (Jackson Walker application for fees); Dkt. 172 (order awarding fees).

[154] *In re Denbury Resources Inc., et al.*, No. 20-33801, Dkt. 238.

[155] *Id.* at Dkt. 363 (Jackson Walker application for fees); Dkt. 384 (order awarding fees); Dkt. 407 (supplemental application); Dkt. 442 (order awarding supplemental fees).

[156] *In re iQor Holdings Inc., et al.,* No. 20-34500, Dkt. 154.

[157] *Id.* at Dkt. 233 (Jackson Walker application for fees); Dkt. 252 (order awarding fees).

| | | | |
|---|---|---|---|
| Bouchard Transportation Co., Inc. | 10/28/2020[158] | $436,790[159] | $23,380 | 11/12/2021 |
| Mule Sky LLC (Gulfport Energy) | 12/11/2020[160] | $765,173.50[161] | $54,525.50 | 08/23/2021 |
| Seadrill Partners, LLC | 12/23/2020[162] | $286,885[163] | $28,223 | 08/10/2021 |
| Seadrill Limited | 3/8/2021[164] | $501,242[165] | $5,594.50 | 01/07/2022 |
| Brilliant Energy, LLC | 4/13/2021[166] | $186,363.50[167] | $0 | 12/30/2022 |
| Katerra Inc. | 6/29/2021[168] | $858,653.01[169] | $0 | 01/28/2022 |
| Basic Energy Services, Inc. | 12/13/2021[170] | $1,543,432.34[171] | $0 | 09/29/2022 |
| Strike LLC | 1/6/2022[172] | $875,026[173] | $0 | 08/18/2022 |
| Seadrill New Finance Limited | 2/8/2022[174] | $27,286[175] | $0 | 02/21/2022 |

---

[158] *In re Bouchard Transportation Co., Inc., et al.,* No. 20-34682, Dkt. 173.

[159] *In re Tug Robert J. Bouchard, Corporation,* No. 20-34758, Dkt. 29 (Jackson Walker application for fees); Dkt. 63 (order awarding fees).

[160] *In re Gulfport Energy Corporation,* No. 20-35562, Dkt. 390.

[161] *In re Mule Sky LLC, et al.,* No. 20-35561, Dkt. 10 (Jackson Walker application for fees); Dkt. 212 (order awarding fees).

[162] *In re Seadrill Partners, LLC, et al.,* No. 20-35740, Dkt. 110.

[163] *Id.* at Dkt. 643 (Jackson Walker application for fees); Dkt. 690 (order awarding fees).

[164] *In re Seadrill Limited, et al.,* No. 21-30427, Dkt. 250.

[165] *Id.* at Dkt. 1281 (Jackson Walker application for fees); Dkt. 1340 (order awarding fees).

[166] *In re Brilliant Energy, LLC,* No. 21-30936, Dkt. 68.

[167] *Id.* at Dkt. 234 (Jackson Walker application for fees); Dkt. 241 (order awarding fees)

[168] *In re Katerra Inc., et al.,* No. 21-31861, Dkt. 289.

[169] *Id.* at Dkt. 1523 (Jackson Walker application for fees); Dkt. 1639 (order awarding fees).

[170] *In re Basic Energy Services, Inc., et al.,* No. 21-90002, Dkt. 809.

[171] *Id.* at Dkt. 1459 (Jackson Walker application for fees) Dkt. 1511 (order awarding fees).

[172] *In re Strike LLC, et al.,* No. 21-90054, Dkt. 363.

[173] *Id.* at Dkt. 1220 (Jackson Walker application for fees); Dkt. 1248 (order awarding fees).

[174] *In re Seadrill New Finance Limited, et al.,* No. 22-90001, Dkt. 94.

[175] *Id.* at Dkt. 99 (Jackson Walker application for fees); Dkt. 121 (order awarding fees).

| | | | |
|---|---|---|---|
| 4E Brands Northamerica LLC | 3/24/2022[176] | $859,425.5[177] | $0 | 12/29/2022 |
| Sungard AS New Holdings | 5/10/2022[178] | $414,495[179] | $0 | 12/30/2022 |
| LaForta — Gestao e Investments | 7/15/2022[180] | $505,907.50[181] | $0 | 10/04/2023 |
| **Total** | | **$12,608,299.45** | **$1,120,677.00** | |

135.   For its part, Kirkland served as lead counsel in 17 of the 26 cases in which Jackson Walker and Freeman served as local counsel before Judge Jones, and it was awarded over $162 million in attorneys' fees in those cases.

| Bankruptcy Debtor | Kirkland & Ellis Application for Appointment | Fees Awarded to Kirkland Ellis by Judge Jones | Date of Final Fee Award |
|---|---|---|---|
| Westmoreland Coal Company | 10/22/2018[182] | $9,495,567.65[183] | 8/20/2019[184] |
| Jones Energy | 4/23/2019[185] | $1,192,125.00[186] | 7/2/2019[187] |
| McDermott International Inc. | 2/19/2020[188] | $8,257,742.50[189] | 9/8/2020[190] |

---

[176] *In re 4E Brands North America LLC*, No. 22-50009, Dkt. 72.
[177] *Id.* at Dkt. 391 (Jackson Walker application for fees); Dkt. 427-1 (order awarding fees).
[178] *In re Sungard AS New Holdings, et al.*, No. 22-90018, Dkt. 211.
[179] *Id.* at Dkt. 850 (Jackson Walker application for fees); Dkt. 897 (order awarding fees).
[180] *In re LaForta Gestao e Investmentimentos Sociedade Unipessoal LDA*, No. 22-90126, Dkt. 67.
[181] *Id.* at Dkt. 286 (Jackson Walker application for fees); Dkt. 298 (order awarding fees).
[182] *Westmoreland Coal Company,* No. 18-35672, Dkt. 227
[183] *Id.* at Dkt. 2278
[184] *Id.*
[185] *Jones Energy,* No. 19-32112, Dkt. 121.
[186] *Id.* at Dkt. 250.
[187] *Id.*
[188] *McDermott International Inc.,* No. 20-30336, Dkt. 428.
[189] *Id.* at Dkt. 1020.
[190] *Id.*

| Sheridan Holding Company I, LLC | 4/1/2020[191] | $158,486.50[192] | 5/28/2020[193] |
|---|---|---|---|
| Whiting Petroleum Corporation | 4/16/2020[194] | $10,461,562.00[195] | 10/29/2020[196] |
| Hornbeck Offshore Services, Inc. | 5/26/2020[197] | $1,476,937.00[198] | 8/11/2020[199] |
| Stage Stores LLC | 5/28/2020[200] | $1,966,436.00[201] | 12/16/2020[202] |
| Neiman Marcus Group LTD, LLC | 6/3/2020[203] | $10,334,120.00[204] | 12/10/2020[205] |
| J.C. Penny Company, Inc. | 6/11/2020[206] | $17,581,886.00[207] | 4/7/2021[208] |
| Chesapeake Energy Corporation | 7/16/2020[209] | $23,448,619.50[210] | 4/26/2021[211] |

---

[191] *Sheridan Holding Company, I, LLC*, No. 20-31884, Dkt. 125.

[192] *Id.* at Dkt. 185.

[193] *Id.*

[194] *Whiting Petroleum Corporation,* No. 20-32021, Dkt. 153.

[195] *Id.* at Dkt. 832.

[196] *Id*

[197] *Hornbeck Offshore Services, Inc.,* Dkt. 118

[198] *Id.* at Dkt. 282.

[199] *Id.*

[200] *Stage Stores LLC,* No. No.20-32564, Dkt.*351*

[201] *Id.* at Dkt. 984

[202] *Id.*

[203] *Neiman Marcus Group LTD,* No. 20-32519, Dkt. 748.

[204] *Id.* at Dkt. 2146.

[205] *Id.*

[206] *JC Penny, Company Inc.,* No. 20-20182, Dkt. 684.

[207] *Id.* at Dkt. 2865.

[208] *Id.*

[209] *Chesapeake Energy Corporation,* No. 20-33233, Dkt. 372.

[210] *Id.* at Dkt. 3541.

[211] *Id.*

| | | | |
|---|---|---|---|
| Covia Holdings Corporation | 7/8/2020[212] | $14,962,568.00[213] | 3/8/2021[214] |
| Denbury Resources Inc. | 8/28/2020[215] | $2,148,213.50[216] | 11/25/2020[217] |
| iOor Holdings Inc. | 9/28/20202[218] | $886,010.00[219] | 1/8/2021[220] |
| Bouchard Transportation Co., Inc. | 10/27/2020[221] | $3,441,866.00[222]<br>$3,214,819.00[223] | 3/15/2021[224]<br>6/10/2021[225] |
| Mule Sky LLC (Gulfport Energy) | 12/17/2020[226] | $15,605,476.00[227] | 7/21/2021[228] |
| Seadrill Partners, LLC | 12/23/2020[229] | $2,219,555.00[230] | 8/03/2021[231] |
| Seadrill Limited | 3/8/2021[232] | $22,613,288.23[233] | 12/28/2020[234] |

[212] *Covia Holdings Corporation,* No. 20-33295, Dkt. 125.
[213] *Id.* at Dkt. 1232.
[214] *Id.*
[215] *Denbury Resources Inc.,* No. 20-33801, Dkt. 234.
[216] *Id.* at Dkt. 382.
[217] *Id.*
[218] *iQor Holdings Inc.,* No. 20-34500, Dkt 152
[219] *Id.* at Dkt. 259
[220] *Id.*
[221] *Bouchard Transportation Co., Inc.,* No. 20-34682, Dkt. 167.
[222] *Id.* at Dkt. 658 (Order Granting First Interim Fee Award)
[223] *Id.* at Dkt 967 (Order Granting Second Interim Fee Award)
[224] *Id.* at Dkt. 658 (Order Granting First Interim Fee Award)
[225] *Id.* at Dkt 967 (Order Granting Second Interim Fee Award)
[226] *Mule Sky LLC (Gulfport Energy),* 20-35562 at Dkt. 460.
[227] *Mule Sky LLC,* No. 20-3556, at Dkt. 72.
[228] *Id.*
[229] *Seadrill Partners, LLC,* No. 20-35740, Dkt. 107.
[230] *Id.* at Dkt. 674.
[231] *Id.*
[232] *Seadrill Limited,* No. 21-30427, Dkt. 242
[233] *Id.* at Dkt.1325
[234] *Id.*

| Katerra Inc. | 6/25/2021[235] | $12,920,192.21[236] | 1/26/202[237] |
|---|---|---|---|
| Seadrill New Finance Limited | 2/8/2022[238] | $212,994.00[239] | 3/10/2022[240] |
| Total | | $162,598,464.09 | |

136.    Kirkland & Ellis partners knew about the intimate relationship between Jones and Walker, yet failed to disclose the relationship or include it in their declaration of disinterestedness even though it was lead counsel overseeing the reorganization. Further, Kirkland & Ellis has not even disputed Jackson Walker's assertion that the relationship was disclosed to the firm in March 2021. Nevertheless, it failed to disclose the relationship or correct existing disclosures or declarations of disinterestedness.

137.    The Defendants' wrongful conduct in furtherance of the Jones-Freeman-Jackson Walker-Kirland & Ellis Enterprise, including the predicate acts described herein, was a direct and substantial cause of injury to Plaintiff. Defendants intended to enrich themselves at the expense of the bankruptcy estate and creditors, such as Plaintiff. As a foreseeable result of Defendants' conduct, Plaintiff was deprived of the opportunity to have bankruptcy proceedings determined on the merits free from the influence of interested parties. Additionally, as a foreseeable result of Defendants' conduct,

---

[235] *Katerra Inc.,* No. 21-31861, Dkt. 244.
[236] *Id.*. at Dkt. 1631.
[237] *Id.*
[238] *Seadrill New Finance Limited,* No. 22-90001, Dkt. 92.
[239] *Id.*  at Dkt. 106.
[240] *Id.*

Plaintiff's financial recovery as a bankruptcy creditor was reduced because the bankruptcy estate available to pay creditors, including Plaintiff, was diminished by the fees improperly awarded to Jackson Walker, Freeman, and Kirkland & Ellis by Judge Jones. Further, as a result of Defendants' misconduct, the loans taken out by the Bouchard Parties against the life insurance policies remain unpaid and certain policies terminated, resulting in over $40 million in losses, as well as adverse tax consequences to the Bouchard Parties given BTC's status as a sub chapter "s" corporation and the failure to repay the loans on the life insurance policies. In addition, the Bouchard Parties have been denied any recovery on their claims against BTC, including the amounts provided for under the Settlement Agreement. Further, Mr. Bouchard suffered reputational harm and has been unable to obtain new employment as a result of Defendants' misconduct. Similarly, the foregoing resulted in Mr. Bouchard's equity stake in BTC being vitiated, resulting in losses of hundreds of millions of dollars in value. Further, these proceedings caused emotional trauma for Mr. Bouchard, who lost the generational family business he dedicated his life to due to the malfeasance of the RICO Defendants and the Portage Point Parties as described herein. He also sustained mental anguish damages as a result of the harsh treatment he received in court, including the *sua sponte* removal of Mr. Bouchard as CEO, and as a result of learning his case was litigated in a courtroom corrupted by fraud, in which the law firms, Freeman, and the judge conspired to enrich themselves, with no level playing field for any litigant who did not fall in line with the plan or who dared question professional fees.

138.   At all relevant times, the Enterprise engaged in interstate commerce and the activities of the Enterprise affected interstate commerce. Defendants' conduct in furtherance of the goals of the Enterprise included, but was not limited to, the following actions affecting interstate commerce:

(1) Out of state litigants appeared before Judge Jones.[241]

(2) Defendants Freeman, Jackson Walker, and Kirkland & Ellis represented out-of-state litigants in bankruptcy proceedings before Judge Jones.[242]

(3) Defendants caused the movement of money, including attorneys' fees and bankruptcy estate assets, from one state to another.

(4) Defendants caused the transfer of services from one state to another.

139.   Defendants' predicate acts were related to each other in that they involved the same pattern of using mail and wire communications to perpetuate the frauds that Defendants Jackson Walker, Freeman, and Kirkland & Ellis were not interested parties in proceedings before Judge Jones, that Judge Jones was not subject to recusal in cases involving Defendants Jackson Walker and Freeman because of his intimate relationship with Freeman, and that positions, decisions, and funds were being awarded/approved

---

[241] *See U.S. v. Stratton,* 649 F.2d 1066, 1075 fn. 12 (5th Cir. 1981) (finding "ample evidence" of a connection between racketeering acts involving bribery of judge and interstate commerce where, among other things, out-of-state-litigants appeared before the judge).
[242] *Id.*

to Defendants Jackson Walker, Freeman, and Kirkland & Ellis based solely on the evidence and merits and not due to influence and self-dealing.

140.   As described in this Complaint, Defendants' pattern of racketeering activity includes, but is not limited to, two or more violations of 18 U.S.C. § 1503 (obstruction of justice), § 1341 (mail fraud), § 1343 (wire fraud), § 152 (bankruptcy fraud) and § 1346 (honest services fraud).

### Violations of 18 U.S.C. § 1503 (Obstruction of Justice)

141.   Defendants have committed multiple instances of obstruction of justice in violation of 18 U.S.C. § 1503 which also constitutes racketeering activity within the meaning of 18 U.S. C. § 1961(1). Section 1503 prohibits any person from influencing, obstructing, impeding or intimidating any officer of a federal court in the discharge of his duty.[243]

142.   Defendants violated 18 U.S.C. § 1503(a) through acts of influence as set forth in this Complaint, which acts include, but are not limited to, the following:

> a.   Freeman used her intimate, personal relationship with Judge Jones to influence favorable rulings in cases where she or Defendants Jackson Walker and/or Kirkland & Ellis appeared before Judge Jones.

> b.   Defendants Jackson Walker and Kirland & Ellis used their knowledge of the relationship between Freeman and Judge Jones to influence Judge

---

[243] 18 U.S.C. § 1503(a).

Jones to issue favorable rulings in cases where Defendants Jackson Walker and/or Kirkland & Ellis appeared before Judge Jones.

c.   Defendant Jackson Walker influenced Judge Jones to make rulings that were favorable to Jackson Walker and its clients by offering lucrative payments and prestigious case assignments to Freeman that indirectly benefitted Judge Jones.

d.   All Defendants knowingly and deliberately concealed, or failed to properly reveal, the existence of an intimate, personal relationship between Freeman and Judge Jones, thereby influencing officers of the bankruptcy court to permit the assignment of cases involving Defendants Freeman, Jackson Walker, and/or Kirkland & Ellis to Judge Jones' court.

143.   Judge Jones was an "officer in or of" a federal district court within the meaning of 18 U.S.C. § 1503 prohibiting influencing, impeding or intimidating any officer of a federal court in the discharge of his duty.

144.   These acts of influence obstructed justice and were at the heart of Defendants' scheme to enrich and benefit themselves through the issuance of favorable appointments and rulings from Judge Jones.

**Violations of 18 U.S.C. § 1341 (Mail Fraud)**

145.   Defendants have committed multiple instances of mail fraud in violation of 18 U.S.C. § 1341 which also constitutes racketeering activity within the meaning of 18 U.S.C. § 1961(1).

146.    For purpose of executing and attempting to execute their course of conduct, Defendants would, and did, knowingly cause to be placed in any Post Office or authorized depository for mail, items to be sent and delivered by the United States Postal Services, including but not limited to: (i) matters used to communicate with each other as co-conspirators and to further the goals of the Enterprise, (ii) matters used to communicate with clients and potential clients regarding the favorable outcomes Defendants Freeman, Jackson Walker, and/or Kirkland & Ellis have and would be able to obtain in proceedings before Judge Jones, (iii) matters containing misrepresentations or omissions regarding the relationship that existed between Freeman and Judge Jones, and (iv) invoices and billing materials reflecting fees sought and awarded to Defendants.

147.    Defendant's scheme to defraud was dependent upon information and documents passed by mail, in furtherance of Defendants' deceptive scheme, including, but not limited to, the following:

a.    Application to be Appointed as Co-Counsel and Conflicts Counsel for Debtors and Debtors in Possession prepared by Jackson Walker and signed by Jackson Walker partner, Matthew Cavenaugh, and filed in the United States Bankruptcy Court for the Southern District of Texas on or about October 28, 2020 in the BTC bankruptcy.[244] Under the rules governing a bankruptcy proceeding, a firm seeking to be employed by a debtor or debtor

---

[244] *BTC*, 20-34682, Dkt. 173.

in possession must show that it is disinterested and must disclose all connections. Jackson Walker submitted a declaration of disinterestedness disclosing conflicts of interest in the Firm's application for appointment; but did not disclose the intimate relationship between the Jackson Walker partner and the judge overseeing the case.[245] To the contrary, Jackson Walker affirmatively stated it was a disinterested party.

b. <u>Application for an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession</u> prepared by Kirkland & Ellis and e-filed by Jackson Walker partner Cavenaugh on October 27, 2020.[246] Even though its partners long knew of the Jones-Freeman relationship, Kirkland & Ellis partner Ryan Bennett submitted a declaration of disinterestedness that did not identify the relationship between Judge Jones and its local counsel's partner Freeman, even while discussing a conflicts search involving bankruptcy judges.[247]

c. <u>Order Appointing Jackson Walker as Co-Counsel and Conflicts Counsel for Debtors and Debtors in Possession</u> entered by Judge Jones on November 23,

---

[245] *Id.* at Ex. B., p. 1 (Cavenaugh submitting a "verified statement of disinterestedness pursuant to Bankruptcy Rule 2014(a)").
[246] *Id.* Dkt. 167 & Ex. A.
[247] *Id.* Dkt. 167 Ex. A at 8–11 & Schedule 1(d).

2020 in the BTC bankruptcy.[248] In the Order, Judge Jones instructed Jackson Walker to periodically review its files to ensure that no conflict or other disqualifying circumstances exists.[249] Judge Jones instructed Jackson Walker to promptly supplement its declaration of disinterestedness if any new relevant facts or relationships are uncovered or arise. Judge Jones did not disclose in the Order the intimate relationship he was having with Jackson Walker partner, Freeman.[250]

d. <u>Three Interim Applications for Attorneys' Fees</u> filed on March 19, May 5, and October 18, 2021, by Cavenaugh on behalf of Jackson Walker in the BTC bankruptcy.[251] The applications requested an aggregate $436,790 in fees and $5,371.24 in expenses, including $23,380 in fees for Freeman.[252] The application did not disclose the intimate relationship between Judge Jones and Jackson Walker partner, Freeman and did not trigger Jackson Walker to amend its declaration of disinterestedness.

e. <u>Two Interim Applications for Attorneys' Fees</u> filed on February 13 and May 12, 2021, one filed by Kirkland & Ellis attorney Genevieve Graham, and another by Cavenaugh on behalf of Kirkland & Ellis for an aggregate $6.6

---

[248] *Id.* Dkt. 245.
[249] *Id.*
[250] *Id.*
[251] *Id.* Dkts. 686, 856; *In re Tug Robert J. Bouchard, Corporation*, No. 20-34758, Dkt. 29.
[252] *BTC*, 20-34682, Dkt. 686 at Ex. 4, p. 81 of PDF; [252] *Id.* Dkt. 856 Ex. 4 at p. 76 of PDF; *In re Tug Robert J. Bouchard, Corporation*, No. 20-34758, Dkt. 29 at Ex. 6, p. 120 of PDF.

million in attorneys' fees and $216,734.54 in expenses.[253] Kirkland & Ellis

partner Bennett submitted supporting declarations for each fee application

without disclosing the Jones-Freeman relationship or amending his

declarations of disinterestedness.[254]

f.  <u>Orders Awarding Attorneys' Fees</u> to Kirkland & Ellis on March 15 and June

10, 2021,[255] and to Jackson Walker on April 20,[256] June 10,[257] and November

12, 2021,[258] for the full amounts requested, entered by Judge Jones in the BTC

bankruptcy. In the orders, Judge Jones did not disclose that he was awarding

fees to his intimate partner, Freeman, and to his intimate partner's firm,

Jackson Walker.

g.  <u>Order removing Mr. Bouchard as CEO</u> and authorizing Matthew Ray of

Portage Point to act for an on behalf of BTC with respect to all matters

relating to the Chapter 11 cases; entered by Judge Jones on February 26,

2021.[259]

---

[253] *BTC*, 20-34682, Dkt. 529 at 3 & Ex. A; Dkt. 882 at 1 & Ex. A.

[254] *Id.* Dkt. 529 Ex. A; Dkt. 882 Ex. A.

[255] *Id.* at Dkt. 658 (Order Granting Kirland & Eliis' first interim fee award); Dkt. 967 (order granting Kirkland & Ellis' second interim fee award).

[256] *Id.* Dkt. 810 (order granting Jackson Walker's first interim fee award).

[257] *Id.* Dkt. 966 (order granting Jackson Walker's second interim fee award).

[258] *In re Tug Robert J. Bouchard, Corporation*, No. 20-34758, Dkt. 63 (order granting Jackson Walker's third interim fee award).

[259] *BTC*, 20-34682, Dkt. 569.

h. <u>Motion for Final Decree</u> to close the affiliate Chapter 11 cases filed by Michael Cavenaugh on behalf of Jackson Walker and Kirkland & Ellis on September 24, 2021 in the BTC bankruptcy.[260] Despite admitted knowledge of the intimate relationship between Judge Jones and its partner, Freeman, at this time and in violation of its continuing responsibility to supplement its declaration of disinterestedness if new information or relationships are uncovered, neither Jackson Walker nor Kirkland & Ellis disclosed the relationship between Judge Jones and Freeman.

i. <u>Final Decree</u> entered by Judge Jones closing the Chapter 11 affiliate cases on September 28, 2021, again not disclosing the relationship.[261]

148.   These mail communications were part and parcel of Defendants' scheme to defraud Plaintiff and benefit themselves through the issuance of improper rulings from Judge Jones that favored his romantic and domestic partner, Freeman, and the firm for which she worked, Jackson Walker.

**Violations of 18 U.S.C. § 1343 (Wire Fraud)**

149.   Defendants have committed multiple instances of wire fraud in violation of 18 U.S.C. § 1343 which also constitutes racketeering activity within the meaning of 18 U.S.C. § 1961(1).

---

[260] *Id.* Dkt. 1379.
[261] *Id.* Dkt. 1389

150.   For purpose of executing and attempting to execute their scheme to defraud creditors including Plaintiff, through material deceptions, Defendants would, and did, knowingly transmit and cause to be transmitted in interstate commerce by means of wire "transmissions" communications including but not limited to: (i) emails and telephone calls used to communicate with each other as co-conspirators and to further the goals of the Enterprise, (ii) emails and telephone calls used to communicate with clients and potential clients regarding the favorable outcomes Defendants Freeman, Jackson Walker, and Kirkland & Ellis have and would be able to obtain in proceedings before Judge Jones, (iii) electronic filings of documents containing misrepresentations or omissions regarding the relationship that existed between Freeman and Judge Jones, and (iv) electronic invoices and billing materials reflecting attorneys' fees sought by and awarded to Defendants.

151.   Defendant's scheme to defraud was dependent upon information and documents passed by wire in furtherance of Defendants' deceptive scheme, including, but not limited to, the following:

      a.  Application to be Appointed as Co-Counsel and Conflicts Counsel for Debtors and Debtors in Possession prepared by Jackson Walker and signed by Jackson Walker partner, Matthew Cavenaugh, and filed in the United States Bankruptcy Court for the Southern District of Texas on or about

October 28, 2020 in the BTC bankruptcy.[262] Under the rules governing a bankruptcy proceeding, a firm seeking to be employed by a debtor or debtor in possession must show that it is disinterested and must disclose all connections. Jackson Walker submitted a declaration of disinterestedness disclosing conflicts of interest in the Firm's application for appointment; but did not disclose the intimate relationship between the Jackson Walker partner and the judge overseeing the case.[263] To the contrary, Jackson Walker affirmatively stated it was a disinterested party.

b.  <u>Application for an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession</u> prepared by Kirkland & Ellis and e-filed by Jackson Walker partner Cavenaugh on October 27, 2020.[264] Even though its partners long knew of the Jones-Freeman relationship, Kirkland & Ellis partner Ryan Bennett submitted a declaration of disinterestedness that did not identify the relationship between Judge Jones and its local counsel's partner Freeman, even while discussing a conflicts search involving bankruptcy judges.[265]

---

[262] *BTC*, 20-34682, Dkt. 173.
[263] *Id.* at Ex. B., p. 1 (Cavenaugh submitting a "verified statement of disinterestedness pursuant to Bankruptcy Rule 2014(a)").
[264] *Id.* Dkt. 167 & Ex. A.
[265] *Id.* Dkt. 167 Ex. A at 8–11 & Schedule 1(d).

c. <u>Order Appointing Jackson Walker as Co-Counsel and Conflicts Counsel for</u>
   <u>Debtors and Debtors in Possession</u> entered by Judge Jones on November 23,
   2020 in the BTC bankruptcy.[266] In the Order, Judge Jones instructed Jackson
   Walker to periodically review its files to ensure that no conflict or other
   disqualifying circumstances exists.[267] Judge Jones instructed Jackson Walker
   to promptly supplement its declaration of disinterestedness if any new
   relevant facts or relationships are uncovered or arise. Judge Jones did not
   disclose in the Order the intimate relationship he was having with Jackson
   Walker partner, Freeman.[268]

d. <u>Three Interim Applications for Attorneys' Fees</u> filed on March 19, May 5,
   and October 18, 2021, by Cavenaugh on behalf of Jackson Walker in the BTC
   bankruptcy.[269] The applications requested an aggregate $436,790 in fees and
   $5,371.24 in expenses, including $23,380 in fees for Freeman.[270] The
   application did not disclose the intimate relationship between Judge Jones
   and Jackson Walker partner, Freeman and did not trigger Jackson Walker to
   amend its declaration of disinterestedness.

---

[266] *Id.* Dkt. 245.
[267] *Id.*
[268] *Id.*
[269] *Id.* Dkts. 686, 856; *In re Tug Robert J. Bouchard, Corporation*, No. 20-34758, Dkt. 29.
[270] *BTC*, 20-34682, Dkt. 686 at Ex. 4, p. 81 of PDF; [270] *Id.* Dkt. 856 Ex. 4 at p. 76 of PDF; *In re Tug Robert J. Bouchard, Corporation*, No. 20-34758, Dkt. 29 at Ex. 6, p. 120 of PDF.

e. <u>Two Interim Applications for Attorneys' Fees</u> filed on February 13 and May 12, 2021, one filed by Kirkland & Ellis attorney Genevieve Graham, and another by Cavenaugh on behalf of Kirkland & Ellis for an aggregate $6.6 million in attorneys' fees and $216,734.54 in expenses.[271] Kirkland & Ellis partner Bennett submitted supporting declarations for each fee application without disclosing the Jones-Freeman relationship or amending his declarations of disinterestedness.[272]

f. <u>Orders Awarding Attorneys' Fees</u> to Kirkland & Ellis on March 15 and June 10, 2021,[273] and to Jackson Walker on April 20,[274] June 10,[275] and November 12, 2021,[276] for the full amounts requested, entered by Judge Jones in the BTC bankruptcy. In the orders, Judge Jones did not disclose that he was awarding fees to his intimate partner, Freeman, and to his intimate partner's firm, Jackson Walker.

g. <u>Order removing Mr. Bouchard as CEO</u> and authorizing Matthew Ray of Portage Point to act for an on behalf of BTC with respect to all matters

---

[271] *BTC*, 20-34682, Dkt. 529 at 3 & Ex. A; Dkt. 882 at 1 & Ex. A.
[272] *Id.* Dkt. 529 Ex. A; Dkt. 882 Ex. A.
[273] *Id.* at Dkt. 658 (Order Granting Kirland & Eliis' first interim fee award); Dkt. 967 (order granting Kirkland & Ellis' second interim fee award).
[274] *Id.* Dkt. 810 (order granting Jackson Walker's first interim fee award).
[275] *Id.* Dkt. 966 (order granting Jackson Walker's second interim fee award).
[276] *In re Tug Robert J. Bouchard, Corporation*, No. 20-34758, Dkt. 63 (order granting Jackson Walker's third interim fee award)

relating to the Chapter 11 cases; entered by Judge Jones on February 26, 2021.[277]

h. <u>Motion for Final Decree</u> to close the Chapter 11 affiliate cases filed by Michael Cavenaugh on behalf of Jackson Walker and Kirkland & Ellis on September 24, 2021 in the BTC bankruptcy.[278] Despite admitted knowledge of the intimate relationship between Judge Jones and its partner, Freeman, at this time and in violation of its continuing responsibility to supplement its declaration of disinterestedness if new information or relationships are uncovered, neither Jackson Walker nor Kirkland & Ellis disclosed the relationship between Judge Jones and Freeman.

i. <u>Final Decree</u> entered by Judge Jones closing the Chapter 11 affiliate cases on September 28, 2021, again not disclosing the relationship.[279]

152.   These wire communications were part and parcel of Defendants' scheme to defraud Plaintiff and benefit themselves through the issuance of improper rulings from Judge Jones that favored his romantic partner, Freeman, the firm for which she worked, Jackson Walker, and lead counsel Kirkland & Ellis.

---

[277] *BTC*, 20-34682, Dkt. 569.
[278] *Id.* Dkt. 1379.
[279] *Id.* Dkt. 1389

**Violations of 18 U.S.C. § 1346 (Honest Services Mail and Wire Fraud)**

153.   Defendants' scheme or artifice to defraud was designed and intended to deprive Plaintiff and the public of the intangible right of honest services in violation of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud) and § 1346 (honest services fraud). Plaintiff and all parties affected by the BTC bankruptcy were entitled to honest services from the judge presiding over the bankruptcy and from the attorneys representing the debtor and debtor-in-possession.

154.   Defendants misused the intimate relationship between Judge Jones and Freeman for personal gain an advantage. That is, Defendants deprived Plaintiff and the public of the intangible right of honest services by benefitting from the secret intimate relationship between Freeman and Jones. Defendants Jackson Walker, Kirkland & Ellis, and Freeman benefitted, directly or indirectly, by receiving financial compensation, enhanced status as bankruptcy attorneys, and favorable rulings for their clients due to the involvement of Judge Jones' intimate partner, Freeman.   Judge Jones, in turn, benefitted indirectly from the financial payments and enhanced opportunities afforded to Freeman by Jackson Walker and Kirkland & Ellis because of her involvement and influence in proceedings in his Court.

155.   Defendants' repeated representations of disinterestedness and failure to disclose the intimate relationship between Judge Jones and Freeman were material, false representations made as part of the scheme. Indeed, "[l]itigants in all of our courts are entitled to expect that the rules will be followed, the required disclosures will be made,

and that the court's decisions will be based on a record that contains all the information applicable law and regulations require."[280]

156.   Defendants unlawful and unfair practices are actionable, particularly where Defendants had a fiduciary duty to Plaintiff. As attorneys for the debtor-in-possession, Freeman and Jackson Walker owed a fiduciary duty to the bankruptcy estate and to Plaintiff as a creditor of the bankruptcy estate. As a federal judge, Judge Jones owed a fiduciary duty to the public and to the litigants before him.  Judge Jones owed a fiduciary duty to Plaintiff, before him as a creditor, in a bankruptcy case over which he presided.

157.   Defendants willfully participated in the scheme to deprive Plaintiff and the public of the intangible right of honest services through multiple acts of mail fraud and wire fraud as outlined above. Defendants' acts of honest services fraud were committed by use of the mails and wires as previously alleged.

### Violations of 18 U.S.C. § 152 (Bankruptcy Fraud)

158.   Defendants have committed multiple instances of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2), 152(3) and 152(6) each of which also constitute racketeering activity within the meaning of 18 U.S. C. § 1961(1).

159.   Under 18 U.S.C. § 152(2) a defendant commits bankruptcy fraud if he or she "knowingly and fraudulently makes a false oath or account in or in relation to any case

---

[280] *Alix v. McKinsey & Co.*, 23 F.4th 196, 204 (2d Cir. 2022) (denying Rule 12(b)(6) motion to dismiss against RICO/bankruptcy fraud allegation concerning fraudulent disclosure statement).

under title 11." Defendants committed acts of bankruptcy fraud by knowingly and fraudulently declaring that they were not interested parties in cases before Judge Jones despite awareness of the relationship between Freeman and Judge Jones. For example, Jackson Walker submitted an October 28, 2020 declaration of disinterestedness in the BTC bankruptcy disclosing conflicts of interest in the Firm's application for appointment; but did not disclose the intimate relationship between the Jackson Walker partner and the judge overseeing the case.[281] To the contrary, Jackson Walker affirmatively stated it was a disinterested party.

160.    Additionally, Kirkland & Ellis submitted an October 27, 2020 declaration of disinterestedness in the BTC bankruptcy disclosing conflicts of interest in the Firm's application for appointment; but did not disclose the intimate relationship between the Jackson Walker partner and the judge overseeing the case.[282] Even though its partners long knew of the relationship, Kirkland & Ellis failed to identify the relationship between Judge Jones and its local counsel's partner, Freeman, even while discussing a conflicts search involving bankruptcy judges.

161.    Defendants Jackson Walker, Freeman, and Kirkland & Ellis also committed acts of bankruptcy fraud by continuing to file pleadings and documents in Judge Jones court, including the March 19, May 5, and October 18, 2021 Jackson Walker applications for

---

[281] *BTC*, 20-34682, Dkt. 173 at Ex. B., p. 1 (Cavenaugh submitting a "verified statement of disinterestedness pursuant to Bankruptcy Rule 2014(a)").
[282] *Id.* Dkt. 167 Ex. A at 8–11 & Schedule 1(d).

attorneys' fees filed by Cavenaugh, the February 13 and May 12, 2021 Kirkland & Ellis application for attorneys' fees filed by Cavenaugh and Graham,[283] and the September 24, 2021 motion for final decree to close the Chapter 11 affiliate cases filed by Cavenaugh in the BTC bankruptcy,[284] and by continuing to engage in proceedings in Judge Jones' court without disclosing the relationship between Freeman and Judge Jones.

162.    Under 18 U.S.C. § 152(3) a defendant commits bankruptcy fraud if he or she "knowingly and fraudulently makes a false declaration, certificate, verification or statement under penalty of perjury…in or in relation to any case under Title 11." Defendants Jackson Walker, Freeman, and Kirkland & Ellis committed acts of bankruptcy fraud by knowingly and fraudulently declaring that the Firm was not an interested party in cases before Judge Jones or failing to disclose the Jones-Freeman relationship in the declarations of disinterestedness as set forth in the preceding paragraphs, despite awareness of the relationship between Freeman and Judge Jones. Defendants Jackson Walker, Freeman, and Kirkland & Ellis also committed acts of bankruptcy fraud by continuing to file or allowing to be filed pleadings and documents in Judge Jones court, as set forth in the preceding paragraphs, and continuing to engage

---

[283] *Id.* Dkt. 529 at 3 & Ex. A; Dkt. 882 at 1 & Ex. A.
[284] *Id.* Dkt. 1379.

in proceedings in Judge Jones' court without disclosing the relationship between Freeman and Judge Jones.

163.   Judge Jones committed acts of bankruptcy fraud by finding that Jackson Walker and Freeman were disinterested parties despite knowledge of the relationship between himself and Freeman and by continuing to preside over cases involving Jackson Walker and Freeman despite the intimate relationship between himself and Freeman without ever disclosing the relationship.  Judge Jones' acts of bankruptcy fraud include his order appointing Jackson Walker as co-counsel and conflicts counsel for debtors and debtors in possession on November 23, 2020 in the BTC bankruptcy without disclosing his intimate relationship with a Jackson Walker partner, Freeman.[285] They also include his April 20, June 10 and November 12, 2021 orders[286] awarding Jackson Walker attorneys' fees (including fees billed by Freeman) without disclosing that he was awarding fees to his intimate partner, Freeman, and to his intimate partner's firm, Jackson Walker.

164.   Under 18 U.S.C. § 152(6) a defendant commits bankruptcy fraud if he or she "knowingly and fraudulently gives, offers, receives, or attempt to obtain any money or property, renumeration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any cause under title 11."  Defendants committed acts of

---

[285] *Id.*  Dkt. 245.
[286] *Id.* Dkt. 810 (order granting Jackson Walker's first interim fee award); *Id.* Dkt. 966 (order granting Jackson Walker's second interim fee award); *In re Tug Robert J. Bouchard, Corporation*, No. 20-34758, Dkt. 63 (order granting Jackson Walker's third interim fee award)

bankruptcy fraud by knowingly and fraudulently giving (Judge Jones) and receiving (Jackson Walker, Freeman, and Kirkland & Ellis directly, and Judge Jones indirectly through Freeman) attorneys' fees in the BTC bankruptcy (including the March 19, May 5, and October 18, 2021 Jackson Walker applications for attorneys' fees, the February 13 and May 12, 2021 Kirkland & Ellis application for attorneys' fees,[287] and the March 15, April 20,[288] June 10, 2021,[289] and November 12, 2021[290] orders entered by Judge Jones awarding fees) and other advantageous appointments and rulings in bankruptcy proceedings.

165.   As described *supra* ¶ 121, Defendants' racketeering activities described herein were the substantial and proximate cause of damages to Plaintiff. Further, because Defendants' conduct targeted the federal judiciary and the bankruptcy process in particular, "the judiciary's responsibility to superintend the integrity of the bankruptcy process lessens the plaintiff's burden to show a direct injury, at least at the pleading stage."[291]

166.   Plaintiff is entitled to and respectfully request (1) three times their actual damages, (2) attorneys' fees, (3) pre-judgment and post-judgment interest, (4) costs, (5)

---

[287] *BTC*, 20-34682, Dkt. 529 at 3 & Ex. A; Dkt. 882 at 1 & Ex. A.
[288] *Id.* Dkt. 810 (order granting Jackson Walker's first interim fee award).
[289] *Id.* at Dkt. 658 (Order Granting Kirland & Eliis' first interim fee award); Dkt. 967 (order granting Kirkland & Ellis' second interim fee award); *Id.* Dkt. 966 (order granting Jackson Walker's second interim fee award).
[290] *In re Tug Robert J. Bouchard, Corporation*, No. 20-34758, Dkt. 63 (order granting Jackson Walker's third interim fee award)
[291] *Id.* at 207 (cleaned up).

disgorgement of profits and forfeiture of fees, (6) nominal damages, (7) any other damages permitted pursuant to 18 U.S.C. § 1964(c), and (8) such other and further relief as may be just and appropriate.

## COUNT II
## CONSPIRACY TO ENGAGE IN A PATTERN OF RACKETEERING ACTIVITY IN VIOLATION OF TITLE 18 US.C. § 1962(D)
*(Against Defendants Judge Jones, Jackson Walker, Kirkland & Ellis, LLP, Kirkland & Ellis International, LLP, Elizabeth Freeman)*

167.   Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

168.   Defendants Jones, Freeman, Jackson Walker, and Kirkland & Ellis conspired and agreed, either directly or indirectly, to commit a substantive offense under 18 U.S.C. § 1962(c) as described above.

169.   Defendants Jones, Freeman, Jackson Walker, and Kirkland & Ellis did act in agreement by participating, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1962(b) and (d).

170.   From approximately 2017 or 2018 through the fall of 2023, Defendants Jones, Freeman, Jackson Walker, and Kirkland & Ellis cooperated jointly and severally in the commission of two or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1) (A) and (B), in violation of 18 U.S.C. § 1962(d) as previously set forth in Count I. Defendants Jones, Freeman, Jackson Walker, and Kirkland & Ellis committed these predicate acts as part of a continuous course of conduct that was a pattern of

racketeering activities. Further, upon information and belief, Judge Jones, Jackson Walker, Freeman and Kirkland & Ellis, were in regular contact with one another via email, phone and in-person communications for the purposes of securing appointments in and making decisions regarding bankruptcy cases, getting cases filed in the "friendly" court of Judge Jones, and obtaining favorable decisions and lucrative fee awards from Judge Jones in those cases.

171.   Defendants Jones, Freeman, Jackson Walker, and Kirkland & Ellis' conspiracy to engage in racketeering activity through the predicate acts set forth in Count I were the substantial and proximate cause of damage to Plaintiff. Defendants Jones, Freeman, Jackson Walker, and Kirkland & Ellis intended to enrich themselves at the expense of the bankruptcy estate and creditors, such as Plaintiff. As a foreseeable result of Defendants' conduct, Plaintiff was deprived of the opportunity to have bankruptcy proceedings determined on the merits free from the influence of interested parties. Additionally, as a foreseeable result of Defendants' conduct, Plaintiff's financial recovery as a bankruptcy creditor was reduced because the bankruptcy estate available to pay creditors, including Plaintiff, was diminished by the fees improperly awarded to Jackson Walker, Freeman, and Kirkland & Ellis by Judge Jones. Further, as a result of Defendants' misconduct, the loans taken out against the Bouchard Parties' life insurance policies remain unpaid and certain policies terminated, resulting in over $40 million in losses, as well as adverse tax consequences to the Bouchard Parties given BTC's status as a sub chapter "s" corporation and the failure to repay the loans on the

life insurance policies. In addition, the Bouchard Parties have been denied any recovery on their claims against BTC, including the amounts provided for under the Settlement Agreement. Further, Mr. Bouchard suffered reputational harm and has been unable to obtain new employment as a result of Defendants' misconduct. Similarly, the foregoing resulted in Mr. Bouchard's equity stake in BTC being vitiated, resulting in losses of hundreds of millions of dollars in value. Further, these proceedings caused emotional trauma for Mr. Bouchard, who lost the generational family business he dedicated his life to due to the malfeasance of the RICO Defendants and the Portage Point Parties as described herein. He also sustained mental anguish damages as a result of the harsh treatment he received in court, including the *sua sponte* removal of Mr. Bouchard as CEO, and as a result of learning his case was litigated in a courtroom corrupted by fraud, in which the law firms, Freeman, and the judge conspired to enrich themselves, with no level playing field for any litigant who did not fall in line with the plan or who dared question professional fees.

172.   Additionally, because Defendants' conduct targets the federal judiciary and the bankruptcy process in particular, "the judiciary's responsibility to superintend the integrity of the bankruptcy process lessens the plaintiff's burden to show a direct injury, at least at the pleading stage."[292]

---

[292] *Alix*, 23 F.4th at 207 (cleaned up).

173.   Plaintiff is entitled to and respectfully requests (1) three times their actual damages, (2) attorneys' fees, (3) pre-judgment and post-judgment interest, (4) costs, and (5) any other damages permitted pursuant to 18 U.S.C. § 1964(c), (6) disgorgement of profits and forfeiture of fees, (7) nominal damages, and (8) such other and further relief as may be just and appropriate.

**COUNT III**
**COMMON LAW FRAUD**
*(Against Defendants Judge Jones, Jackson Walker, Kirkland & Ellis, LLP, Kirkland &*
*Ellis International, LLP, Elizabeth Freeman)*

174.   Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

175.   Plaintiff alleges common-law fraud against all Defendants. In Texas, the elements of common law fraud are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Allstate Ins. Co v. Receivable Fin. Co. LLC*, 501 F.3d 398, 406 (5th Cir. 2007) (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001)).

176.   The details of Defendants' material misrepresentations are set forth in more detail in Count I and the preceding sections, which are incorporated herein by reference. Defendants Jackson Walker and its partner Freeman, along with lead counsel   in   the

reorganization, Kirkland & Ellis, committed common-law fraud by knowingly declaring that Jackson & Walker was not an interested party in cases before Judge Jones and/or failing to disclose the relationship in the declarations of disinterestedness. For example, Jackson Walker submitted a declaration of disinterestedness in the BTC bankruptcy, filed by Jackson Walker partner Cavenaugh, disclosing conflicts of interest in the Firm's application for appointment; but did not disclose the intimate relationship between the Jackson Walker partner and the judge overseeing the case. To the contrary, Jackson Walker affirmatively stated it was a disinterested party. Despite actively working and billing on the case, Freeman, likewise, failed to disclose the relationship between herself and Judge Jones.

177.    Additionally, Kirkland & Ellis submitted a declaration of disinterestedness signed by partner Bennett in the BTC bankruptcy disclosing conflicts of interest in the firm's application for appointment; but did not disclose the intimate relationship between the Jackson Walker partner and the judge overseeing the case. Even though its partners knew of the relationship, Kirkland & Ellis failed to identify the relationship between Judge Jones and its local counsel's partner, Freeman, even while discussing a conflicts search involving bankruptcy judges. Nor did it ever update its declaration of disinterestedness.

178.    These were material representations in that the disclosure was required to secure appointment under the Bankruptcy Code. At the time the representations were made, Jackson Walker, Freeman, and Kirkland & Ellis knew about the relationship between

Judge Jones and Freeman, but nevertheless falsely represented the Firm was disinterested. Jackson Walker, Freeman, and Kirkland & Ellis made the representations with the intent that all parties to the bankruptcy would rely on it and not challenge the appointments. All parties to the bankruptcy, including Plaintiff, relied on the false representation, and thereby suffered injury by, among other things, Jackson Walker, Freeman, and Kirkland & Ellis securing appointment and receiving attorneys' fees from the bankruptcy estate awarded by Judge Jones, all without disclosure of the intimate relationship.

179.   Defendants Jackson Walker, Freeman, and Kirkland & Ellis also committed fraud by continuing to file or allow to be filed misleading pleadings and documents in Judge Jones court. For instance, on February 13, 2021, Kirkland & Ellis's e-filed an application for $3.4 million in attorneys' fees and $168,840.51 in expenses.[293] Kirkland & Ellis partner, Bennett, submitted a supporting declaration without disclosing the Jones-Freeman relationship.[294] And on May 12, 2021, the firm e-filed an application for $3.2 million in attorneys' fees and $47,894.03 in expenses, with Bennett again providing a declaration without disclosing the relationship.[295] Likewise, on March 19 and May 5, 2021, Jackson Walker filed two interim fee applications requesting $148,101 and

---

[293] *Id.* Dkt. 529 at 3.
[294] *Id.* Dkt. 529 at Ex. A.
[295] *Id.* Dkt. 882 at 1 & Ex. A.

$97,075 in attorneys' fees and $1,161.75 and $1,011 in expenses.[296] Those amounts included $15,614.50[297] and $7,765.50[298] in fees billed by Freeman. While petitioning for these fees, neither Cavenaugh, Freeman, nor any attorney at Jackson Walker disclosed the intimate relationship between Judge Jones and the Jackson Walker partner. Indeed, throughout the BTC bankruptcy proceedings, Jackson Walker, Kirkland & Ellis and Freeman continued to engage in proceedings in Judge Jones' court without disclosing the relationship between Freeman and Judge Jones and without correcting the declarations of disinterestedness.

180.   These documents filed or allowed to be filed by Jackson Walker and Freeman while failing to correct the declarations of disinterestedness were material misrepresentations that the previously filed disclosure of disinterestedness were valid. At the time the representations were made, Jackson Walker, Freeman, and Kirkland & Ellis knew about the relationship between Judge Jones and Freeman, but nevertheless falsely represented that there was no conflict involving Judge Jones and that Jackson Walker was disinterested by failing to correct the declarations of disinterestedness. Jackson Walker, Freeman, and Kirkland & Ellis made the representations with the intent that all parties to the bankruptcy would rely on them and not challenge the appointment, award of attorneys' fees, and other filings. All parties to the bankruptcy,

---

[296] *Id.* Dkts. 686, 856.
[297] *Id.* Dkt. 686 at Ex. 4, p. 81 of PDF.
[298] *Id.* Dkt. 856 Ex. 4 at p. 76 of PDF.

including Plaintiff, relied on the false representations, and thereby suffered injury when, among other things, Jackson Walker, Freeman, and Kirkland & Ellis were appointed and awarded attorneys' fees from the bankruptcy estate by Judge Jones, all without disclosure of the intimate relationship.

181.    Judge Jones committed fraud by finding that Jackson Walker and Freeman were disinterested parties despite his knowledge of the relationship between himself and Freeman.  Judge Jones further committed fraud by continuing to preside over cases involving Jackson Walker and Freeman despite the intimate relationship between himself and Freeman and without ever disclosing the relationship. Judge Jones' fraud includes his order appointing Jackson Walker as co-counsel and conflicts counsel for debtors and debtors in possession on November 23, 2020 in the BTC bankruptcy without disclosing his intimate relationship with a Jackson Walker partner, Freeman. By appointing Jackson Walker, Judge Jones falsely represented that the Firm was disinterested when he knew that he was having an intimate relationship with Freeman, a partner of the Firm. Judge Jones made the representation with the intent that all parties to the bankruptcy would rely on it and not challenge the appointment. All parties to the bankruptcy, including Plaintiff, relied on the false representation, and thereby suffered injury when, among other things, Jackson Walker was appointed and awarded attorneys' fees from the bankruptcy estate by Judge Jones, all without disclosure of the intimate relationship.

182.   Judge Jones also committed fraud in his April 20,[299] June 10,[300] and November 12, 2021[301] orders awarding Jackson Walker its full fee request (including fees billed by Freeman) without disclosing that he was awarding fees to his intimate partner, Freeman, and to his intimate partner's firm, Jackson Walker. By awarding Jackson Walker attorneys' fees, Judge Jones falsely represented that the Firm was disinterested when he knew that he was having an intimate relationship and domestic partnership with Freeman, a partner of the Firm. Judge Jones made the representation with the intent that all parties to the bankruptcy would rely on it and not challenge the award of attorneys' fees. All parties to the bankruptcy, including Plaintiff, relied on the false representation, and thereby suffered injury when Jackson Walker was awarded attorneys' fees from the bankruptcy estate by Judge Jones, all without disclosure of the intimate relationship.

183.   The foregoing misrepresentations were made willfully and with knowledge of their falsity when made. Alternatively, Defendants made these representations recklessly without any knowledge of the truth and as a positive assertion.

184.   Plaintiff is entitled to actual damages and exemplary damages based on Defendants' fraud. Tex. Civ. Prac. & Rem. Code § 41.003(a). Plaintiff also requests

---

[299] *Id.* Dkt. 810 (order granting Jackson Walker's first interim fee award).
[300] *Id.* Dkt. 966 (order granting Jackson Walker's second interim fee award).
[301] *In re Tug Robert J. Bouchard, Corporation*, No. 20-34758, Dkt. 63 (order granting Jackson Walker's third interim fee award)

disgorgement of profits and forfeiture of fees, nominal damages, and such other and further relief as may be just and appropriate.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
*(Against All Defendants)*

185.   Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

**As Against Jackson Walker, Kirkland & Ellis and Elizabeth Freeman**

186.   Upon the filing of a chapter 11 petition, the debtor becomes a debtor-in-possession ("DIP") with fiduciary duties to its creditors. *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner),* 783 F.3d 266, 271 (5th Cir. 2015) (citing 11 U.S.C. §§ 1101, 1106–08). Lawyers representing DIPs must have their employment approved by the bankruptcy court and must satisfy a host of obligations, including requirements to disclose all "connections" and to satisfy ethics standards, among others, prohibiting conflicts of interest. 11 U.S.C. §§ 101(14), 327.

187.   As attorneys for, among other things, debtors-in-possession, Defendants Freeman, Jackson Walker, and Kirkland & Ellis owed a fiduciary duty to the bankruptcy estate and to Plaintiff as a creditor of the bankruptcy estate.

188.   Plaintiff, as a creditor of the bankruptcy estate and the sole shareholder of BTC, reposed confidence and trust in Defendants Freeman, Jackson Walker, and Kirkland & Ellis as conflicts counsel and/or counsel for the debtor-in-possession. Plaintiff relied, directly or indirectly, on Defendants Freeman, Jackson Walker, and Kirkland & Ellis to

carry out their function as conflicts counsel and/or counsel for the debtor-in-possession in a manner that enabled the fair resolution of bankruptcy proceedings.

189. Counsel for a debtor in possession owes a fiduciary duty to the estate and to creditors of the estate that includes, but is not limited to:

    a. a duty to reveal known conflicts of interest with court professionals,

    b. a duty to disclose acts of conversion, concealment, or misuse of estate property,

    c. a duty to reveal matters having an adverse effect on the bankruptcy estate,

    d. a duty to avoid actions that would wrongfully deplete the fund from which creditors were to be paid, and

    e. a duty to avoid intentional wrongs.

190. Defendants Freeman, Jackson Walker, and Kirkland & Ellis knew or should have known that creditors, such as Plaintiff, relied on their proper oversight and preservation of the bankruptcy estate from which creditors were to be paid and to reveal any matters adversely impacting the fair, impartial handling of the bankruptcy estate.

191. Plaintiff relied on the false representations of Defendants Freeman, Jackson Walker, and Kirkland & Ellis as being disinterested parties in the bankruptcy proceedings before Judge Jones. Plaintiff relied on the false representations of Defendants Freeman, Jackson Walker, and Kirkland & Ellis as to the reasonableness and appropriateness of fees that were paid from the bankruptcy estate (thereby reducing the estate that was available to pay creditors such as Plaintiff), and that such fees were

not the product of an undisclosed, intimate relationship between the petitioning attorney and her firm and the judge awarding them.

**As Against Judge Jones**

192.    As a federal judge, Judge Jones owed a fiduciary duty to the public and to the litigants before him. Judge Jones owed a fiduciary duty to Plaintiff who was before Judge Jones as the CEO and sole shareholder of BTC and as creditors in the bankruptcy proceeding presided over by Judge Jones.

193.    Judge Jones, as a federal bankruptcy judge, owed a fiduciary duty to the public and to the litigants who appeared in his courtroom. Such a duty embodies: (i) a duty of loyalty, which encompasses impartiality, (ii) a duty of candor, (iii) a duty of good faith and fair dealing, and (iv) a duty to refrain from all forms of self-dealing, including the duty to refrain from dealings benefiting persons (such as Freeman) who are closely identified with the fiduciary.

194.    Judge Jones owed a fiduciary duty to the public and to the litigants that appeared in his courtroom including, but not limited to:

    a.  a duty to reveal conflicts of interest with litigants and/or their counsel,

    b.  a duty to decide matters impartially based solely on the evidence,

    c.  a duty to disqualify himself in a proceeding in which his impartiality might reasonably be questioned,

    d.  a duty to disqualify himself from awarding compensation to a person with whom he is so connected as to render it improper for the judge to authorize such compensation,

    e.  a duty to reveal matters having an adverse effect on the bankruptcy estate,

    f.  a duty to avoid actions that would wrongfully deplete the estate from which creditors were to be paid,

    g.  a duty to avoid self-dealing, and

    h.  a duty to avoid intentional wrongs.

195.   Judge Jones knew or should have known that Plaintiff, as the CEO and sole shareholder for BTC, and as creditors of BTC, relied on him to be free from influence or self-interest in overseeing bankruptcy proceedings, properly oversee and preserve the bankruptcy estate from which creditors were to be paid, and to reveal any matters adversely impacting the fair and impartial adjudication of the bankruptcy estate.

196.   Plaintiff relied on Judge Jones' implicit and explicit assurances that there were no undisclosed interested parties involved in the bankruptcy proceedings before him. Plaintiff relied on the rulings of Judge Jones as to the reasonableness and appropriateness of fees that were paid from the bankruptcy estate to the other Defendants.

**As Against Portage Point Partners and Matthew Ray**

197.    The Portage Point Parties as the CRO, CEO and the Plan Administrator, for BTC and its estates in the Chapter 11 Cases, owed a fiduciary duty to BTC, its estates and its creditors and shareholders, including the Bouchard Parties.

198.    The Portage Point Parties owed a fiduciary duty to BTC, its estate and its creditors that included:

  a.  a duty to disclose acts of conversion, concealment, or misuse of estate property,

  b.  a duty to reveal matters having an adverse effect on the bankruptcy estate,

  c.  a duty to avoid actions that would wrongfully deplete or diminish the value of the business or its assets,

  d.  a duty to avoid conflicts of interest, and

  e.  a duty to avoid intentional wrongs.

199.    The Portage Point Parties knew or should have known that interested parties, creditors, and shareholders, such as Plaintiff, relied on the Portage Point Parties' oversight and operation of BTC to preserve and enhance the value of BTC and BTC's assets.

200.    Plaintiff relied on the Portage Point Parties assurances that it would maintain or enhance the business and value of BTC. This is particularly so given the Portage Point Parties' acknowledgement that the fleet needed to be kept in operation to maintain the business and preserve value. Plaintiff also relied upon Portage Point Parties to act in the interests of BTC (and interested parties) and to not assume conflicting roles or act

with conflicting interests for the benefit of itself or others at the expense of interested parties such as Plaintiff.

**Allegations Against All Defendants**

201.   Defendants, each, breached their fiduciary duties by acts including, but not limited to:

    a. securing the appointment of Defendants Freeman, Jackson Walker, and Kirkland & Ellis as attorneys on bankruptcy cases, including in the BTC bankruptcy before Judge Jones, despite Judge Jones' having a personal and financial interest in the outcome of the case;

    b. providing false or misleading information for purposes of deceiving the public, the judiciary, and bankruptcy shareholders and creditors such as Plaintiff;

    c. withholding from Plaintiff and the public facts material to federal bankruptcy court decisions;

    d. Judge Jones failing to recuse or the law firms failing to move to disqualify Judge Jones where it was clear his impartiality might reasonably be questioned, and Judge Jones failing to recuse or the law firms failing to move to disqualify Judge Jones from awarding compensation to a law firm and individual with whom he was so connected as to render it improper for the judge to authorize such compensation;

    e. defrauding creditors and shareholders such as Plaintiff;

f.  influencing the orders issued in bankruptcy proceedings for the benefit of Defendants and to the detriment of creditors and shareholders such as Plaintiff;

g.  enhancing the status, reputation, and demand for the services of Defendants Freeman, Jackson Walker, and Kirkland & Ellis as bankruptcy attorneys by issuing rulings favorable to Defendants Freeman, Jackson Walker, and Kirkland & Ellis;

h.  wrongfully terminating Bouchard as CEO of BTC;

i.  installing the Portage Point Parties as CEO of BTC despite Portage Point Parties' utter lack of experience managing and operating a large ocean-going barge company;

j.  failing to take steps necessary to properly run BTC's business and/or to preserve and maximize the value of BTC's assets;

k.  forcing a liquidation and resulting sale of BTC's assets that realized only a small fraction of the value of those assets;

l.  assuming positions where their duties to Plaintiff were in conflict with Defendants' responsibilities to others or materially limited by Defendants' personal interests;

m.  failing to provide appropriate disclosures and transparency;

n.  entering and using an unconsummated Settlement Agreement to manipulate and restrict Plaintiff from taking other actions to protect and assert Plaintiff's rights;

o.  profiting from the issuance of bankruptcy court rulings favoring Defendants,

p.  acting to benefit their own self-interest to the detriment of Plaintiff and other creditors;

q.  shielding themselves from public, judicial and governmental scrutiny relating to the relationship between Freeman and Judge Jones; and

r.  committing intentional wrongs.

202.   Defendants knew or should have known that creditors and shareholders, such as Plaintiff, would be harmed by Defendants' actions in breach of Defendants' fiduciary duties.

203.   As a direct and proximate result of Defendants' breaches of their fiduciary duties, Judge Jones improperly presided over a case in which his impartiality should have been reasonably questioned, and Plaintiff suffered damages including, but not limited to economic harm, monetary loss, emotional distress, and mental anguish. As a foreseeable result of Defendants' conduct, Plaintiff was deprived of the opportunity to have bankruptcy proceedings determined on the merits free from the influence of interested parties. Additionally, as a foreseeable result of Defendants' conduct, Plaintiff's financial recovery as a bankruptcy creditor was reduced because the bankruptcy estate available to pay creditors, including Plaintiff, was diminished by the fees improperly awarded to Jackson Walker, Freeman, and Kirkland & Ellis by Judge Jones. Further, as a result of Defendants' misconduct, the loans taken out against the Bouchard Parties' life insurance policies remain unpaid and certain policies terminated, resulting in over $40

million in losses, as well as adverse tax consequences to the Bouchard Parties given BTC's status as a sub chapter "s" corporation and the failure to repay the loans on the life insurance policies. In addition, the Bouchard Parties have been denied any recovery on their claims against BTC, including the amounts provided for under the Settlement Agreement. Further, Mr. Bouchard suffered reputational harm and has been unable to obtain new employment as a result of Defendants' misconduct. Similarly, the foregoing resulted in Mr. Bouchard's equity stake in BTC being vitiated, resulting in losses of hundreds of millions of dollars in value. Further, these proceedings caused emotional trauma for Mr. Bouchard, who lost the generational family business he dedicated his life to due to the malfeasance of the RICO Defendants and the Portage Point Parties as described herein. These proceedings were also extremely stressful for Plaintiff. Plaintiff sustained mental anguish damages as a result of the harsh treatment they received in court, and as a result of learning their case was litigated in a courtroom corrupted by fraud, in which the law firms, Freeman, the Portage Point Parties and the judge conspired to enrich themselves, and with no level playing field for those who protested the plan or professional fees.

204.   Plaintiff is entitled to and respectfully request (1) compensatory damages, (2) damages for emotional distress and mental anguish, (3) punitive damages, (4) pre-judgment and post-judgment interest, (5) costs of suit, (6) disgorgement of profits and forfeiture of fees, (7) nominal damages, and (8) such other and further relief as may be just and appropriate.

## COUNT V
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
*(Against Defendants Kirkland & Ellis, LLP and Kirkland & Ellis International, LLP)*

205.   Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

206.   At all times, Defendants Kirkland & Ellis, LLP and Kirkland & Ellis International, LLP (Kirkland & Ellis) were aware of the fiduciary duties owed to Plaintiff, the creditors, and other interested parties to the BTC bankruptcy by Jackson Walker, Freeman, and Judge Jones.

207.   Despite this knowledge, Kirkland & Ellis aided and abetted Jackson Walker, Freeman, and Judge Jones in their breach of their respective fiduciary duties owed to Plaintiff, the creditors, and other interested parties to the BTC Bankruptcy.

208.   As a direct and proximate result of Kirkland & Ellis' wrongful acts and omissions, Plaintiff suffered damages.

209.   Plaintiff is entitled to and respectfully request (1) compensatory damages, (2) damages for emotional distress and mental anguish, (3) punitive damages, (4) pre-judgment and post-judgment interest, (5) costs of suit, (6) disgorgement of profits and forfeiture of fees, (7) nominal damages and (8) such other and further relief as may be just and appropriate.

## COUNT VI
## NEGLIGENT MISREPRESENTATION
*(Against Defendants Jackson Walker, Kirkland & Ellis, LLP,*
*Kirkland & Ellis International, LLP, Judge Jones, Elizabeth Freeman)*

210.   Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

211.   Defendants provided misleading and false information and/or omitted information regarding past or existing material facts relating to the intimate relationship between Freeman and Judge Jones.

212.   Defendants provided misleading and false information and/or omitted information by representing themselves to be disinterested.  Defendants negligently, carelessly, or without reasonable grounds for believing it to be true, misrepresented themselves as "disinterested" in the proceedings before Judge Jones

213.   Under the rules governing bankruptcy proceedings, for a firm to be employed by a debtor or debtor-in-possession, it must show that it is *disinterested* and must disclose all "connections[.]" 11 U.S.C. § 101(14), 327; Fed. R. Bankr. P. 2014 (requiring "a verified statement of the person to be employed setting forth the person's connections with the debtor, creditor, or any other party of interest").

214.   On October 28, 2020, a Jackson Walker partner, Cavenaugh, filed an application for Jackson Walker to be appointed as co-counsel and conflicts counsel in the Chapter 11 bankruptcy case filed on behalf of BTC.   As the sole shareholder of BTC, Bouchard was an interested party in that case.  Plaintiff was also a creditor in that case.

215.   In connection with the BTC bankruptcy, Cavenaugh e-filed a declaration of "disinterestedness," purporting to disclose any conflicts of interest in the Firm's application for appointment.   He did not disclose the intimate, domestic relationship between the Jackson Walker partner and the bankruptcy judge overseeing the case. Nor did Freeman, who actively worked on and billed in the case, disclose the intimate relationship between herself and Judge Jones.

216.   Cavenaugh also e-filed the application for Kirkland & Ellis to serve as lead counsel for BTC, including a declaration of disinterestedness, completed by Kirkland & Ellis partner Bennett, that did not identify the relationship between Judge Jones and Freeman

217.   Neither Freeman, nor Jackson Walker, nor Kirkland & Ellis as lead counsel, disclosed the intimate relationship between Freeman and Judge Jones in the BTC case or in any other case in which they were counsel.

218.   On November 23, 2020, Judge Jones entered an order appointing Jackson Walker as co-counsel and conflicts counsel for debtors and debtors in possession.   On the same day, Judge Jones entered an order authorizing the employment of Kirkland & Ellis.  Judge Jones did not disclose his intimate relationship with a partner of the firm he was appointing.  Instead, he fostered the false impression that conflicts would be taken seriously in his court by instructing Jackson Walker to "review its files periodically during the pendency of these chapter 11 cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are

discovered or arise, Jackson Walker LLP will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration, as required by Bankruptcy Rule 2014(a)[.]"

219.    Kirkland & Ellis e-filed an application for $3.4 million in attorneys' fees and $168,840.51 in expenses on February 13, 2021.  Kirkland & Ellis partner, Bennett, submitted a supporting declaration without disclosing the Jones-Freeman relationship. And on May 12, 2021, the firm e-filed an application for $3.2 million in attorneys' fees and $47,894.03 in expenses, with Bennett again providing a declaration that failed to disclose the Jones-Freeman relationship.   Judge Jones awarded Kirkland & Ellis the full amount of its fee requests on March 15 and June 10, 2021.[302]

220.    On March 19 and May 5, 2021, Jackson Walker filed two interim fee applications requesting $148,101 and $97,075 in attorneys' fees and $1,161.75 and $1,011 in expenses.[303] Those amounts included $15,614.50[304] and $7,765.50[305] in fees billed by Freeman.  While petitioning for these fees, neither Cavenaugh, Freeman, nor any attorney at Jackson Walker disclosed the intimate relationship between Judge Jones and the Jackson Walker partner. Indeed, throughout the BTC bankruptcy proceedings, Jackson Walker, Kirkland & Ellis and

---

[302] *Id.* at Dkt. 658 (Order Granting Kirland & Eliis' first interim fee award); Dkt. 967 (order granting Kirkland & Ellis' second interim fee award).
[303] *Id.* Dkts. 686, 856.
[304] *Id.* Dkt. 686 at Ex. 4, p. 81 of PDF.
[305] *Id.* Dkt. 856 Ex. 4 at p. 76 of PDF.

221.   Judge Jones awarded Jackson Walker its full fee request (including fees billed by Freeman) on orders dated April 20,[306] June 10,[307] and November 12, 2021.[308]   At no point did when awarding fees, did Judge Jones disclose that he was awarding fees to the law firm where his girlfriend, with whom he shared a home, was a partner.

222.   Defendants had a duty to the Court, to Plaintiff and other creditors and interested parties in the bankruptcy proceeding, and to the general public, to provide truthful, accurate and complete information about the intimate relationship between Freeman and Judge Jones because that relationship created a situation where Judge Jones' impartiality might reasonably be questioned.

223.   Defendants failed to exercise reasonable care by failing to provide truthful, accurate, and complete information about circumstances -- the relationship between Freeman, as counsel for one of the parties, and Judge Jones, as the presiding judge -- that could reasonably bear on the impartiality of the bankruptcy proceeding.

224.   Because of Defendants' failures to exercise reasonable care, the information provided to the Court, the general public, to creditors, and to interested parties, including Plaintiff, regarding the relationship between Freeman and Judge Jones was misleading and/or false, including, but not limited to, the following:

---

[306] *Id.* Dkt. 810 (order granting Jackson Walker's first interim fee award).
[307] *Id.* Dkt. 966 (order granting Jackson Walker's second interim fee award).
[308] *In re Tug Robert J. Bouchard, Corporation*, No. 20-34758, Dkt. 63 (order granting Jackson Walker's third interim fee award)

(a) affirmatively misrepresenting that Defendants were disinterested despite the intimate relationship between Freeman and Judge Jones,

(b) omitting disclosure of the intimate relationship between Freeman and Judge Jones when such information called into question the impartiality of proceedings, and

(c) failing to correct prior statements of disinterestedness once the relationship between Freeman and Judge Jones became known.

225. Defendants intended Plaintiff, and other creditors, to rely upon their misrepresentations of disinterestedness, so that Plaintiff, and other creditors, would not object to Jackson Walker and Kirkland & Ellis' representation of BTC or seek the recusal of Judge Jones.

226. All interested parties to the bankruptcy, including Plaintiff, reasonably relied on Defendants' false representations that they were disinterested, and remained ignorant to the truth of the intimate relationship between Judge Jones and the Jackson Walker partner.

227. As a direct and proximate cause of Defendants' negligent misrepresentations, Plaintiff thereby suffered injury when, among other things, Jackson Walker and Kirkland & Ellis were appointed and awarded attorneys' fees from the bankruptcy estate by Judge Jones, all without disclosure of the intimate relationship.  Plaintiff suffered damages including, but not limited to economic harm, monetary loss, mental anguish, and emotional distress.

228.   Plaintiff is entitled to and respectfully request (1) compensatory damages, (2) damages for emotional distress and mental anguish, (3) punitive damages, (4) pre-judgment and post-judgment interest, (5) costs of suit, (6) disgorgement of profits and forfeiture of fees, (7) nominal damages, and (8) such other and further relief as may be just and appropriate.

## COUNT VII
## PROFESSIONAL NEGLIGENCE
*(Against Defendants Jackson Walker, Kirkland & Ellis, LLP,*
*Kirkland & Ellis International, LLP, Elizabeth Freeman, Portage Point Partners*
*and Matthew Ray)*

229.   Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

230.   Defendants acts and omissions as pled above constitute legal malpractice and professional negligence.

231.   Defendants undertook to provide professional legal services and financial services for BTC. in connection with BTC's Chapter 11 bankruptcy proceedings.  At all relevant times, Defendants Jackson Walker, Kirkland & Ellis, and Freeman held themselves out as experts in the field of bankruptcy law.  The Portage Point Parties held themselves out as experts in financial restructuring.

232.   In the course of handling the bankruptcy matter for BTC, Defendants negligently, intentionally and/or fraudulently made representations to Plaintiff that they were disinterested in the bankruptcy proceeding.   In reliance upon these

representations, Plaintiff did not know, and had no reason to know, that Judge Jones was involved in an intimate relationship with a partner at Jackson Walker. Accordingly, Plaintiff was deprived of the opportunity to object to Jackson Walker and Kirkland & Ellis' representation of BTC and/or to seek the disqualification of Judge Jones.

233.   Plaintiff avers that Defendants were negligent and/or committed malpractice in the following regards:

    a.  By failing to inform the Court and litigants, including Plaintiff, that Jackson Walker partner, Elizabeth Freeman, was involved in an intimate relationship with Judge Jones during the period that Defendants were representing BTC in bankruptcy proceedings before Judge Jones,

    b.  By affirmatively representing to the Court, litigants and public that they were disinterested, despite the fact that Jackson Walker partner, Elizabeth Freeman, was involved in an intimate relationship with Judge Jones during the period that Defendants were representing BTC in bankruptcy proceedings before Judge Jones,

    c.  By failing to correct prior statements of disinterestedness once the relationship between Freeman and Judge Jones became known,

    d.  By failing to properly carry out their duties as legal representatives of BTC (Jackson Walker, Kirkland & Ellis and Freeman) or as CRO and CEO of BTC (the Portage Point Parties),

     e.  By mismanaging the assets of BTC and acting or failing to act in ways that diminished the value of BTC's assets,

     f.  By failing to effectuate the Settlement Agreement thereby preventing Plaintiff from recouping the amounts loaned to BTC as provided for through the Settlement Agreement.

234.   Defendants knew that as creditors and shareholders in BTC's bankruptcy proceeding, Plaintiff was among a limited group that could reasonably have been expected to have access to Defendants' misrepresentations and could reasonably have been expected to act in reliance upon such misrepresentations.

235.   Each of the Defendants had a duty to provide professional services that a reasonable and prudent attorney or financial restructuring professional would have provided under the same or similar circumstances.  Defendants failed to provide the legal services or the restructuring services that a reasonably prudent attorney would have provided under the same or similar circumstances. Defendants' conduct constitutes professional negligence and legal malpractice.

236.   As a direct and proximate result of Defendants' negligence and/or malpractice, Plaintiff suffered damages including, but not limited to economic harm, monetary loss, and emotional distress.

237.   Plaintiff is entitled to and respectfully requests (1) compensatory damages, (2) damages for emotional distress and mental anguish, (3) punitive damages, (4) pre-judgment and post-judgment interest, (5) costs of suit, (6) disgorgement of profits and

forfeiture of fees, (7) nominal damages, and (8) such other and further relief as may be just and appropriate.

**COUNT VIII**
**COMMON-LAW CIVIL CONSPIRACY**
*(Against Defendants Jackson Walker, Kirkland & Ellis, LLP,*
*Kirkland & Ellis International, LLP, Judge Jones and Elizabeth Freeman)*

238.    Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

239.    Plaintiff alleges a civil conspiracy against all Defendants in connection with (1) Jackson Walker, Freeman, and Kirkland & Ellis securing appointment before Judge Jones and collecting millions of dollars in attorneys' fees  from Judge Jones without any of the Defendants disclosing the Jones-Freeman intimate relationship and while affirmatively representing disinterestedness; and (2) Defendants' breaching their fiduciary duty to creditors including Plaintiff and other interested parties to the BTC bankruptcy.

240.    The elements of civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.[309]

241.    Defendants agreed to collect profit through the Jones-Freeman relationship by securing lucrative appointments before Judge Jones and millions of dollars in attorneys'

---

[309] *United Biologics, L.L.C. v. Allergy & Asthma Network*, 819 F. App'x 204, 208 (5th Cir. 2020) (citing *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)).

fees, with all Defendants profiting directly or indirectly from the arrangement. Defendants had a meeting of the mind on the object of the conspiracy, unlawfully collecting millions in attorneys' fees and securing lucrative appointments—and on the course of action—failing to disclose the Jones-Freeman intimate relationship and affirmatively representing disinterestedness.

242. These misrepresentations, including but not limited to the declaration of disinterestedness and subsequent pleadings and participation in proceedings made without amending the disclosures are unlawful, overt acts. The creditors, Plaintiff, and other interested parties to the BTC bankruptcy suffered damages as a proximate result, including but not limited to the improper appointment and award of attorneys' fees to Freeman, Jackson Walker, and Kirkland & Ellis. Further, because Defendants' conduct targets the federal judiciary and the bankruptcy process in particular, "the judiciary's responsibility to superintend the integrity of the bankruptcy process lessens the plaintiff's burden to show a direct injury, at least at the pleading stage."[310]

243. Defendants also committed civil conspiracy to breach their fiduciary duty to creditors including Plaintiff and other interested parties to the BTC bankruptcy by agreeing not to disclose the intimate Jones-Freeman relationship and to affirmatively represent disinterestedness while collecting unlawful profit. Defendants took one or more unlawful acts, including filing fraudulent declarations of disinterestedness and

---

[310] *Alix*, 23 F.4th at 207 (cleaned up).

failing to amend them, and creditors, including Plaintiff, and other interested parties were damaged as the proximate result.

244.    Plaintiff is entitled to and respectfully request damages including (1) compensatory damages, (2) damages for emotional distress and mental anguish, (3) punitive damages, (4) pre-judgment and post-judgment interest, (5) costs of suit, (6) disgorgement of profits and forfeiture of fees, (7) nominal damages, (8) exemplary damages, and (9) such other and further relief as may be just and appropriate.

## COUNT IX
## UNJUST ENRICHMENT
*(Against All Defendants)*

245.    Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

246.    Defendants enriched themselves at the expense of the bankruptcy estate and the creditors and shareholders, such as Plaintiff. As a foreseeable result of Defendants' conduct, Plaintiff's recovery as a bankruptcy creditor and shareholder was reduced because the bankruptcy estate was diminished by the fees improperly awarded to Jackson Walker, Kirkland & Ellis, and the Portage Point Parties by Judge Jones who was having an intimate relationship with and co-owned/shared a home with a Jackson Walker partner, Freeman.

247.    The law firm Defendants, Jackson Walker, Kirkland & Ellis and Freeman, used their positions as bankruptcy counsel for BTC, to engage in self-dealing and generally improper conduct, and were enriched by such conduct.  The law firm Defendants,

Jackson Walker, Kirkland & Ellis and Freeman received substantial fees, were able to retain large clients with promises of access to a favorable judge, and enhanced their reputations as bankruptcy counsel because Judge Jones' rulings in their cases were influenced by his intimate relationship with Freeman.

248.   The Portage Point Parties who controlled BTC in their position as CRO, CEO and Plan Administrator in the Chapter 11 Cases, used their control and power to engage in self-dealing and generally improper conduct, and were enriched by such conduct through exorbitant professional fees that largely benefitted only the Portage Point Parties and not BTC, its estates or its creditors.   The Portage Point Parties further benefitted from their conflicts including acting as a consultant for the asset purchaser JMB immediately following the Sale, calling into question the motives behind the Sale which, as described above, yielded far less value than anticipated. Moreover, the Portage Point Parties collected fees related to the Settlement Agreement yet ultimately abandoned the Settlement to the detriment of the Bouchard Parties

249.   Defendants' wrongful and fraudulent conduct, as alleged in this Complaint, caused Defendants to become unjustly enriched and receive benefits that otherwise would not have been achieved at the expense of Plaintiff.

250.   Jackson Walker took $436,790 in attorneys' fees in the BTC bankruptcy,[311] including $23,380 in fees billed by Freeman, all without ever disclosing the Jones-Freeman relationship.   Kirkland & Ellis collected $6,656,685 in attorneys' fees.[312] On information and belief, Freeman received financial benefit from this case, and Judge Jones, as Freeman's intimate partner and co-owner of a shared home, received indirect benefits as well.

251.   The Portage Point Parties were awarded at least $8,162,921 in professional fees.[313] This was so, despite the Portage Point parties failure to effectively manage the Chapter 11 proceedings, including the sale of BTC assets and the failure of the Portage Point Parties to consummate the Settlement Agreement that had been negotiated with the Bouchard Parties.

252.   Had Defendants not engaged in the wrongful conduct, particularly had they revealed the existence of an intimate relationship between Judge Jones and Freeman who was a partner at Jackson Walker, Defendants Jackson Walker, Kirkland & Ellis, Freeman, and Portage Point would not have been awarded fees by Judge Jones.

---

[311] *In re Tug Robert J. Bouchard, Corporation*, No. 20-34758, Dkt. 29 (Jackson Walker application for fees); Dkt. 63 (order awarding fees).

[312] *Bouchard Transportation Co., Inc.,* No. 20-34682, Dkt. 167,  Dkt. 658 (Order Granting First Interim Fee Award), Dkt 967 (Order Granting Second Interim Fee Award)

[313] On March 16, 2021, the Court issued an order granting the first interim fee application of Portage Point Partners. The Order awarded $1,881,312 for professional services. *In re Bouchard Transportation Co., Inc., et al.,* No. 20-34682, Dkt. 668. On May 12, 2021, an order was issued granting Portage Point Partner's second interim fee application and awarding the company $695,588.70. *Id.* at Dkt 884. A third interim fee application was granted by Order dated August 3, 2021. That Order awarded Portage Point Partners $5,464, 979.50. *Id.* at Dkt. 1158.

253.    In equity and fairness, Defendants must return the fees wrongfully approved by Judge Jones and collected by Defendants Jackson Walker, Kirkland & Ellis, Freeman, and the Portage Point Parties for work on the BTC bankruptcy case.

## COUNT X
## BIVENS CLAIM FOR INTERFERENCE WITH CONSTITUTIONAL RIGHTS
*(Against Judge Jones)*

254.    Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

255.    This cause of action is brought under the United States Constitution pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971) for Judge Jones' violations of Plaintiff's clearly established rights under the Fifth and Fourteenth Amendments of the United States Constitution.

256.    The actions of Judge Jones violated Plaintiff's clearly established constitutional rights not to be deprived of life, liberty and property without due process of law and to not be deprived of the right to equal protection under the laws under the Fifth and Fourteenth Amendments of the United States Constitution.

257.    The acts and omissions of Judge Jones violated Plaintiff's rights under the Fifth and Fourteenth Amendments of the United States Constitution including, but not limited to, the following constitutional rights:

      a.      Deprivation of Plaintiff's property without due process of law,

      b.      Deprivation of Plaintiff's right to an unbiased tribunal,

c.      Deprivation of Plaintiff's right to know opposing evidence,

d.      Deprivation of Plaintiff's right to have a decision based exclusively on the evidence presented,

e.      Deprivation of Plaintiff's right to equal access to courts,

f.      Deprivation of Plaintiff's right to equal protection under the laws.

258.   Judge Jones violated the federal constitution through acts including, but not limited to: (i) influencing the assignment of bankruptcy cases so that cases involving clients of Defendant Jackson Walker and Freeman were heard in his court, (ii) approving the payment of attorneys' fees to Defendants Jackson Walker and Freeman, (iii) making judicial decisions based on personal relationships and self-interest rather than the evidence presented, (iv) wrongfully terminating Bouchard as CEO of BTC and installing the Portage Point Parties as CEO of BTC to restrict Bouchard's involvement and access to information regarding bankruptcy proceedings and to avoid Bouchard's questions or challenges to Defendants actions, (v) failing to take steps necessary to properly run BTC's businesses and to preserve and maximize the value of BTC's assets, (vi) forcing a liquidation and resulting sale of BTC's assets that realized only a small fraction of the value of those assets, (vii) failing to disclose to Plaintiff and other creditors his intimate relationship with an attorney (Defendant Freeman) representing the debtor, and (v) issuing rulings favorable to Jackson Walker and Freeman to enhance the status and reputation of Freeman and Jackson Walker as bankruptcy attorneys so as to increase demand for their services.

259.    Judge Jones was a federal officer acting under color of federal authority at the time that he violated Plaintiff's Constitutional rights.

260.    Plaintiff sues Judge Jones in his personal capacity with regard to Plaintiff's *Bivens* claim against Judge Jones.

261.    Plaintiff lacks a statutory cause of action, or an available statutory cause of action does not provide a meaningful remedy for the unconstitutional actions of Judge Jones.

262.    An appropriate remedy, namely damages, can be imposed against Judge Jones for his unconstitutional actions against the Plaintiff.

263.    Plaintiff was damaged by Judge Jones' actions including, but not limited to, Plaintiff suffering a loss of their civil rights, suffering a deprivation of equal access to the courts, suffering a deprivation of due process, suffering monetary losses, and being caused emotional distress and pain and suffering.

264.     Plaintiff is entitled to and respectfully request (1) compensatory damages, (2) punitive damages, (3) nominal damages, (4) reasonable attorneys' fees and costs, and (5) such other and further relief as may be just and appropriate.

## COUNT XI
## CONSPIRACY TO INTERFERE WITH CONSTITUTIONAL RIGHTS UNDER BIVENS
*(Against All Defendants)*

265.    Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

266.    Beginning in approximately 2017 and continuing through approximately October 2023, the exact dates being unknown to Plaintiff, in Texas and elsewhere, Defendants did knowingly and intentionally and unlawfully combine, conspire, and agree, under color of federal and state law, to enrich themselves (and to elevate their status and reputation) by depriving Plaintiff of his constitutional rights to equal protection and due process in bankruptcy proceedings involving Defendants Freeman and Jackson Walker and presided over by Judge Jones.

267.    By the conduct described in the preceding counts, Defendants conspired and agreed together, whether directly or indirectly, for the purpose of enriching themselves by depriving Plaintiff of his constitutional rights under the Fifth and Fourteenth Amendments of the United States Constitution.

268.    Defendants' overt acts in furtherance of the conspiracy, as set forth in this Complaint, include but are not limited to the following:

a.   securing the appointment of Jackson Walker and/or Freeman as counsel on bankruptcy cases before Judge Jones despite Judge Jones' having a personal and financial interest in the outcome of the case;

b.   removing Morton Bouchard from his long-held position as CEO of BTC and installing the Portage Point Parties as CEO of BTC despite the Portage Point Parties lack of experience in managing and operating a large ocean-going barge company;

c. deceiving the public, the judiciary, BTC shareholders and bankruptcy creditors such as Plaintiff,

d. failing to provide appropriate disclosures and transparency;

e. withholding from Plaintiff and the public facts material to federal bankruptcy court decisions,

f. defrauding creditors such as Plaintiff,

g. forcing a liquidation and resulting sale of BTC's assets that realized only a small fraction of the value of those assets;

h. influencing the orders issued in bankruptcy proceedings for the benefit of Defendants (and clients represented by Defendants) and to the detriment of Plaintiff,

i. entering and using an unconsummated Settlement Agreement to manipulate and restrict Plaintiff from taking other actions to protect and assert Plaintiff's rights;

j. enhancing the status, reputation and demand for Defendants Jackson Walker and Freeman's services as bankruptcy attorneys by issuing rulings favorable to Defendants Jackson Walker and Freeman (and the clients they represented),

k. profiting from the issuance of bankruptcy court rulings favoring Defendants and Defendants' clients,

l. securing large attorneys' fees that directly benefitted Jackson Walker, Kirkland & Ellis and Freeman and indirectly benefitted Judge Jones himself,

m. shielding themselves from public, judicial and governmental scrutiny of wrongful acts.

269. Defendants' conspiracy to interfere with Plaintiff's constitutional rights included illegal actions including, but not limited to 18 U.S.C. § 1503 (obstruction of justice), § 1341(mail fraud), § 1343 (wire fraud), § 152 (bankruptcy fraud), and § 1346 (honest services fraud).

270. As a direct and proximate result of Defendants' acts and omissions, Plaintiff suffered damages including, but not limited to, a loss of his civil rights, deprivation of equal access to the courts, deprivation of due process, monetary losses, emotional distress, and mental anguish.

271. Plaintiff is entitled to and respectfully request (1) compensatory damages, (2) punitive damages, (3) nominal damages, (4) reasonable attorneys' fees and costs, and (5) such other and further relief as may be just and appropriate.

**COUNT XII**
**RETALIATION / WRONGFUL TERMINATION**
*(Against Defendants Portage Point Partners and Matthew Ray)*

272. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth here in full.

273. The Portage Point Parties directly and/or indirectly controlled BTC in their role as CRO. After Bouchard challenged the professional fees asserted in the Chapter 11

Cases and sought to put in place additional procedures for review and oversight before such fees were presented to the Court for approval, and to bring any issues to the Court, the Portage Point Parties (in concert with the other professionals) sought to remove Bouchard through actions intended to effectuate his termination from any position of control.

274.   Thereafter, without notice, due process, or an evidentiary record, and without consideration of the ramifications of replacing Bouchard, the fourth-generation founder, with an inexperienced accountant, the Portage Point Parties proceeded through their acts and omissions to have Bouchard removed as CEO.

275.   The Portage Point Parties' actions included negligently failing to consider or address the ramifications of Mr. Bouchard's removal with respect to the continued viability of the business without experienced leadership.

276.   As a result of the Portage Point Parties' misrepresentations and negligence, Mr. Bouchard was terminated by the Bankruptcy Court shortly thereafter, whereupon Mr. Ray was appointed as CEO.

277.   Such actions were taken in retaliation against Mr. Bouchard for his efforts to monitor the mounting professional fees in the Chapter 11 Cases and raise any issues with the Bankruptcy Court (putting the Portage Point Parties' *gravy train* at risk). Bouchard was removed to ensure, among other things, that he had no internal oversight function and could not raise concerns regarding professional fees before the Bankruptcy Court.

278.    The wrongful removal of Bouchard was against public policy and undertaken and performed with an improper motive, malice, wantonness, and/or dishonesty, to enable the Portage Point Parties to continue to exploit their position of power through multiple and conflicting appointments as CEO and CRO in the Chapter 11 Cases and as consultant to JMB, all for their own personal profit.

279.    The resulting injury in connection with such removal included damages to Mr. Bouchard's reputation, inability to obtain new employment, immediate devaluation of Mr. Bouchard's stock holdings (and ultimately a forced fire sale of the business), and BTC's inability to pay back the Bouchard Loans (together with adverse tax implications and cancellation of Mr. Bouchard's life insurance policies), resulting in losses of millions of dollars or more.

280.    As a direct and proximate result of the Portage Point Parties' actions, Plaintiff is entitled to and respectfully request (1) compensatory damages, (2) punitive damages, (3) nominal damages, (4) reasonable attorneys' fees and costs, and (5) such other and further relief as may be just and appropriate.

**COUNT XIII**
**TORTIOUS INTERFERENCE WITH EMPLOYMENT**
*(Against Defendants Portage Point Partners and Matthew Ray)*

281.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth here in full.

282.    Here, Bouchard had a business relationship with BTC, serving as CEO and a director.  Portage Point Parties interfered with Mr. Bouchard's business relationship

with BTC without limitation, misrepresenting facts and issues before the Bankruptcy Court relating to Bouchard and BTC and negligently failing to consider or address the ramifications of Bouchard's removal with respect to the continued viability of the business without experienced leadership.

283.   Portage Point Parties exerting financial pressure on Bouchard by threatening to terminate him and vitiate his equity interests and/or value of such, and advocating to the Bankruptcy Court and to other professionals and employees of BTC that Bouchard be terminated from his positions as CEO and director of BTC.

284.   As a result of the Portage Point Parties' efforts, on February 26, 2021, the Bankruptcy Court removed Mr. Bouchard from his positions as CEO and director of BTC., causing harm to Mr. Bouchard.

285.   Defendant Ray, on the other hand, benefited from Bouchard's termination by being immediately appointed as the CEO of BTC, wherein they had power which they wielded to control the operations, and  steer additional work their way, including, taking over various positions of authority, wearing multiple and conflicting hats as CEO, Plan Administrator, and as a consultant for JMB, the DIP Lender, and successor purchaser of the assets.

286.   The Portage Point Parties interfered with Bouchard's employment at BTC because Bouchard was examining and attempting to reign in the mounting professional fees in the Chapter 11 Cases and raise any issues with the Bankruptcy Court.

287.    The Portage Point Parties interference with Bouchard's employment at BTC and the operations of BTC's business, were against public policy and undertaken and performed with an improper motive, malice, wantonness, and/or dishonesty, in order to enable the Portage Point Parties to continue to exploit their position of power through multiple and conflicting (and in many cases undiscovered) appointments as CEO and CRO in the Chapter 11 Cases and as consultant to JMB, conflicts of interest and/or self-dealing, all for their own personal profit.

288.    As a result of the Portage Point Parties tortious interference with Bouchard's employment, Plaintiff sustained significant damages.   Plaintiff is entitled to and respectfully request (1) compensatory damages, (2) punitive damages, (3) nominal damages, (4) reasonable attorneys' fees and costs, and (5) such other and further relief as may be just and appropriate.

## COUNT XIV
## BREACH OF CONTRACT
*(Against Defendants Portage Point Partners and Matthew Ray)*

289.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth here in full.

290.    The elements of a cause of action for breach of contract are (i) the existence of a contract; (ii) the performance of one party under the contract; (iii) a breach by the other party; and (iv) resulting damages caused by such breach.

291.    The Portage Point Parties executed the Settlement Agreement but failed to make reasonable efforts to obtain approval of the Settlement Agreement as required by its

terms. In particular, Ray refused to appear and testify at the hearing to approve the Settlement Agreement or make any other efforts to advance the Settlement Agreement following the Bankruptcy Court's insistence that he do so before it would consider approval.

292.    Upon information and belief, Ray refused to testify in order to prevent disclosure of damaging information, constituting bad faith, despite having executed the Settlement Agreement.

293.    At the same time, the Bouchard Parties fully performed all of their obligations under the Settlement Agreement and sent a series of letters to counsel for BTC requesting that they proceed to obtain approvals, declaring a default and time is of the essence for failure to prosecute the Settlement Agreement, and demanding that Ray notify the D&O carrier of pending claims.

294.    As a result of the foregoing, Plaintiff has suffered and will continue to suffer damages. The resulting breach by the Portage Point Parties resulted in the loss of millions of dollars in connection with the unsatisfied Bouchard Claims and hundreds of thousands of dollars in legal costs associated with the Settlement Agreement that the Portage Point Parties have now abandoned.

295.    Plaintiff is entitled to and respectfully request (1) compensatory damages, (2) punitive damages, (3) nominal damages, (4) reasonable attorneys' fees and costs, and (5) such other and further relief as may be just and appropriate.

## COUNT XV
## ACCOUNTING

*(Against Defendants Portage Point Partners and Matthew Ray)*

296.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth here in full.

297.    The elements of a cause of action for accounting are (i) the existence of a confidential or fiduciary relationship and (ii) a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest.

298.    The Portage Point Parties as the CRO, CEO and ultimately, the Plan Administrator, for BTC and its estates in the Chapter 11 Cases, owed a fiduciary duty to BTC, its estates and its creditors, including the Bouchard Parties.

299.    As discussed above, the Portage Point Parties have violated their fiduciary duties which resulted in the Portage Point Parties receiving, among other things, substantial professional fees in which the Bouchard Parties have an interest as creditors and shareholders of BTC.

300.    The amount of money received by the Portage Point Parties through its multiple conflicting roles as detailed herein, is unknown to Plaintiff and cannot be ascertained without an accounting of the Portage Point Parties' receipts and disbursements (including any interested transactions entered into by Portage Point Parties).

301.   Plaintiff demands an accounting of the aforementioned transactions from the Portage Point Parties who have failed and refused, and continue to fail and refuse, to render such an accounting.

## COUNT XVI
## RESPONDEAT SUPERIOR AND/OR AGENCY LIABILITY
*(Against Defendants Jackson Walker, Kirkland & Ellis, LLP,
Kirkland & Ellis International, LLP and Portage Point Partners)*

302.   Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth here in full.

303.   Each of the entities named in this Complaint—Jackson Walker, LLP, Kirkland & Ellis, LLP and Kirkland & Ellis International, LLP, and Portage Point Parners—is liable for the acts of its agents under the doctrine of respondent superior and/or under agency law and/or for the acts of its partners or employees.

304.   In the alternative, Jackson Walker, LLP , Kirkland & Ellis, Portage Point Partners their employees, agents and ostensible agents engaged in joint ventures, joint enterprises, and/or are liable under the direct corporate liability theory, conspiracy, and/or are liable under the theory of respondeat superior.

## PRAYER FOR RELIEF

305.   WHEREFORE, PREMISES CONSIDERED, Plaintiff prays for the following relief:

a.   An order finding that Defendants Jones, Freeman, Jackson Walker, and Kirkland & Ellis' actions, as set out above, violate RICO (18 U.S.C. §

129

1962(a); constitute obstruction of justice (18 U.S.C. §1503), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bankruptcy fraud (18 U.S.C. § 152), and honest services fraud (18 U.S.C. § 1346); and constitute a conspiracy to commit RICO violations (18 U.S.C. § 1962(d)).

b.   An order finding Defendants committed fraud, breached their fiduciary duties, aided and abetted the breach of fiduciary duties, made negligent misrepresentations, committed professional negligence and legal malpractice, committed common-law civil conspiracy, were unjustly enriched, interfered with Plaintiff's Constitutional rights, conspired to interfere with Plaintiff's Constitutional rights, breached their contract with Plaintiff by failing to make reasonable efforts to have the Settlement Agreement approved, tortiously interfered with Plaintiff's employment, and retaliated, and caused the wrongful termination of Plaintiff from his position at BTC;

c.   An order finding Defendants violated Plaintiff's clearly established constitutional rights to due process and equal protection of the laws;

d.   Enter judgment against Defendants for monetary, actual, consequential, and compensatory damages, including mental anguish damages, caused by Defendants unlawful conduct.

e.   Order the disgorgement of profits and forfeiture of fees obtained by Defendants through wrongful conduct;

f.      Award Plaintiff statutory damages;

g.      Award Plaintiff nominal damages;

h.      Award Plaintiff costs and expenses of suit;

i.      Award Plaintiff pre and post-judgment interest; and

j.      Award such other and further relief to which Plaintiff may be entitled at

law or in equity.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

By:   /s/ Mikell A. West
Mikell A. West
Texas State Bar No. 24070832
S.D. Tex. Bar No. 1563058
Robert W. Clore
Texas State Bar No. 24012426
S.D. Tex. Bar No. 2032287
BANDAS LAW FIRM, P.C.
802 Carancahua Street, Suite 1400
Corpus Christi, Texas 78401
Telephone: (361) 698-5200
Facsimile: (361) 698-5222
mwest@bandaslawfirm.com
rclore@bandaslawfirm.com