**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| Morton S. Bouchard, III, Individually and as Co-Trustee for the Morton S. Bouchard III 2017 Family Trust,<br><br>*Plaintiff*,<br><br>*v.*<br><br>David R. Jones, Elizabeth Carol Freeman, Jackson Walker, LLP, Kirkland & Ellis, LLP, Kirkland & Ellis International, LLP, Portage Point Partners, LLC, and Matthew Ray,<br><br>*Defendants*. | Civil Action No. 4:24-cv-00693 |

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS BY DEFENDANTS PORTAGE POINT PARTNERS, LLC AND MATTHEW RAY

Defendants Portage Point Partners, LLC ("Portage Point") and Matthew Ray ("Mr. Ray," and together, the "Portage Point Parties") respectfully request that the Court dismiss Counts IV, VII, IX, XI, XII, XIII, XIV, XV, and XVI of the Complaint (the "Complaint") of Plaintiff Morton S. Bouchard, individually and as co-trustee for the Morton S. Bouchard III 2017 Family Trust (collectively, "Bouchard" or "Plaintiff") as against the Portage Point Parties pursuant to Federal Rule of Civil Procedure 12(b)(6).

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL ALLEGATIONS AND RELEVANT BACKGROUND ........................................... 3

   A.  The Company and the Events Leading to Bankruptcy ...................................... 3

   B.  The Retention of Professionals and Chapter 11 Filing ..................................... 5

   C.  Plaintiff's Removal from BTC .................................................................... 6

   D.  The Removal and Governance Orders ........................................................ 8

   E.  BTC's Restructuring ................................................................................ 9

   F.  The Asset Sales ..................................................................................... 10

   G.  The Chapter 11 Plan and Exculpation of the Plan Administrator ..................... 12

   H.  The Unconsummated "Settlement Agreement" ............................................ 13

LEGAL STANDARD ......................................................................................................... 14

ARGUMENT ..................................................................................................................... 15

   A.  All Claims Are Barred by the Exculpation Orders. ...................................... 17

   B.  Counts VII, IX, XI, XII, and XIII Are Time-barred. ..................................... 21

   C.  The Complaint Does Not State Any Plausible Claim of Wrongdoing by the Portage Point Parties. ................................................................................ 23

   D.  All Claims Are Barred by the Barton Doctrine. ........................................... 26

   E.  Counts IV, VII, and IX Are Derivative Claims That Plaintiff Lacks Standing to Bring.. 28

   F.  Count IV Fails for the Additional Reason that the Portage Point Parties Owed No Fiduciary Duties to Plaintiff Individually. ...................................... 30

   G.  Count XI Fails Because Plaintiff Fails to Plead a Cognizable *Bivens* Conspiracy Claim. 31

   H.  Counts XII and XIII Fail to Plead Basic Elements of Claims Under Employment Law.. 32

   I.  Count XIV Fails Because the Portage Point Parties Are Not Parties to the Settlement Agreement, the Settlement Agreement Is Not a Valid Contract, and the Portage Point Parties Did Not Breach It. ............................................... 35

J.   Count XV Fails Because Plaintiff Has Not Pleaded Circumstances Showing That an Accounting Is Necessary.................................................................................... 36

K.   Count XVI Is Not an Independent Claim. ...................................................... 37

L.   In the Alternative, the Bankruptcy Court Is the Proper Venue for All Claims................. 37

M.   Plaintiff Should Not Be Granted Leave to Replead........................................... 38

CONCLUSION.................................................................................................... 39

PORTAGE POINT PARTIES' MOTION TO DISMISS

# TABLES OF AUTHORITIES

**Cases**

*Academy of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*,
    998 F.3d 190 (5th Cir. 2021) ............................................................................... 21

*Agar Corp., Inc. v. Electro Circuits Int'l, LLC*,
    580 S.W.3d 136 (Tex. 2019) ............................................................................... 22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................. 14

*Barton v. Barbour*,
    104 U.S. 126 (1881) ............................................................................................. 27

*Beavers v. Metro. Life Ins. Co.*,
    566 F.3d 436 (5th Cir. 2009) ............................................................................... 23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................. 14

*Brooks v. AAA Cooper Transp.*,
    781 F. Supp. 2d 472 (S.D. Tex. 2011) ................................................................. 34

*Brunson v. Nichols*,
    2018 WL 7286410 (W.D. La. Dec. 7, 2018) ....................................................... 31

*Butler v. S. Porter*,
    999 F.3d 287 (5th Cir. 2021) ............................................................................... 31

*Carnero G&P, LLC v. SN EF Maverick LLC*,
    657 B.R. 202 (S.D. Tex. 2024) ............................................................................ 19

*Compare Ackel v. Nat'l Comm'ns, Inc.*,
    339 F.3d 376 (5th Cir. 2003) ......................................................................... 22, 32

*Egbert v. Boule*,
    596 U.S. 482 (2022) ............................................................................................. 32

*Equipment Leasing, LLC v. Three Deuces, Inc.*,
    2011 WL 6141443 (E.D. La. Dec. 9, 2011) ....................................................... 28

*Erikson v. Renda*,
    590 S.W.3d 557 (Tex. 2019) ............................................................................... 21

PORTAGE POINT PARTIES' MOTION TO DISMISS

*Estate of Detwiler v. Offenbecher*,
    728 F. Supp. 103 (S.D.N.Y. 1989) ....................................................... 24

*Galindo v. City of Del Rio*,
    2021 WL 2763033 (W.D. Tex. Mar. 26, 2021) .................................... 30

*Grant v. Lone Star Co.*,
    21 F.3d 649 (5th Cir. 1994) ................................................................ 33

*Haskett v. Capital Land Servs., Inc.*,
    2015 WL 12556307 (S.D. Tex. Dec. 9, 2015) ................................... 37

*HCB Fin. Corp. v. McPherson*,
    8 F.4th 335 (5th Cir. 2021) ........................................................... 38, 39

*Hernandez v. Mesa*,
    885 F.3d 811 (5th Cir. 2018) .............................................................. 32

*Herrera v. Resignato*,
    621 S.W.3d 835 (Tex. Ct. App. 2021) ................................................ 33

*In re Agape Christian Fellowship of Arlington*,
    2007 WL 2332593 (N.D. Tex. Aug. 14, 2007) ................................... 21

*In re All-Tex Staffing & Personnel, Inc.*,
    599 B.R. 289 (Bankr. S.D. Tex. 2019) ............................................... 19

*In re AMC-Tex., Inc.*,
    430 B.R. 371 (Bankr. W.D. Tex. 2010) .............................................. 37

*In re Bouchard Transp. Co, Inc.*,
    Case No. 20-34682 (Bankr. S.D. Tex.) ........................................ passim

*In re Buccaneer Res., L.L.C.*,
    912 F.3d 291 (5th Cir. 2019) .............................................................. 29

*In re Cornerstone Prods., Inc.*,
    416 B.R. 591 (Bankr. E.D. Tex. 2008) ............................................... 31

*In re Lockwood Holdings Inc.*,
    2024 WL 727762 (S.D. Tex. Feb. 22, 2024) ................................. 29, 30

*In re Loggins*,
    513 B.R. 682 (Bankr. E.D. Tex. 2014) ............................................... 26

*In re Lyons Equip. Co., Inc.*,
    436 B.R. 281 (Bankr. W.D.N.Y. 2010) ............................................... 31

PORTAGE POINT PARTIES' MOTION TO DISMISS

*In re NC12, Inc.*,
  478 B.R. 820 (Bankr. S.D. Tex. 2012) .................................................................. 30

*In re Preferred Ready-Mix, LLC*,
  2024 WL 1392550 (S.D. Tex. Mar. 31, 2024) ................................................. 27, 28

*In re Radnor Holdings Corp.*,
  564 B.R. 467 (N.D. Tex. 2019), *aff'd sub nom. Matter of Acis Cap. Mgmt., L.P.*, 850 F. App'x
  302 (5th Cir. 2021) ............................................................................................ 30

*In re SBMC Healthcare, LLC*,
  2017 WL 2062992 (S.D. Tex. May 11, 2017) ...................................................... 38

*In re Tug Robert J. Bouchard Corp.*,
  Case No. 20-34758 (Bankr. S.D. Tex.) ......................................................... passim

*In re W.B. Care Center, LLC*,
  497 B.R. 604 (Bankr. S.D. Fla. 2013) ................................................................. 27

*J.D. Fields & Co., Inc. v. N. Am. Fabricators, L.L.C.*,
  2015 WL 13119409 (S.D. Tex. June 16, 2015) .................................................... 36

*Jackson v. Varono*,
  2018 WL 5046227 (W.D. La. Oct. 17, 2018) ...................................................... 31

*Johnson Serv. Grp., Inc. v. France*,
  2011 WL 248552 (N.D. Tex. Jan. 27, 2011) ........................................................ 34

*Johnson v. Wells Fargo Bank, NA*,
  999 F. Supp. 2d 919 (N.D. Tex. 2014) ................................................................ 36

*Jones v. Alcoa, Inc.*,
  339 F.3d 359 (5th Cir. 2003) ............................................................................... 22

*Konnethu v. Harris County Hosp. Dist.*,
  669 F. Supp. 2d 78 (S.D. Tex. 2009) .................................................................. 33

*Landry's, Inc. v. Animal Legal Defense Fund*,
  631 S.W.3d 40 (Tex. 2021) .................................................................................. 34

*Matter of Educators Grp. Health Tr.*,
  25 F.3d 1281 (5th Cir. 1994) ............................................................................... 29

*Matter of Foster*,
  2023 WL 20872 (5th Cir. Jan. 3, 2023) .............................................................. 28

*Matter of Highland Cap. Mgmt., L.P.*,
  48 F.4th 419 (5th Cir. 2022) ............................................................................... 18

v

*Matter of Linn Energy, L.L.C.*,
   927 F.3d 862 (5th Cir. 2019)..................................................................... 18, 19

*Matter of S.I. Acquisition, Inc.*,
   817 F.2d 1142 (5th Cir. 1987)............................................................................ 29

*McClellan v. Ritz-Carlton Hotel Co.*,
   961 S.W.2d 463 (Tex. Ct. App. 1997) ........................................................... 22, 33

*McLean v. Int'l Harvester Co.*,
   817 F.2d 1214 (5th Cir. 1987)............................................................................ 34

*Morton S. Bouchard, III et al.*,
   Case No. 4:21-cv-02937 (S.D. Tex. Feb. 11, 2022)........................................... 13

*Moyo v. Centrica PLC*,
   2013 WL 6813912 (S.D. Tex. Dec. 24, 2013) ................................................ 22, 33

*Muratore v. Darr*,
   375 F.3d 140 (1st Cir. 2004) ............................................................................. 28

*Nat'l Bus. Consultants Inc. v. Lightfoot*,
   292 F. App'x 298 (5th Cir. Aug. 19, 2008)....................................................... 28

*Oliva v. Nivar*,
   973 F.3d 438 (5th Cir. 2020)............................................................................. 31

*Salas v. United States*,
   667 F. Supp. 3d 380 (W.D. Tex. 2023).......................................................... 4, 15

*Savoia-McHugh v. McCrary*,
   2022 WL 1997191 (S.D. Tex. June 6, 2022) ..................................................... 21

*Sligh v. City of Conroe*,
   87 F.4th 290 (5th Cir. 2023)........................................................................... 4, 15

*Tampico v. Martinez*,
   987 F.3d 387 (5th Cir. 2021)............................................................................. 21

*Travelers Indem. Co. v. Bailey*,
   557 U.S. 137 (2009) .................................................................................... 18, 21

*Ultraflo Corp. v. Pelican Tank Parts, Inc.*,
   926 F. Supp. 2d 935 (S.D. Tex. 2013) ............................................................... 23

*VeroBlue Farms USA, Inc. v. Wulf*,
   465 F. Supp. 3d 633 (N.D. Tex. 2020) ............................................................... 15

PORTAGE POINT PARTIES' MOTION TO DISMISS

*Villegas v. Schmidt,*
  788 F.3d 156 (5th Cir. 2015)............................................................................. 26, 27

**Statutes**

11 U.S.C. § 1141(a) ............................................................................................. 37

28 U.S.C. § 959(a) ............................................................................................... 28

**Rules**

Fed. R. Bankr. Proc. 9024 .................................................................................... 19

Fed. R. Civ. P. 60(b)(6) ........................................................................................ 32

Fed. R. Civ. Proc. 12(b)(6) ........................................................................... passim

PORTAGE POINT PARTIES' MOTION TO DISMISS

# INTRODUCTION

The Portage Point Parties do not belong in this case. Plaintiff's claims arise from a "bankruptcy scandal" involving an alleged "secret relationship" between former Chief Bankruptcy Judge David Jones ("Jones") and Elizabeth Freeman ("Freeman"), who was then a partner at Jackson Walker LLP ("Jackson Walker"). The Complaint spins a wild conspiracy involving not only Jones and Freeman, but also Jackson Walker and Kirkland & Ellis LLP ("K&E"), the law firms that Plaintiff retained as bankruptcy counsel on behalf of his former company, Bouchard Transportation Corp. ("BTC" or the "Company").

Absent from this alleged conspiracy are any of the Portage Point Parties. They are not named as defendants to the alleged RICO conspiracy. They are not named in the parallel *Van Deelen* action,[1] another RICO case brought by Plaintiff's law firm based on the same alleged "bankruptcy scandal." Buried in a footnote, the Complaint concedes—as it must—an utter lack of evidence that the Portage Point Parties had any knowledge of the Jones–Freeman relationship. *See* Compl. ¶ 7 n.7. There is equally no allegation that the appointment of Mr. Ray or Portage Point, the work that they performed, or the fees that they earned for this work, had any connection to the Jones–Freeman relationship. The U.S. Trustee—which has the statutory role of protecting the integrity of the bankruptcy system and has sought to vacate certain Jackson Walker fees, including in the BTC bankruptcy—has never raised an issue in relation to the fees of Mr. Ray or Portage Point. By Plaintiff's own admission, the Jones–Freeman "scandal" has nothing to do with the Portage Point Parties.

Instead, Plaintiff includes the Portage Point Parties in a vexatious attempt to relitigate matters that either were, or should have been, addressed by Plaintiff in the Chapter 11 proceedings

---

[1] *Van Deelen v. Jones*, Case No. 4:23-cv-3729 (S.D. Tex.).

of his former company, BTC.  Plaintiff is unhappy that the Bankruptcy Court removed him from his role as CEO of the Company.  But that removal, by Plaintiff's own admission, occurred "sua sponte," after the Bankruptcy Court concluded that Plaintiff was actively impeding the Chapter 11 process, preventing BTC from making payroll, and blocking its ability to access needed interim financing.  None of this is alleged to have anything to do with the Portage Point Parties.  Plaintiff is simply seeking an end-run around the bankruptcy process to avenge personal grievances, settle scores, and seek recoveries that he was unsuccessful in achieving in Chapter 11.

As one would expect, there are rules and orders in place to prevent this.  First, in a series of orders that Plaintiff never objected to, appealed, or sought to reopen, the Portage Point Parties are exculpated from the very liability that Plaintiff is seeking to impose on them, and Plaintiff is enjoined from bringing such claims.  Second, Plaintiff has not complied with the Barton Doctrine, which requires that he seek leave from the Bankruptcy Court prior to bringing suit against court-appointed estate professionals in their official capacities.  Third, many of Plaintiff's claims violate the "shareholder standing rule," a longstanding restriction that prohibits shareholders, even sole shareholders, from bringing actions to enforce the rights of the company, particularly in bankruptcy, where doing so would impair the rights of other creditors with higher priority claims.  Fourth, over half of Plaintiff's claims are time-barred.

Finally, even if Plaintiff somehow could overcome these threshold issues, the Complaint fails to allege the basic wrongdoing that would be necessary to sustain his claims.  Plaintiff does not and cannot identify any fiduciary duty that the Portage Point Parties owed to Plaintiff personally, rather than the to the Chapter 11 estate, let alone any conduct that breached any fiduciary duty.  Their sole duty was to maximize the value of the estate, they performed that duty, and there is no allegation to the contrary.  To the extent Plaintiff complains about a so-called "fire

sale" of BTC's assets out of bankruptcy, the Portage Point Parties were not responsible for those sales. Instead, Plaintiff himself selected Jefferies LLC ("Jefferies"), an international investment bank, to run an auction—not Portage Point. There is no allegation that this bank was under any conflict, and the sales were the result of a robust auction process with over 180 parties—far from a "fire sale." As for Plaintiff's breach-of-contract claim, the Complaint admits that there was never an enforceable contract in the first place and, in any event, admits that the Portage Point Parties were not parties to the alleged contract.

In short, the Portage Point Parties are innocent bystanders to the Jones–Freeman story, and they should not be dragged along as collateral damage. They respectfully request that the Court dismiss the claims against the Portage Point Parties pursuant to Federal Rule of Civil Procedure 12(b)(6).

## FACTUAL ALLEGATIONS AND RELEVANT BACKGROUND

### A.   The Company and the Events Leading to Bankruptcy

This action arises from the Chapter 11 bankruptcy of BTC, a family-owned collection of companies that, for over 100 years, had operated ocean-going petroleum barges along the Eastern Seaboard and Gulf Coast of the United States. Complaint ("Compl.") ¶ 63. Historically, when fully operational, the Company was a leading provider of petroleum transportation services to major domestic and international oil companies. *Id.* Plaintiff was the fourth-generation owner of the Company, and he was its CEO, sole officer, sole director, and one hundred percent shareholder. *Id.* ¶ 64.

Under his stewardship, the Company collapsed. His tenure saw the Company suffer a series of fatal disasters, including six fatalities resulting from three explosions on BTC vessels.

*See* Bk. 20-34682, Dkt. 79 ¶ 2; Bk. 20-34682, Dkt 985 ¶ 9 & n.2.[2]  The latest of these was a 2017 explosion on a BTC vessel off the Texas coast that claimed the lives of two crewmembers and spilled thousands of barrels of crude oil into the ocean.  *See* Bk. 20-34682, Dkt. 79 ¶ 2.  Following that incident and numerous other infractions, the Company's classification society—a non-governmental body that establishes technical standards and certifies vessel compliance—canceled its longstanding contract with the Company.  *Id*.  The U.S. Coast Guard then proceeded to withdraw BTC's compliance certification, a requirement of the Company's major customers.  *Id.*

From there, Plaintiff was effectively canceled by the industry, and BTC's financial and liquidity position deteriorated precipitously.  *See* Bk. 20-34682, Dkt. 1171-1 ¶ 18.  Without the needed regulatory certifications, BTC could not service customers or generate positive cash flow.  Bk. 20-34682, Dkt. 79 ¶ 3.  Most shipyards and brokers were unwilling to work with Plaintiff.  Bk. 20-34682, Dkt. 1171-1 ¶ 18.  Clients were unwilling to run BTC vessels.  *Id.*  Without revenue, the Company lacked the liquidity and human capital necessary to perform repairs on the fleet, re-obtain required regulatory and other certifications, or otherwise place vessels back in service.  Bk. 20-34682, Dkt. 79 ¶ 3.  Out-of-court funding sources were tapped and then dried up.  *Id.*  At the same time, the Company had almost $230 million outstanding of funded debt.  *Id.* ¶ 4.

By September 2020, BTC's operations had ground to a halt.  *Id.* ¶ 3.  BTC's revenue had completely dried up.  *Id.*  Remaining crews had not been paid, and BTC's fleet was at risk, with the lead insurance underwriter threatening to cancel insurance during hurricane season.  *Id.* ¶ 3.

---

[2] Filings from the BTC Chapter 11 proceedings are referenced herein by their docket number in the consolidated Chapter 11 cases, captioned *In re Bouchard Transp. Co, Inc.*, Bk. 20-34682 (Bankr. S.D. Tex.).  In his Complaint, Plaintiff expressly asks this Court to take judicial notice of many of these filings, *see* Compl. ¶ 40 n.38, and characterizes others at length in his pleading, *see, e.g.*, Compl. ¶¶ 46, 54, 89, 93.  In evaluating a motion to dismiss, the Court may consider (1) "the pleadings and any attachments to the pleadings"; (2) "documents incorporated into the complaint by reference"; (3) "documents that a defendant attaches to its motion to dismiss if those documents are referred to in a plaintiff's complaint and are central to a plaintiff's claim"; (4) "matters of public record"; and (5) "information subject to judicial notice."  *Salas v. United States*, 667 F. Supp. 3d 380, 385 (W.D. Tex. 2023); *see also Sligh v. City of Conroe*, 87 F.4th 290, 297 (5th Cir. 2023).

BTC could not sustain even idle operations or pay crewmembers, suppliers, trade vendors, and other core business partners. *Id.* Many of those counterparties resorted to self-help maritime remedies throughout the U.S., resulting in the seizure of BTC's vessels. *Id.* This reached a crescendo in the fall of 2020, when multiple vessels were scheduled for foreclosure sales, with the first slated for September 29, 2020. *Id.*

In the meantime, as Debtors later alleged in an adversary proceeding, Plaintiff "used the [Company's] finite resources to lead a lifestyle of luxury, including purchasing and using a private jet for which the [Company] had no facially valid business purpose." *In re Tug Robert J. Bouchard Corp.*, Bk. 20-34758, Dkt. 226 ("Adversary Complaint") ¶¶ 21–26. During this time, BTC missed payroll on multiple occasions and fell behind on critical expenses (including rent, health insurance, fuel costs, and senior secured loan payments). *Id.* ¶ 22. All the while, Plaintiff refused to sell the private plane, a Gulfstream G650 aircraft, and prioritized "paying personal expenses with the [Company's] funds, including but not limited to country club memberships, overpaying BTC's employees." *Id.* ¶ 25. By the time that the Portage Point Parties were retained, BTC was already decimated by Plaintiff's reckless mismanagement and corporate looting.

## B. The Retention of Professionals and Chapter 11 Filing

With his Company on the brink of liquidation, Plaintiff personally selected a team of professionals to explore a restructuring. Compl. ¶ 62. In September and October 2020, BTC retained Jefferies as its investment banker; Portage Point as its financial and restructuring advisor; and K&E and Jackson Walker as restructuring counsel. Bk. 20-34682, Dkt. 79 ¶ 57. Plaintiff personally approved and executed these engagements, including the Portage Point engagement, on behalf of BTC. Bk. 20-34682, Dkt. 165.

Aided by its professionals, the Company engaged in extensive negotiations with its existing

5

lenders regarding an out-of-court refinancing that would provide the Company with sufficient near-term liquidity to stop the foreclosure sales of the Company's vessels. Bk. 20-34682, Dkt. 79 ¶ 50. However, no party was willing to provide new money on an out-of-court basis. *Id.*

Accordingly, on September 28 and 29, 2020, BTC and certain affiliates filed voluntary Chapter 11 petitions. Compl. ¶ 43. This was critical to prevent the imminent foreclosure sales of the Company's vessels, obtain the much-needed "breathing space" of an automatic stay, raise incremental financing to pay crewmembers, hire employees, secure vessels, and hire a classification society to bring the Company back into compliance with the Coast Guard. Bk. 20-34682, Dkt. 79 ¶ 4. The Chapter 11 cases were assigned to then-Chief Judge David Jones. Compl. ¶ 43.

### C. Plaintiff's Removal from BTC

Plaintiff's mismanagement continued after the bankruptcy filing, to the point where he became an active impediment to the Chapter 11 proceedings. At the start of the cases, employee payroll was nearly three months delinquent. Bk. 20-34682, Dkt. 1171-1 ¶ 20. These employees remained on vessels, unpaid, while Mr. Bouchard enjoyed the use of the Gulfstream G650 aircraft. *Id.* Plaintiff had failed to maintain the Company's books and records. *See* Bk. 20-34682, Dkt. 557 at 8:13–15 (BTC's "books and records ha[d] not been kept up as one would have expected for a long period of time."). And he was impeding the sale of Company assets, including the Gulfstream G650 aircraft, that was necessary to generate desperately needed cash for the business, including to fund payroll. Bk. 20-34682, Dkt. 591, at 6.

This all came to a head in two hearings on February 24 and 26, 2021. *Id.*, Dkt. 557, 591. The Company had again missed payroll. The Debtors had fully exhausted the initial $29 million of their debtor-in-possession financing ("DIP") facility and had not met the conditions precedent to access the remaining $31 million. *Id.*, Dkt. 359 (Tr. 7:21–9:1). The DIP lender informed the

Bankruptcy Court that it was unwilling to advance further funds unless the Company agreed to a series of milestones for the sale of its assets. However, Plaintiff was unwilling to "even discuss that proposal." *Id*., Dkt. 557 (Tr. 23:17–21). As the Bankruptcy Court was informed, BTC and the DIP lender were at an "impasse" because Plaintiff would "never engage" with the DIP lender's request for "sale milestones for certain of the debtor's assets." *Id*., Dkt. 591 (Tr. 5:24–6:16). With Plaintiff standing in the way of the Company's access to critical financing, and with another payroll deadline looming, the case had reached a breaking point.

Confronted with all of this, the Bankruptcy Court intervened. Consistent with his practice across countless other cases (whether involving Jackson Walker or not), Jones made clear that he was "not going to have unpaid employees even for a day" or "finance the case on the back of vendors." *Id*., Dkt. 557 (Tr. 14:6–12). The Bankruptcy Court also explained that he "kn[ew] what was going on" with respect to Plaintiff's obstruction of the bankruptcy process and cautioned that "[e]ventually if I don't get movement, I will . . . take this out of all of your hands because I have waited, and I've given everybody a chance and I've given hints along the way." *Id*. On February 26, 2021, after learning that impasse remained between the DIP lender and "current management," the Bankruptcy Court had the following exchange with counsel for the Debtors:

> THE COURT: So, Mr. Bennett, let me make your life easier today. When you say "current management," I assume that you mean Mr. Bouchard.
>
> MR. BENNETT: That's correct, sir. He's the sole officer and CEO.
>
> THE COURT: His tenure as an officer of this debtor-in-possession ends now. Now, that may mean that I appoint a trustee. It may mean that I appoint Mr. Ray, if he's willing to take over, but Mr. Bouchard's position as an officer of this debtor-in-possession ends right now.

*Id*., Dkt. 591 (Tr. 5:24–6:16). The Bankruptcy Court noted that prior to ordering Plaintiff's removal, it had "given him his opportunity" and "sat quietly long enough." *Id.*, Dkt. 591 (Tr.

10:24–25). The Bankruptcy Court then appointed Mr. Ray to serve as the Chief Restructuring Officer ("CRO") of BTC.[3] Plaintiff was also removed as the Company's sole director and pending the appointment of two independent directors to comprise the Company's new board, Mr. Ray was "empowered with full corporate authority." *Id.*, Dkt. 591 (Tr. 9:24–25).

As expressly conceded in the Complaint, this order was issued "*sua sponte.*" Compl. ¶ 71. The Complaint does not allege that Plaintiff's removal was the result of the Jones–Freeman relationship. Nor could it: Removing Plaintiff did not affect the fees paid to Jackson Walker, and there is nothing else about the relationship between Jones and Freeman that could have created any personal incentive to remove Plaintiff. And the Complaint certainly does not allege that the Bankruptcy Court's removal of Plaintiff resulted from any alleged misconduct by the Portage Point Parties.

### D. The Removal and Governance Orders

On February 26, 2021, the court issued a written order (the "Removal Order") confirming Plaintiff's removal and Mr. Ray's appointment as CRO. Bk. 20-34682, Dkt 569 ¶¶ 1–2. The Removal Order vested Mr. Ray with "exclusive and complete authority to act on behalf of the Debtors." *Id.* ¶ 2. The order exculpated Mr. Ray and Portage Point in the broadest possible terms:

> Neither the CRO, Portage Point, Portage Point's agents and affiliates, Portage Point personnel serving at the direction of the CRO, nor the Independent Directors shall have or incur liability for, and each of the CRO, Portage Point, Portage Point's agents and affiliates, Portage Point personnel serving at the direction of the CRO, and the Independent Directors ***shall be released and exculpated from any claims and causes of action for any claim related to any act or omission in connection with, relating to, or arising out of***, the Chapter 11 Cases, the DIP Facility, or any restructuring transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Chapter 11 Cases, the DIP Facility, the filing of the Chapter 11 Cases, the pursuit of confirmation of a chapter

---

[3] The Bankruptcy Court had previously approved the retention of Mr. Ray as CRO, but his appointment remained provisional until Debtors obtained sufficient directors' and officers' insurance. *Id.* ¶ 2. Plaintiff never obtained this insurance, and therefore Mr. Ray's appointment as CRO did not take effect until the Removal Order, as described herein.

11 plan, the pursuit of consummation of a chapter 11 plan, the sale or disposition of any property of the estate, the administration and implementation of a chapter 11 plan, or the distribution of property under a chapter 11 plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place during the pendency of the Chapter 11 Cases . . . .

Bk. 20-34682, Dkt. 569 ¶ 4 (emphasis added). It further permanently enjoined all parties in interest "from commencing any action or other proceeding of any kind on account of or in connection with or with respect to any claim and/or cause of action that is released and exculpated pursuant to the foregoing sentence." *Id.* The only exception to exculpation is a finding of "actual fraud, willful misconduct, or gross negligence," and this finding must be made by the Bankruptcy Court. *Id.* The Bankruptcy Court has never made any such finding, and Plaintiff never asked it to do so.

On March 5, 2021, the Bankruptcy Court issued a supplemental order appointing two directors to comprise the Company's board of directors—Mr. Ray and an independent director, Patrick J. Bartels Jr. ("Mr. Bartels"). Bk. 20-34682, Dkt. 608 ¶¶ 1–2 (the "Governance Order"). The Governance Order further exculpated Mr. Ray in his role as director. *Id.* ¶ 4. Mr. Bartels, the independent director, has not been named as a defendant in this litigation, nor does the Complaint allege that Mr. Bartels had any conflict of interest such that his independence would be called into question.

Plaintiff had 14 days to appeal the Removal and Governance Orders, but never did so. Nor has Plaintiff ever asked the Bankruptcy Court to reopen or reconsider either order.

### E.    BTC's Restructuring

Led by Mr. Ray and Portage Point, the Company saw a remarkable turnaround. Following Plaintiff's removal, Debtors found a customer willing to charter its vessels. Bk. 20-34682, Dkt. 1171-1 ¶ 19. Debtors entered into three charters with this customer that delivered approximately $9.0 million of annual profit and additional value of $4.8 million in annualized savings, resulting

in a net annualized benefit to the Debtors' estates of $13.8 million. *Id.* After Plaintiff's removal, the Debtors finally were able to sell the Gulfstream G650 aircraft for $44 million, generating over $15 million of proceeds for the estate. *Id.* ¶ 20. The Debtors were also able to enhance the Company's liquidity by negotiating and procuring, with Jefferies, a replacement $90 million DIP facility from a replacement DIP lender, JMB Capital Partners ("JMB"). Bk. 20-34682, Dkt. 756. This turnaround would not have been possible without the efforts of Mr. Ray and Portage Point, who stepped in to develop creative solutions for extremely difficult problems across the BTC business.

Perhaps recognizing as much, Plaintiff did not even object to his removal. In fact, Plaintiff initially provided Debtors with consultation regarding business operations. *See* Bk. 20-34682, Dkt. 883. Other interested parties supported the removal as well, including BTC lender Wells Fargo, which stated "[w]e appreciate the direction that things are going." *Id.* at 12. Far from the abrupt "coup" Plaintiff describes in his complaint, *see* Compl. ¶ 3, his removal was anticipated and, ultimately, a turning point that rescued BTC from the brink of liquidation.

### F.     The Asset Sales

At a hearing on April 29, 2021, BTC's counsel informed the Bankruptcy Court that the Debtors were "in alignment with the various stakeholders to conduct not only a thorough but swift marketing process for an exit." Bk. 20-34682 (Tr. 6:18–22). To that end, BTC's investment banker, Jefferies, commenced a marketing process that contemplated "all types of proposals, including the requisite exit financing to support a plan of reorganization and/or the sale of substantially all or certain assets of the debtors" and would "maximize value" for all stakeholders. Bk. 20-34682, Dkt. 852 (Tr. 7:9–14). The Complaint does not—and cannot—allege that Jefferies was controlled by the Portage Point Parties or that the Portage Point Parties otherwise had any

responsibility for the sales process.  To the contrary, Jefferies acted as an independent investment bank charged with maximizing value through a sale process.

Far from the "fire sale" suggested by the Complaint, Jefferies conducted a robust and transparent marketing and auction process.  Jefferies "cast a wide net by contacting over 180 potential bidders, executing non-disclosure agreements with approximately 100 interested parties, who were provided access to a virtual data room containing detailed information about the Debtors' industry, business, and assets, and conducting numerous follow-up diligence meetings with potential bidders." Bk. 20-34682, Dkt. 1171 ¶ 11.  The sale process culminated in an auction with multiple bidders on different categories of collateral. *Id.* ¶ 2.

On August 5, 2021, the Bankruptcy Court approved the asset sales. *Id.*  At the hearing, Jefferies' Richard Morgner ("Mr. Morgner") testified that the Debtors ran "a robust competitive marketing process prior to the auction" and that "we took Judge Jones's words to heart as a group of Debtor professionals and we unturned every stone." Bk. 20-34682, Dkt. 1206 (Tr. 46:13–24).  BTC's independent director, Mr. Bartels, also testified in support of the bidding procedures used at auction.  *See* Bk. 20-34682, Dkt. 1244 (Tr. 101:1–107:7).  Because the sales process was conducted by Jefferies, neither Mr. Ray nor anyone else at Portage Point were called upon to testify in connection with the sales' approval.  Bk. 20-34682, Dkt. 1206 (Tr. 46:13–47:17).

The Bankruptcy Court approved the sales process, noting that "I could not be more happy with the sales process as you [Mr. Morgner] have described it. . ..  I don't think I have seen this thorough a process in a very long time . . . at a complicated time in our history." Bk. 20-34682, Dkt. 1206, (Tr. at 76:11–15).  The court also remarked: "I will officially go on the record today and tell you that I'm very proud and happy with the job that you all have done. It's an example that ought to be followed in more cases." *Id.* (Tr. 76:19–22).  Notably, the UCC, which was

charged with protecting the rights of the Company's unsecured creditors (who often recover the least in a Section 363 sale scenario), did not object to the sale. And, although Plaintiff initially filed a limited objection to the sale based on a purported lack of information regarding the sales process, Plaintiff withdrew it and never appealed the sale orders. *See* Bk. 20-34682, Dkt. 1206 (Tr. 63:16–17).

### G. The Chapter 11 Plan and Exculpation of the Plan Administrator

On August 23, 2021, BTC filed its Chapter 11 plan of reorganization (the "Plan"). Bk. 20-34682, Dkt. 1293. The Plan contemplated that virtually all of the Debtors' assets would be sold, while any remaining assets would be wound down. On August 26, 2021, the Bankruptcy Court approved the Plan following a hearing. Bk. 20-34682, Dkt. 1319. The Plan was widely supported by key stakeholders, including BTC's independent director and the UCC. Importantly, the U.S. Trustee, which is tasked with protecting the integrity of the federal bankruptcy system, did not object to the Plan. To effectuate the wind down, the Plan created the role of Plan Administrator as "the sole manager, sole director, and sole officer of the Post-Effective Date Debtor." Plan at 24.

Under the Plan, the Plan Administrator was granted the broadest possible exculpation. Specifically, the Plan provided that "the Plan Administrator and all professionals retained by the ***Plan Administrator . . . shall be deemed exculpated*** . . . [and] shall have no liability whatsoever to any party for the liabilities and/or obligations . . . of the Debtors." *Id*. at 36 (Art. VII.C). Neither Plaintiff nor any other party objected to these provisions in the Plan.

Instead, Plaintiff filed a limited appeal from the Plan, taking issue with its general exculpation clause (the "Plan Exculpation Clause"). *See* Bouchard's Limited Objection to Plan, Bk. 20-34682, Dkt. 1225 ¶ 25. Plaintiff did ***not*** appeal the earlier Removal Order or Governance

Order that exculpated Mr. Ray, in his roles as CRO and director, and Portage Point in role as restructuring advisor in the Chapter 11 proceedings. Indeed, Plaintiff was clear that he was not appealing those orders: "Debtors have one thing correct: that order—entered five months before confirmation of the Plan—is not on appeal here and is not part of, in any way, the Confirmation Order that has been appealed." *See* Appellant's Resp. Br., *Morton S. Bouchard, III et al.*, Case No. 4:21-cv-02937, at 29 & n.11 (S.D. Tex. Feb. 11, 2022) (Dkt. 16).

In February 2023, the District Court remanded to the Bankruptcy Court to modify the Plan "only to the extent that it approved the exculpation provision releasing a broad range of third parties." *Id.*, Dkt. 52 at 5–6. The District Court did not direct the Bankruptcy Court to revise the separate exculpation provisions specifically concerning the Plan Administrator. *See* Bk. 20-34682, Dkt. 1293 at 36 (Art. VII.C); *see also* Bk. 20-34682, Dkt. 1225 ¶ 25 (Plaintiff's objection to Arts. X.E, X.F, and X.G of the Plan, but not Art. VII.C). Following remand, on May 28, 2024, the Bankruptcy Court entered an agreed order conforming the Plan (the "Conforming Order"). Bk. 20-34758, Dkt. 417. The only change in the Conforming Order was to the definition of "Exculpated Party" for purposes of the Plan Exculpation Clause. The Conforming Order was clear that it "solely modifies" this Plan Exculpation Clause and "Nothing in this Order shall in any way limit, modify, or otherwise affect any other provision of the Plan, the Confirmation Order, or any other entered by the Court in the Chapter 11 cases." *Id.* ¶ 2.

## H. The Unconsummated "Settlement Agreement"

In early February 2023, Plaintiff and BTC proposed a settlement agreement to the Bankruptcy Court to resolve the Adversary Proceeding and Plaintiff's potential claims against the estate of BTC. Bk. 20-34758, Dkt. 311. The proposed Settlement Agreement provided that it "shall be of no force and effect unless and until" an Approval Order from the Bankruptcy Court

was entered.  Bk. 20-34758, Dkt. 311-1 ("Settlement Agreement").  Neither Mr. Ray nor Portage Point was a party to this agreement—Mr. Ray signed in his capacity as Plan Administrator on behalf of the wind-down estate.  *Id.* at 11.

As the Complaint concedes, the "Settlement Agreement was never consummated" because it was never approved by the Bankruptcy Court.  Compl. ¶ 91.  On March 21, 2023, the UCC filed an objection to the Settlement motion arguing that the Settlement Agreement was not in the best interest of creditors.  UCC Obj., Bk. 20-34758, Dkt. 316.  On March 28, 2023, the Bankruptcy Court held a hearing on the Plan Administrator's motion seeking approval of the proposed Settlement Agreement.  Mar. 28, 2023, Hearing Tr., Bk. 20-34758, Dkt. 328.   On the advice of counsel, Mr. Ray was not present in the courtroom; instead, Jeffrey Gasbarra ("Mr. Gasbarra"), Portage Point's managing director who was familiar with the proposed Settlement Agreement and its negotiations, attended the hearing.  The Court did not approve the Settlement Agreement at the hearing.  *Id.* (Tr. 28:9–14).  Instead, the motion was adjourned in an attempt to resolve the UCC objection.  *Id.*  The proposed Settlement Agreement has since been abandoned and remains unapproved to this day.  Plaintiff has never asked the Bankruptcy Court to enforce it.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do."  *Bell Atl. Corp.*, 550 U.S. at 545.  Plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true."  *Id.*

In evaluating a motion to dismiss, the Court may consider (1) "the pleadings and any attachments to the pleadings"; (2) "documents incorporated into the complaint by reference"; (3) "documents that a defendant attaches to its motion to dismiss if those documents are referred to in a plaintiff's complaint and are central to a plaintiff's claim"; (4) "matters of public record"; and (5) "information subject to judicial notice." *Salas v. United States*, 667 F. Supp. 3d 380, 385 (W.D. Tex. 2023); *see also Sligh v. City of Conroe*, 87 F.4th 290, 297 (5th Cir. 2023).

Federal Rule of Civil Procedure 9(b) further requires a party asserting claims that sound in fraud to plead "with particularity the circumstances constituting fraud." "[W]hat triggers specific pleading for fraud claims is not the label attached to the claims but the substance of the allegations." *VeroBlue Farms USA, Inc. v. Wulf*, 465 F. Supp. 3d 633, 653 (N.D. Tex. 2020). While not pleaded as "fraud," Plaintiff's claims sound in fraud because he alleges that the Portage Point Parties conspired to remove him as CEO and enrich themselves. *See, e.g.*, Compl. ¶¶ 267–68; *see also VeroBlue Farms*, 465 F. Supp. 3d at 653–54 (applying Rule 9's heightened pleading standard to claims that "include specific factual assertions of fraudulent conduct in the body of the count").

## **ARGUMENT**

Plaintiff's claims against the Portage Point Parties are fatally flawed for multiple, cross-cutting reasons, as summarized in the following chart.

| Count | Grounds for Dismissal |
|---|---|
| Breach of fiduciary duty (Count IV) | • Barred by Exculpation Orders (Argument A)<br>• Insufficiently pleaded under Rule 12(b)(6) (Argument C)<br>• Failure to comply with the Barton Doctrine (Argument D)<br>• Lacks standing to bring derivative claims (Argument E) |

| | |
|---|---|
| | • No fiduciary duty owed to Plaintiff individually (Argument F) |
| Professional negligence (Count VII) | • Barred by Exculpation Orders (Argument A)<br>• Time-barred (Argument B)<br>• Insufficiently pleaded under Rule 12(b)(6) (Argument C)<br>• Failure to comply with the Barton Doctrine (Argument D)<br>• Lacks standing to bring derivative claims (Argument E) |
| Unjust enrichment (Count IX) | • Barred by Exculpation Orders (Argument A)<br>• Time-barred (Argument B)<br>• Insufficiently pleaded under Rule 12(b)(6) (Argument C)<br>• Failure to comply with the Barton Doctrine (Argument D)<br>• Lacks standing to bring derivative claims (Argument E) |
| Conspiracy to interfere with constitutional rights under *Bivens* (Count XI) | • Barred by Exculpation Orders (Argument A)<br>• Time-barred (Argument B)<br>• Insufficiently pleaded under Rule 12(b)(6) (Argument C)<br>• Failure to comply with the Barton Doctrine (Argument D)<br>• Failure to plead a cognizable *Bivens* claim (Argument G) |
| Retaliation (Count XII) | • Barred by Exculpation Orders (Argument A)<br>• Time-barred (Argument B)<br>• Insufficiently pleaded under Rule 12(b)(6) (Arguments C and H)<br>• Failure to comply with the Barton Doctrine (Argument D) |
| Wrongful termination (Count XII) | • Barred by Exculpation Orders (Argument A)<br>• Time-barred (Argument B)<br>• Insufficiently pleaded under Rule 12(b)(6) (Arguments C and H)<br>• Failure to comply with the Barton Doctrine (Argument D) |
| Tortious interference with | • Barred by Exculpation Orders (Argument A) |

| employment (Count XIII) | • Time-barred (Argument B)<br>• Insufficiently pleaded under Rule 12(b)(6) (Argument C)<br>• Failure to comply with the Barton Doctrine (Argument D) |
|---|---|
| Breach of contract (Count XIV) | • Barred by Exculpation Orders (Argument A)<br>• Insufficiently pleaded under Rule 12(b)(6) (Arguments C and I)<br>• Failure to comply with the Barton Doctrine (Argument D) |
| Accounting (Count XV) | • Barred by Exculpation Orders (Argument A)<br>• Insufficiently pleaded under Rule 12(b)(6) (Arguments C and J)<br>• Failure to comply with the Barton Doctrine (Argument D) |
| Respondeat superior* (Count XVI)<br><br>*against Portage Point only* | • Barred by Exculpation Orders (Argument A)<br>• Insufficiently pleaded under Rule 12(b)(6) (Argument C)<br>• Failure to comply with the Barton Doctrine (Argument D)<br>• Not an independent claim (Argument K) |

### A. All Claims Are Barred by the Exculpation Orders.

Plaintiff's claims are brought in violation of certain orders (collectively, the "Exculpation Orders," and defined individually below) entered by the Bankruptcy Court and are barred by the injunctions contained therein.

*First*, the Removal Order exculpates both Mr. Ray and Portage Point from any and all liabilities related to any act or omission arising out of or related to the BTC Chapter 11 proceedings, including transactions and agreements in connection with the Chapter 11 proceedings, the sale or disposition of any property of the estate, and the administration and implementation of a Chapter 11 plan. Removal Order ¶ 4 (Bk. 20-34682, Dkt. 569). The Removal Order then permanently enjoins all parties in interest to the BTC Chapter 11 proceedings, including

Plaintiff, from commencing any actions on exculpated claims. *Id.*

*Second*, the Governance Order provides the same exculpation and injunction for all claims arising out of Mr. Ray's conduct as a director of BTC during the Chapter 11 proceedings. Governance Order ¶ 4 (Bk. 20-34682, Dkt. 608).

*Third*, the "Plan Administrator Exculpation" at Article VII.C of the Plan exculpates Mr. Ray, as Plan Administrator, and Portage Point, as professionals retained by the Plan Administrator. Bk. 20-34682, Dkt. 1293 ("First Am. Joint Plan"), at 36.

Each of the Exculpation Orders is enforceable and not subject to collateral attack. Res judicata attaches to final bankruptcy-court orders. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 152 (2009) ("[O]nce the 1986 Orders became final on direct review (whether or not proper exercises of bankruptcy court jurisdiction and power), they became res judicata to the "'parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'"). Indeed, in addressing a non-debtor exculpation order, the Supreme Court held: "[W]here the plain terms of a court order unambiguously apply, as they do here, they are entitled to their effect." *Id.* at 150; *see also Matter of Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 438 n.15 (5th Cir. 2022) (holding governance orders issued by the bankruptcy court exculpating CRO, independent directors, and supporting professionals were enforceable as res judicata). Confirmed Chapter 11 Plans are similarly entitled to res judicata. *See Matter of Linn Energy, L.L.C.*, 927 F.3d 862, 867 (5th Cir. 2019) (holding post-confirmation collateral attack on bankruptcy plan was untimely and barred by res judicata where party failed to object in the Chapter 11 proceedings).

Any attempt by Plaintiff to argue that the Exculpation Orders are overbroad or otherwise

unenforceable is therefore barred. Plaintiff never objected to or appealed any of the Exculpation Orders. Plaintiff appealed a separate provision of the Plan—the Plan Exculpation Clause, *see* Compl. ¶¶ 96–100—but he did not challenge the Plan Administrator Exculpation in that appeal or any of the prior Exculpation Orders. *See* Bouchard Limited Objection, Bk. 20-34682, Dkt. 1225 ¶ 25 (objecting to Article X §§ E, F, and G of the Plan but not Article VII.C). Indeed, the Conforming Order, to which Plaintiff consented, is clear that it has no effect on that Plan Administrator Exculpation or any other prior order of the Bankruptcy Court, including any other Exculpation Order. Conforming Order ¶ 2. And Plaintiff did not preserve any objection to the Plan Administrator Exculpation at Article VII.C. *See Matter of Linn Energy, L.L.C.*, 927 F.3d at 867; *Carnero G&P, LLC v. SN EF Maverick LLC*, 657 B.R. 202, 216 (S.D. Tex. 2024) (holding plaintiff failed to preserve objections to bankruptcy plan where plaintiff had actual notice of the plan and its confirmation and did not object). Plaintiff has not sought to reopen any of the Exculpation Orders, and his time to do so has expired. *See* Fed. R. Bankr. Proc. 9024 (motion for relief from order shall be brought no more than one year after entry of the order); *In re All-Tex Staffing & Personnel, Inc.*, 599 B.R. 289, 313 (Bankr. S.D. Tex. 2019) (holding eight-month delay in seeking relief from order was untimely).

Each of Plaintiff's claims is barred by the clear terms of the Exculpation Orders. The Complaint is premised entirely on the Portage Point Parties' administration of the BTC Chapter 11 proceedings. For example, the duties that the Portage Point Parties allegedly breached arise from their official roles as fiduciaries and professionals to the BTC estate. *See* Compl. ¶¶ 197, 235. Plaintiff claims as damages the professional fees the Portage Point Parties received for their work in the Chapter 11 proceedings. *See* Compl. ¶ 251. These are all claims "arising out of or relating to the Debtors and/or the Chapter 11 Cases." Removal Order ¶ 4; *see also* Governance

Order ¶ 4 (exculpating the Portage Point Parties from any claims "related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases . . .").

All remaining claims against Mr. Ray as Plan Administrator relate to his official duties in that role. For example, the Complaint takes issue with a $1.4 million sale of certain piers following confirmation of the Plan. *See* Compl. ¶ 85. That sale is alleged to have been conducted by "the Plan Administrator." *Id.* Equally, for purposes of Plaintiff's claims relating to the Settlement Agreement, the Complaint alleges that the Settlement Agreement was "executed by Mr. Ray in his capacity as Plan Administrator." Compl. ¶ 91. These claims directly violate the Plan Administrator Exculpation, which provides in the clearest possible terms that "the Plan Administrator and all professionals retained by the Plan Administrator . . . ***shall be deemed exculpated*** . . . [and] shall have no liability whatsoever to any party for the liabilities and/or obligations . . . of the Debtors." First Am. Joint Plan at 36. In addition, the Removal and Governance Orders independently exculpate the Portage Point Parties from claims arising from or relating to "the administration and implementation of a chapter 11 plan" and "the distribution of property under a chapter 11 plan or any other related agreement." Removal Order ¶ 4; Governance Order ¶ 4.

Finally, Plaintiff's claims do not fall within any exception for claims "related to any act or omission that is determined by a final order of this Court to have constituted actual fraud, willful misconduct, or gross negligence." Removal Order ¶ 4; *see also* Governance Order ¶ 4 (similar). No order of the Bankruptcy Court has determined that the Portage Point Parties committed actual fraud, willful misconduct, or gross negligence. Nor has Plaintiff even pleaded that he sought such an order from the Bankruptcy Court. The exception does not apply without one. *See* Removal Order ¶¶ 4, 7 (requiring any finding of actual fraud, willful misconduct, or gross negligence to be

made "by a final order of this Court" (*i.e.*, the Bankruptcy Court)); Governance Order ¶¶ 4, 11 (requiring finding to be made by a "a final order of a court of competent jurisdiction" and providing for exclusive jurisdiction in the Bankruptcy Court); *see also Travelers Indem. Co.*, 557 U.S. at 150 ("[W]here the plain terms of a court order unambiguously apply, as they do here, they are entitled to their effect."). Regardless, as discussed in Argument Section C, *infra*, Plaintiff does not even plead facts that, if true, could establish actual fraud, willful misconduct, or gross negligence against the Portage Point Parties.

Plaintiff's claims are squarely within those released by the Exculpation Orders, and Plaintiff has violated the Bankruptcy Court's permanent injunction by bringing them.

**B.      Counts VII, IX, XI, XII, and XIII Are Time-barred.**

Plaintiff asserts six claims whose statutes of limitations have already expired. Five of these are governed by a two-year statute of limitations under Texas law, including the claims for professional negligence (Count VII), unjust enrichment (Count IX), *Bivens* conspiracy (Count XI), wrongful termination (Count XII), and tortious interference with employment (Count XIII). *See Erikson v. Renda*, 590 S.W.3d 557, 563 (Tex. 2019) (professional negligence); *Savoia-McHugh v. McCrary*, 2022 WL 1997191, at *7 (S.D. Tex. June 6, 2022) (unjust enrichment); *Tampico v. Martinez*, 987 F.3d 387, 392 (5th Cir. 2021) (*Bivens* conspiracy); *In re Agape Christian Fellowship of Arlington*, 2007 WL 2332593, at *3 (N.D. Tex. Aug. 14, 2007) (wrongful termination); *Academy of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*, 998 F.3d 190, 201 (5th Cir. 2021) (tortious interference).

Each of the claims set forth in the preceding paragraph are time-barred. Counts VII, IX, and XI are premised on the Portage Point Parties' alleged failure to maximize the value of the estate with respect to the asset sales. *See* Compl. ¶¶ 233(e), 246, 268(g). The asset sales were

approved on August 5, 2021. Bk. 20-34682, Dkts. 1193, 1194. The Plan became effective on September 3, 2021. Bk. 20-34682, Dkt. 1340. The last sale of assets immediately followed the Plan's effective date in September 2021. Compl. ¶¶ 84–85. Each of these were more than two years before Plaintiff filed his complaint on February 26, 2024. Counts XII and XIII, Plaintiff's claims arising from his removal as CEO on February 26, 2021, expired even earlier on February 26, 2023. Counts VII, IX, XI, XII, and XIII should therefore be dismissed. *See Jones v. Alcoa, Inc.*, 339 F.3d 359, 366, 368 (5th Cir. 2003).

The sixth claim, for retaliation under Title VII (Count XII),[4] which is also time-barred, is governed by a slightly different and even shorter limitations period. Title VII required Plaintiff to file a charge with the EEOC within 180 days of the alleged unlawful employment practice, unless he had begun proceedings with a state or local agency, in which case the limitations period would have been extended to 300 days. *Moyo v. Centrica PLC*, 2013 WL 6813912 (S.D. Tex. Dec. 24, 2013). Because the statute of limitations under Title VII accrues from the time the allegedly wrongful act causes an injury giving rise to a claim, *see Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 144 (Tex. 2019), Plaintiff's retaliation claim has been time-barred since at least December 23, 2021 (300 days from February 26, 2021, when the Bankruptcy Court removed Plaintiff as CEO).

No tolling doctrines extend these limitations periods. Plaintiff was fully aware of all the events discussed above at the time they occurred. *See Beavers v. Metro. Life Ins. Co.*, 566 F.3d

---

[4] Though Plaintiff asserts "Retaliation / Wrongful Termination" together as one claim in Count XII, they are in fact two separate claims. Retaliation arises under federal law at Title VII, whereas wrongful termination is a claim under Texas common law. *Compare Ackel v. Nat'l Comm'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (explaining retaliation under Title VII), *with McClellan v. Ritz-Carlton Hotel Co.*, 961 S.W.2d 463, 464 (Tex. Ct. App. 1997) (explaining the public-policy exception to Texas's presumption of employment at will). The Portage Point Parties explain the grounds for dismissing both claims in this brief, but refer to both as "Count XII" to conform with Plaintiff's labeling.

436, 439 (5th Cir. 2009) (explaining that discovery rule tolls the statute of limitations only when the "nature of the injury incurred is inherently undiscoverable"); *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F. Supp. 2d 935, 950 (S.D. Tex. 2013) ("The doctrine of fraudulent concealment tolls the running of limitations only until the fraud is discovered or could have been discovered with reasonable diligence."). Plaintiff cannot use the October 2023 revelation of the Jones–Freeman relationship to toll the limitations periods for his claims against the Portage Point Parties because these claims do not arise from the Jones–Freeman relationship and, as discussed, Plaintiff concedes he has no evidence the Portage Point Parties were even aware of it (*see* Compl. ¶ 7 n.7).

**C.    The Complaint Does Not State Any Plausible Claim of Wrongdoing by the Portage Point Parties.**

Plaintiff's allegations do not meet Rule 12(b)(6)'s minimum threshold. By Plaintiff's own allegations, there is no evidence that the Portage Point Parties had anything to do with the alleged RICO conspiracy. Plaintiff does not allege that the Portage Point Parties took any action in furtherance of the conspiracy. Plaintiff does not even allege that the Portage Point Parties were aware of the alleged Jones–Freeman relationship on any date before the news broke to the general public. To the contrary, buried in a footnote, Plaintiff affirmatively concedes that he has *no evidence* the Portage Point Parties had *any* knowledge of the relationship. *See* Compl. ¶ 7 n.7. This is a direct admission that the Portage Point Parties are nothing more than bystanders to the central story animating Plaintiff's 131-page complaint.

Instead, Plaintiff's "claims" against the Portage Point Parties amount to a scattershot of grievances with the Chapter 11 proceedings involving his former company. Perhaps unhappy that he lost his company in those proceedings, Plaintiff is attempting an end-run around the bankruptcy process to re-litigate issues that are now foreclosed by the Chapter 11. These claims are legally deficient for a multitude of reasons discussed at length throughout this memorandum. But as an

23

initial matter, Plaintiff simply fails to allege that the Portage Point Parties committed any wrongdoing, intentional or negligent, in anything more than conclusory terms.

Plaintiff's claims for breach of fiduciary duty (Count IV), professional negligence (Count VII), and unjust enrichment (Count IX) seek relief on the basis that the Portage Point Parties failed to make "professionally reasonable efforts" to maximize the value of the Debtor estate. However, Plaintiff does not identify the relevant standard of care, let alone what the Portage Point Parties supposedly did to breach that standard of care. The sole duty of Mr. Ray and Portage Point was to maximize the value of the BTC estate. In doing so, the Portage Point Parties were entitled to rely on the advice of the other estate fiduciaries, including K&E, Jefferies, and were in all events subject to the oversight of an independent director. *See Estate of Detwiler v. Offenbecher*, 728 F. Supp. 103, 150 (S.D.N.Y. 1989) (explaining that corporate fiduciaries are entitled to rely on the advice of financial and legal advisors). The Portage Point Parties performed their duties, in good-faith reliance on advice of the Company's advisors, and there is no allegation to the contrary.

*First*, the Portage Point Parties did not remove Plaintiff from the Company—the Bankruptcy Court did, and Plaintiff admits as much. *See* Compl. ¶ 71 ("Judge Jones issued a *sua sponte* order removing Mr. Bouchard"). Plaintiff does not identify any acts by the Portage Point Parties that "effectuated" his removal. Compl. ¶ 68. Plaintiff then fails to identify any negligent acts by the Portage Point Parties after his removal. In fact, Plaintiff acknowledges that the Portage Point Parties entered into contracts to preserve the value of the fleet. Compl. ¶ 76. Plaintiff does not allege any other deficiencies in the Portage Point Parties' operation of the Company, and he does not allege any deficiencies in the auction process for the estate's assets.

*Second*, Plaintiff's insinuations of a conflict of interest with JMB —which won the auction to acquire certain BTC assets in the sale process—do not withstand even the lightest scrutiny. *See*

Compl. ¶¶ 80–89.  The Complaint alleges that, after the sale closed, the Portage Point Parties were "immediately hired by JMB as a consultant to assist in running the purchased business."  Compl. ¶ 83.  But the Plan expressly provided that it "shall not limit the authority . . . of the Plan Administrator . . . to continue the employment of any former manager or officer, including pursuant to any transition services agreement" between BTC and JMB.  First Am. Joint Plan at 24. The Complaint then seems to claim a lack of proper disclosure but goes on to admit that the potential transition services *were* disclosed.  *See* Compl. ¶ 83 (acknowledging that "the Portage Point Parties left open the possibility that it might provide 'transition services' for JMB after the Sale (which was stated in the Plan and orders approving the Sale)"); *id.* ¶ 87 (acknowledging that the Portage Point Parties "advised that they may be employed by JMB").  In any event, this alleged "conflict" could not have affected the sale of assets to JMB, which happened *before* there was any transition services agreement with the Portage Point Parties.

*Third*, as to the sale of certain pier property following confirmation of the Plan, *see* Compl. ¶ 85, the buyer is not even alleged to be JMB, and Plaintiff does not allege any conflict of interest with the actual purchaser.  *See id.*  In any event, the basic premise of the supposed conflict is flawed because the "competing masters" allegedly consisting of the estate, its shareholders, and its creditors (including JMB), Compl. ¶ 86, are not competing at all.  All would benefit from maximizing the value of the estate through obtaining the highest possible price for the sale of its assets.

*Fourth*, Plaintiff concedes that Mr. Ray and Portage Point are not parties to the Settlement Agreement.  Rather, Mr. Ray signed the Settlement Agreement in his capacity as Plan Administrator. Compl. ¶ 91.  That means the wind-down estate, not Mr. Ray, was the party to the proposed Settlement Agreement.  Regardless, Plaintiff further concedes that the Settlement

Agreement was never consummated. *Id*. It is therefore not an enforceable contract by its own terms. *Id.* Although Plaintiff attempts to argue that Mr. Ray did not take sufficient efforts to obtain approval, the Complaint admits that the Plan Administrator filed a motion with the Bankruptcy Court seeking its approval. Compl. ¶ 92.

Even if Plaintiff had identified wrongdoing (he has not), Plaintiff fails to explain how any of the Portage Point Parties' actions proximately caused his alleged injuries. While Plaintiff includes a conclusory assertion that the Portage Point Parties reduced the value of the bankruptcy estate,[5] he does not plead what the value would have been but for their management, how that value compared to BTC's debts, or where Plaintiff's claims would fall in the order of priority. Even assuming *arguendo* that the Portage Point Parties failed to maximize estate value in some way (they did not), these allegations do not provide sufficient basis to infer that *Plaintiff's* recovery was at all impacted. *See In re Loggins*, 513 B.R. 682, 703 (Bankr. E.D. Tex. 2014).

For these reasons and more described below, Plaintiff's complaint fails to allege the basic wrongdoing necessary to support his claims against the Portage Point Parties. His claims should be dismissed under Rule 12(b)(6) and, to the extent they purport to allege fraud, Rule 9(b).

### D.     All Claims Are Barred by the Barton Doctrine.

Court-appointed officers of bankruptcy estates, like a CRO, are protected by the "Barton Doctrine"[6] against liability for acts taken in the officer's official capacity. *See Villegas v. Schmidt*, 788 F.3d 156, 158–59 (5th Cir. 2015). The Barton Doctrine requires a plaintiff to seek leave of the court that appointed the fiduciary before the plaintiff may bring suit. *See id.* This rule protects against attempts by parties "to obtain some advantage over the other claimants" on estate assets

---

[5] As explained in Argument E, *infra*, these are not even Plaintiff's harms to assert. Claims premised on harms to the estate are derivative claims belonging to the estate, not an individual shareholder or creditor.
[6] So named for the Supreme Court's decision in *Barton v. Barbour*, 104 U.S. 126 (1881).

by circumventing the bankruptcy court's administration of the process to ensure that assets are distributed fairly. *Barton v. Barbour*, 104 U.S. 126, 128 (1881). For example, in *In re Preferred Ready-Mix, LLC*, 2024 WL 1392550, at \*6 (S.D. Tex. Mar. 31, 2024), the District Court applied the Barton Doctrine to hold that the plaintiff's failure to seek leave to sue a receiver from the state court that appointed it barred suit in the federal bankruptcy court. The Barton Doctrine applies to a CRO appointed by the bankruptcy court and the CRO's supporting firm. *See Villegas*, 788 F.3d at 159 (explaining that the Barton Doctrine protects a "bankruptcy-court-appointed officer"); *In re W.B. Care Center, LLC*, 497 B.R. 604, 611 (Bankr. S.D. Fla. 2013) (dismissing suit against CRO and his supporting firm as "squarely prohibited" by the Barton Doctrine).

Plaintiff did not comply with the Barton Doctrine. The Portage Point Parties were appointed by the Bankruptcy Court as the Debtors' restructuring advisors (Portage Point) and CRO, director, and Plan Administrator (Mr. Ray). *See* Order, Bk. 20-34682, Dkt. 243; Governance Order ¶ 2; Compl. ¶ 67. Plaintiff's allegations all concern the Portage Point Parties' performance in their official capacities as CRO, restructuring advisor, and Plan Administrator of the BTC estates. Plaintiff was therefore required under the Barton Doctrine to seek leave of the Southern District of Texas Bankruptcy Court that appointed the Portage Point Parties to those roles, but he has not. For these reasons, just as in *Villegas*, Plaintiff's claims must be dismissed. *See Villegas*, 788 F.3d at 159 (affirming dismissal for failure to comply with the Barton Doctrine); *In re: Preferred Ready-Mix*, 2024 WL 1392550, at \*3, \*6 (S.D. Tex. Mar. 31, 2024) (remanding to the Bankruptcy Court with instructions to dismiss for plaintiff's failure to comply with the Barton Doctrine and observing that Barton Doctrine is "jurisdictional in nature").

No exception to the Barton Doctrine applies here.[7]  Plaintiff's claims do not concern "carrying on business" as required for the § 959(a) statutory exception to apply—BTC had no ongoing business during the Portage Point Parties' tenure because its operations shut down prior to filing for Chapter 11.  *See* Bk. 20-34682, Dkt. 79 ¶ 3; *Nat'l Bus. Consultants Inc.*, 292 F. App'x at 300 (holding § 959(a) did not apply where the company had "ceased all business operations").  Plaintiff's allegations against the Portage Point Parties instead concern only "administering or liquidating the bankruptcy estate," which falls outside the scope of § 959(a), and Plaintiff additionally is not a stranger to the Chapter 11 proceedings.  *Equipment Leasing, LLC v. Three Deuces, Inc.*, 2011 WL 6141443, at *4 (E.D. La. Dec. 9, 2011); *In re Preferred Ready-Mix*, 2024 WL 1392550, at *3.  And Plaintiff does not allege any *ultra vires* acts by the Portage Point Parties.  *Id.*; *Matter of Foster*, 2023 WL 20872, at *6.  Plaintiff therefore has no basis to excuse his failure to comply with the Barton Doctrine, and his Complaint must be dismissed.

E.     **Counts IV, VII, and IX Are Derivative Claims That Plaintiff Lacks Standing to Bring.**

Three of Plaintiff's claims are derivative rather than direct in nature and purport to vindicate harm on behalf of the Debtors, including two time-barred claims—professional negligence (Count VII) and unjust enrichment (Count IX)—and one claim for breach of fiduciary

---

[7] Two exceptions exist to the Barton Doctrine.  First, 28 U.S.C. § 959(a) contains a statutory exception to the Barton Doctrine pursuant to which claims may be brought without permission where the challenged acts concern "carrying on business" with estate property.  Courts interpret § 959(a) to apply "when a receiver or trustee is operating a business from which a stranger to the bankruptcy process is harmed."  *See In re Preferred Ready-Mix*, 2024 WL 1392550, at *3.  Section 959(a) does not apply to liquidation or preservation of assets within a bankruptcy process. *See Equipment Leasing, LLC*, 2011 WL 6141443, at *4 (holding § 959(a) does not apply to suits arising from "administering or liquidating the bankruptcy estate"); *Nat'l Bus. Consultants Inc. v. Lightfoot*, 292 F. App'x 298, 300 (5th Cir. Aug. 19, 2008) (holding § 959(a) did not apply because the receiver's actions involved "only liquidation"); *Muratore v. Darr*, 375 F.3d 140, 144 (1st Cir. 2004) ("[C]ourts have concluded that merely holding and collecting the assets intact, collecting and liquidating the assets of the debtor, and taking steps for the care and preservation of the property do not constitute 'carrying on business.'" (citations omitted)).  Second, the Barton Doctrine does not protect "*ultra vires*" actions, *i.e.*, actions outside the scope of the appointed professional's official duties. *In re Preferred Ready-Mix*, 2024 WL 1392550, at *3; *Matter of Foster*, 2023 WL 20872, at *6 (5th Cir. Jan. 3, 2023).

duty (Count IV).  *First*, all derivative claims on behalf of the BTC estates were released in the confirmed Plan.  *See* First Am. Plan, Bk. 20-34682, at 41 (Bankr. S.D. Tex. Aug. 23, 2021).  Even if Plaintiff's derivative claims had not already been released by the Plan, an individual shareholder or creditor lacks standing to bring derivative claims.  *See Matter of Educators Grp. Health Tr.*, 25 F.3d 1281, 1284 (5th Cir. 1994) ("If a cause of action belongs to the estate, then the trustee has exclusive standing to assert the claim."); *see also Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1153 (5th Cir. 1987) (explaining that allowing "the plaintiff's actions to proceed would undercut the general bankruptcy policy of ensuring that all similarly-situation [individuals] are treated fairly").  A claim is derivative if it depends on or derives from harm to the estate or depletion of estate assets.  *See In re Buccaneer Res., L.L.C.*, 912 F.3d 291, 293 (5th Cir. 2019).  To pursue a claim on its own behalf, a creditor must show that its "direct injury is not dependent on injury to the estate."  *Id.* at 293–94.

A recent decision from the Southern District of Texas, *In re Lockwood Holdings Inc.*, 2024 WL 727762 (S.D. Tex. Feb. 22, 2024), is instructive.  There, Michael Lockwood was the sole shareholder, CEO, and creditor for the Lockwood entities that entered Chapter 11.  *Id.* at *1. Lockwood filed a petition against the estate's financial advisory firm and the chief restructuring officer asserting negligence and failure to adequately disclose conflicts of interest.  *Id.*  Lockwood argued that the defendants' misconduct caused him direct financial harm, rather than derivative, because he was the sole shareholder of the Lockwood entities and because he personally guaranteed the entities' debt.  *Id.* at *6.  The Bankruptcy Court rejected this argument, and the District Court affirmed.  *Id.*  The District Court explained that where "the actions of a professional caused the enterprise to be worth less than if the right job had been done.  That's a derivative claim. That claim is not owned by Mr. Lockwood, he can't bring it."  *Id.*  Even for Lockwood, who was

the sole shareholder and creditor of the Lockwood entities, any harm that "comes about *only* because of harm to the debtor" was a derivative claim that was not his to assert. *Id.*

As in *Lockwood*, Plaintiff's Counts IV, VII, IX are derivative. In Plaintiff's own words, the alleged breaches of fiduciary duty (Count IV) "resulted in Mr. Bouchard's equity stake in BTC being vitiated" (Compl. ¶ 203); the alleged professional negligence (Count IX) "diminished the value of BTC's assets" (Compl. ¶ 233(e)); and for unjust enrichment (Count VII), "the bankruptcy estate was diminished by the fees improperly awarded to" defendants (Compl. ¶ 246). These are all harms to the BTC estate, not Plaintiff directly—and it makes no difference that Plaintiff was the sole shareholder. *In re Lockwood Holdings*, 2024 WL 727762, at *6; *see also In re NC12, Inc.*, 478 B.R. 820, 836 (Bankr. S.D. Tex. 2012) (holding claims were derivative where there was "no indication of any harm to [Plaintiff] *other than* the harm to" the company). Even Plaintiff's tacked-on claims of "mental anguish" and "emotional distress" are themselves derivative injuries that indirectly arise from harm to BTC. *See* Compl. ¶ 203. As courts hold, alleged damages for mental anguish, humiliation, and reputational harm are equally subject to dismissal as "derivative injuries that 'indirectly stem from the alleged harm'" to the company. *Galindo v. City of Del Rio*, 2021 WL 2763033, at *4 (W.D. Tex. Mar. 26, 2021). Plaintiff lacks standing to bring these derivative claims, and Counts IV, VII, and IX should be dismissed. *See In re Radnor Holdings Corp.*, 564 B.R. 467, 484–85 (N.D. Tex. 2019) (dismissing shareholder's derivative claims where shareholder only alleged harm through the debtor, "by virtue of his ownership of equity"), *aff'd sub nom. Matter of Acis Cap. Mgmt., L.P.*, 850 F. App'x 302 (5th Cir. 2021).

### F. Count IV Fails for the Additional Reason that the Portage Point Parties Owed No Fiduciary Duties to Plaintiff Individually.

To the extent Plaintiff seeks to prosecute his breach of fiduciary duty claim (Count IV) as a direct claim against the Portage Point Parties, it fails because individual creditors are not owed

fiduciary duties; fiduciary duties are owed by appointed estate professionals only to the estate or creditors as a whole. *See In re Cornerstone Prods., Inc.*, 416 B.R. 591, 607–08 (Bankr. E.D. Tex. 2008). This includes a duty to avoid favoring one creditor over others. *See In re Lyons Equip. Co., Inc.*, 436 B.R. 281, 285 (Bankr. W.D.N.Y. 2010) ("The restructuring officer simply owes no special duty to any specific creditor or employee."). Because Plaintiff is an individual creditor, the Portage Point Parties owed him no fiduciary duty directly and Count IV should be dismissed for this independent reason.

### G. Count XI Fails Because Plaintiff Fails to Plead a Cognizable *Bivens* Conspiracy Claim.

Plaintiff's *Bivens* conspiracy claim (Count XI) as against the Portage Point Parties is entirely frivolous. Plaintiff concedes that he has no evidence the Portage Point Parties were even aware of the Jones–Freeman relationship that Plaintiff alleges was the foundation of the conspiracy, let alone that they ever agreed to participate in it. *See* Compl. ¶ 7 n.7. Given that Plaintiff does not name the Portage Point Parties as defendants to any of the other conspiracy counts, it appears the Portage Point Parties' inclusion in Count XI is most likely a mistake.

To the extent Plaintiff did intend to include the Portage Point Parties in this count, however, *Bivens* does not extend to these circumstances. The Fifth Circuit has cautioned that "extending *Bivens* to new contexts is a 'disfavored judicial activity,'" *Oliva v. Nivar*, 973 F.3d 438, 442 (5th Cir. 2020), and that "in recent decades, the Supreme Court has consistently refused to extend *Bivens* to *any* new context," *Butler v. S. Porter*, 999 F.3d 287, 293 (5th Cir. 2021). This would be a new *Bivens* context. The Supreme Court "has never recognized a *Bivens* action under the Due Process Clause outside of the context of gender discrimination." *Jackson v. Varono*, 2018 WL 5046227, at *5 (W.D. La. Oct. 17, 2018). And courts have never recognized a *Bivens* claim under any theory of conspiracy. *Brunson v. Nichols*, 2018 WL 7286410, at *3 (W.D. La. Dec. 7, 2018).

When a new *Bivens* context is presented, a *Bivens* remedy is unavailable if there are "'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert v. Boule*, 596 U.S. 482, 492 (2022). "If there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy." *Id.* Such special factors counsel against extending *Bivens* to the Portage Point Parties here. For one, the uncertainty of whether a *Bivens* cause of action exists is itself "a special factor that forecloses relief." *Id.* at 493; *see also Hernandez v. Mesa*, 885 F.3d 811, 818 (5th Cir. 2018) (en banc) ("The newness of this 'new context' should alone require dismissal."). The Portage Point Parties also are particularly poor targets for a new *Bivens* context because they are not government officials. In addition, Plaintiff concedes that the Portage Point Parties were unaware of the Jones–Freeman relationship that forms the basis of Plaintiff's alleged conspiracy. Compl. ¶ 7 n.7. Finally, there is an "alternative remedial structure" in place in the form of a U.S. Trustee that has shown itself fully capable of seeking to vacate fees if it deems appropriate—including in the BTC Chapter 11. *Egbert*, 596 U.S. at 483; Mot. for Relief from Judgment or Order Pursuant to Fed. R. Civ. P. 60(b)(6), Bk. 20-34758, Dkt. 354.

### H. Counts XII and XIII Fail to Plead Basic Elements of Claims Under Employment Law.

Plaintiff's claims under employment law—retaliation/wrongful termination (Count XII) and tortious interference with employment (Count XIII)—are entirely inapplicable to this case.

First, despite being pleaded as one claim, retaliation and wrongful termination as against public policy are two different claims. Retaliation is a Title VII claim under federal law, whereas wrongful termination arises under Texas common law. *Compare Ackel v. Nat'l Comm'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (explaining retaliation under Title VII), *with McClellan v. Ritz-*

*Carlton Hotel Co.*, 961 S.W.2d 463, 464 (Tex. Ct. App. 1997) (explaining the public-policy exception to Texas's presumption of employment at will). In any event, regardless of which claim Plaintiff intended to plead, it fails because the Portage Point Parties were not Plaintiff's employer and therefore did not terminate him—the Bankruptcy Court did. *See* Compl. ¶ 71 ("Nevertheless, Judge Jones issued a *sua sponte* order removing Mr. Bouchard after a status hearing on a separate matter."). Neither retaliation nor wrongful termination may be asserted against a party other than the employer who terminated the individual. *See Grant v. Lone Star Co.*, 21 F.3d 649, 653 (5th Cir. 1994) ("Thus, we conclude that title VII does not permit the imposition of liability upon individuals unless they meet title VII's definition of 'employer.'"); *Herrera v. Resignato*, 621 S.W.3d 835, 842 (Tex. Ct. App. 2021) ("only an employer can wrongfully terminate the employment relationship").

Aside from that obvious and fatal flaw, Plaintiff's claims for retaliation and wrongful termination fail for additional reasons. For his retaliation claim, Plaintiff failed to exhaust his remedies before the EEOC or a state agency and is now time-barred from doing so. *See Moyo*, 2013 WL 6813912, at *1; Argument Section B, *supra*. Plaintiff was also not engaged in any protected activity under Title VII. *See Konnethu v. Harris County Hosp. Dist.*, 669 F. Supp. 2d 781, 793 (S.D. Tex. 2009) ("An employee has engaged in activity protected by Title VII if he has either opposed any practice made an unlawful employment practice by Title VII or made a charge, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII."). Plaintiff's wrongful termination claim fails because Plaintiff was not asked to perform any illegal act. The public-policy exception to employment at will "allows an employee to sue for wrongful termination if fired 'for the *sole reason* that the employee refused to perform an illegal act.'" *McClellan*, 961 S.W.2d at 464; *see also Brooks v. AAA Cooper Transp.*, 781 F. Supp. 2d

472, 483 (S.D. Tex. 2011). Plaintiff does not allege that he was asked to, or that he refused to, perform any illegal act. Even if he did (though he did not), it would not be the "sole" reason he was terminated. *Id.*

Plaintiff's claim for tortious interference with employment is similarly flawed. Plaintiff alleges that the Portage Point Parties interfered with his employment relationship by "misrepresenting facts and issues before the Bankruptcy Court relating to Bouchard and BTC" and "advocating to the Bankruptcy Court and to other professionals and employees of BTC that Bouchard be terminated from his positions as CEO and director of BTC." Compl. ¶¶ 282–83. However, he does not identify any specific misrepresentation the Portage Point Parties supposedly made to the Bankruptcy Court. *See Johnson Serv. Grp., Inc. v. France*, 2011 WL 248552, at *2 (N.D. Tex. Jan. 27, 2011) (dismissing insufficiently pleaded tortious-interference claim). Plaintiff cannot provide this specificity because his allegations are false—the transcripts from the February 24 and 26, 2021 hearings are available in the public record and show clearly that the Portage Point Parties did even not advocate for his removal, let alone misrepresent any fact in doing so. *See* Bk. 20-34682, Dkts. 557, 591. In any event, it would not matter even if he could because statements made in a court proceeding are absolutely privileged against tort claims. *See McLean v. Int'l Harvester Co.*, 817 F.2d 1214, 1220 (5th Cir. 1987); *Landry's, Inc. v. Animal Legal Defense Fund*, 631 S.W.3d 40, 46 (Tex. 2021) ("Although commonly applied in defamation cases, the [judicial-proceedings] privilege prohibits 'any tort litigation based on the content of the communication at issue.'"). Plaintiff further alleges that the Portage Point Parties "threaten[ed] to terminate him and vitiate his equity interests and/or value of such," Compl. ¶ 283, but he again fails to identify any specific instances of this. That never occurred, nor would it even make sense for the Portage Point Parties to say that, because they had no authority to "terminate" him at that time. Because Plaintiff

does not allege any statements the Portage Point Parties made outside (or inside) of court hearings preceding his removal, Plaintiff has no basis for his tortious-interference claim.

**I.      Count XIV Fails Because the Portage Point Parties Are Not Parties to the Settlement Agreement, the Settlement Agreement Is Not a Valid Contract, and the Portage Point Parties Did Not Breach It.**

Plaintiff's claim for breach of the proposed Settlement Agreement fails to establish the basic elements of that claim. For starters, the Portage Point Parties are not parties to it. Compl. ¶ 91 ("... the Settlement Agreement, executed by Mr. Ray *in his capacity as Plan Administrator* ..." (emphasis added)). While that alone is sufficient to dismiss the claim, the proposed Settlement Agreement is also not a valid contract. By its own terms, the proposed Settlement Agreement was "subject to an order of the Bankruptcy Court approving the Settlement Agreement (the 'Approval Order') and shall be of no force and effect unless and until the Approval Order is entered." Settlement Agreement § 10. It further specifies that obtaining the Approval Order is a condition precedent to the Settlement Agreement being in force, and that if the Approval Order is not obtained, each of the parties' rights and interests "shall be restored without prejudice as if this Settlement Agreement had never been entered." *Id.* § 12. Plaintiff concedes that the Settlement Agreement "was never consummated." Compl. ¶ 91.

Regardless, the Portage Point Parties fulfilled any purported obligations under Settlement Agreement § 10. That provision stated in relevant part: "The Post-Effective Date Debtors agree to use best efforts to obtain expeditious approval of the within Settlement Agreement, including filing a motion for such approval within five (5) business days of execution." Settlement Agreement § 10. Plaintiff acknowledges that the Post-Effective Date Debtors filed that motion seeking approval. Compl. ¶ 92; Motion for Approval of Proposed Settlement Agreement, Bk. 20-34758, Dkt. 311. Because Mr. Ray was advised by counsel that he did not need to attend, Portage

Point's Mr. Gasbarra, who was familiar with the proposed Settlement Agreement and its negotiations, attended the hearing to testify in support of the motion.  March 28, 2023, Hearing Tr., Bk. 20-34758, Dkt. 328 (Tr. 7:24–27:2).  The Bankruptcy Court requested testimony from Mr. Ray, and the parties—including Plaintiff's counsel—agreed to reschedule the hearing to a date when Mr. Ray could attend.  March 28, 2023 Hearing Tr., Bk. 20-34758, Dkt 328 (Tr. 29:4–5) (Bouchard's counsel: "I understand that makes sense, from my perspective.").  The motion was then adjourned while the parties attempted to resolve the UCC's objection to it and was later taken off the calendar.  The Portage Point Parties sufficiently sought approval of the proposed Settlement Agreement.

Finally, Plaintiff does not adequately plead any damages resulting from the alleged breach.  Plaintiff's legal costs for negotiating the Settlement Agreement and seeking its approval are not caused by any breach of it.  *See* Compl. ¶ 95.  Plaintiff also fails to plead facts explaining what the "Bouchard Claims" were or what their likelihood of success would be if they were allowed.  Compl. ¶ 95.  Plaintiff's breach-of-contract claim should be dismissed for this additional reason.  *See J.D. Fields & Co., Inc. v. N. Am. Fabricators, L.L.C.*, 2015 WL 13119409, at *2 (S.D. Tex. June 16, 2015) (dismissing counterclaim for breach of contract for failure to allege damages).

### J.    Count XV Fails Because Plaintiff Has Not Pleaded Circumstances Showing That an Accounting Is Necessary.

Plaintiff's claim for an accounting is first premature.  An accounting is generally, though not universally, considered an equitable remedy rather than a standalone claim.  *See, e.g.*, *Johnson v. Wells Fargo Bank, NA*, 999 F. Supp. 2d 919, 935 (N.D. Tex. 2014).  Regardless of how it is characterized, however, an accounting requires an underlying breach of fiduciary duty, and for the reasons explained throughout this memorandum, Plaintiff has not adequately pleaded one.  *See id.*

In addition, Plaintiff has not pleaded any circumstances warranting an accounting.  "An

36

accounting is proper under equity if the facts presented are so complex that adequate relief is not available at law." *In re AMC-Tex., Inc.*, 430 B.R. 371, 413 (Bankr. W.D. Tex. 2010). But when "the use of regular discovery allows for adequate relief, an accounting is not required." *Id.* The only benefit that Plaintiff pleads the Portage Point Parties received was their earned professional fees. *See* Compl. ¶ 299. Those amounts are readily available on the public docket through Portage Point's applications for payment of professional fees. To the extent Plaintiff would be entitled to recover any other amounts from the Portage Point Parties (though he is not and does not plead what those may be), Plaintiff does not explain why normal discovery procedures would be inadequate. An accounting is not proper here.

## K. Count XVI Is Not an Independent Claim.

Respondeat superior is not an independent cause of action. *See Haskett v. Capital Land Servs., Inc.*, 2015 WL 12556307, at *6 n.2 (S.D. Tex. Dec. 9, 2015). Count XVI should therefore be dismissed.

## L. In the Alternative, the Bankruptcy Court Is the Proper Venue for All Claims.

On August 26, 2021, the Bankruptcy Court issued its order confirming the Plan. Order, Bk. 20-34682, Dkt. 1319 (the "Confirmation Order"). The Confirmation Order provides that "this Bankruptcy Court retains jurisdiction over all matters arising out of or related to these Chapter 11 Cases and the Plan." Confirmation Order at 35; *see also* 11 U.S.C. § 1141(a) ("[T]he provisions of a confirmed plan bind . . . any creditor, equity security partner, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan."). The Removal and Governance Orders also each provide that "This Court retains exclusive jurisdiction with respect to all matters arising from or related to the

implementation, interpretation, and enforcement of this Order." Removal Order ¶ 7; Governance Order ¶ 11.

This Court should dismiss Plaintiff's claims with prejudice for all the reasons discussed throughout this Memorandum. However, in the alternative, this Court should dismiss for improper venue in favor of the Bankruptcy Court. As discussed above at Argument Section A, *supra*, Plaintiff's claims against the Portage Point Parties center entirely on their administration of the Chapter 11 proceedings. The Confirmation, Removal, and Governance Orders each provide for exclusive jurisdiction in the Bankruptcy Court for such claims. Confirmation Order at 35; Removal Order ¶ 7; Governance Order ¶ 11. By bringing them here, Plaintiff seeks to avoid the procedures in place to protect the fairness of the distribution of the estate among BTC's various stakeholders, and instead seeks to obtain a disproportionate return that he is not entitled to. If it does not dismiss Plaintiff's claims outright, this Court should not permit him to circumvent the Bankruptcy Court's orders or process and should instead dismiss for improper venue.

## M. Plaintiff Should Not Be Granted Leave to Replead.

Dismissal with prejudice is proper when a complaint's deficiencies cannot be cured by an amendment. *HCB Fin. Corp. v. McPherson*, 8 F.4th 335, 345–46 (5th Cir. 2021). That is the case here. Plaintiff's incurable deficiencies include:

- The Exculpation Orders cannot be appealed or reopened.

- Plaintiff's claims for professional negligence (Count VII), unjust enrichment (Count IX), *Bivens* conspiracy (Count XI), retaliation/wrongful termination (Count XII), and tortious interference with employment (Count XIII) are time-barred.

- For Plaintiff's claims of breach of fiduciary duty (Count IV), professional negligence (Count VII), unjust enrichment (Count IX), and *Bivens* conspiracy (Count XI), Plaintiff lacks standing to bring derivative claims. *See In re SBMC Healthcare, LLC*, 2017 WL 2062992, at *20 (S.D. Tex. May 11, 2017) (affirming dismissal with prejudice because "shareholders lack standing to prosecute claims derived from wrongs done to a corporation").

38

- For Plaintiff's claim of breach of fiduciary duty (Count IV), the Portage Point Parties owe no fiduciary duty to Plaintiff individually.

- For Plaintiff's claim of retaliation and/or wrongful termination (Count XII) and tortious interference with employment (Count XIII), the Portage Point Parties did not terminate Plaintiff from his position as CEO and are absolutely privileged in any statements made in court.

- For Plaintiff's claim of breach of contract (Count XIV), the Settlement Agreement never came into force and the Portage Point Parties are not parties to it.

- Plaintiff concedes that he has no evidence the Portage Point Parties knew of or participated in any conspiracy with the RICO defendants.

Because Plaintiff will not be able to cure these deficiencies, among others, his claims against the Portage Point Parties should be dismissed with prejudice. *HCB Fin. Corp.*, 8 F.4th at 345–46.

## **CONCLUSION**

For the reasons set forth above, the Portage Point Parties respectfully request that this Court dismiss Counts IV, VII, IX, XI, XII, XIII, XIV, XV, and XVI with prejudice insofar as they are pleaded against the Portage Point Parties. In the alternative, the Portage Point Parties respectfully request that this Court dismiss the above-listed claims for improper venue.

Dated: June 14, 2024

By:     /s/ Michael P. Lynn
        _____

Michael P. Lynn PC
*Attorney in Charge*
Texas Bar No: 12738500
Christopher Akin
Texas Bar No: 00793237
Jamie Drillette
Texas Bar No: 24105820
Andy Kim
Texas Bar No: 24136638
**LYNN PINKER HURST & SCHWEGMANN LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3801
mlynn@lynnllp.com
cakin@lynnllp.com
jdrillette@lynnllp.com
akim@lynnllp.com

Duane L. Loft*
Shireen Barday*
Anastasia Cembrovska*
John McAdams*
**PALLAS PARTNERS (US) LLP**
75 Rockefeller Plaza
New York, NY 10001
Telephone: (212) 970-2300
Duane.Loft@pallasllp.com
Shireen.Barday@pallasllp.com
Anastasia.Cembrovska@pallasllp.com
John.McAdams@pallasllp.com

*Admitted *pro hac vice*

*Attorneys for Defendants Portage Point Partners, LLC and Matthew Ray*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 14, 2024, a true and correct copy of this documents was served on the following counsel of record vis the Court's CM/ECF system and by e-mail in compliance with the Federal Rules of Civil Procedure and Southern District of Texas Local Rule 5.3:

Mikell Alan West
Robert W. Clore
**BANDAS LAW FIRM, PC**
802 N. Carancahua Street, Suite 1400
Corpus Christi, Texas 78401
Telephone: (361) 698-5200
mwest@bandaslawfirm.com
rclore@bandaslawfirm.com

*Counsel for Plaintiff Morton S. Bouchard*

John J. Sparacino
**MCKOOL SMITH, PC**
600 Travis Street, Suite 7000
Houston, Texas 77002
Telephone: (713) 485-7300
Facsimile (713) 485-7344
jsparacino@mckoolsmith.com

Russell Hardin, Jr.
Jennifer Elizabeth Brevorka
Leah Graham
Emily Smith
**RUSTY HARDIN & ASSOCIATES, LLP**
1401 McKinney Street, Ste. 2250
Houston, TX 77010
Telephone: (713) 652-9000
rhardin@rustyhardin.com
jbrevorka@rustyhardin.com
lgrahm@rustyhardin.com
esmith@rustyhardin.com

*Counsel for Jackson Walker LLP*

Tom Kirkendall
2 Violetta Ct
The Woodlands, TX 77381
(713) 703-3536
bigtkirk@gmail.com

*Counsel for Elizabeth C. Freeman*

John Hueston
California Bar No. 164921 (*Pro Hac Vice*)
**HUESTON HENNIGAN LLP**
523 West 6th St., Unit 400
Los Angeles, CA 90014
Telephone: (213) 788-4340
Facsimile: (888) 866-4825
jhueston@hueston.com

*Counsel for Kirkland & Ellis LLP and*
*Kirkland & Ellis International LLP*

David J. Beck
**BECK REDDEN LLP**
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720
dbeck@beckredden.com

Gregory Torres
ATTORNEY AT LAW, P.L.L.C.
457 Jefferson Street
Eagle Pass, Texas 78852
Telephone: (830) 773-6811
Facsimile: (830) 773-6469
g_torres_law@hotmail.com

*Additional Counsel for Kirkland & Ellis LLP and Kirkland & Ellis International LLP*

By: _/s/ Michael P. Lynn_
     Michael P. Lynn