**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| MORTON S. BOUCHARD, III, INDIVIDUALLY AND AS CO-TRUSTEE FOR THE MORTON S. BOUCHARD 2017 FAMILY TRUST <br><br> PLAINTIFF, <br><br> V. <br><br> DAVID R. JONES, ELIZABETH CAROL FREEMAN, JACKSON WALKER, LLP, KIRKLAND & ELLIS, LLP, KIRKLAND & ELLIS INTERNATIONAL, LLP, PORTAGE POINT PARTNERS, LLC, AND MATTHEW RAY <br><br> DEFENDANTS. | CIVIL ACTION FILE NO. 4:24-CV-00693 |

To the Honorable Alia Moses,
Chief United States District Judge:

**PLAINTIFF'S RESPONSE TO DEFENDANT
ELIZABETH CAROL FREEMAN'S MOTION TO DISMISS**

i

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

    A. Judge Jones's Relationship with Elizabeth Freeman, a Partner at Jackson Walker, and Plan to Transform the Southern District of Texas into a Center for Bankruptcy Litigation....................................................................................................................3

    B. Judge Jones Awards Millions of Dollars in Fees to His Live-In Girlfriend and the Firm Where She Was a Partner.....................................................................................4

    C. The Intimate Relationship Between Freeman and Jones Comes to Light ...................7

STANDARD...........................................................................................................................8

ARGUMENT & AUTHORITIES .........................................................................................9

    I.     Plaintiff Adequately Pleads Causation of Damages .................................................9

    II.    Plaintiff's RICO Claims Are Adequately Alleged...................................................12

        A. Plaintiff Has Sufficiently Alleged Each Challenged Element of His RICO Claim................................................................................................................12

            1. Plaintiff has sufficiently alleged injury and causation...............................13

            2. Plaintiff has sufficiently pleaded the existence of the Enterprise .............13

            3. Plaintiff has alleged a purpose for the Enterprise that is separate from its predicate acts of racketeering...................................................................13

            4. The Enterprise had a separate structure and functioned as a continuing unit ..................................................................................................................15

            5. Plaintiff has properly alleged Freeman's agreement to the RICO conspiracy ................................................................................................17

            6. Plaintiff has adequately alleged racketeering activity by Freeman and the other defendants ....................................................................................19

    III.   The *Bivens* Conspiracy Claim Is Adequately Pled .................................................20

    IV.   Freeman's Arguments Related to "Other Defects" Fail .........................................22

        A. The Attorney Immunity Doctrine Does Not Bar Plaintiff's Claims ..........22

        B. The Judicial Proceedings Privilege Does Not Bar Plaintiff's Claims ........24

        C. Freeman's Duty of Care Argument Is Inapplicable Here ..........................25

D.  Plaintiff Has Alleged Sufficient Facts That Defendants Were Unjustly Enriched ...................................................................................26

V.    Plaintiff Has Standing ........................................................................27

VI.   Plaintiff Requests Leave to Amend His Complaint Prior to Dismissal .................30

CONCLUSION AND PRAYER ...................................................................31

## <u>TABLE OF AUTHORITIES</u>

*Cases*

*Alix v. McKinsey & Co.,*
    23 F.4th 196 (2d Cir. 2022) ..................................................................11, 29, 30

*Alpert v. Crain, Caton & James, P.C.,*
    178 S.W.3d 398 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)..............................22

*AMS Sensors USA Inc. v. Renesas Elecs. Am. Inc.,*
    No. 4:08-CV-00451, 2021 WL 12234726 (E.D. Tex. Dec. 14, 2021). ...........................26

*Anderson v. Valdez,*
    845 F.3d 580 (5th Cir. 2016) ...................................................................................8

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).................................................................................................8

*Benchmark Elecs., Inc. v. J.M. Huber Corp.,*
    343 F.3d 719 (5th Cir. 2003) ...................................................................................9

*Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.,*
    595 S.W.3d 651 (Tex. 2020)...............................................................................23, 24

*Bird v. W.C.W.,*
    868 S.W.2d 767 (Tex. 1994). ...............................................................................25

*Bivens v. Six Unknown Federal Narcotics Agents,*
    403 U.S. 388 (1971)...................................................................................8, 20, 21, 22

*Boyle v. U.S.,*
    556 U.S. 938 (2009).......................................................................................15, 16, 17

*Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC,*
    566 B.R. 815 (W.D. Tex. 2017) ...............................................................................18

*Cantey Hanger, LLP v. Byrd,*
    467 S.W.3d 477 (Tex. 2015).................................................................................22, 24

*Ctr. For Inquiry, Inc., v. Warren,*
    845 Fed. Appx. 325 (5th Cir. 2021)..........................................................................10

*Dell Inc. v. Mishra,*
    No. A-16-CV-00641-SS, 2018 WL 3717119 (W.D. Tex. Aug. 3, 2018)........................16

*Diamond Consortium, Inc. v. Manookian*,
    2017 WL 1495091 (E.D. Tex. April 26, 2017)................................................15

*Egbert v. Boule*,
    596 U.S. 482 (2022)........................................................................................21

*Fernandez-Lopez v. Hernandez*,
    2020 WL 9396487 (W.D. Tex. Nov. 20, 2020)................................................14

*Galindo v. City of Del Rio*,
    2021 U.S. LEXIS 126766 (W.D. Tex. Mar. 26, 2021)....................................27

*In re 4E Brands Northamerica LLC*,
    No. 22-50009 (Bankr. S.D. Tex.)..........................................................4, 8, 12

*In re Bouchard Transp. Co., Inc., et al.*,
    No. 20-34682 (Bankr. S.D. Tex.)................................................................2, 6

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)...........................................................................15

*In re Jones*,
    37 B.R. 969 (N.D. Tex. Bankr. 1984)...............................................12, 25, 31

*In re Nat'l Forge Co.*,
    326 B.R. 532 (W.D. Pa. May 26, 2005)............................................12, 25, 31

*James v. Brown*,
    637 S.W.2d 914 (Tex. 1982) ..........................................................................25

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ...........................................................................9

*Louisiana World Exposition v. Federal Ins. Co.*,
    858 F.2d 233 (5th Cir. 1988) ...........................................................12, 25, 31

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..........................................................................10, 28, 30

*Manax v. McNamara*,
    660 F.Supp. 657 (W.D. Tex. 1987)................................................................15

*McClellon v. Lone Star Gas Co.*,
    66 F.3d 98 (5th Cir. 1995) ..............................................................................31

*Oakes Farms Food & Distrib. Servs., L.L.C. v. Sch. Dist. Of Lee Cty.,*
    541 F. Supp. 3d 1334 (M.D. Fla. May 28, 2021) ..............................................29

*Oliva v. Nivar,*
    973 F.3d 438 (5th Cir. 2020). .............................................................................21

*Perales v. Bank of Am., N.A.,*
    No. CIV.A. H-14-1791, 2014 WL 3907793 (S.D. Tex. Aug. 11, 2014) ...........26

*Poole v. Houston & TC Ry. Co.,*
    58 Tex. 134 (1882) .............................................................................................24

*Potomac Electric Power Company v. Electric Motor and Supply, Inc.,*
    262 F.3d 260 (4th Cir. 2001) ..............................................................11, 29, 30

*Rosario v. Livaditis,*
    962 F.2d 1013 (7th Cir. 1992) ..................................................................11, 29

*Servicios Azucareros de Venez., C.A. v. John Deere Thibodeaux, Inc.,*
    702 F.3d 794 (5th Cir. 2012) ............................................................................27

*Standardbred Owners Ass'n v. Roosevelt Raceway Assocs. L.L.P.,*
    985 F.2d 102 (2d Cir. 1993)..............................................................................11

*Taylor v. Tolbert,*
    655 S.W.3d 637 (Tex. 2022)........................................................................22, 23

*United States v. Elliott,*
    571 F.2d 880 (5th Cir. 1978) ............................................................................17

*United States v. Jones,*
    873 F.3d 482 (5th Cir. 2017) ............................................................................18

*Walker v. Beaumont Indep. Sch. Dist.,*
    No. 1:15-CV-379, 2016 WL 6823512 (E.D. Tex. July 13, 2016) ....................16

*Statutes*

11 U.S.C. § 101(14) ........................................................................................4, 23

11 U.S.C. § 327 ..............................................................................................4, 23

18 U.S.C. § 152 ...................................................................................................19

18 U.S.C. § 1341 .................................................................................................19

18 U.S.C. § 1343 .................................................................................................19

18 U.S.C. § 1346.............................................................................................................19

18 U.S.C. § 1503.......................................................................................................19, 27

18 U.S.C. § 1961(1).......................................................................................................19

Fed. R. Bankr. P. 2014...............................................................................................4, 23

Fed. R. Civ. P. 9(b)..........................................................................................................9

Fed. R. Civ. P. 12(b)(6).............................................................................................1, 8, 9

Fed. R. Civ. P. 60(b)(6)....................................................................................................8

Plaintiff Morton S. Bouchard, III, individually and as co-trustee for the Morton S. Bouchard 2017 Family Trust, ("Plaintiff") (collectively, the "Bouchard Parties") respectfully states the following in support of his Response to Defendant Elizabeth Carol Freeman's ("Freeman") Motion to Dismiss under Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

1.      Freeman boldly casts aspersions on Plaintiff while largely passing over her own central role in what is perhaps the most significant bankruptcy scandal in U.S. history, as recently documented by the Fifth Circuit.[1]

2.      For years, the (recently resigned) Chief Judge of the Bankruptcy Court for the Southern District of Texas, Judge David R. Jones ("Jones"), awarded millions of dollars in attorneys' fees to his live-in girlfriend, attorney Elizabeth Freeman, and Jackson Walker, LLP ("Jackson Walker"), the law firm where Freeman was a partner.  Jones, Freeman, Jackson Walker, Kirkland & Ellis LLP, and Kirkland & Ellis International LLP[2] (collectively, "Defendants"), were able to replicate the scheme in multiple mega-bankruptcy cases by carefully concealing the existence of the Jones-Freeman relationship from creditors, shareholders and others who would be likely to object to the debtor being represented by the girlfriend of the presiding judge.

3.      It is this scheme by Defendants to fraudulently conceal the Jones-Freeman relationship while reaping financial and reputational benefits from it that is the genesis for Plaintiff's claims. Interestingly, Freeman barely mentions her secret relationship with Judge Jones in her account of the facts.

4.      As Bouchard alleged in his Original Complaint, the Jones-Freeman-Jackson Walker-Kirkland & Ellis Enterprise, working together with restructuring advisor Portage Point Partners, LLC

---

[1] *See* Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones, Southern District of Texas, Under the Judicial Improvement Act of 2002, Dkt. 1-1.
[2] Kirkland & Ellis LLP and Kirkland & Ellis International LLP are collectively referenced herein as "Kirkland."

("Portage Point") and its founder Matthew Ray (with Portage Point, "Portage Point Parties"), dismantled Bouchard Transportation Company ("BTC"),[3] a generational ocean-going barge company worth nearly three quarters of a billion dollars, for pennies on the dollar. With the presiding judge working in concert, they orchestrated a coup to remove BTC's longtime CEO, Mr. Bouchard, when he began scrutinizing professional fees. The Defendants then proceeded to hold a fire sale of the company's assets. In the process, Plaintiff lost tens of millions of dollars, which he had invested personally to help keep the company afloat. He also incurred considerable costs in defending against an adversary proceeding lodged by the Defendants after he scrutinized their fees and business reputation damages from their malicious attacks, which prevented him from obtaining new employment.

5.      A central theme of Freeman's motion is her belief that Bouchard is responsible for the downfall of his own company, which she claims eliminates any liability for her role in concealing the relationship with the judge who sua sponte removed Bouchard after he questioned professional fees and awarded Freeman, her law firm, and Kirkland millions of dollars.[4] What she forgets is this a motion to dismiss under Rule 12b(6). She cannot overcome Plaintiff's well-pleaded facts by controverting them with her own self-serving argument[5] or documents not cited by Plaintiff in his Complaint. The evidence will ultimately refute Freeman's false assertions. But this motion to dismiss is not the place for it. Almost all of Freeman's remaining arguments are a rehash of her motion against Plaintiff Van Deelen, also before this Court, and can be disposed of on similar bases.

---

[3] BTC, as referenced herein, includes Bouchard Transportation Co., Inc. and its affiliated entities. The chapter 11 cases were jointly administered under Case No. 20-34682 in the Bankruptcy Court for the Southern District of Texas; however, the Chapter 11 affiliate cases were closed on September 28, 2021. *See BTC*, 20-34682, Dkt. 1389 (Bankr. S.D. Tex. Sept. 28, 2021) (J. Jones).

[4] *See e.g.,* Motion to Dismiss at ¶ 13 (arguing that contrary to Plaintiff's Complaint, "Plaintiff's alleged damages were caused by his mismanagement of BTC and one of the consequences of that mismanagement – that is, the liquidation of BTC's assets under a chapter 11 plan that BTC creditors overwhelmingly approved.").

[5] ¶ 5 (falsely arguing, without any reference to the Complaint, that "Plaintiff's management of BTC in the chapter 11 case was disastrous.").

## STATEMENT OF FACTS

A.  **Judge Jones's Relationship with Elizabeth Freeman, a Partner at Jackson Walker, and Plan to Transform the Southern District of Texas into a Center for Bankruptcy Litigation.**

6.      In 2015, Judge Jones was appointed Chief Judge of the Bankruptcy Court for the Southern District of Texas. Jones quickly transformed the Southern District of Texas into a nationwide center for high-dollar complex Chapter 11 bankruptcies.[6] Judge Jones signed a general order in 2018 directing all complex Chapter 11 cases filed in the District to just two judges—himself and Judge Marvin Isgur.[7]

7.      Freeman clerked for Judge Jones for six years[8]—sometime between 2011 and 2018. At some point, the two began a romantic relationship. By 2017, they were living together.[9] On June 26, 2017, they executed a survivorship agreement as co-owners of a million dollar-plus home in Houston.[10]

8.      After Freeman left her six-year clerkship, she joined Jackson Walker's Houston office.[11] Jackson Walker announced Freeman as a partner in 2018.[12] Upon Freeman's arrival, Jackson Walker began securing appointments in myriad large Chapter 11 cases where Jackson Walker served as local counsel with Kirkland as lead[13] (despite Kirkland itself having a local Houston office).

---

[6] Sujeet Indap, *The downfall of the judge who dominated bankruptcy in America*, THE FINANCIAL TIMES (Nov. 21, 2023), accessible at https://www.ft.com/content/574f0940-d82e-4e4a-98bd-271058cce434 (last visited Dec. 4, 2023).

[7] *See* General Order 2018-1 (Jan. 29, 2018).

[8] The Law Office of Liz Freeman, https://lizfreemanlaw.com/about.html (last visited December 4, 2023).

[9] Dkt. 1-1.

[10] *See* June 26, 2017 Survivorship Agreement executed by Freeman and Jones, Dkt. 1-2; e-filed and e-recorded by the Harris County Clerk on June 27, 2017.

[11] Chief Judge Priscilla Richman of the Fifth Circuit stated in her written order that Freeman "was a partner in the Jackson Walker LLP law firm, it appears from at least 2017 until December 2022." Dkt. 1-1 at 1.

[12] *Jackson Walker Expands Bankruptcy/Reorganization, Wealth Planning, and White Collar Defense Practices*, Jackson Walker (May 23, 2018), https://www.jw.com/news/jackson-walker-expands-bankruptcy-reorganization-wealth-planning-and-white-collar-defense-practices/ (last visited Dec. 4, 2023).

[13] *See* Brenda Sapino Jeffries, *Kirkland's Bankruptcy Partnership With Jackson Walker Could Be a Sign of Things to Come*, Law.com (Aug. 25, 2020), accessible at https://www.law.com/americanlawyer/2020/08/25/kirklands-bankruptcy-partnership-with-jackson-walker-could-be-a-sign-of-things-to-come/ (last visited Dec. 4, 2023).

9.      By 2019, Jackson Walker was "the leading counsel firm for corporate debtors filing for bankruptcy in Houston."[14] "Kirkland & Ellis [led] large debtor-side representations … by a significant margin, while Jackson Walker, Kirkland's preferred local counsel in the Southern District of Texas, picked up more local debtor's representations than any other firm."[15]

**B.      Judge Jones Awards Millions of Dollars in Fees to His Live-In Girlfriend and the Firm Where She Was a Partner.**

10.      Judge Jones presided over at least 26 cases in which he awarded Jackson Walker more than $12 million in attorneys' fees and expenses while Freeman was a partner at Jackson Walker and while Freeman and Jones were living together and having an intimate relationship.[16] This includes approximately $1 million in fees billed directly by Freeman herself.[17] Meanwhile, Kirkland was awarded over $162 million in attorneys' fees as lead counsel in cases in which Jackson Walker served as co-counsel before Judge Jones. None of the Defendants ever disclosed the Jones-Freeman relationship in any of these cases.

11.      Under the rules governing bankruptcy proceedings, for a firm to be employed by a debtor or debtor-in-possession, it must show that it is disinterested and must disclose all connections. 11 U.S.C. §§ 101(14), 327; Fed. R. Bankr. P. 2014 (requiring a verified statement of the person to be employed setting forth the person's connections with the debtor, creditor, or any other party of interest).

---

[14] Tom Hals, *Exclusive-Law Firm Tied to Bankruptcy Judge Resignation Did Not Make Conflict Disclosures-Data Analysis*, Reuters (Oct. 30, 2023), https://www.usnews.com/news/top-news/articles/2023-10-30/exclusive-law-firm-tied-to-bankruptcy-judge-resignation-did-not-make-conflict-disclosures-data-analysis (last visited Dec. 4, 2023).

[15] Dan Roe, *Kirkland & Ellis, Jackson Walker Dominate Debtor-Side Bankruptcy as Restructuring Market Heats Up*, Law.com (Aug. 3, 2023), accessible at https://www.law.com/americanlawyer/2023/08/03/kirkland-ellis-jackson-walker-dominate-debtor-side-bankruptcy-as-restructuring-market-heats-up/.

[16] Motion for Relief for Judgment in *In re 4E Brands NorthAmerica LLC*, filed on November 3, 2023, No. 22-50009, Dkt. 517 at Ex. 6A–B (Bankr. S.D. Tex.). Plaintiff respectfully moves for this Court to take judicial notice of all federal court filings referenced in the complaint.

[17] *Id.* at 11.

12.     Mr. Bouchard was the fourth-generation owner and 100% shareholder of BTC through various trusts. Mr. Bouchard is also the former CEO of BTC. He had over 45 years' experience at BTC and understood the size and complexity of its business.

13.     In 2020, Mr. Bouchard approached Kirkland about BTC's financial concerns, during the height of the Jones-Freeman-Jackson Walker-Kirkland Enterprise.[18] When Bouchard spoke with Kirkland, partner Ryan Bennett told him to file Chapter 11 in Houston because they had a "friendly" judge.[19] BTC filed the Chapter 11 cases in September 2020. As part of the filing, and at the recommendation of a Kirkland partner, Portage Point, through Mr. Ray, was appointed as chief restructuring advisor to assist with accounting, reporting, management, developing strategies for the go forward business, and general bankruptcy services, with Mr. Bouchard continuing to serve as the CEO.

14.     Ahead of the bankruptcy, the Bouchard Parties loaned more than $40 million to BTC pursuant to two promissory notes to help support operations. The loans were funded by borrowing and withdrawing from life insurance policies held by Mr. Bouchard and the Bouchard Trust, as well as from other assets of the Bouchard Parties.

15.     After the Chapter 11 cases were filed and with costs of the proceedings mounting, Mr. Bouchard sought to compel Portage Point (and BTC's other professionals) to submit supporting invoices for his review prior to payment to manage costs, which were spiraling out of control.[20] This request was rejected out of hand by Kirkland. Thereafter, in February 2021, in what can best be described as a coup to keep the gravy train rolling without additional internal oversight, the Portage Point Parties, in conjunction with Kirkland, Jackson Walker, Freeman, and Judge Jones, effectuated

---

[18] Complaint ¶ 62.
[19] *Id.*
[20] *Id.* ¶ 68.

the removal of Mr. Bouchard as CEO, despite overwhelming support for Mr. Bouchard as CEO among BTC employees and despite his critical importance to BTC.

16.     In fact, Judge Jones issued a *sua sponte* order removing Mr. Bouchard after a status hearing on a separate matter. No motion to remove Mr. Bouchard was ever filed, and he was given no notice of the removal. Judge Jones simply removed him *sua sponte* during a hearing on an unrelated matter.[21] A written order followed with no findings other than a reference to hearings, neither of which were on a motion for removal. Contrary to Defendants' assertions, Bouchard vigorously protested his removal with Kirkland afterwards.

17.     Freeman supplies a counter-narrative, impermissibly going outside the pleadings, and relying on other pleadings and argument Defendants made during hearings.[22] This Court should not consider this material in connection with the Rule 12(b)(6) motion. Even if it does, Freeman's argument is undermined by Plaintiff's well-pleaded facts.

18.     Portage Point and Ray then took control of BTC's functions—including the management of professionals such as themselves, Jackson Walker, and Kirkland. The Portage Point Parties' takeover of BTC's operation (without experience or knowledge of the industry) quickly transitioned into the closing down of BTC's business. BTC was forced into liquidation, largely for the Portage Point Parties' own benefit. All meaningful ties with Mr. Bouchard were cut, with no transition or succession plan.

19.     Under the control of the Portage Point Parties, however, BTC's operations abruptly halted, and liquidation commenced. The business was ultimately sold for a fraction of its pre-bankruptcy value, which approached three quarters of a billion dollars or more.

---

[21] *Id.* ¶ 71 (citing *BTC*, 20-34682, Dkt. 569; Dkt. 591 at 7).
[22] *See e.g.,* Motion to Dismiss at ¶¶ 5-6, 8. Freeman even goes even further and speculates, falsely, about Plaintiff's presence at several hearings. Motion to Dismiss at ¶ 5.

20.     Underscoring the questionable sale and inherent conflicts, the Portage Point Parties were immediately retained as consultants to the purchaser. Portage Point and Ray simultaneously served as both CRO and CEO of BTC and consultant to the secured creditor and purchaser immediately following the sale (and potentially prior to the sale).

21.     On or about February 2023, as part of a purported effort to resolve the Bouchard Parties' claims in the Chapter 11 cases—including both secured and unsecured claims totaling more than $40 million—the Portage Point Parties entered into a settlement agreement with the Bouchard Parties on behalf of BTC. Nevertheless, the Portage Point Parties failed to properly proceed with seeking the required approvals and as a result, the Settlement Agreement was never consummated, severely prejudicing the Bouchard Parties.

22.     As a result of Defendants' misconduct, the loans taken out against such policies remain unpaid and certain policies terminated, resulting in over $40 million in losses, as well as adverse tax consequences to the Bouchard Parties.

## C.     The Intimate Relationship Between Freeman and Jones Comes to Light.

23.     In October 2023, Judge Jones finally admitted both his intimate relationship with Freeman and that he had shared a home with her for years.[23]

24.     On October 13, 2023, Chief Judge Priscilla Richman of the Fifth Circuit entered a written order identifying a complaint against Judge Jones.[24] Chief Judge Richman found "probable cause to believe that misconduct by Judge Jones has occurred."[25] Further, Chief Judge Richman observed that "Judge Jones is in an intimate relationship with Elizabeth Freeman. It appears that they

---

[23] Alexander Gladstone & Andrew Scurria, *Bankruptcy Judge Jones Named in Lawsuit Over Romantic Relationship with Local Lawyer*, Wall Street Journal Pro, (Oct. 7, 2023), https://www.wsj.com/articles/bankruptcy-judge-jones-named-in-a-lawsuit-over-romantic-relationship-with-local-lawyer-71df2c00.
[24] *See* Dkt. 1-1.
[25] *Id.* at 1.

have cohabited (living in the same house or home) since approximately 2017."[26] She further recognized that Judge Jones had awarded substantial attorneys' fees payable to Jackson Walker for services performed by Freeman, and, even in cases in which it does not appear Freeman provided legal services or advice, there is a reasonable probability that Elizabeth Freeman, as a partner in that firm, obtained a financial benefit from, or had a financial interest in, fees approved by Judge Jones.[27]

25.     Judge Jones submitted his resignation in October 2023. On November 3, 2023, the U.S. Trustee began filing motions under Fed. R. Civ. P. 60(b)(6) requesting that orders awarding fees and expenses be set aside, noting "all orders awarding fees and expenses are tainted" in light of Judge Jones's failure to recuse himself from presiding over cases where Jackson Walker was counsel while Freeman was both living with him and a partner at Jackson Walker.[28]

26.     Plaintiff filed this action in February 2024. On April 29, 2024, Freeman filed her Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) ("Motion to Dismiss"), asserting pleading deficiencies in Plaintiff's Complaint ("Complaint") related to Plaintiff's damages, Racketeer Influenced and Corrupt Organizations Act ("RICO"), *Bivens*, and standing claims.

## STANDARD

27.     To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* The plausibility standard is not akin to a probability requirement. *Id.* All well-pleaded facts must be accepted as true and viewed in the light most favorable to the plaintiff. *Anderson v. Valdez*,

---

[26] *Id.*
[27] *Id.* at 2.
[28] *See 4E Brands*, 22-50009, Dkt. 517.

845 F.3d 580, 589 (5th Cir. 2016); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009). ("Usually, under Rule 12(b)(6), [courts] must draw all reasonable inferences in the plaintiff's favor.").

28.     Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003), opinion modified on denial of reh'g, 355 F.3d 356 (5th Cir. 2003). Put simply, Rule 9(b) requires the who, what, when, where, and how to be laid out. *Id.* What is essential is that the defendant be put on notice of the alleged fraudulent conduct. *See id.*

## ARGUMENT & AUTHORITIES

## I.     PLAINTIFF ADEQUATELY PLEADS CAUSATION OF DAMAGES.

29.     Plaintiff was directly damaged by Defendants' wrongful acts. Freeman's argument to the contrary, which fails to accept Plaintiff's well-pleaded facts as true, is based on the faulty presumption that Plaintiff's damages were caused by his alleged mismanagement of BTC and one of the consequences of that mismanagement – the liquidation of BTC's assets under the Chapter 11 Plan. This Court cannot entertain this erroneous countervailing theory because it disputes Plaintiff's well-pleaded facts.    Freeman also claims that Bouchard's failure to appeal certain aspects of the confirmation order is what caused his damages.[29] What Freeman misses is she and the RICO Defendants withheld information that would have changed everything. Had Bouchard known of the Jones-Freeman relationship and Defendants' use of it to reap huge fees and punish those who stood in their way, he and others could have made informed decisions to oppose the racket.[30]

30.     Freeman's causation argument also ignores many of Plaintiff's asserted damages which include, but are not limited to, (1) the costs and expenses incurred in filing motions and attending

---

[29] Motion to Dismiss at 13.
[30] Complaint ¶ 132(g), 133. 155.

hearings in a bankruptcy proceeding that he did not realize were futile because the playing field was tilted against him from the outset, (2) the costs[31] incurred in defending an adversary proceeding brought by the RICO Defendants after Bouchard demanded to review professional invoices at a time when Bouchard did not realize such defense was futile because the playing field was tilted against him from the outset, (3) damages to Bouchard's business reputation[32] based on false allegations made by the RICO Defendants in the adversary suit, after he demanded to review professional invoices, that Bouchard's lifestyle was responsible for tanking BTC, made at a time when Bouchard was unaware that defense of such suit and allegations was futile because there was no level playing field, (4) costs in having to appeal Judge Jones' overruling of his objection to an exculpation provision purporting to effectively immunize Portage Point for its misconduct, which he would not have had to incur if Defendants had disclosed the Jones-Freeman relationship and Jones would have been removed from the case, (5) the loss of his due process rights and harm to the bankruptcy process in which he took part which, at a minimum, entitled Plaintiff to nominal damages,[33] and (6) mental anguish damages based on the false allegations lodged against him by the RICO Defendants and the harsh treatment he received from the judge and attorneys who were at risk of being exposed by him, and based on the distress of learning the bankruptcy process he invested substantial time, effort and resources participating in was tainted by corruption. Each of these damages was a direct and inevitable result of Defendants' wrongdoing and resulted in harm to Plaintiff directly.[34]

---

[31] Complaint ¶ 166 (alleging costs as damages for RICO claim); ¶ 173 (same for RICO conspiracy claim). To the extent Freeman argues a factual deficiency in Plaintiff's allegations for costs as damages, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Ctr. for Inquiry, Inc. v. Warren*, 845 Fed. Appx. 325, 328 (5th Cir. 2021). Alternatively, Plaintiff requests leave to amend his complaint to include these allegations. *See infra* § VI.

[32] Complaint ¶ 9 ("Mr. Bouchard suffered reputational harm and has been unable to obtain new employment as a result of Defendants' misconduct"); ¶ 121 (same); ¶ 137 (same in context of Count I RICO claim); ¶ 171 (same in the context of Count II RICO conspiracy claim).

[33] *Id.* ¶ 166 (alleging nominal damages in Count I RICO claim); ¶ 121 (describing Defendants' corruption of the bankruptcy system); ¶ 173 (alleging nominal damages in Count II RICO claim); *see also* ¶¶ 256, 266 (due process violation).

[34] To the extent Freeman argues and this Court determines that any of these damages have not been adequately pleaded, Plaintiff moves for leave to amend to include them. *See infra*.

31.     It is, at least, plausible that such expenditures and expenses, made by Plaintiff in reliance on false representations by Enterprise members that they were disinterested and conflict-free parties, form a recoverable financial loss that is not derivative of any injury sustained by the bankruptcy estate. *See Standardbred Owners Ass'n v. Roosevelt Raceway Assocs. LLP*, 985 F.2d 102 (2d Cir.1993) (plaintiff horse breeders, who purchased equipment and trained horses under assurances from defendant that horse racing would continue after defendant purchased facility had standing to bring a RICO action to recover financial expenditures and expenses).

32.     Moreover, the injury visited upon the bankruptcy system and process by Defendants' acts also represents a direct harm to Plaintiff. "If [a Defendant's] conduct has corrupted the process of engaging bankruptcy advisors, as [Plaintiff] plausibly alleges, then the unsuccessful participants in that process are <u>directly harmed</u>." *Alix v. McKinsey & Co.*, 23 F.4th 196, 204 (2d Cir. 2022) (emphasis added). Defendants' wrongful acts corrupted the bankruptcy process and inflicted direct harm on Plaintiff as a participant in that bankruptcy process.

33.     Plaintiff has also alleged facts plausibly demonstrating an injury to his due process rights and the bankruptcy process in which he took part. These injuries, at a minimum, entitle Plaintiff to nominal damages. *Potomac Electric Power Company v. Electric Motor and Supply, Inc.,* 262 F.3d 260, 265–66 (4th Cir. 2001); *Rosario v. Livaditis,* 962 F.2d 1013, 1021 (7th Cir. 1992) (remanding for a new trial on damages in RICO case because the jury found liability but "did not award even nominal damages on the RICO counts."). A finding of nominal damages would also trigger an award of attorneys' fees. Thus, if some damage has been alleged to exist, even if it is not readily quantifiable, Plaintiff has asserted a plausible claim for nominal damages that is adequate to establish standing. *Potomac,* 262 F.3d at 266.

Lastly, it cannot be said at this early stage in proceedings that Plaintiff has no financial interest in the fees that were wrongfully paid to Jackson Walker, Freeman, and Kirkland and that may be

ordered disgorged. Further, not only was Bouchard a shareholder, but he was also a creditor, having "loaned more than $40 million to BTC pursuant to two promissory notes to help supports its operating expenses, including payroll, insurance, fuel and oil, and port and pilot costs, and to safeguard, support and maintain its fleet of vessels to the highest standards in the industry."[35] "These loans were listed as outstanding debts of BTC in sworn declarations filed by Ray and in BTC's tax returns signed by Ray under penalty of perjury."[36]

Thus, the argument made in the Van Deelen litigation—that returned attorneys' fees could not be distributed to the plaintiff under the confirmation plan (which was in any event has been refuted by the U.S. Trustee)[37]—does not apply here. Plaintiff plausibly alleged causation.

34.     Given this, and since this Court must give Plaintiff all reasonable inferences at this stage, under the "plausibility" pleading standard, the Complaint is sufficient. Alternatively, to the extent this Court is inclined to dismiss any claim based on a determination that it is derivative of the estate's claims, Plaintiff respectfully requests that the Court do so without prejudice so that he may request leave for derivative standing. *See Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988); *In re Nat'l Forge Co.*, 326 B.R. 532, 545–46 (W.D. Pa. May 26, 2005); *In re Jones*, 37 B.R. 969, 974 (N.D. Tex. Bankr. 1984).

## II.     PLAINTIFF'S RICO CLAIMS ARE ADEQUATELY ALLEGED.

### A.     Plaintiff Has Sufficiently Alleged Each Challenged Element of His RICO Claim.

35.     Freeman erroneously asserts that Plaintiff does not sufficiently plead certain specific facts of his RICO claim. Plaintiff's Complaint, however, alleges each of the items Freeman claims are lacking, including: an injury and causation, an Enterprise that existed separate and apart from its

---

[35] Complaint ¶ 65.
[36] *Id.*
[37] *4E Brands*, 22-50009, Dkt. 600 at 4-5 (footnote omitted).

12

racketeering activity, a structure and continuing existence of the Enterprise, and acts constituting racketeering activity. In short, Plaintiff has sufficiently alleged each challenged element of his RICO claim and Freeman's motion to dismiss Plaintiff's RICO claims should be denied.

### 1. Plaintiff has sufficiently alleged injury and causation.

36.    For the reason set forth in the previous section, Plaintiff has properly alleged injury and causation due to Defendants' scheme. *See supra* Argument, I.

### 2. Plaintiff has sufficiently pleaded the existence of the Enterprise.

37.    Contrary to Freeman's assertion, Plaintiff has sufficiently pled sufficient facts regarding the existence of the Enterprise, outlining, among other facts: the participants, the timeline of the Jones-Freeman relationship and Freeman's association with Jackson Walker, the declarations of disinterestedness at issue, the purpose and goal of the Enterprise and how it was carried out, the fees awarded as a result of the Enterprise, and more.[38]

### 3. Plaintiff has alleged a purpose for the Enterprise that is separate from its predicate acts of racketeering.

38.    Plaintiff also adequately alleged that the Enterprise had a purpose separate and apart from its predicate acts. That is, the Enterprise undertook both legitimate actions (providing legal services related to bankruptcy proceedings) and actions which constituted a pattern of racketeering (e.g., bankruptcy fraud, mail and wire fraud, honest services fraud). Thus, the purpose of the Enterprise was not merely to commit frauds; but rather, to boost the professional reputations and financial opportunities of the Enterprise members through means that sometimes included fraudulent acts of racketeering. This was plainly alleged in Plaintiff's complaint:

> [T]he purpose of the Jones-Freeman-Jackson Walker-Kirkland & Ellis Enterprise was to increase the prestige and influence of each actor in bankruptcy practice, while enriching the respective law firms and attorney Freeman. This purpose was accomplished through multiple

---

[38] *See, e.g.,* Complaint ¶¶ 122-140 (including incorporation by reference of factual allegations section).

predicate acts, and without disclosing the Jones-Freeman intimate relationship to affected parties and creditors.[39]

[…]

The Enterprise functioned to achieve the shared goals of increasing prestige and enriching Defendants, which they accomplished both directly through approval of improper attorneys' fee awards and indirectly by elevating the status and demand for Defendants Jackson Walker, Freeman, and Kirkland & Ellis as bankruptcy attorneys, and by securing favorable bankruptcy court appointments and rulings – including millions of dollars, if not tens of millions of dollars, awarded to Jackson Walker and Kirkland & Ellis as attorneys' fees - that were influenced by intimate relationships and self-interest and not based exclusively on the merits. [40]

39.    The distinguishable case Freeman cites where an enterprise was found not to have an existence separate and apart from the racketeering activities involved members who came together solely for a one-time criminal activity. In *Fernandez-Lopez v. Hernandez*, the RICO claim arose from a single transaction – a 2015 visa application. More specifically, the defendants in *Fernandez-Lopez* were alleged to have worked together to obtain visas for temporary workers at a landscaping business in Maryland but then funneling the workers upon arrival in the U.S. to a separate demolition business in Alabama. 2020 WL 9396487, at *1-*2 (W.D. Tex. Nov. 20, 2020). The court noted that there were no allegations of shared purpose or activities among the two enterprise members other than those related to visa fraud. *See, e.g., id.* at *12.

40.    Such shortfalls are not present in the case at bar. Defendants here are alleged to have been a working consortium of legal professionals who conspired to boost their reputational status and income through *both* legitimate legal work and illegal acts, including RICO predicate acts. This scheme, consisting of both legitimate and illegal acts, was repeated in numerous mega-bankruptcy cases filed in the Southern District of Texas over a period of years. Thus, the Enterprise did not exist merely to perform RICO predicate acts; the Enterprise existed to further the professional and financial benefits

---

[39] *Id.* ¶ 126.
[40] *Id.* ¶ 131.

to its members and used RICO predicate acts to improperly inflate those benefits. The facts alleged in this case are akin to those in *Diamond Consortium, Inc. v. Manookian,* where enterprise members were alleged to have provided representation and acted as co-counsel in other litigations. 2017 WL 1495091, at *4 (E.D. Tex. April 26, 2017). The court in *Diamond Consortium* found that an association-in-fact enterprise had been adequately pled to have an existence separate and apart from the pattern of racketeering. *Id.* The same finding should follow in the case at bar.

### 4.  The Enterprise had a separate structure and functioned as a continuing unit.

41.    Freeman erroneously maintains that the absence of allegations regarding a decision-making or internal coordination structure within the enterprise reflects a pleading deficiency. Not so. The case Freeman cites for the requirement that a decision-making structure must be alleged pre-dates the Supreme Court's decision in *Boyle v. U.S.,* 556 U.S. 938 (2009).[41] In *Boyle,* a RICO defendant argued that the district court erred by failing to instruct the jury that it was required to find that the enterprise had an ascertainable structural hierarchy distinct from the charged predicate acts. *Id.* at 943. In rejecting such a requirement, the Supreme Court recognized that "[a]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose. *Such a group need not have a hierarchical structure or a 'chain of command'* ... [m]embers of the group need not have fixed roles[.]" *Id.* at 948 (emphasis added). Thus, after *Boyle*, an association in fact enterprise need have no formal hierarchy or means for decision-making. *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 368 (3d Cir. 2010).

42.    In rejecting a strict requirement of a structural hierarchy distinct from the charged predicate acts, the Supreme Court made several comments that are instructive here. First, the Supreme Court noted that the structure of an association-in-fact enterprise may be established by looking for three structural features: a purpose, relationships among those associated with the enterprise, and

---

[41] *See* Motion to Dismiss at 16, n.52 (citing *Manax v. McNamara,* 660 F.Supp. 657, 662 (W.D. Tex. 1987), aff'd, 842 F.2d 808 (5th Cir. 1988)).

longevity sufficient to permit those associated to pursue the enterprise's purpose. *Boyle*, 556 U.S. at 946. Second, the Supreme Court directly addressed whether an enterprise's structure must go "beyond that inherent in the pattern of racketeering activity in which it engages. *Id.* at 945. The court noted that, to the extent phrasing requiring a structure/purpose beyond the racketeering activity, "is interpreted to mean that the existence of an enterprise is a separate element that must be proved, it is of course correct." *Id.* at 947. This unremarkable holding merely affirms that the existence of an enterprise is an element distinct from the enterprise's pattern of racketeering activity. *Id.* On the other hand, the Supreme Court cautioned, "if the phrase is used to mean that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity, it is incorrect." *Id.* To the contrary the pattern of racketeering activity and the evidence establishing an enterprise "may in particular cases coalesce." *Id.*

43.     Post *Boyle,* recent Texas federal court cases have moved away from the requirement of a hierarchical structure or decision-making process. *See Dell Inc. v. Mishra*, No. A-16-CV-00641-SS, 2018 WL 3717119, at *5 (W.D. Tex. Aug. 3, 2018) ("An association-in-fact enterprise 'need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc.'"); *Walker v. Beaumont Indep. Sch. Dist., No.* 1:15-CV-379, 2016 WL 6823512, at *3 (E.D. Tex. July 13, 2016), report and recommendation adopted, No. 1:15-CV-379, 2016 WL 4198279 (E.D. Tex. Aug. 8, 2016), aff'd, 938 F.3d 724 (5th Cir. 2019) (same).

44.     Cases that continue to reference a hierarchical or decision-making structure tend to do so as one means of demonstrating that the RICO Enterprise functions as a separate and continuing unit. But there are other means of doing so as well. Proof of an association-in-fact's separate existence may be derived from evidence of rules, routines, or processes through which the entity maintains its continuing operations and seeks to conceal its illegal acts. *Boyle*, 556 U.S. at 955 (Stevens, J., dissenting).

16

Proof of an enterprise's separate existence may also be established through evidence that it provides goods or services to third parties, as such an undertaking will require organizational elements more comprehensive than those necessary to perform a pattern of predicate acts. *Id.* at 956. Further, the Supreme Court has cautioned against the notion that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity. *Boyle*, 556 U.S. at 947. To the contrary the pattern of racketeering activity and the evidence establishing an enterprise "may in particular cases coalesce." *Id.*

45.     Here, Plaintiff has alleged that, for at least six years, the members of the Enterprise worked together to provide legitimate legal services to third parties while also increasing the demand, prestige and compensation received for those services through acts of racketeering. This is sufficient to allege the existence of a continuing Enterprise.

### 5.     Plaintiff has properly alleged Freeman's agreement to the RICO conspiracy.

46.     Freeman charges that Plaintiff does not specifically allege that Defendants agreed to commit predicate acts.[42] In truth, Plaintiff has clearly alleged that Defendants agreed to exploit the Jones-Freeman relationship while concealing the relationship from others:

> Defendants had a meeting of the mind on the object of the conspiracy, unlawfully collecting millions in attorneys' fees and securing lucrative appointments—and on the course of action—failing to disclose the Jones-Freeman intimate relationship and affirmatively representing disinterestedness.[43]

47.     Freeman may label Plaintiff's allegations of an agreement as conclusory; but the law recognizes that agreements to commit illegal acts are rarely proclaimed from the rooftops. For that reason, direct evidence of agreement is unnecessary. *U.S. v. Elliott,* 571 F.2d 880, 903 (5th Cir. 1978).

---

[42] *See* Motion to Dismiss at ¶ 19.
[43] Complaint ¶ 241.

Instead, "proof of such an agreement may rest upon inferences drawn from relevant and competent circumstantial evidence ...." *Id.* The existence of an agreement, a defendant's guilty knowledge, and the defendant's participation in the RICO conspiracy may each be inferred from the circumstances. *U.S. v. Jones,* 873 F.3d 482, 489 (5th Cir. 2017); *Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC*, 566 B.R. 815, 857 (W.D. Tex. 2017).

48.     Here, Plaintiff has alleged ample facts showing *or inferring* Freeman's agreement to participate in a scheme to leverage the Jones-Freeman relationship for financial and reputational benefits. Freeman obviously knew of her own relationship with Judge Jones since its conception. It is implausible that four sophisticated legal defendants (including two large firms and a federal judge) would have all arrived at, and adhered for years to, the same (*wrong*) conclusion that the Jones-Freeman relationship did not have to be disclosed without ever consulting with one another and agreeing on a course of action. The more plausible explanation, and an inference supported by the alleged facts, is that Defendants agreed not to disclose the Jones-Freeman relationship.

49.     Notably, Kirkland did not file any mega-bankruptcy cases with Jackson Walker as local counsel from 2006 to 2016. Yet, after Freeman joined Jackson Walker in 2018, Kirkland hired Jackson Walker as local counsel in 42 of the 46 mega-bankruptcies it filed in the Southern District of Texas since 2019.  This was done despite Kirkland having a local office of its own (with over 200 attorneys) in Houston. The dramatic shift and proliferation of Kirkland's mega-bankruptcy filings in the Southern District of Texas (with Jackson Walker and Freeman on board as local counsel) suggests all Defendants aware of the Jones-Freeman relationship and agreed to partake in the opportunity it presented for financial and reputational benefits.[44]

---

[44] It is also odd that Kirkland hired Jackson Walker as local counsel but accepted (supposedly without inquiry or question) why Freeman, a former clerk for Judge Jones, would not perform one of the primary tasks that local counsel is hired to perform and appear in Judge Jones's courtroom. It is reasonable to infer that this abnormality was acceptable to Defendants because they were aware of the Jones-Freeman relationship.

50.     Ultimately questions regarding the extent and details of the agreement—and the conspiracy as a whole—will be answered after discovery. At this point, it is sufficient that Plaintiff has alleged Freeman's agreement to the conspiracy and alleged facts from which it can be inferred that Freeman agreed to conceal and benefit from the Jones-Freeman relationship.

> **6.     Plaintiff has adequately alleged racketeering activity by Freeman and the other Defendants.**

51.     Plaintiff has alleged that Defendants' pattern of racketeering activity includes, but is not limited to, two or more violations of 18 U.S.C. § 1503 (obstruction of justice), § 1341 (mail fraud), § 1343 (wire fraud), § 152 (bankruptcy fraud) and § 1346 (honest services fraud).[45] Freeman does not identify any specific flaw in Plaintiff's pleading of these predicate acts, but instead argues that the approximately sixteen (16) pages of the Complaint dedicated to predicate acts lack "any specific facts, dates, names, communication or events" alleging racketeering activity.[46]   That accusation is demonstrably false. Taking Plaintiff's obstruction of justice allegations as an example, Plaintiff has alleged that Defendants violated 18 U.S.C. § 1503, which also constitutes racketeering activity within the meaning of 18 U.S.C. § 1961(1).[47] Plaintiff more specifically alleges that Freeman used her personal relationship with Jones to influence favorable rulings (including appointments and fee awards) in violation of § 1503, which prohibits influencing, obstructing, impeding or intimidating any officer of a federal court.[48] Plaintiff's various fraud allegations are even more specific alleging the statutes that were violated,[49] the existence of fraudulent statements, including statements that Defendants were disinterested and that there were no conflicts of interests,[50] specific pleadings where fraudulent statements were made and the dates they were filed.[51]

---

[45] Complaint ¶ 124.
[46] Motion to Dismiss at ¶ 20.
[47] Complaint ¶¶ 124, 141.
[48] *Id.* ¶¶ 141-142.
[49] *E.g., id.* ¶ 153.
[50] *E.g., id.* ¶¶ 159-160.
[51] *E.g., id.*

52.     The Complaint has sufficiently pled its claims to put Freeman (and the other Defendants) on notice of the claims against them.

## III.     THE *BIVENS* CONSPIRACY CLAIM IS ADEQUATELY PLED.

53.     In just one-paragraph, Freeman asserts that Plaintiff's *Bivens* conspiracy claim[52] lacks "pleading specificity[.]"[53] However, Freeman does not provide any context or identify any particular aspect of Plaintiff's *Bivens* count that is claimed to be lacking in specificity so as to enable Plaintiff to adequately respond. Furthermore, while the Supreme Court has not previously extended *Bivens* liability to equity holders suffering a deprivation of rights in a bankruptcy proceeding, Freeman has identified no "special factors" weighing against such a claim. As outlined in *Bivens*, where a case involves "no special factors counseling hesitation in the absence of affirmative action by Congress[,]" federal courts may use any available remedy to make good the wrong done where a federal officer acting under the color of federal authority violates the Constitution. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 396 (1971).

54.     The victim of a constitutional violation by a federal agent has a right to recover damages against the agent in federal court pursuant to *Bivens*. *Bush v. Lucas*, 647 F.2d 573, 575 (5th Cir. 1981), aff'd, 462 U.S. 367 (1983). When a *Bivens* claim is asserted in a context other than what has been recognized by the Supreme Court in three previous *Bivens* cases, as Plaintiff does here, the right to recover may be recognized where: (1) the Defendant has established no "special factors" counselling hesitation in the absence of affirmative action by Congress, or (2) Congress has not provided an alternative remedy explicitly declared to be a substitute for recovery under the Constitution.  *See id.* Those conditions are met in the case at bar.

---

[52] Plaintiff's *Bivens* claim (Count X) is brought only against Judge Jones; accordingly, Freeman's argument only applies to the *Bivens* conspiracy claim (Count XI).
[53] Motion to Dismiss at ¶ 21.

55.     Freeman asserts that the Supreme Court has refused to extend *Bivens* liability to new contexts or categories of defendants, such as equity holders like Plaintiff. As outlined in *Bivens*, where a case involves "no special factors counseling hesitation in the absence of affirmative action by Congress[,]" federal courts may use any available remedy to make good the wrong done where a federal officer acting under the color of federal authority violates the Constitution. *See Bivens,* 403 U.S. at 396. Freeman suggests the circular logic that recognition of a new cause of action is itself a special factor that should preclude recognition of a new cause of action. If the law were as Freeman suggests, there would be no need for a new context test at all; every new context would present a disqualifying special factor simply by virtue of being new. The Supreme Court's caution about "uncertainty" as a special factor is better understood as applying to cases likely to have unpredictable and widespread consequences; not as an obstacle to recognition of narrow and egregious misconduct such as exists here. *See Egbert v. Boule*, 596 U.S. 482, 493 (2022) (cautioning that uncertainty as to "'systemwide' consequences" of recognizing a new *Bivens* action may be a special factor). Nor do the U.S. Trustee's powers provide an alternative remedy barring recognition of a *Bivens* claim. The U.S. Trustee's duties are focused on protecting the integrity of the bankruptcy system, not remedying violations of individuals' constitutional rights.

56.     The facts of this case are unprecedented and extraordinary, and thus may raise unprecedented legal questions. As the *Nivar* case Freeman cites indicates, courts confronting *Bivens* claims must ask first if the claims fall into one of the three existing actions, and "[s]econd, if not, should we recognize a new *Bivens* action here?" *Oliva v. Nivar*, 973 F.3d 438, 441-42 (5th Cir. 2020). The hesitancy to extend *Bivens* to new contexts is rooted in considerations of separation of powers, leading courts to evaluate who should decide a damages remedy—Congress or the courts. *See id.* at 443. The egregious conduct at issue here took place within the judicial branch, and thus it seems logical that same branch should address the conduct and the remedy under *Bivens*. Notably, Freeman has not

cited a case that expressly states a *Bivens* claim cannot be brought in a case with facts like those in the case at bar.

## IV.    FREEMAN'S ARGUMENTS RELATED TO "OTHER DEFECTS" FAIL.

57.    In one short section, Freeman attempts to persuade this Court to dismiss Plaintiff's claims based on assertions of: (i) attorney immunity doctrine, (ii) judicial-proceedings privilege, (iii) lack of duty of care, and (iv) failure to state a claim for unjust enrichment.[54]

### A.  The Attorney Immunity Doctrine Does Not Bar Plaintiff's Claims.

58.    Texas' attorney immunity defense provides that a lawyer is immune from prosecution by a non-client for conduct committed in the course of representing the lawyer's client. *Taylor v. Tolbert,* 644 S.W.3d 637, 642 (Tex. 2022). Attorney immunity exists to encourage aggressive representation and advocacy by attorneys that might be hindered if attorneys feared being subjected to lawsuits by third parties. *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). Attorney immunity is not unlimited, however. Immunity attaches to "the kind of conduct" attorneys engage in when discharging their professional duties; therefore, if an attorney engages in conduct that is not "lawyerly work" or is "entirely foreign to the duties of a lawyer" or falls outside the scope of client representation, the attorney-immunity defense is inapplicable. *Taylor*, 655 S.W.3d at 646; *Alpert v. Crain, Caton & James, P.C.,* 178 S.W.3d 398, 406 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).  As the party seeking to apply the attorney immunity defense, Freeman bears the burden of proving that its actions were the type of conduct involving a "uniquely lawyerly capacity" and calling upon the attorney's "skills as an attorney." *Taylor*, 655 SW.3d at 645-46 (movant bears burden of conclusively proving affirmative defense of attorney immunity applies).  That showing has not been made here.

59.    First, Freeman conveniently (but erroneously) defines the conduct at issue as preparing bankruptcy pleadings, appearing at hearings, or seeking court approval of the Plan.  These are not the

---

[54] *Id.* at ¶¶ 22-25.

acts giving rise to Plaintiff's claims. Plaintiff's claims arise from Jackson Walker's scheme to employ the girlfriend (Freeman) of a federal judge and to secretly leverage that intimate relationship to garner increased employment opportunities, increased fees, and increased professional standing. That is neither an act of advocacy nor one requiring lawyerly skill. "An attorney is not immune from suit for participating in criminal or 'independently fraudulent activities' that fall outside the scope of the attorney's representation of a client." *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.,* 595 S.W.3d 651, 657 (Tex. 2020)

60.     Even to the extent that Defendants' scheme led the firms to omit and conceal the obvious conflict in court filings, disclosing an obvious conflict of interest is not a uniquely lawyerly tasks. The duty to disclose conflicts is something required of *all* participants in a bankruptcy proceeding. *See, e.g.,* 11 U.S.C. § 101(14), 327; Fed. R. Bankr. P. 2014(a) (imposing disclosure requirements on "attorneys, accountants, appraisers, auctioneers, agents or other professionals"). The Texas Supreme court affirmed this logic noting that a lawyer who made statements to the press on a client's behalf is not partaking of the office, training and kill of an attorney "because '[a]nyone – including press agents, spokespersons, or someone with no particular training or authority at all – can publicize a client's allegations to the media.'" *Taylor,* 655 SW.3d at 646. The same is true here. Attorney immunity does not attach to the administrative act of identifying one's connections with other participants in a bankruptcy case because doing so is not an act of legal advocacy and does not require any particular "lawyerly" skill.

61.     Going a step farther, knowingly misrepresenting one's conflict status to the Court is not a lawyerly act. Freeman compares the firms to the attorney in *Bethel* who was accused of destroying key evidence by disassembling and testing a trailer's brakes while representing the defendant in a fatal car accident case. But *Bethel* involved the distinguishable circumstance where an attorney was accused of destruction of property during testing – but the alleged destruction amounted to disassembling the

brakes without a protocol or video, changing the position of adjuster screws to facilitate disassembly, and spilling oil. *Bethel,* 595 S.W.3d at 658. Those facts – involving inadvertent changes to evidence resulting from discovery testing – are nothing like the deliberate conduct at issue in the case at bar.

62.     The Texas Supreme Court has had several occasions to consider the scope of the attorney immunity defense. Its comments on the types of conduct that are not protected by attorney immunity are instructive here. For instance, while declining to recognize a categorical exception for conduct alleged to be criminal, the court noted that "there is a wide range of criminal conduct that is not within the 'scope of client representations'" and therefore not subject to attorney immunity. *Id.* at 657. Nor does immunity apply to acts that do not involve the provision of legal services. For example, an attorney who participates in a fraudulent business scheme with a client is unprotected by attorney immunity, as such acts are "entirely foreign to the duties of an attorney." *Cantey Hanger,* 467 S.W.3d at 482 (citing *Poole v. Houston & TC Ry. Co.,* 58 Tex. 134, 137 (1882)).

63.     Here, Freeman and the other defendants are alleged to have conspired to use the secret Jones-Freeman relationship to secure professional and financial benefits for themselves. This scheme existed separate and apart from Defendants' representation of its bankruptcy clients. Likewise, the firms' concealment of the Jones-Freeman relationship also was not an act of legal representation, but, rather a ministerial or administrative matter required of lawyers and non-lawyers alike in a bankruptcy proceeding. Because Jackson Walker's misrepresentation and concealment of the Jones-Freeman relationship was (1) outside the scope of the legal representation it provided to BTC and (2) not a lawyerly act in that it was required of lawyers and non-lawyers alike, attorney immunity should not apply to bar Plaintiff's state law claims.

### B.   The Judicial Proceedings Privilege Does Not Bar Plaintiff's Claims.

64.     Freeman distorts the purpose of Texas's judicial proceedings privilege, which provides that "[c]ommunications in the due course of a judicial proceeding will not serve as the basis of a civil

24

action for libel or slander…" *James v. Brown,* 637 S.W.2d 914, 916 (Tex. 1982). The policy behind the judicial proceedings privilege is to protect the integrity of the adversarial litigation process and ensure that a court or jury is able to get the information it needs without witnesses and litigants fearing retaliatory suits for defamation. *Id.* at 917. Consistent with this purpose, Texas courts generally discuss and apply the privilege in relation to defamatory statements. The Texas Supreme Court declined to expand the privilege beyond libel and slander. *Id.* at 918; *Bird v. W.C.W.,* 868 S.W.2d 767, 771 (Tex. 1994).

65.     The firms' false representations of disinterestedness are not defamatory statements. The mere fact that wrongful acts and omissions the firms made elsewhere were also made in a court filing should not immunize the firms (or Freeman) from liability. This is the conclusion drawn by the Texas Supreme Court where the mere fact that a doctor communicated his misdiagnosis to the Court during a legal proceeding did not immunize him from liability for medical malpractice. *James*, 637 S.W.2d at 917-18. Ultimately, while an in-court statement may not form the basis of a defamation action, "the unavailability of a defamation action does not preclude a plaintiff from pursuing other remedies at law." *Id.*

**C.  Freeman's Duty of Care Argument Is Inapplicable Here.**

66.     To the extent Freeman's argument related to duty of care centers on Plaintiff's professional negligence and breach of fiduciary duty claims, Plaintiff withdraws such claims against Freeman.[55]

67.     However, Freeman cannot earnestly argue that misrepresentations made by Defendants, including those related to their disclosures (or lack thereof), are not actionable because

---

[55] If the Court is inclined to rule on Plaintiff's withdrawn claims for professional negligence and breach of fiduciary duty, Plaintiff requests that any dismissal of these claims be without prejudice to allow Plaintiff opportunity to request leave for derivative standing to pursue these claims. *See Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988); *In re Nat'l Forge Co.*, 326 B.R. 532, 545–46 (W.D. Pa. May 26, 2005); *In re Jones*, 37 B.R. 969, 974 (N.D. Tex. Bankr. 1984).

Plaintiff was independently represented during the bankruptcy proceedings. Conflict disclosure requirements under the Rules are intended to be relied upon not only by clients, but also by the Court and by all participants in a legal proceeding. Plaintiff is thus well within the sphere of people who Freeman and the other Defendants intended to be guided by the misrepresentations.

### D.  Plaintiff Has Alleged Sufficient Facts That Defendants Were Unjustly Enriched.

68.    The law does not allow a person to profit by wrongdoing at the expense of another. Unjust enrichment allows recovery when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage. *Perales v. Bank of Am., N.A.,* No. CIV.A. H-14-1791, 2014 WL 3907793, at *3 (S.D. Tex. Aug. 11, 2014).  Freeman does not challenge the adequacy of Plaintiff's allegations with regard to Defendants' receipt of a benefit (appointments, fees, and status) or Defendants' use of fraud and undue advantages (concealing the romantic relationship between Freeman and the presiding judge).  Instead, Freeman contends the claim should be dismissed because, in her opinion, Plaintiff is not any worse off than he would have been if Defendants had not been unjustly enriched.  Freeman's subjective and disputed views of the harm to Plaintiff or the value of Defendants' own work are not grounds for dismissal on the pleadings.

69.    In an analogous case involving trade secret appropriation, a Texas federal court noted that the mere fact the defendant would have realized profits even without the having appropriated trade secrets to improve its manufacturing, did not compel the conclusion that it was not unjustly enriched by the appropriation. *AMS Sensors USA Inc. v. Renesas Elecs. Am. Inc.,* No. 4:08-CV-00451, 2021 WL 12234726, at *7 (E.D. Tex. Dec. 14, 2021). The amount of profit attributable to the misappropriation was for the factfinder to decide.  *Id.*  The same is true here.  Whether Freeman and Jackson Walker would have been hired by Kirkland without the Jones-Freeman connection and whether they would have been awarded the same amount of fees by a disinterested judge are issues for a jury to decide.  But it is, at least, plausible that Freeman and the other Defendants profited unduly

26

by concealing and capitalizing upon the Jones-Freeman relationship.  Accordingly, Freeman's motion

to dismiss Plaintiff's unjust enrichment claim should be denied.

## V.      PLAINTIFF HAS STANDING.

70.     "[S]tanding jurisprudence contains two strands: Article III [or constitutional] standing,

which enforces the Constitution's case-or-controversy requirement, and prudential standing, which

embodies 'judicially self-imposed limits on the exercise of federal jurisdiction[.]'" *Servicios Azucareros de*

*Venez., C.A. v. John Deere Thibodeaux, Inc.*, 702 F.3d 794, 801 (5th Cir. 2012).

71.     The premise of Freeman's assertion that Plaintiff lacks prudential standing is

mistaken—Plaintiff's claims are not derivative of the bankruptcy, nor are they an improper collateral

attack on the BTC plan. Plaintiff has uniquely personal claims from which he suffered direct harm.

*See Galindo v. City of Del Rio*, 2021 U.S. LEXIS 126766, *9 (W.D. Tex. Mar. 26, 2021) (citations omitted)

("individuals have no standing to secure a personal recovery for an alleged wrong done to the business

entity, unless they are able to show some direct harm to themselves").

72.     For example, Plaintiff was the victim of a RICO predicate act of obstruction of justice

(18 U.S.C. § 1503) when Defendants failed to disclose the romantic, live-in relationship between Jones

and Freeman.[56] Defendants dismantled BTC, orchestrated a coup to remove Mr. Bouchard as BTC's

CEO when he began scrutinizing professional fees, and proceeded to hold a fire sale of the company's

assets that was rife with conflicts. In the process, Plaintiff lost tens of millions of dollars which he had

invested personally to help keep the company afloat.[57]

Additionally, Defendants' fraud in concealing the Jones-Freeman relationship, and exacting

retribution against him after he protested fees, caused him to incur legal costs and fees in defending

---

[56] *See* Complaint ¶¶ 141, 142(d) (alleging violation of 18 U.S.C. § 1503, obstruction of justice in connection with improperly influencing officers of the bankruptcy court by "knowingly and deliberately concealed, or failed to properly reveal, the existence of an intimate, personal relationship between Freeman and Judge Jones").
[57] *See, e.g., id.* ¶¶ 65, 74, 121.

the adversary proceeding brought by Kirkland and Jackson Walker. After Bouchard stepped out of line and "dared [to] question professional fees[,]"[58] not only did the consortium have him removed, but Freeman, Jackson Walker, and Kirkland smeared him in the adversary proceeding by claiming he was living high on the hog and that he tanked his generational company. Not only did Bouchard incur considerable costs and fees, but he also sustained "reputational harm" of business and prevented him from "obtain[ing] new employment…."[59] These actions also caused him mental anguish.

Defendants' fraud in hiding the Jones-Freeman relationship, and punishing him for demanding review of professional fees, also caused him to incur legal costs and fees in having to appeal Judge Jones' improper overruling of his objection to an exculpation provision purporting to effectively immunize Portage Point for its misconduct.[60] While Bouchard succeeded in overturning Jones' improper ruling in this respect, he was forced to incur fees and expenses that would not have been required had Freeman and the other defendants properly disclosed the improper connection with the judge that resulted in a ruling influenced by the intimate relationship and that was not based exclusively on the merits.[61]

73.    Plaintiff sustained mental anguish and reputational damages[62] resulting from the harsh treatment and *sua sponte* removal of Mr. Bouchard as CEO, in addition to the loss of the generational family business Plaintiff had dedicated his life to due to the malfeasance of Defendants.[63]

74.    Plaintiff's lost funds and reputational and mental anguish damages, among others, are not injuries under a confirmation plan or order. Rather, they are the result of Defendants' conspiracy to keep the Jones-Freeman conspiracy secret from outsiders at any cost. These damages are

---

[58] *Id.* ¶ 121.
[59] *Id.* ¶ 137.
[60] *Id.* ¶¶ 96–100.
[61] *Id.* ¶¶ 131, 132(l), 133, 148, 164.
[62] "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (citations omitted).
[63] *See, e.g.,* Complaint ¶ 121.

independent of injuries to BTC and the bankruptcy estate. *See Oakes Farms Food & Distrib. Servs., LLC v. Sch. Dist. of Lee Cty.*, 541 F. Supp. 3d 1334, 1343 (M.D. Fla. May 28, 2021) ("[t]he harm to Mr. Oakes's First Amendment rights is distinct and personal from the economic harm to Oakes Farms").

75.    Further, in *Alix v. McKinsey & Co.*, 23 F.4th 196, 204 (2d Cir. 2022), the Court of Appeals described that the "district court gave insufficient consideration to the fact that [the defendant's] alleged misconduct targeted the federal judiciary[,]" which requires courts "to focus on the responsibilities that Article III courts must shoulder to ensure the integrity of the Bankruptcy Court and its processes."

76.    When a defendant's conduct "target[s] the federal judiciary[,]" a somewhat different analysis is required. Courts must:

> focus on the responsibilities that Article III courts must shoulder to ensure the integrity of the Bankruptcy Court and its processes. Litigants in all of our courts are entitled to expect that the rules will be followed, the required disclosures will be made, and that the court's decisions will be based on a record that contains all the information applicable law and regulations require. **If [Defendant's] conduct has corrupted the process of engaging bankruptcy advisors, as [Plaintiff] plausibly alleges, then the unsuccessful participants in that process are <u>directly harmed</u>.** The fact that this case invokes our supervisory responsibilities makes our resolution of it *sui generis* and of little, if any, application to 'ordinary' RICO cases where these responsibilities are not front and center.

*Id.* (emphasis added).

77.    Under *Alix*, Plaintiff was directly harmed as an unsuccessful participant in the bankruptcy process. *Id.* The need for this Article III Court to superintend the integrity of the bankruptcy court and its process is even greater than *Alix* because the corruption was not limited to bankruptcy participants, but rather included the Chief Judge of the Bankruptcy Court.

78.    Further, Plaintiff has alleged facts plausibly demonstrating some injury to his due process rights and the bankruptcy process in which he took part. These injuries, at a minimum, entitle him to nominal damages. *See Potomac,* 262 F.3d at 265–66; *Rosario,* 962 F.2d at 1021 (remanding for a

new trial on damages in RICO case because the jury found liability but "did not award even nominal damages on the RICO counts."). A finding of nominal damages would also trigger an award of attorneys' fees. Thus, if some damage has been alleged to exist, even if not readily quantifiable, Plaintiff maintains a plausible claim for nominal damages that is adequate to establish damages. *See Potomac,* 262 F.3d at 266. That some injuries may be difficult to quantify does not preclude a showing of causation. *Id.* at 265 ("[e]ven if the precise amount of its injury is not susceptible of ready proof, it is clear that a reasonable finder of fact could infer that some injury has occurred"); *Alix*, 23 F.4th at 207 ("uncertainty as to amount of damages in not a reason to deny a plaintiff some recovery").

79.     Plaintiff's Complaint plausibly states a claim that his injuries are personalized, and not derivative of the bankruptcy. He has a sufficiently particularized, individual harm to support a finding of prudential standing.

80.     Plaintiff has also alleged Article III standing. Constitutional standing requires three elements: (i) Plaintiff suffered an injury in fact, meaning an injury is of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent; (ii) a causal connection between injury and the conduct brought before the court; and (iii) it must be likely that a favorable decision by the court will redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). For the reasons outlined in Section I, Plaintiff has adequately pled injury and causation. *See supra,* Argument, I. And a favorable decision by this Court granting the relief sought by Plaintiff would redress the injury caused by Defendants. These damages are redressable through money damages from Defendants. They are not speculative. Thus, Plaintiff has Constitutional standing.

## VI.     PLAINTIFF REQUESTS LEAVE TO AMEND HIS COMPLAINT PRIOR TO DISMISSAL.

81.     Should this Court find the Complaint deficient in any regard, Plaintiff respectfully requests leave to amend or supplement his Complaint. "The court should freely give a complainant

… leave to amend defective allegations in a pleading. … Thus, the appropriate remedy when granting a motion based on nonconforming or deficient pleadings is to grant the complainant time within which to amend the complaint." *McClellon v. Lone Star Gas Co.*, 66 F.3d 98, 103 (5th Cir. 1995). Granting Plaintiff leave to amend his Complaint would not prejudice Defendants, who are already on notice of the claims.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Freeman's Motion to Dismiss. To the extent this Court is inclined to dismiss any claim based on a determination that it is derivative of the estate's claims, Plaintiff respectfully requests that the Court do so without prejudice so that he may request leave for derivative standing. *See Louisiana World*, 858 F.2d at 247; *Nat'l Forge*, 326 B.R. at 545–46; *Jones*, 37 B.R. at 974. Plaintiff requests such other and further relief to which he may be entitled at law or in equity.

Dated: July 1, 2024

Respectfully submitted,

By:    /s/ Mikell A. West
   Mikell A. West
   Texas State Bar No. 24070832
   S.D. Tex. Bar No. 1563058
   Robert W. Clore
   Texas State Bar No. 24012426
   S.D. Tex. Bar No. 2032287
   BANDAS LAW FIRM, P.C.
   802 Carancahua Street, Suite 1400
   Corpus Christi, Texas 78401
   Telephone: (361) 698-5200
   Facsimile: (361) 698-5222
   mwest@bandaslawfirm.com
   rclore@bandaslawfirm.com

**<u>Certificate of Service</u>**

I hereby certify that on July 1, 2024, I electronically filed the foregoing instrument with the Clerk of the Court using CM/ECF system which provides notification to all counsels of record.

<u>/s/ *Mikell A. West*</u>
Mikell A. West