IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Morton S. Bouchard, III, Individually and as Co-Trustee for The Morton S. Bouchard, III Family Trust; | Civil Action File No. 4:24-cv-693 |
| Plaintiff, | |
| v. | Jury Trial Demanded |
| David R. Jones, Elizabeth Carol Freeman, Jackson Walker, LLP, Kirkland & Ellis, LLP, and Kirkland & Ellis International, LLP, Portage Point Partners, LLC and Matthew Ray, | |
| Defendants. | To the Honorable Alia Moses, Chief United States District Judge: |

**PLAINTIFF'S RESPONSE TO DEFENDANTS KIRKLAND & ELLIS LLP AND KIRKLAND & ELLIS INTERNATIONAL LLP'S MOTION TO DISMISS**

i

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND.......................................................................................8

LEGAL STANDARD.................................................................................................15

ARGUMENT ..............................................................................................................16

    I.      Plaintiff Sufficiently Alleged Core Factual Allegations........................................16

        A.  Plaintiff's Original Complaint plausibly alleges factual allegations that satisfy
            Rule 9(6) ........................................................................................................17

            1.   Plaintiff plausibly alleged Kirkland's knowledge of the Jones-Freeman
                relationship, circumstantially, by describing the timing of Freeman joining
                Jackson Walker and the ensuing filing of mega-bankruptcies in Houston
                by Jackson Walker and Kirkland. .............................................................18

            2.   Allegations that Kirkland worked with Jones to make Houston the
                epicenter for mega-bankruptcies provide additional circumstantial facts of
                Kirkland's knowledge .................................................................................22

            3.   The leading and most credible financial periodical in the world supports
                Plaintiff's allegations ................................................................................23

             4.   Kirkland's failure to disagree with Jackson Walker's statements about its
                disclosure to Kirkland in March 2021 supports Plaintiff's allegations......27

            **5.**   That the Jones-Freeman relationship was easily discoverable by public
                information supports that Kirkland knew of the Jones-Freeman
                relationship.............................................................................................. 29

        B.  There are no inconsistencies that undermine Plaintiff's allegations............. 30

        C.  There are no innocent and obvious alternative explanations for Plaintiff's
            allegations against Kirkland.......................................................................... 31

    II.     Plaintiff has Standing......................................................................................... 33

    III.    Plaintiff Plausibly Pleaded Proximate Causation as to Kirkland........................ 36

    IV.    Plaintiff Alleged Materially False Statements by Kirkland ................................ 42

        A.  Plaintiff identified Kirkland's fraudulent omissions with particularity ........ 42

    B.  The Complaint referenced the bankruptcy rules to describe Kirkland's duty to disclose; It alleged fraud in Kirkland concealing material facts about the Jones-Freeman relationship ........................................................................ 44

    C.  Case law and other authority supports Plaintiff's argument that, as lead counsel for debtor-in-possession, Kirkland was required to disclose ........... 46

    D.  Kirkland's fraudulent omissions were material ............................................. 47

V.     Kirkland's "Independent" Grounds for Dismissal Should Each Be Denied ....... 48

    A.  Plaintiff has properly alleged RICO claims ................................................ 48

       1.  Plaintiff has standing to bring RICO claims ............................................ 48

          a.  Plaintiff plausibly alleged an injury to his business or property by reason of Defendants' RICO violations ............................................ 49

          b.  Plaintiff plausibly alleged that his injuries were caused by Defendants' RICO violations ................................................................. 53

       2.  Plaintiff has properly alleged a RICO Enterprise ..................................... 53

          a.  Kirkland does not dispute that Plaintiff alleged a purpose for the Enterprise that is separate from its predicate acts of racketeering .... 53

          b.  Plaintiff adequately alleged the Enterprise's structure by describing the purpose, relationships, and continuing acts of the Enterprise ........... 54

          c.  Plaintiff properly alleged that Kirkland operated and managed the Enterprise ................................................................................. 57

       3.  Plaintiff adequately alleged predicate acts .............................................. 58

    B.  Plaintiff adequately alleged Kirkland's agreement to the RICO conspiracy 65

    C.  Plaintiff has properly alleged a *Bivens* conspiracy ....................................... 68

    D.  Plaintiff adequately alleged reliance in connection with his state law claims ..................................................................................................... 70

    E.  Plaintiff's state law claims are not preempted ............................................. 71

    F.  Plaintiff's state law claims are not barred by Texas's "attorney immunity" or "judicial-proceedings privilege." ................................................................. 73

       1.  The judicial proceedings privilege does not bar Plaintiff's state law claims ..................................................................................................... 73

       2.  Attorney immunity does not bar Plaintiff's state law claims ................. 74

G.  Plaintiff's claims for negligent misrepresentation, professional negligence, unjust enrichment and *Bivens* conspiracy are not time-barred. .................. 76

H.  Plaintiff withdraws his claim against Kirkland for professional negligence and breach of fiduciary duty ............................................................... 79

I.  Plaintiff has alleged facts stating a basis for finding Kirland liable for its participation in the breach of fiduciary duties and under a theory of respondent superior ........................................................................................ 79

J.  If Kirkland's motion to dismiss is not denied outright, Plaintiff requests leave to amend ............................................................................................... 81

CONCLUSION AND PRAYER ............................................................... 82

## <u>TABLE OF AUTHORITIES</u>

<u>*Cases*</u>

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970)............................................................68

*Aetna Casualty & Surety Co. v. Gaines*,
    713 F.2d 1187 (5th Cir. 1983) ..........................................23

*Alix v. McKinsey & Co.*,
    23 F.4th 196  (2d Cir. 2022) ...........................7, 37, 40, 41, 45, 51, 60

*Allgood v. R.J. Reynolds Tobacco Co.*,
    80 F.3d 168 (5th Cir. 1996)..............................................71

*Alpert v. Crain, Caton & James, P.C.*,
    178 S.W.3d 398, 405 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). ...........................74

*Arce v. Burrow*,
    958 S.W.2d 239 (Tex. App. 1997)....................................41

*Azby Fund v. Wadsworth Ests,. L.L.C.*,
    2022 U.S. App. LEXIS 34109  (5th Cir. 2020) ................30

*Beirne, Maynard & Parson, L.L.P. v. Cypresswood Land Partners*,
    2010 U.S. Dist. LEXIS 146549 (S.D. Tex. June 8, 2020) ..........................28, 44

*Berda v. CBS Inc.*,
    800 F. Supp. 1272 (W.D. Pa.), *aff'd*, 975 F.2d 1548 (3rd Cir. 1992)................30

*Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*,
    595 S.W.3d 651 (Tex. 2020)........................................75, 76

*Bird v. W.C.W.*,
    868 S.W.2d 767 (Tex. 1994). ...........................................73

*Bivens v. Six Unknown Federal Narcotics Agents*,
    403 U.S. 388 (1971).....................................................69, 70

*Blacks in Tech. Int'l v. Blacks in Tec. LLC*,
    2022 U.S. Dist. LEXIS 94538 (N.D. Tex. May 26, 2022) .................................*50*

*Boyd v. Angelica Textile Servs.*,
    2012 U.S. Dust, LEXIS 90831 (S.C. May 18, 2012).........................................68

*Boyle v. U.S.*,
    556 U.S. 938  (2009).......................................................54

*Brickley for CryptoMetrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys*., LLC,
  566 B.R. 815  (W.D. Tex. 2017) ....................................................................................66

*Bush v. Lucas*,
  647 F.2d 573 (5th Cir. 1981), *aff'd*, 462 U.S. 367 (1983) .................................................69

*Campbell v. Wells Fargo Bank*,
  781 F.2d 440 (5th Cir. 1986) ..........................................................................................15

*Cantey Hanger, LLP v. Byrd*,
  467 S.W.3d 477  (Tex. 2015)....................................................................................74, 76

*Carroll v. Fort James Corp.*,
  470 F.3d 1171 (5th Cir. 2006) .......................................................................................43

*In re CF Holding Corp.*,
  164 B.R. 799, 807-08 (D. Conn. Feb. 17, 1994)......................6, 25, 43, 45, 46, 47, 48, 70

*Chapman & Cole v. Itel Container Int'l B.V.*,
  865 F.2d 676  (5th Cir. 1989) .........................................................................................26

*Collins v. Zolnier*,
  No. 09-17-00418-CV, 2019 WL 2292333 (Tex.App.-Beaumont, May 30, 2019).............73

*Walker v. S.W.I.F.T SCRL*,
  517 F. Supp. 2d 801, 807(E.D.Va. 2007) .......................................................................26

*CSX Transp., Inc. v. Gilkison*,
  2012 U.S. Dist. LEXIS 61719 (N.D. Va. May 3, 2012)..............................................60, 61

*Ctr. For Inquiry, Inc., v. Warren*,
  845 Fed. Appx. 325 (5th Cir. 2021)................................................................................49

*Cypress/ Spanish Ft. I, L.P. v. Prof'l Serv. Indus., Inc.*,
  814 F.Supp.2d 698 (N.D. Tex. 2011). ............................................................................79

*Daddona v. Gaudio*,
  156 F. Supp. 2d 153  (D. Conn. 2000).............................................................................61

*D'Onofrio v. Vacation Publ'ns., Inc.*,
  888 F.3d 197 (5th Cir. 2018)..........................................................................................80

*Egbert v. Boule*,
  596 U.S. 482 (2022)........................................................................................................69

*Escobar v. City of Del Rio,*
    No. DR-20-CV-0031, 2023 U.S. Dist. LEXIA 4176745 (W.D. Tex. Oct. 2, 2023) .........15

*Feld Entm't, Inc. v. ASPCA,*
    873 F. Supp. 2d 288 (D.C. Jul. 9, 2012) ..................................................................60

*Floyd v. Hefner,*
    556 F.Supp.2d 617 (S.D. Tex. 2008)......................................................................80

*Franchise Tax Bd. V Alcan Aluminum,*
    493 U.S. 331(1990).................................................................................................36

*Galindo v. City of Del Rio,*
    2021 U.S. LEXIS 126766 (W.D. Tex. Mar. 26, 2021).................................33, 35

*Green v. Doe,*
    260 Fed. Appx. 717  (5th Cir. 2007) ..................................................................78

*Hendricks v. Thornton,*
    973 S.W.2d 348 (Tex. App.—Beaumont 1998, pet. denied)............................80

*Hunter Bldgs. & Mfg., L.P. v. MBI Global LLC*
    436 S.W.3d 9 (Tex. App. — Houston [14th Dist.] 2014, pet. denied) .....................80

*In re 4E Brands Northamerica LLC,*
    No. 22-50009  .......................................................................5, 13, 14, 27, 28, 42

*In re Bouchard Transp. Co., Inc., et al*
    No. 20-34682 .......................................................................................1, 2, 7, 10

*In re Bradley,*
    495 B.R. 747 (Bankr. S.D. Tex. 2013) ..................................................................46

*In re Brentwood Lexford Partners, LLC*
    292 B.R. 255  (Bankr. N.D. Tex. 2003) ................................................................72

*In re Cement Lock v. Gas Technology Institute,*
    2005 U.S. Dist. LEXIS 220058 (N.D. Ill. Sept. 30, 2005) .........................38, 50

*In re CF Holding Corp.,*
    164 B.R. 799 (D. Conn. Feb. 17, 1994)..................................................6, 47, 70

*In re Depugh,*
    409 B.R. 125 (Bankr. S.D. Tex. 2009) ..................................................................46

*In re Eon Enterprises Corp.,*
    59 F.3d 174 (9th Cir.1995) .................................................................................6, 47

*In re Jones,*
    37 B.R. 969  (N.D. Tex. Bankr. 1984).............................................................52, 70, 82

*In re Landry,*
    350 B.R. 51 (Bankr. E.D. La. 2006) ..............................................................................30

*In re Linn Energy, LLC,*
    Bk. No. 16-60040 (S.D. Tex.) ........................................................................................20

*In re Nat'l Forge Co.,*
    326 B.R. 532 (W.D. Pa. May 26, 2005).........................................................52, 79, 82

*In re NC12, Inc.,*
    478 B.R.820 (Bankr. S.D. Tex. 2012) ...........................................................................36

*In re Perry,*
    425 B.R. 323(Bankr. S.D. Tex. 2010) ...........................................................................72

*In re Schlotzsky's Inc.,*
    351 B.R. 430 (Bankr. W.D. Tex. 2006) .........................................................................81

*In re Shirley*
    134 B.R. 940 (Bankr. App. 9th Cir. 1992) ....................................................................72

*In re Tug Robert J. Bouchard*,
    No. 20-03276  ................................................................................................................66

*In Re: Ultra Petroleum Corp., et al.,*
    No. 16-32202  ................................................................................................................20

*In re United States OPM Data Sec. Breach Litig.,*
    928 F. 3d 42  (D.C. Cir. 2019) ......................................................................................40

*In re W. Delta Oil Co.,*
    432 F.3d 347 (5th Cir. 2005) .........................................................................................44

*In re Westmoreland Coal Co.,*
    No. 18-35682 .................................................................................................................22

*Jacobs v. Tapscott,*
    2006 U.S. Dist. LEXIS 68619 (N.D. Tex. Sept. 25, 2006)............................................41

*James v. Brown,*
    637 S.W.2d 914 (Tex. 1982) .......................................................................73, 74

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,*
    677 F.2d 1045  (5th Cir. 1982) ...........................................................................15

*Khurana v. Innovative Health Care Sys.*
    130 F.3d 143 (5th Cir. 1997) ...............................................................38, 50, 51

*Kingham v. Pham,*
    753 F. App'x 336 (5th Cir. 2019) .......................................................................77

*Kinzbach Tool Co. v. Corbett-Wallace Corp.,*
    160 S.W.2d 509 (Tex. 1942) ...............................................................................80

*Lafrentz v. Lockheed Martin Corp.,*
    No. 4:18-CV-4229, 2021 WL 4350175 (S.D. Tex. Sept. 10, 2021) ..................71

*Liberty Sackets Harbor L.L.C. v. Vill. Of Sackets Harbor,*
    776 Fed. Appx. 1, (2d Cir. 2019) .......................................................................36

*Lone Star Fund V (US), LP v. Barclays Banks PLC,*
    594 F.3d 383 (5th Cir. 2010) ..............................................................................15

*Louisiana World Exposition v. Federal Ins. Co.,*
    858 F.2d 233  (5th Cir. 1988) ...............................................................52, 79, 82

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555, 561, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992)............34, 40, 49

*Marriott Bros v. Gage,*
    704 F. Supp. 731 (N.D. Tex. Oct. 7, 1988) ........................................................63

*McClellon v. Lone Star Gas Co.,*
    66 F.3d 98 (5th Cir. 1995).................................................................................81

*In re McDermott,*
    No. 20-30336.......................................................................................................44

*McGowan v. S. Methodist U.,*
    No. 3:18-CV-00141-N, 2024 WL 455340, (N.D. Tex. Feb. 5, 2024) ...............78

*Meadows v. Hartford Life Ins. Co.,*
    492 F.3d 634 (5th Cir. 2007).............................................................................80

*Murphy v. Campbell,*
    964 S.W.2d 265 (Tex. 1997) ...................................................................78

*Oakes Farms Food & Distrib. Servs., L.L.C. v. Sch. Dist. Of Lee Cty.,*
    I541 F.Supp. 3d 1334, (M.D. Fla. May 28, 2021) ...........................................*36*

*Potomac Electric Power Company v. Electric Motor and Supply, Inc.,*
    262 F.3d 260 (4th Cir. 2001) ....................................................38, 49, 52

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993)....................................................................................57

*Rodriguez-Meza v. Venegas,*
    No. DR-17-CV-42, 2018 U.S. Dist. LEXIS 226744 (W.E. Tex. Sept. 27, 2018) .......15, 18

*Rosario v. Livaditis,*
    962 R.2d 1013 (7th Cir. 1992) ..................................................38, 52

*Rotella v. Pederson,*
    144 F.3d 892(5th Cir. 1998) ....................................................................77

*Seitzman v Hudson Riv. Assoc.,*
    143 Misc 2d 1068 (Sup Ct 1989) ..............................................................81

*Shaikh v. Texas A&M Univ. Coll. of Med.*
    739 F. App'x 215 (5th Cir. 2018) ..............................................................80

*Shannon v. Ham*
    2015 U.S. Dist. LEXIS 190760(N.D. Tex. May 5, 2015) ................................56

*Shell Oil Co. v. Ross,*
    356 S.W.3d 924, (Tex. 2011). ..................................................................77

*Smith v. Our Lady of the Lake Hosp. Inc.,*
    960 F.2d 439 (5th Cir. 1992) ....................................................................29

*Snow Ingredients, Inc. v. SnoWizard, Inc.,*
    833 F.3d 512 (5th Cir. 2016) ....................................................................60

*Spitzberg v. Hous. Am. Energy Corp.,*
    758 F.3d 676 (5th Cir. 2014) ....................................................................15

*St. Paul Mercury Ins. Co. v. Williamson,*
    224 F.3d 425 (5th Cir. 2000) ....................................................................60

*Standardbred Owners Ass'n v. Roosevelt Raceway Assocs. L.L.P.,*

985 F.2d 102 (2d Cir. 1993) ................................................................................39, 51

*State Farm Mut. Auto. Ins. Co. v. Makris*,
 No. 01-5351, 2003 U.S. Dist. LEXIS 3374 (E.D. Pa. Mar. 4, 2003) ................................60

*Stevenson v. Thornburg,*
 2024 J.S. Dist. LEXIS 26313 (S.D.N.Y. Feb. 14, 2024) ......................................................56

*Stockman v. Flotek Indus., Inc.,*
 2010 WL 3785586 (S.D. Tex. Sept. 29, 2010) ....................................................................26

*Taggart v. DOJ,*
 2018 U.S. Dist. LEXIS 130088 (S.D.N.Y. Aug. 1, 2018) ....................................................68

*Taylor v. Tolbert,*
 644 S.W.3d 637 (Tex. 2022) ........................................................................................74, 75

*Tel—Tel-Phonic Services, Inc., v. TBS Int'l, Inc.,*
 975 F.2d 1134 (5th Cir. 1992) ..............................................................................................15

*Thompson v. Deutsche Bank Nat'l Tr. Co.,*
 775 F.3d 298 (5th Cir. 2014) ...............................................................................................78

*Umbrella Inv. Group v. Wolters Kluwer Fin. Servs.,*
 972 F.3d 710 (5th Cir. 2020) ................................................................................................17

*United States v. Elliott,*
 571 F.2d 880 (5th Cir. 1978) ...............................................................................................65

*United States v. Harris,*
 821 F.3d 589 (5th Cir. 2016) ...............................................................................................42

*United States v. Johnson,*
 825 Fed. Appx. 156 (5th Cir. 2020) .....................................................................................23

*U.S. v. Jones,*
 873 F.3d 482 (5th Cir. 2017) ...............................................................................................66

*United States ex rel. Integra Med. Analytics, L.L.C. v. Baylor Scott & White Health,*
 816 F. App's 892 (5th Cir. 2020) .........................................................................................31

*United States v. Teel,*
 691 F.3d 578(5th Cir. 2012). ................................................................................................63

*Valdez v. Hollenbeck,*

465 S.W.3d 217 (Tex. 2015) ....................................................................................77

*Van Deelen v. Dickson, et al.,*
No. 20-03309 .....................................................................................................28

*Willis v. Maverick,*
760 S.W.2d 642 (Tex.1988) ..............................................................................79

*Warnock v. State Farm Mut. Auto. Ins. Co.,*
No. 5:08cv01, 2008 U.S. Dist. LEXIS 81507 (S.D. Miss. Oct. 14, 2008) ........60

*Warranty Gold, Ltd. V. KPMG, L.L.P,*
2006 U.S. Dist. LEXIS 94382 (W.D. Tex. Jul. 25, 2006) ..................................39

*Whalen v. Carter,*
954 F.2d 1087 (5th Cir. 1992) ...........................................................................48

*Wilkinson v. USAA Fed. Sav. Bank Tr. Services,*
No. 14-13-00111-CV, 2014 WL 3002400 .........................................................73

*Worldwide Asset Purchasing, L.L.C. v. Rent–A–Center E., Inc.,*
290 S.W.3d 554 (Tex. App.—Dallas 2009, no pet.)...........................................70

*Young Innovations, Inc. v. Dental Health Products, Inc.,*
No. CV 4:18-01726, 2019 WL 13211665 (S.D. Tex. Aug. 8, 2019)..................80

*Zografidis v. Richards,*
2022 U.S. Dist. LEXIS 247061 (D. Conn. Jul. 5, 2022).....................................68

<u>Statutes and Rules</u>

11 U.S.C. § 327......................................................................................................25

11 U.S.C. § 326..............................................................................................6, 25, 44

11 U.S.C. § 328......................................................................................................25

11 U.S.C. § 101 .........................................................................................44, 70, 75

11 U.S.C. § 1327.............................................................................................45, 70

18 U.S.C. § 152 ....................................................................................................64

18 U.S.C. § 1503....................................................................................................58

18 U.S.C. § 1341 ....................................................................................................59

18 U.S.C. § 1343 ....................................................................................................59

18 U.S.C. § 1346 ...............................................................................................59

18 U.S.C. § 1352 ...............................................................................................59

18 U.S.C. § 1964(c) ..........................................................................................49

28 U.S.C. § 455 (a) ...............................................................................43, 45, 47

Fed. R. Bankr. P. 2014 ............................................................6, 43, 44, 45

Fed. R. Bank. P. 5002 (b) ...........................................6,7, 43, 45, 47, 70

Fed. R. Civ. P. 9 ....................................................................15, 17, 26, 33

Fed. R. Civ. P. 12(b)(6) ....................................................10, 12,15, 32, 33, 36

Fed. R. Civ. P. 60(b)(6) ...................................................................14

Plaintiff Morton S. Bouchard, III, individually and as co-trustee, (collectively, the "Bouchard Parties"), files this response to Defendants Kirkland & Ellis LLP and Kirkland & Ellis International LLP's ("Kirkland") Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and would respectfully show the Court the following:

## INTRODUCTION

Morton S. Bouchard was forced to watch as the New York-based ocean-going petroleum tugboat and barge company his great grandfather, grandfather, and father built more than 100 years ago and which he ran since 1992, Bouchard Transportation Company ("BTC"), was systematically dismantled by Defendants. Kirkland has raked in more than $160 million from Judge Jones through the Jones-Freeman-Jackson Walker connection and was paid more than $6 million by Jones for its role in the BTC liquidation.

BTC only ended up before Jones because Kirkland partner Ryan Bennett advised Bouchard to file Chapter 11 in the Southern District of Texas where they had a "friendly" judge. But Jones was only friendly so long as Bouchard played "nicely" within the sandbox of the Jones-Freeman-Jackson Walker-Kirkland Enterprise. When Bouchard began questioning professional billing in the bankruptcy, Jones quickly—and without so much as a motion—removed him as CEO on February 26, 2021, replacing him with Kirkland's chosen financial advisor, Portage Point Partners, and its founder Matthew Ray. During the hearing in which he sua sponte removed Bouchard, Jones told Ray he was "willing to go to great lengths to encase [Ray] within the judicial immunity from which [Jones] benefit[s]."[1]

---

[1] *In re Bouchard Transp. Co., Inc., et al.*, 20-34682, Dkt. 591 at 13.

As a 2019 MPI[2] assessment predicted, Bouchard's removal was catastrophic for BTC. At the time of the filing of bankruptcy in September 2020, 85–90% of BTC's fleet was chartered out.[3] Under the control of the Portage Point, BTC's operations abruptly halted, and liquidation commenced. Meanwhile, around a month after Ray took over BTC, in March 2021, Kirkland partner Ryan Bennett, lead counsel in the bankruptcy, sold Ray his vacation home in Michigan.[4] And by August 2021, just five months after Bouchard's removal, BTC's assets were sold for pennies on the dollar. As described in Plaintiff's Original Complaint, Portage Point engaged in self-dealing with the sale of BTC's once considerable assets.[5]

Bouchard did not just watch in agony as his family business was destroyed by Defendants. He attempted to salvage it by providing more than $40 million in loans, using his own life insurance policies, among other assets, as collateral. This money went to fund BTC's operations—including covering payroll.

Relying on matters outside Plaintiff's Original Complaint, Kirkland attempts to interject its own false allegations from an adversary proceeding that it filed against Bouchard (and which it used as leverage against Bouchard's $40 million claim) to insinuate that his lifestyle, including the use of a private jet, led to the company's failure. This extraneous argument should not be considered.[6] In any event, BTC was a near billion-dollar nationwide entity, the largest independent ocean-going petroleum barging company in the United States, with a large fleet of tugboats and barges. It is hardly surprising extensive travel would be required of Bouchard and other BTC employees. Bouchard was responsible

---

[2] MPI is a prestigious national consulting firm that specializes in business valuation. *See* https://mpival.com/about-us/.
[3] Complaint ¶ 73.
[4] *In re Bouchard*, No. 20-34682, Dkt. 778 at ¶10.
[5] *See* Complaint ¶¶ 80–89.
[6] To the extent it is, Plaintiff requests leave to supply facts correcting the false allegations.

for dealing with any array of issues including finance, sales, marketing, shipbuilding, legal matters, dealing with customers, negotiating all maritime insurance, and safety and security.[7] Kirkland's self-serving representations that Bouchard refused to sell the jet or deal with lenders, again interjected from outside the pleadings in this case, are false and should not be considered.[8] Bouchard did everything in his power to keep the company in business while Defendants, including Kirkland, made it just one of many companies that they have taken apart to fund their Enterprise.

Kirkland's motion to dismiss is largely a rehash of its motion filed against Plaintiff Michael Van Deelen, also before this Court. The Court should deny this motion for many of the same reasons advanced by Van Deelen. Additionally, Plaintiff is a creditor who invested more than $40 million attempting to keep BTC afloat, and is situated differently than Van Deelen, with his own unique claims, damages, and standing. As a result of Defendants' misconduct, the loans taken out against the insurance policies remain unpaid and certain policies terminated, resulting in over $40 million in losses, as well as adverse tax consequences to Plaintiff given BTC's status as a sub chapter "s" corporation and the failure to repay the loans on the life insurance policies. Plaintiff has been denied any recovery on his claims against BTC, including the amounts provided for under the Settlement Agreement executed by Ray. Further, Bouchard suffered reputational harm and has been unable to obtain new employment as a result of Defendants' misconduct and disparagement. The proceedings also caused emotional trauma for Bouchard, who lost the generational family business he dedicated his life to, due to the malfeasance of the RICO Defendants, including Kirkland. Bouchard also suffered mental anguish as a result of the harsh treatment he received in court, including the *sua sponte* removal of Bouchard as CEO, and as a result of learning his case was litigated in a courtroom corrupted by fraud,

---

[7] *Id.* ¶ 64
[8] To the extent Kirkland's extraneous material is considered, Plaintiff requests leave to address it.

in which the law firms, Freeman, and the judge conspired to enrich themselves, with no level playing field for any litigant who did not fall in line with the plan or who dared question professional fees.

Kirkland continues to try to distance itself from the group it made more than $160 million with in dozens of mega-bankruptcies. The firm again characterizes itself as an innocent "bystander" that had nothing to do with the self-dealing of Jones awarding millions in fees to his live-in girlfriend, her law firm, and the firm it almost always associated with, Kirkland. But the facts alleged in Plaintiff's Original Complaint demonstrate, or at the very least allow for the reasonable inference of, just the opposite.

Between 2018 and 2022, Kirkland appeared together with Jackson Walker and Freeman as local counsel in virtually every mega-bankruptcy Kirkland filed in the Southern District of Texas. Kirkland followed this same recipe – selecting Freeman and her firm as local counsel and filing cases in the district where her intimate partner presided – for at least 42 different mega-bankruptcy cases filed after 2019.[9]

Additional facts strongly indicate Kirkland had knowledge of the Jones-Freeman relationship and was anything but a bystander:

- Kirkland's filings with Jackson Walker and in the Southern District of Texas increased dramatically *immediately* after Judge Jones girlfriend became available for hire.

- The most credible financial periodical in the world reported being told by "multiple Kirkland partners" that they were "long aware of the romantic relationship between the pair."

---

[9] *Id.* ¶ 37.

- As one of the world's leading law firms that claims to have run a conflict check on bankruptcy judges, Kirkland was likely to have found the same information regarding Jones and Freeman's cohabitation as Plaintiff uncovered as a pro se litigant. And,

- Kirkland itself has still not disputed that it was informed by Jackson Walker of the romantic relationship in March 2021.

Kirkland dances around outright denial that any of its partners knew of the relationship either before or after March 2021. It now attempts to mislead the Court by claiming that in March 2021, "all that could have been 'disclosed' at that time was that Van Deelen had *accused* Jones and Freeman of a romantic relationship[.]"[10] In fact, the well-pleaded facts referencing Jackson Walker's filings show it told Kirkland about both the accusations *and Freeman's acknowledgement of the relationship*, at least in the past.[11]

After describing that in March 2021, "Freeman confirmed that there had been a romantic relationship[,]"[12] Jackson Walker stated it "disclosed *these matters* to our Kirkland co-counsel, who disclosed them to the client."[13] In context, "these matters" plainly include Freeman's admission. There is no reason to believe Jackson Walker kept the admission from Kirkland. If that's what Kirkland is suggesting, it should come out and say so.[14] Even if it does, that is a factual dispute among defendants and Plaintiff has plausibly alleged Kirkland's knowledge of the Jones-Freeman relationship, which it used to secure huge attorneys' fees.

---

[10] Motion to Dismiss at 2 (emphasis added).
[11] *See* Complaint ¶ 108.
[12] *Id.* ¶108 (citing *In re 4E Brands Northamerica LLC*, No. 22-50009, Dkt. 526-1 at 3).
[13] *Id.* (citing *4E Brands*, 22-50009, Dkt. 526-1 at 3–4) (emphasis added).
[14] Jackson Walker's filing under seal of several communications from Van Deelen and its reference to the communications broadly as defamatory, *see* Motion to Dismiss at 3, without specifying what in the sealed communications were defamatory, does nothing to suggest that Jackson Walker did not inform Kirkland of the admissions as Jackson Walker says it did.

Without the slightest sense of irony, Kirkland asks this Court to consider Van Deelen's credibility at the time he filed the anonymous letter in March 2021. As Kirkland notes, Van Deelen's only evidence at the time was an anonymous letter that alleged possible inappropriate behavior.

In fact, Kirkland fought to keep the letter out of evidence during the hearing on the motion to recuse even after it had been made aware of Freeman's admissions. As the Fifth Circuit noted, had the relationship been disclosed, "[t]here is a reasonable probability that … the motion to recuse would have been granted."[15]

Otherwise, Kirkland believes it had no obligation to reveal a conflict involving its local counsel that so inured to its benefit. Once again, Kirkland fails to acknowledge that it's linchpin case, *In re Eon Enterprises Corp.*, 59 F.3d 174 (9th Cir. 1995) (unpubl. mem. op.), is an unpublished, four-paragraph, nonprecedential memorandum opinion with essentially no analysis that cannot be cited in the circuit where it was authored and has never been cited by any court.

Meanwhile, the Bankruptcy Code and Rules, as well as at least one published opinion, support Plaintiff's argument that Kirkland, as lead counsel for debtor-in-possession, was required to disclose its knowledge of the intimate, live-in relationship between its local counsel and the judge. *See In re CF Holding Corp.*, 164 B.R. 799, 807–08 (D. Conn. Feb. 17, 1994) ("[t]he general concerns of the Code and the courts to promote public confidence in the integrity of the bankruptcy system are compelling reasons to apply a prophylactic rule in considering the extent of the fiduciary duties of an attorney for a debtor in possession"); *see also* 11 U.S.C. § 327(a); Fed. R. Bankr. P. 2014; Fed. R. Bank. P. 5002(b) (bankruptcy judge may not approve appointment of professional "if that person is or has been so connected with such judge … to render the appointment or employment improper"); *see* Fed. R. Bank.

---

[15] Complaint, Ex. 1 at 2.

P. 5002(b), Notes of the Advisory Committee ("subdivision (b) alerts the potential appointee or employee and party seeking approval of employment to consider the possible relevance or impact of subdivision (b) and *indicates to them that appropriate disclosure* **must** *be made to the bankruptcy court* before accepting appointment or employment.") (emphasis added). By failing to disclose the relationship in connection with its applications for appointment, declarations of disinterestedness, proposed orders, motions for attorneys' fees, and motions for final decrees, *almost all of which were e-filed through a Jackson Walker attorney,*[16] Kirkland necessarily represented to the Court and those interested in the bankruptcy that neither Kirkland, nor its local counsel filing on its behalf, had any impermissible "connection" with the judge as contemplated under Rule 5002(b). *See* Fed. R. Bank P. 5002(b) and Notes of Advisory Committee.

Kirkland's misrepresentations were not mere clerical errors or technical violations of bankruptcy rules. They were a corruption of the bankruptcy process that resulted in direct harm to everyone involved in that process – including Plaintiff. These fraudulent representations are actionable under RICO, as well as through common law claims such as fraud and unjust enrichment, among others. *See Alix v. McKinsey & Co.*, 23 F.4th 196, 204 (2d Cir. 2022) (denying Rule 12(b)(6) motion to dismiss against RICO/bankruptcy fraud allegation concerning fraudulent disclosure statement, noting that "[l]itigants in all of our courts are entitled to expect that rules will be followed, the required disclosures will be made, and that the court's decisions will be based on a record that contains all the information applicable law and regulations require").

Kirkland has not shown itself entitled to dismissal on the pleadings. Kirkland's threshold arguments are meritless. First, Plaintiff satisfied the particularity and plausibility of standard of Rule

---

[16] *In re Bouchard Transportation Co., Inc., et al.,* No. 20-34682, Dkts. 167, 882, 1379.

9(b). Second, Plaintiff has standing. He is not asserting claims held by BTC or its shareholders, but rather his own, individualized claims. Third, Kirkland's failure to disclose the Jones-Freeman relationship proximately caused Plaintiff's injuries. Fourth, Kirkland made materially false statements. Likewise, each of Kirkland's grounds for dismissal as to Plaintiff's individual claims fail. Plaintiff satisfied each requirement of its RICO claims. Plaintiff's state law claims are not barred by the judicial-proceedings privilege or attorney immunity, nor are they preempted by federal law. All of Plaintiff's alleged causes of action exist. And none are barred by limitations. Kirkland's motion to dismiss should be denied.

## FACTUAL BACKGROUND

Morton Bouchard served as President of BTC since 1992, successfully growing it into one of the largest independently owned ocean-going petroleum barge companies in the United States, with over 50 vessels.[17] Because of Bouchard's extensive experience and understanding of the highly regulated petroleum barge industry and BTC's operations, a 2019 MPI appraisal noted he was a key figure at BTC, and critically, that the company would suffer significant adverse impacts if he were to leave.[18]

While COVID negatively impacted the industry, BTC had a state-of-the-art fleet, and positioned itself to capitalize on the subsequent uptick in demand.[19] In 2020, Bouchard approached Kirkland about BTC's financial concerns, during the height of the Jones-Freeman-Jackson Walker-Kirkland Enterprise.[20]

---

[17] Complaint ¶¶63, 64.
[18] *Id.* ¶64.
[19] *Id.* ¶75.
[20] *Id.*

When Bouchard spoke with Kirkland, Bennett told him to file Chapter 11 in Houston because they had a "friendly" judge.[21] Bennett also told him he needed Jackson Walker and Portage Point. What Kirkland did not tell him was that its local counsel, Freeman, a key restructuring partner at Jackson Walker, was in a long-standing intimate relationship and living with this judge. Nor did it tell Bouchard in March 2021, when Jackson Walker states it disclosed the Jones-Freeman relationship to Kirkland. Nor did it tell him when Freeman later admitted to the relationship again in 2022.

Likewise, neither Kirkland nor any of the defendants referenced the disqualifying relationship in their declarations of disinterestedness nor did they ever update them. In fact, Kirkland's declaration of disinterestedness, which goes so far as listing Judge Jones among the individuals for whom a conflicts search was conducted,[22] has not been updated to this day.

With Chapter 11 underway, Bouchard prepared a detailed business plan, working with his relationships, to position the fleet to be fully operational—the surest way to preserve and enhance BTC's value.[23] However, costs began mounting at a troubling pace, and Bouchard sought to compel Portage Point and the other professionals to submit supporting invoices for his review prior to payment to manage costs.[24] Bouchard insisted that vessel employees and office employees (excluding himself) be paid first, before any professional fees as part of the operational plan.  This was adamantly rejected by Bennett of Kirkland.[25]

Just days after Bouchard questioned the professional billing, Jones promptly and without any motion before him, removed Bouchard as CEO on February 26, 2021, replacing Bouchard with

---

[21] *Id.* ¶ 62.
[22] *Id.* ¶46.
[23] *Id.* ¶ 75.
[24] *Id.* ¶68.
[25] *Id.*

Portage Point and Ray.[26] Kirkland claims Bouchard's "removal was anticipated[.]"[27] Undoubtedly, it was anticipated by Defendants, who orchestrated it. But it was not by Bouchard. He was given no notice of the removal. Judge Jones simply removed him sua sponte during a hearing on an unrelated matter.[28] A written order followed with no findings other than a reference to hearings, neither of which were on a motion for removal. Contrary to Kirkland's assertion, Bouchard vigorously protested his removal with Kirkland afterwards. Kirkland simply ignored his complaints and Bennett told Bouchard he could no longer speak with him because he was representing BTC.

Bouchard's removal was done despite overwhelming support for him as CEO among BTC employees and despite his critical importance to its operations.[29]

Kirkland supplies a counter-narrative, impermissibly going outside the pleadings, and relying on its own pleadings and argument made during hearings.[30] This Court should not consider this material in connection with the Rule 12(b)(6) motion. Even if it does, Kirkland's argument is undermined by Plaintiff's well-pleaded facts.

For example, during a February 25, 2021, hearing in which Kirkland and Ray repeatedly reminded the court of unpaid professional fees (with $6.7 million already supposedly accumulated),[31] Ray made unsworn statements blaming Bouchard's past book-keeping as delaying his understanding of the company's financial situation.[32] But during the same hearing, a lender for the debtor complained that Ray had not shared projections or financial models.[33] Ray had also not filed monthly

---

[26] *Id.*
[27] Motion to Dismiss at 5.
[28] *Id.* ¶71 (citing *BTC*, 20-34682, Dkt. 569; Dkt. 591 at 7).
[29] *Id.* ¶ 69.
[30] *See e.g.,* Motion to Dismiss at 4.
[31] *Bouchard*, 20-34682, Dkt. 557 at 10, 13, 30.
[32] *Id.* Dkt. 557 at 8.
[33] *Id.* at 16.

operating reports.[34] Ray claimed he filed an extension when he had not, and in fact only spoke with the U.S. Trustee about it.[35] In fact, Ray had no experience in how the accounting system worked.[36]

In any event, as the 2019 MPI anticipated, Bouchard's removal was catastrophic for BTC. At the time of the filing of bankruptcy in September 2020, 85–90% of BTC's fleet was chartered out.[37] Under the control of the Portage Point, BTC's operations abruptly halted, and liquidation commenced. Meanwhile, around a month after Ray took over BTC, in March 2021, Kirkland partner Ryan Bennett, lead counsel in the bankruptcy, sold Ray his vacation home in Michigan.[38] And by August 2021, just five months after Bouchard's removal, BTC's assets were sold for pennies on the dollar.[39] As described in Plaintiff's Original Complaint, Portage Point engaged in self-dealing with the sale of BTC's once considerable assets.[40]

Kirkland filed its first interim fee application for $3.4 million on February 13, 2021.[41] Bennett submitted a supporting declaration without disclosing the Jones-Freeman relationship.[42] On or about March 6, 2021, Jackson Walker claims it disclosed the Jones-Freeman relationship to Kirkland.[43] Nevertheless, Kirkland subsequently argued against a recusal motion brought by Van Deelen in the McDermott litigation, and successfully fought to keep out the anonymous letter discussing the Jones-Freeman relationship.

---

[34] *Id.* at 16–17.
[35] *Id.* at 18–19.
[36] Complaint ¶ 8.
[37] Complaint ¶ 73.
[38] *Id.* ¶ 89.
[39] *Id.* ¶ 3, 79.
[40] *See id.* ¶¶ 80–89.
[41] *Id.* ¶ 49.
[42] *Id.*
[43] *Id.* ¶¶ 53, 108, 136.

Then, a couple of weeks after removing Bouchard (who had been complaining about fees), Jones awarded Kirkland its full fee request on March 15, 2021.[44] Still, nobody disclosed the relationship. Kirkland filed a second interim fee motion on May 12, 2021, this one for $3.2 million, and again failed to disclose the relationship.[45] The firm also failed to disclose the relationship in connection with Jackson Walker's fee motions, which included time billed by Freeman. Judge awarded Kirkland its full fee request for the second interim application on June 10, 2021.[46]

Kirkland notes that Bouchard did not file objections to the fee motions.[47] But, Kirkland never supplied Bouchard or any interested person with the facts necessary to lodge an objection—i.e., that its local counsel was in an intimate, live-in relationship with the judge, and that anyone who interfered with the plans of the Jones-Freeman-Jackson Walker-Kirkland Enterprise would face Jones' wrath.

Bouchard did not just watch in agony as his family business was destroyed by Defendants. He attempted to salvage it by securing more than $40 million in loans, using his own life insurance policies, among other assets, as collateral.[48] This money went to fund BTC's operations—including covering payroll.[49]

Going beyond Plaintiff's Original Complaint, Kirkland relies on its own false allegations from an adversary proceeding that it filed against Bouchard (and which it used as leverage against Bouchard's $40 million claim) to discredit the loan. This Court should not consider Kirkland's self-

---

[44] *Id.* ¶¶ 50, 147(f).
[45] *Id.* ¶49.
[46] *Id.* ¶ 50.
[47] Motion to Dismiss at 6, 16.
[48] Complaint ¶¶ 9, 65.
[49] *Id.* ¶ 65.

serving material outside Plaintiff's pleadings at the 12(b)(6) stage. Regardless, these allegations are also false.[50]

Kirkland also goes outside the Original Complaint in insinuating that Bouchard's lifestyle, including the use of a private jet, led to the company's failure. This too should not be considered. Regardless, BTC was a near billion-dollar nationwide entity with a large fleet of tugboats and barges. Bouchard was responsible for dealing with any array of issues requiring considerable travel, including finance, sales, marketing, shipbuilding, legal matters, dealing with customers, negotiating all maritime insurance, and serving on protection and indemnity club boards.[51] Bouchard did everything in his power to keep the company in business while Defendants, including Kirkland, made it just one of many companies to fund their Enterprise.

Throughout the entire process, Judge Jones maintained his denial and Jackson Walker, Kirkland, and Freeman kept mum regarding the information they had concerning the relationship.[52] According to Jackson Walker, it learned about the intimate relationship between Freeman and Jones on March 6, 2021, and disclosed it to Kirkland. While relying on Jackson Walker's version of events, Kirkland tries to spin Jackson Walker's statements so that the firm only disclosed allegations of the relationship, and not Freeman's admission. The problem with that is it is not what Jackson Walker said. In fact, the well-plead facts show that not only did Kirkland know about the relationship when Jackson Walker said it disclosed it to Kirkland in March 2021, but it knew about it long before but kept it secret to keep the gravy train rolling.

---

[50] Again, to the extent these extraneous and misleading allegations are considered, Plaintiff requests leave to amend his complaint to address them.
[51] *Id.* ¶ 64.
[52] *See e.g., 4E Brands*, 22-50009, Dkt. 517, at 3.

On October 7, 2023, Judge Jones finally admitted to the press his intimate relationship and that he had shared a home with Freeman for years.[53] Kirkland seeks the benefit of Jones' statement to the press that he alone made the decision not to disclose.[54] But Jones alone made that decision for himself. Jackson Walker, Kirkland, and Freeman each chose not to disclose as well. And to the extent Jones instructed them not to do so, this is no legal excuse for failing to do what they were required to do by law. Kirkland also seeks cover from the U.S. Trustee's description of the Jones-Freeman relationship as "secret[.]"[55] By secret, the U.S. Trustee plainly meant secret from the public and those interested in the bankruptcy; it has never suggested Jones and Freeman kept it secret from Jackson Walker or Kirkland.

On November 3, 2023, the U.S. Trustee began filing motions under Fed. R. Civ. P. 60(b)(6) requesting that orders awarding fees and expenses be set aside.[56] As the U.S. Trustee observed, "all orders awarding fees and expenses are tainted" in light of "Judge Jones' failure to recuse himself from presiding over cases where Jackson Walker was counsel for the debtor-in-possession while Freeman was both living with him and a partner at Jackson Walker[.]"[57]

The U.S. Trustee's silence so far on Kirkland's involvement in the Jones' scandal should in no way be seen as exoneration. On information and belief, the U.S. Trustee's investigation is ongoing. And it has never indicated Kirkland is outside the realm of its investigation. Nor is the Fifth Circuit's written order identifying a complaint against Judge Jones under the Rules for Judicial Conduct an exculpation as to Kirkland. The Fifth Circuit addressed Jones' conduct alone. That the U.S. Trustee

---

[53] Alexander Gladstone & Andrew Scurria, *Bankruptcy Judge Jones Named in Lawsuit Over Romantic Relationship with Local Lawyer*, Wall Street Journal Pro, (Oct. 7, 2023).
[54] *See* Motion to Dismiss at 7.
[55] *Id.* (citing Bk. 20-34758, Dkt. 354 at 3).
[56] *See 4E Brands*, 22-50009, Dkt. 517
[57] *Id.* at Dkt. 517, at 3.

14

has not yet attempted to claw back fees Jones awarded to Kirkland does not mean that it will not ultimately do so, nor that Plaintiff's claims against Kirkland are in any way deficient.

## Legal Standard

A Rule 12(b)(6) motion to dismiss "is viewed with disfavor and is rarely granted." *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). To survive a 12(b)(6) motion to dismiss, a plaintiff must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face under *Bell Atlantic v. Twombly* and *Ashcroft v. Iqbal*." *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 683 (5th Cir. 2014) (internal citations omitted). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Escobar v. City of Del Rio*, No. DR-20-CV-0031, 2023 U.S. Dist. LEXIS 176745, *6 (W.D. Tex. Oct. 2, 2023). The complaint must be liberally construed in the plaintiff's favor, all reasonable inferences must be drawn in favor of the plaintiff's claims, and the factual allegations of the complaint must be taken as true. *See Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986). Beyond the ordinary pleading standard, a party alleging fraud "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Allegations about conditions of the mind, such as defendant's knowledge of the truth and intent to deceive, however, may be pleaded generally." *Rodriguez-Meza v. Venegas*, No. DR-17-CV-54, 2018 U.S. Dist. LEXIS 226744, *50 (W.D. Tex. Sept. 27, 2018) (Moses, J.) (quoting *Tel—Tel-Phonic Services, Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1138 (5th Cir.1992) (citing Fed. R. Civ. P. 9(b)). The Court's task is to determine whether a plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Id.* (citing *Lone Star Fund V (US), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)).

## ARGUMENT

### I.   Plaintiff Sufficiently Alleged Core Factual Allegations.

Plaintiff adequately stated a claim under Rule 12(b)(6) and alleged fraud with sufficient particularity under Rule 9(b). Plaintiff's Original Complaint supplies the who, what, when, and where of Kirkland's fraud in failing to disclose the Jones-Freeman relationship.

For example, the Complaint alleges that on October 27, 2020, "[e]ven though its partners long knew of the Jones-Freeman relationship, Kirkland partner Ryan Bennett submitted a declaration of disinterestedness that did not identify the relationship between Judge Jones and its local counsel's partner Freeman, even while discussing a conflicts search involving bankruptcy judges."[58] It also described that Jackson Walker partner, Matthew Cavenaugh, e-filed the declaration for Kirkland in Jones' court.[59] As described *supra*, Kirkland had a duty to disclose the Jones-Freeman relationship, but fraudulently omitted any discussion of it from the declaration.

Additionally, Plaintiff alleged Kirkland's fraud in filing its two interim applications for attorneys' fees "on February 13 and May 12, 2021, one filed by Kirkland attorney Genevieve Graham, and another by Cavenaugh on behalf of Kirkland for an aggregate $6.6 million in attorneys' fees and $216,734.54 in expenses.[60] Kirkland partner Bennett submitted supporting declarations for each fee application without disclosing the Jones-Freeman relationship or amending his declarations of disinterestedness."[61]

Implicit in the filing of Kirkland's motion, particularly the one e-filed by Jackson Walker, is the representation by Kirkland that there was no improper connection between its local counsel and

---

[58] Complaint ¶147(b).
[59] *Id.*
[60] *Id.* ¶147(e).
[61] *Id.*

the judge in violation of the Bankruptcy Code and Rules. Kirkland had a duty to disclose the Jones-Freeman relationship in connection with the filing of this motion, but fraudulently omitted any discussion of it from the declaration. It also fraudulently failed to amend its declaration of disinterestedness.

As yet another example, Plaintiff alleged that on September 24, 2021, Cavenaugh, on behalf of both Jackson Waker and Kirkland, e-filed a motion for final decree to close the affiliate Chapter 11 cases.[62] "Despite admitted knowledge of the intimate relationship between Judge Jones and its partner, Freeman, at this time and in violation of its continuing responsibility to supplement its declaration of disinterestedness if new information or relationships are uncovered, neither Jackson Walker nor Kirkland disclosed the relationship between Judge Jones and Freeman."[63] Again, Kirkland had a duty to disclose the Jones-Freeman relationship, but fraudulently omitted any discussion of it in the motion, and failed to amend its declaration of disinterestedness.

### A.   Plaintiff's Original Complaint plausibly alleges factual allegations that satisfy Rule 9(b).

Kirkland's motion challenges Plaintiff's factual allegations that it knew of the relationship between Jones and Freeman before March 2021.[64] As a point of clarification, while Plaintiff plausibly alleged Kirkland's knowledge beforehand, even if Kirkland did not know of the relationship until, as Jackson Walker has stated (and as Plaintiff has alleged), Jackson Walker disclosed it to the firm in March 2021, then Kirkland still committed fraud repeatedly in failing to amend what it then knew to be fraudulent disclosures.[65]

---

[62] *Id.* ¶147(h).

[63] *Id.*

[64] Motion to Dismiss at 9. Plaintiff's claims survive even if none of Kirkland's partners knew of the intimate relationship before March 2021 because the firm continued filing and even argued affirmatively against a motion to recuse without ever disclosing the relationship. And it failed to amend its own misleading declarations of disinterestedness.

[65] *See* Complaint at ¶¶ 50, 54, 59, 111, 147(e).

Kirkland misstates Plaintiff's burden in pleading knowledge, leaving off the second sentence of Rule 9(b), which in full provides:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice intent, *knowledge*, and other conditions of a person's mind *may be alleged generally.*

Fed. R. Civ. P. 9(b) (emphasis added). Thus, while fraud allegations must be stated with particularity under Rule 9(b), allegations about conditions of mind, including knowledge, "may be alleged generally." Fed. R. Civ. P. 9(b); *Rodriguez-Meza*, No. DR-17-CV-54, 2018 U.S. Dist. LEXIS 226744, *50 (Moses, J.); *see also Umbrella Inv. Group v. Wolters Kluwer Fin. Servs.,* 972 F.3d 710, 713 (5th Cir. 2020). "If the facts pleaded in a complaint are peculiarly within the opposing party's knowledge, fraud pleadings may be based on information and belief." *Umbrella Inv. Group*, 972 F.3d at 713. Still, fraud allegations must not be based on speculation and conclusory allegations. *Id.*

In *Rodriguez-Meza*, your Honor dismissed a RICO conspiracy claim where the complaint generically alleged the defendants knew of and agreed to the conspiracy without alleging *any* specific facts of their knowledge. 2021 U.S. Dist. LEXIS 260678, at *66; *see also Umbrella Inv. Group*, 972 F.3d at 713 (simply pleading that the defendant knew a home was in a flood zone, without any facts explaining how he knew, was insufficient to show fraud). That is not the case here. Plaintiff's Complaint provides considerable facts, both circumstantial and direct, that Kirkland knew of the intimate relationship between Jones and Freeman, yet never disclosed it.

1. **Plaintiff plausibly alleged Kirkland's knowledge of the Jones-Freeman relationship, circumstantially, by describing the timing of Freeman joining Jackson Walker and the ensuing filing of mega-bankruptcies in Houston by Jackson Walker and Kirkland.**

Kirkland continues to insist that Plaintiff's knowledge allegations depend solely on two sentences from a newspaper article.[66] Not so. Plaintiff's allegations draw from myriad sources and his counsels' own research, leading to the reasonable conclusion that Kirkland knew of the relationship. First, the Original Complaint describes the uncanny correlation between Freeman joining Jackson Walker and the two law firms pairing to file dozens of mega-bankruptcies in the Southern District of Texas, where the cases would either be heard by Jones or his mentor and close friend Judge Marvin Isgur.[67]

Jackson Walker hired Freeman in 2018.[68] As described in the Complaint, "[w]ith Freeman's arrival, Jackson Walker began securing appointments in myriad large Chapter 11 cases, serving as local counsel with Kirkland as lead."[69] By 2019, Jackson Walker ascended to "the leading counsel firm for corporate debtors filing for bankruptcy in Houston."[70] And by 2022 and in 2023, Jackson Walker was number one in the nation in local counsel appointments in large bankruptcies.[71] "Kirkland & Ellis [led] large debtor-side representations … by a significant margin, while Jackson Walker, Kirkland's preferred local counsel in the Southern District of Texas, picked up more local debtor's representations than any other firm."[72] "Kirkland & Ellis, the dominant US debtor law firm, had tapped Jackson as co-counsel in at least 46 large cases since 2018, according to data collected by bankruptcydata.com."[73]

---

[66] Motion to Dismiss at 9.
[67] Complaint at ¶¶ 35–39.
[68] *Id.* ¶ 35.
[69] *Id.* ¶ 36.
[70] *Id.* ¶ 37.
[71] *Id.*
[72] *Id.*
[73] *Id.*

Kirkland's argument that the timing "does not fit with [plaintiff's] theory of conspiracy" is belied by the record.[74] The firm can point to two cases—only one involving Judge Jones—where Kirkland and Jackson Walker paired together before Freeman's arrival.[75] But after Freeman's arrival at Jackson Walker, the firms began filing together in mass. Kirkland did not file *any* mega-bankruptcy cases with Jackson Walker as local counsel between 2006 and 2016. Yet, as Plaintiff counsels' research revealed, after Freeman joined Jackson Walker in 2018, Kirkland selected Jackson Walker as local counsel in 42 of the 46 mega-bankruptcies it filed in the Southern District of Texas since 2019.[76] The timing is uncanny. And the fact that the firms continued to file together after Freeman left Jackson Walker—in several instances with Freeman collaborating in the case under the Law Office of Elizabeth Freeman—only demonstrates they continued profiting from the scheme rather than upset the apple cart by disclosing.

As further described in the Original Complaint, this was done despite Kirkland having a local office of its own in Houston.[77] The dramatic shift and proliferation of Kirkland's mega-bankruptcy filings in the Southern District of Texas (with Jackson Walker and Freeman on board as local counsel) suggests Kirkland was aware of the Jones-Freeman relationship and agreed to partake in the opportunity it presented for financial and reputational benefits.

That Kirkland continued working with Freeman after she left Jackson Walker in December 2022, following the second purported "revelation" of her intimate live-in relationship with Jones, does nothing to dispute Kirkland's knowledge or undermine Plaintiff's conspiracy allegations. Even if it

---

[74] Motion to Dismiss at 11.
[75] *Id*; Dkt. 19-1 ¶¶ 3 (citing *In Re: Ultra Petroleum Corp., et al.*, Bk. No. 16-32202 (S.D. Tex.) (filed April 29, 2016); *In Re: Linn Energy, LLC, et al.*, Bk. No. 16-60040 (S.D. Tex.) (filed May 11, 2016)).
[76] *See* Complaint ¶ 37.
[77] *Id.* ¶ 38.

did, Plaintiff alleged that the separation of Freeman from the firm was superficial.[78] Freeman's website does not identify a physical address, and Freeman continued to use Jackson Walker offices to conduct work, collaborate with Jackson Walker lawyers, and even held mediations there through at least March 2023.[79]

Of course, since at least 2011, Jackson Walker also had an attorney, Matthew Cavenaugh,[80] who clerked for bankruptcy judges in the Southern District, including Judge Marvin Isgur.[81] But the onslaught of Kirkland/Jackson Walker joint filings followed Freeman's 2018 arrival, not Cavenaugh's in 2011.

Freeman was not just one of any number of attorneys at Jackson Walker working on the mega-bankruptcy cases. She was an essential part of mega-bankruptcy filings in Houston, which Kirkland would have known well. As Jackson Walker recently acknowledged in response to a motion filed by the U.S. Trustee:

> Elizabeth enjoyed quick and substantial success at Jackson Walker. **From the time of her arrival through today [August 2021], Houston has become a favored venue for complex debtor cases**, in the energy industry and more broadly. Complex cases filed in the Southern District are assigned either to Judge Marvin Isgur or Judge Jones. **Jackson Walker's debtor practice grew very substantially during this time, including cases in which we took an expansive local counsel role, with Kirkland Ellis acting as lead counsel**, and cases in which we were lead debtor's counsel. Much of this work was in cases before either Judge Isgur or Judge Jones. This success was a team effort, involving other bankruptcy partners as well, but

---

[78] *Id.* ¶ 117.

[79] *Id.*

[80] *See* Column, Affairs of State, A Pathway to State Bankruptcy, 30-8 ABIJ 12 (Oct. 2011) (authored by Marvin E. Spouse, III and Matthew Cavenaugh; listing Matthew Cavenaugh as "an associate at Jackson Walker LLP in Houston").

[81] *See* https://www.jw.com/people/matthew-cavenaugh/ (noting Cavenaugh clerked for two years for Bankruptcy Judges Wesley W. Steen and Marvin Isgur)

**Elizabeth's leadership and contribution were recognized as integral**.[82]

Additionally, the pairing of Kirkland and Jackson Walker in Houston-filed mega-bankruptcy cases was so pervasive that it caught the attention of the media, both before and after revelation of the intimate Jones-Freeman relationship.[83]

### 2. Allegations that Kirkland worked with Jones to make Houston the epicenter for mega-bankruptcies provide additional circumstantial facts of Kirkland's knowledge.

As outlined in the Original Complaint, Houston did not become the venue for Kirkland mega bankruptcy filings by accident.[84] Judge Jones worked with the firm to make Houston a bankruptcy hub. One way Jones did so was by establishing a "complex advisory" committee of bankruptcy attorneys to establish it as such.[85] He did so on June 29, 2018—a little over a month after Freeman

---

[82] *In re Westmoreland Coal Co.*, No. 18-35672, Preliminary Response of Jackson Walker LLP to Recent Filings by the Office of the United States Trustee, Dkt. 3362-1 (Nov. 13, 2023) (letter attached to response authored by Jackson Walker partner Pat Cowlishaw) (emphasis added).

[83] *See e.g.,* Kirkland's Bankruptcy Partnership With Jackson Walker Could be a Sign of Things to Come, The American Lawyer, Law.com (Aug. 25, 2020) (noting Matthew Cavenaugh signing Kirkland & Ellis' petition for a debtor "wasn't an unusual arrangement for Kirkland and Jackson Walker, which are listed as debtor's counsel on a number of recently high-profile bankruptcies…. The relationship between the world's only $4 billion firm and Jackson Walker, a member of the Am Law 200 and the largest Texas-only firm, shows that two firms can build a working relationship that goes beyond a traditional referral arrangement"); Dan Roe, Law.com, Kirkland & Ellis, Jackson Walker Continue Debtor-Side Dominance in Strong Q3 for Big Bankruptcy (Oct. 25, 2023), accessible at https://www.law.com/americanlawyer/2023/10/25/kirkland-ellis-jackson-walker-continue-debtor-side-dominance-in-strong-q3-for-big-bankruptcy/ (last visited on Mar. 11, 2024) (In 2023, "Jackson Walker bankruptcy partner Matthew Cavenaugh was the most-retained local counsel through Q3 in the country, while Kirkland's Joshua Sussberg led lead counsel retentions"); Dan Roe, Law.com, Kirkland & Ellis, Jackson Walker Dominate Debtor-Side Bankruptcy as Restructuring Market Heats Up (Aug. 3, 2023), accessible at https://www.law.com/americanlawyer/2023/08/03/kirkland-ellis-jackson-walker-dominate-debtorside-bankruptcy-as-restructuring-market-heats-up/ (last visited Mar. 11, 2024) ("Kirkland & Ellis [led] large debtor-side representations … by a significant margin, while Jackson Walker, Kirkland's preferred local counsel in the Southern District of Texas, picked up more local debtor's representations than any other firm"); Sujeet Indap, The downfall of the judge who dominated bankruptcy in America, The Financial Times (Nov. 21, 2023), accessible at https://www.ft.com/content/574f0940-d82e-4e4a-98bd-271058cce434 (last visited Mar. 11, 2024) ("Kirkland & Ellis, the dominant US debtor law firm, had tapped Jackson as co-counsel in at least 46 large cases since 2018, according to data collected by bankruptcydata.com").

[84] Complaint ¶¶ 28–30.

[85] *Id.* ¶ 28.

joined Jackson Walker.[86] Notably, even though not admitted to practice in Texas, the head of Kirkland's bankruptcy practice was on the committee.[87]

Kirkland worked directly with Jones, Freeman, and Jackson Walker for years and was awarded $162 million for work in Jones' courtroom.[88] In the context of unprecedented joint filings between the firms, this relationship allows further inference Kirkland knew of the special connection between Freeman and the judge.

### 3. The leading and most credible financial periodical in the world supports Plaintiff's allegations.

There is also direct evidence of Kirkland's knowledge, something rare for RICO/fraud cases. Indeed, "fraud or fraudulent intent is seldom proven by categorical facts. Rather, such a finding ordinarily arises as an inference." *Aetna Casualty & Surety Co. v. Gaines*, 713 F.2d 1187, 1192 (5th Cir. 1983); *see also United States v. Johnson*, 825 Fed. Appx. 156, 166 (5th Cir. 2020) (a defendant's guilty knowledge … may be inferred from 'the development and collocation of circumstances'") (quotation omitted).

On November 21, 2023, the Financial Times reported:

> Jackson Walker said it had informed Kirkland about its 2021 inquiry into Freeman's relationship with Jones. Multiple Kirkland partners told the FT that they were **long aware of the romantic relationship between the pair**, though did not know how advanced it was. The Kirkland lawyers assumed the pair had received clearance from a superior court or decided that it was not Kirkland's place to intervene in Jackson's retention applications.[89]

---

[86] General Order 2018-6, (Bankr. S.D. Tex. June 29, 2018).
[87] Complaint ¶ 28 (citing General Order 2018-6, (Bankr. S.D. Tex. June 29, 2018) (listing James Sprayregen on the committee)).
[88] *Id.* ¶ 40.
[89] *Id.* ¶ 109 (quoting Sujeet Indap, The downfall of the judge who dominated bankruptcy in America, THE FINANCIAL TIMES (Nov. 21, 2023), accessible at https://www.ft.com/content/574f0940-d82e-4e4a-98bd-271058cce434 (last visited Mar. 11, 2024)).

The logical inference from this article is Kirkland knew of the intimate nature of the Jones-Freeman relationship before March 2021. Immediately following the sentence, ""Jackson Walker said it had informed Kirkland about its 2021 inquiry into Freeman's relationship with Jones[,]" the author stated that Kirkland partners told him "that they were long aware of the romantic relationship[.]"[90] Kirkland offers no contrary interpretation.

Of course, the Financial Times is regarded "as the most credible publication in reporting financial and economic issues" in the world, ahead of both The Economist and the Wall Street Journal.[91] Kirkland provides no meaningful basis to disregard the admission by its partners. They do not allege that the partners would not have been in a position to have this knowledge. They do not contend they were misquoted or that their partners did not understand the basic legal concept that their words might be taken as an admission.

While taking issue with Plaintiff's reference to the article (but not denying that its partners knew about the relationship), Kirkland simultaneously relies on it as an excuse for non-disclosure— that the partners supposedly "did not know how advanced" the Freeman-Jones relationship was and "assumed the pair had received clearance from a superior court or decided that it was not Kirkland's place to intervene in Jackson's retention applications."

However, as lead counsel, Kirkland could not assume propriety by the judge where it had actual knowledge of impropriety—i.e., it knew its local counsel was in an intimate relationship with Jones requiring disqualification. This is not a case where a defendant would be speculating about

---

[90] Id.
[91] According to the Global Capital Markets Survey, which measures readership habits among senior financial decision makers in the world's largest financial institutions, the Financial Times is considered the most important business read, reaching 36% of the sample population, 11% more than the Wall Street Journal, its main rival. https://web.archive.org/web/20131015044909/http://www.gcmsurvey.com/Media.html (-> urldefense.proofpoint.com). The "Financial Times is one of the world's leading finance news websites, globally recognized for its authority." https://www.alphagamma.eu/finance/best-finance-websites/.

judicial impropriety. The Fifth Circuit already found probable cause that Jones committed judicial misconduct. Kirkland knew about it, but failed to disclose the connection and allowed its misleading declaration and motions as well as Jackson Walker's to remain uncorrected.

Kirkland is mistaken that as counsel for debtor in possession, it need not disclose a conflict it knows about involving its local counsel and the judge. A similar position was rejected in *CF Holding*, where counsel for the debtor in possession knew about a conflict involving financial advisors appointed by the court. 164 B.R. at 807–08. Like this case, counsel argued that there is "no … authority which imposes upon an attorney a duty to disclose the potential conflicts of interest of another professional…." *Id.* at 807. The court disagreed. "The rule of law of no responsibility proposed by [the law firm] … cannot be consonant with the fiduciary responsibilities imposed on bankruptcy estate professionals." *Id.* at 808. Instead, "[t]he general concerns of the Code and the courts to promote public confidence in the integrity of the bankruptcy system are compelling reasons to apply a prophylactic rule in considering the extent of the fiduciary duties of an attorney for a debtor in possession." *Id.*

The court also noted that the Bankruptcy Code provides that when a trustee replaces the debtor, § 326(d) requires the court to deny compensation to the trustee if it "failed to make diligent inquiry into facts" or "with knowledge of such facts, employed a professional person" that is not a disinterested person, or represents an interest adverse to the interest of the estate. *Id.* (citing 11 U.S.C. § 326(d), 327, 328(c)). "It could have been reasonably anticipated that in light of the duties of an attorney for a debtor in possession, that no lower standard would be applied to such attorney with actual knowledge of another professional's loss of disinterestedness." *Id.*

25

As described *supra*, the Financial Times article is just one of many bases of Plaintiff's allegation that Kirkland knew of the Jones-Freeman relationship. Cases indicating that "unverified hearsay" alone will not support Plaintiff's claims are thus inapposite.[92] Again, Rule 9(b) provides that "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

To the extent the party admissions of Kirkland's partners in the Financial Times can be considered hearsay even though they go to the defendant's knowledge, the statements are not rumor, but direct party admissions. Further, the article identifies the source as Kirkland partners. Thus, the source is not entirely anonymous, and discovery will allow for inquiry into the source's reliability.[93]

The Financial Times article does not contradict "documents showing that Kirkland was not informed of the relationship[,]"[94] as Kirkland maintains, because there are no such documents. Kirkland goes outside the Original Complaint to reference Jackson Walker's filing under seal of several communications from Van Deelen, and Jackson Walker's characterizations of the communications broadly as defamatory. Jackson Walker failed to characterize what among the sealed communications were defamatory. This document does nothing to suggest that Jackson Walker did not inform Kirkland of the admissions as Jackson Walker says it did.

Even more absurd is Kirkland's citation to paragraph 112 of the Complaint where Plaintiff describes Jackson Walker's version of events in which Freeman was purportedly dishonest about the relationship when initially confronted by Jackson Walker.[95] Kirkland fails to explain how that dishonesty by Freeman undermines Jackson Walker's statement that it disclosed her admission of the

---

[92] *See* Motion to Dismiss at 8 (citing *Chapman & Cole v. Itel Container Int'l B.V.*, 865 F.2d 676, 685 (5th Cir. 1989); *Stockman v. Flotek Indus., Inc.*, 2010 WL 3785586, at *15 (S.D. Tex. Sept. 29, 2010)).

[93] *Compare with Walker* v. S.W.I.F.T SCRL, 517 F. Supp. 2d 801, 807 (E.D.Va. 2007)(where the source of the article was anonymous, there "appear[ed] to be no way to conduct a reasonable inquiry into the source's reliability").

[94] Motion to Dismiss at 10.

[95] *Id.*

relationship to Kirkland, or how it in any way suggests Kirkland partners were not long aware of the relationship, as their partners admitted.

### 4. Kirkland's failure to disagree with Jackson Walker's statements about its disclosure to Kirkland in March 2021 supports Plaintiff's allegations.

Even setting aside the foregoing evidence, Kirkland has never indicated Jackson Walker's statements about its disclosure to Kirkland in March 2021 are in any way inaccurate. Kirkland can play games with words, but Jackson Walker clearly indicated it disclosed Freeman's admission of the relationship, at least in the past, to the firm. Kirkland has also never affirmatively represented that none of its partners knew of the Jones-Freeman relationship beforehand. Despite its knowledge, Kirkland did nothing to apprise anyone in the bankruptcy proceedings about it.

The fact that Plaintiff has chosen not to believe the defendants' mixed account of who knew what and when does nothing to negate Kirkland's knowledge. Jackson Walker's general counsel claims that in March 2021, "Freeman confirmed that there had been a romantic relationship."[96] Jackson Walker "disclosed these matters to our Kirkland co-counsel, who disclosed them to the client."[97]

Both Jackson Walker and Kirkland argue Freeman lied to them by claiming there was no current relationship, and none was expected going forward; they "each own their own homes; they do not and have not lived together."[98] But both firms indisputably knew in March 2021 that Freeman had been in an intimate relationship with Judge Jones. Whether they took Freeman at her word on whether it was ongoing, despite her failure to come clean beforehand, is beside the point. They knew about a prior conflict affecting countless interested parties in myriad mega-bankruptcies, and despite their continuing duty to update their disclosures, they took no measures to disclose the relationship to those

---

[96] *4E Brands*, No. 22-50009, Dkt. 526-1 at 3.
[97] *Id.* at 3–4.
[98] *Id.* at 4.

parties. In fact, during a March 10, 2021 hearing on a motion to recuse, rather than disclose what the firm knew, Kirkland argued to exclude the anonymous letter received by Van Deelen exposing the Jones-Freeman relationship.[99]

"The Fifth Circuit has uniformly held that under Rule 2014(a), full disclosure is a continuing responsibility, and an attorney is under a duty to promptly notify the court if any potential for conflict arises." *Beirne, Maynard & Parson, L.L.P. v. Cypresswood Land Partners*, 2010 U.S. Dist. LEXIS 146549, *25-26 (S.D. Tex. June 8, 2010) (citation omitted). Kirkland failed that duty.

Of course, the law firms had every reason to question Freeman's supposed response since Freeman had purportedly been hiding the relationship from them for years. Meanwhile, a simple check of real estate records at the time would have exposed it as false.

Further, Jackson Walker's story (and Kirkland's adoption of it) is inconsistent with Freeman's. According to the U.S. Trustee, in a day-long interview with Freeman, she "stated that her cohabitation with Judge Jones was continuous except during the COVID-19 school closures when she lived with her children at another location. *But she admitted that she never moved out of the home she shared and owned with Judge Jones*."[100] Additionally, according to the U.S. Trustee, Freeman's lawyer urged Jackson Walker, in the spring of 2022, to disclose the relationship in all past cases and in cases going forward.[101]

The firms are not absolved because they claim they were told the relationship had ended and would not continue. Kirkland's reliance on Jackson Walker's/Freeman's assurance that the relationship had ended and that it would not continue is an implicit admission that it was improper in the first place. And even accepting that Kirkland believed the assurances of the partner who

---

[99] *Van Deelen v. Dickson, et al.*, 20-03309, Dkt 41, 46.
[100] *4E Brands*, No. 22-50009, Dkt. 645 at 10 n.6 (Feb. 29, 2024) (emphasis added).
[101] *Id.* at 13.

supposedly had been lying to Jackson Walker, it still had a duty to correct previously filed declarations of disinterestedness and to otherwise advise the court and interested parties of the conflict. The firms deliberately chose not to do so. Thus, even if all other direct and circumstantial evidence including the admissions by Kirland's partners in the Financial Times are wrong, there are still sufficient facts to support Plaintiff's allegations of knowledge by Kirkland.

Incredibly, Kirkland believes that not only did it not have to disclose, but it "would not have been appropriate" to disclose the "unverified, rejected, and sealed allegation[.]"[102] That is mind-numbingly false. Since Kirkland knew about the relationship, it is not excused because the party that first exposed the relationship relied on an unverified letter. Kirkland should have disclosed what it knew then rather than argue against recusal, which is why the allegations were then "rejected" (at least until the Fifth Circuit weighed in). Nor does the fact that Judge Jones sealed the letter to keep the relationship secret from those outside the Jones-Freeman-Jackson Walker-Kirkland Enterprise lessen Kirkland's duty to disclose in any respect. Kirkland had a duty to disclose, no matter how uncomfortable it might have been.

Ultimately, to the extent Kirkland's self-serving interpretation of certain statements by its co-conspirators can be viewed in any way as suggesting something less than knowledge of the intimate relationship between Jones and Freeman, they at most "suggest that the defendants' culpability [is] an issue of fact, to be established through litigation[.]" *Smith* v. Our Lady of the Lake Hosp. Inc.,  960 F.2d 439, 446 (5th Cir. 1992)

### 5.  That the Jones-Freeman relationship was easily discoverable by public information supports that Kirkland knew of the Jones-Freeman relationship.

---

[102] Motion to Dismiss at 11.

In June 2017, Jones and Freeman executed a survivorship agreement as co-owners of a million dollar-plus home in Houston.[103] The Harris County Clerk recorded this document in its public records on June 26, 2017. Jones purchased another million-dollar home that Freeman apparently lived in beforehand, and in which Freeman's parents purportedly moved into.[104] All that information was public record at the time Kirkland admits it knew of the relationship in March 2021.

The pro se litigant who Kirkland so readily disparages was able to find these public documents. Yet, one of the largest law firms in the world either intentionally or recklessly ignored this information, choosing to continue profiting by more than one hundred million dollars.

This would not be following up mere rumors as in *Berda v. CBS Inc.*, 800 F. Supp. 1272, 1279 (W.D. Pa.), *aff'd*, 975 F.2d 1548 (3d Cir. 1992) where summary judgment was granted. Freeman confessed to the relationship, albeit according to Jackson Walker, in the past. Since the firms then knew she had been concealing the relationship, they could not stick their collective heads in the sand and avoid liability. That is particularly the case since Kirkland was lead counsel for debtor-in-possession. *Cf. In re Landry*, 350 B.R. 51, 57 (Bankr. E.D. La. 2006) ("once the trustee is in possession of facts that would put a reasonable person on notice of a possible fraud, he has a duty to diligently investigate"); *see also Azby Fund v. Wadsworth Ests., L.L.C.*, 2022 U.S. App. LEXIS 34109, *5 (5th Cir. 2020) (debtor in possession, like the trustee, "takes on fiduciary responsibilities to all creditors").

The foregoing facts further demonstrate the plausibility of Plaintiff's allegations about Kirkland's knowledge, which in any event Plaintiff was only required to allege generally.

**B.  There are no inconsistencies that undermine Plaintiff's allegations.**

---

[103] Complaint ¶ 24.
[104] *Id.* ¶¶ 25–26.

Kirkland's contention that Plaintiff made "contradictory and inconsistent allegations against Kirkland" is meritless.[105] Though Kirkland speaks in the plural, it identifies a single allegation it finds inconsistent. According to Kirkland, Plaintiff's allegation that it worked with Jackson Walker as co-counsel to exploit the Jones-Freeman conduit is inconsistent with the fact that the firms worked together before Freeman joined the firm and after she left.

As noted *supra*, Kirkland is simply wrong that the timing "does not fit with [plaintiff's] theory of conspiracy[.]"[106] The timing is unmistakable. Only after Freeman's arrival in 2018 did Kirkland and Jackson Walker begin filing in mass. Kirkland did not file *any* mega-bankruptcy cases with Jackson Walker as local counsel between 2006 and 2016. Yet, after Freeman joined Jackson Walker in 2018, Kirkland selected Jackson Walker as local counsel in 42 of the 46 mega-bankruptcies it filed in the Southern District of Texas since 2019.[107] In the context of this undeniable pattern, the two cases cited by Kirkland before Freeman's arrival are a blip on the radar. The fact that the firms continued filing together for a while after Freeman left Jackson Walker, in several instances with Freeman collaborating in the case under the Law Office of Elizabeth Freeman, only demonstrates they continued profiting from the scheme rather than disrupt the Enterprise by disclosing.

## C. There are no innocent and obvious alternative explanations for Plaintiff's allegations against Kirkland.

Kirkland broadly states that "every fact alleged" by Plaintiff, apart from the conspiracy allegations, is consistent with a "legal and obvious alternative explanation."[108] That assertion is patently

---

[105] Motion to Dismiss at 11.
[106] Motion to Dismiss at 11.
[107] *See* Complaint ¶ 37.
[108] Motion to Dismiss at 11 (citing *United States ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*, 816 F.App'x 892, 898 (5th Cir. 2020)).

false, as confirmed by Kirkland identifying just two factual allegations. Neither alternative explanation allows for dismissal of Plaintiff's claim.

First, Kirkland references paragraph 131 of the Complaint, which alleges the RICO Enterprise sought to secure favorable bankruptcy appointments that were "influenced by intimate relationships and self-interest and not based exclusively on the merits."[109] Kirkland responds that its appointment was due to its status as a dominant US debtor law firm and not because of "intimate relationships and self-interest."[110] Here, Kirkland distorts the pleadings. Plaintiff alleged that the appointments "were influenced by intimate relationships and self-interest and not based exclusively on the merits."[111] That Kirkland may have been appointed, in part, because of its status is not inconsistent with Plaintiff's allegation. Further, even if Kirkland were appointed solely because of its place in bankruptcy practice, it nevertheless participated in a pattern of racketeering activity, breached its fiduciary duty, committed fraud, among other things, by filing dishonest declarations and motions without disclosing the Jones-Freeman relationship, recouping millions and fees and perpetuating the Enterprise. Viewing the pleadings in a light most favorable to Plaintiff under Rule 12(b)(6), Plaintiff plausibly alleged that appointments by Judge Jones were influenced by intimate relationships and not based exclusively on the merits.

Kirkland also disputes that it used Jackson Walker as local counsel because of Freeman and her connection to Jones. Kirkland responds that it used Jackson Walker as local counsel because of its local knowledge and because it had partners who had clerked for Jones.[112] This ignores that the filings with Kirkland as lead and Jackson Walker as local counsel only started in mass after Freeman

---

[109] Complaint ¶ 131.
[110] Motion to Dismiss at 11.
[111] Complaint ¶ 131.
[112] Motion to Dismiss at 11.

arrived at the firm, and not when Jackson Walker partner Cavenaugh, who clerked for Judge Isgur, joined the firm. It also ignores that Kirkland had a large reorganization section in Houston and also had local knowledge. These reasonable inferences support the allegations.

Kirkland telling Bouchard to file in Houston because they had a "friendly judge," in the context of its knowledge of the Jones-Freeman relationship, is hardly locating the best venue for its client. This forum was in the best interests of Freeman, Kirkland, and Jackson Walker, not BTC. As Plaintiff alleged, these defendants recouped preordained attorneys' fees from Judge Jones and had his backing if anyone stepped out of line, which is exactly what happened when Bouchard questioned professional fees.[113]

The flexible bankruptcy rules are not what led the debtors represented by Kirkland and Jackson Walker to file in Houston. It was their "friendly judge," whom Kirkland knew was in an intimate relationship with a key restructuring partner at Jackson Walker and would serve the interests of the Jones-Freeman-Jackson Walker-Kirkland Enterprise first and foremost.[114] Plaintiff plausibly alleged the key facts necessary for his claims under Rules 9(b) and 12(b)(6).

## II.     Plaintiff has Standing.

Kirkland's challenge to Bouchard's standing fails because Bouchard asserts direct injury from Defendants' misconduct, not derivative injury. Kirkland's standing argument relies on falsely framing Plaintiff's claims as deriving entirely from harm to the debtor. In fact, Plaintiff alleges direct injuries from the Jones-Freeman-Jackson Walker-Kirkland Enterprise relationship that are personal and distinct from those suffered by BTC. These claims do not belong to the estate. *See Galindo v. City of*

---

[113] Complaint ¶ 121 (alleging "the law firms, Freeman, and the judge conspired to enrich themselves, with no level playing field for any litigant who did not fall in line with the plan or who dared question professional fees); *see also* ¶¶ 68, 132(j) (m).
[114] *Id.* ¶¶ 62, 128, 170.

*Del Rio*, 2021 U.S. LEXIS 126766, *9 (W.D. Tex. Mar. 26, 2021) (citations omitted) ("individuals have no standing to secure a personal recovery for an alleged wrong done to the business entity, unless they are able to show some direct harm to themselves").

Of course, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 561, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992) (citations omitted). Plaintiff has adequately alleged direct injury resulting from Defendants' conduct (including Kirkland) separate and apart from injuries suffered by BTC.

For example, Defendants' fraud in concealing the Jones-Freeman relationship, and exacting retribution against him after he protested fees, caused him to incur legal costs and fees in defending the adversary proceeding brought by Kirkland and Jackson Walker. After Bouchard stepped out of line and "dared [to] question professional fees[,]"[115] not only did the consortium have him removed, but Freeman, Jackson Walker, and Kirkland smeared him in the adversary proceeding by claiming he was living high on the hog and that he tanked his generational company. Not only did Bouchard incur considerable costs and fees, but he also sustained "reputational harm" of business and prevented him from "obtain[ing] new employment…."[116] These actions also caused him mental anguish.

Defendants' fraud in hiding the Jones-Freeman relationship, and punishing him for demanding review of professional fees, also caused him to incur legal costs and fees in having to appeal Judge Jones' improper overruling of his objection to an exculpation provision purporting to

---

[115] *Id.* ¶ 121.
[116] *Id.* ¶ 137.

34

effectively immunize Portage Point for its misconduct.[117] While Bouchard succeeded in overturning Jones' improper ruling in this respect, he was forced to incur fees and expenses that would not have been required had Kirkland and the other defendants properly disclosed the improper connection with the judge that resulted in a ruling influenced by the intimate relationship and that was not based exclusively on the merits.[118]

Bouchard also suffered additional mental anguish as a result of the harsh treatment he received in court, including the sua sponte removal of him as CEO, and as a result of learning his case was litigated in a courtroom corrupted by fraud, in which the law firms, Freeman, and the judge conspired to enrich themselves, with no level playing field for those who got in the way.[119]

The expenses, reputational harm and mental anguish directly impacted Bouchard, not BTC. They did not derive from harm to the debtor and are not incidental to the bankruptcy itself or the loss of value in the estate. Rather, they are the result of the defendants' conspiracy to keep the Jones-Freeman conspiracy secret from outsiders at any cost.

In *Galindo*, a plaintiff who owned an LLC attempted to sue in his own name under a contract with the city. 2021 U.S. Dist. LEXIS 126766, at *10. Since the contract was with the LLC and not the individual plaintiff, suit could not be maintained on his behalf. Because any economic harm to Galindo was "merely a consequence of an injury suffered by" the LLC, the shareholder standing rule applied. *Id.* at *10.

In contrast, Bouchard seeks relief for his own injuries distinct from the bankruptcy and any claims held by BTC. Kirkland ignores these damages in falsely claiming that Plaintiff "explicitly

---

[117] *Id.* ¶¶ 96–100.
[118] *Id.* ¶¶ 131, 132(l), 133, 148, 164.
[119] *Id.* ¶ 121.

35

acknowledged" his injuries "are entirely based on alleged harm suffered by the bankruptcy estate."[120] Plaintiff never acknowledged any such thing. The expenses incurred in defending a vitriolic adversary proceeding, having to appeal an improper attempt to immunize Portage Point, as well as the damages to Bouchard's business reputation and mental anguish damages belong to him, not the bankruptcy estate. So do his conspiracy claims under *Bivens*. To the extent there is overlap with damages to the estate, as a shareholder with a direct, personal interest in a claim, Plaintiff has a right to suit even if the rights of the corporation are implicated. *Franchise Tax Bd. v. Alcan Aluminum*, 493 U.S. 331, 336 (1990).

This case is also distinguishable from *Liberty Sackets Harbor LLC v. Vill. of Sackets Harbor*, because the plaintiff did "not allege an injury independent of [the corporation's] injuries[.]" 776 Fed. Appx. 1, 3 (2d Cir. 2019). Plaintiff's legal expenses and reputational and mental anguish damages are independent of injuries to BTC and the bankruptcy estate. *See Oakes Farms Food & Distrib. Servs., LLC v. Sch. Dist. of Lee Cty.*, 541 F. Supp. 3d 1334, 1343 (M.D. Fla. May 28, 2021) ("[t]he harm to Mr. Oakes's First Amendment rights is distinct and personal from the economic harm to Oakes Farms, and the shareholder standing rule is therefore inapplicable"); *In re NC12, Inc.*, 478 B.R. 820, 836 (Bankr. S.D. Tex. 2012) (no standing where the plaintiff did not assert distinct personal damages, like claims for reputational and mental anguish claims here, and there was "no indication of harm to [Plaintiff] other than the harm to the corporation").

**III.    Plaintiff Plausibly Pleaded Proximate Causation as to Kirkland.**

Kirkland's proximate cause argument misconstrues Plaintiff's claims and disregards the burdens and required inferences under Rule 12b(6). It also ignores that the "proximate cause analysis

---

[120] Motion to Dismiss at 13.

differs somewhat" when a defendant in a RICO case "target[s] the federal judiciary." *Alix*, 23 F.4th at 204. Courts must "focus on the responsibilities that Article III courts must shoulder to ensure the integrity of the Bankruptcy Court and its processes." *Id.* "Litigants in all of our courts are entitled to expect that the rules will be followed, the required disclosures will be made, and that the court's decisions will be based on a record that contains all the information applicable law and regulations require." *Id.* When, as here, a defendant has corrupted the bankruptcy disclosure process, "then the unsuccessful participants in that process are directly harmed." *Id.*

Plaintiff plausibly alleged Defendant's conduct corrupted the appointments of counsel, awards of attorneys' fees, the removal of Plaintiff as CEO, and assertion of an adversary proceeding against Bouchard by denying him and other bankruptcy participants information that would have caused them to scrutinize, reveal and object to Defendants' involvement, all of which proximately caused Plaintiff's injuries. Kirkland complains that Bouchard cannot be heard to attack fees now where he failed to object to them below.[121] It is only because of Kirkland's fraud in failing to disclose and concealing the Jones-Freeman relationship that Bouchard did not object. Where the goal was to deny Plaintiff (and other shareholders and creditors) a level playing field in proceedings before Judge Jones, Defendants ought not be heard to disavow that Plaintiff was injured in the very way they intended: by making futile expenditures and suffering business reputational injuries and mental anguish from personal attacks lodged against anyone who opposed Defendants.

The direct injuries alleged by Plaintiff – including incurring legal expenses in defending the adversary proceeding and appealing the improper ruling on the exculpation provision, and suffering business reputational harm, mental anguish, and nominal damages – resulted from Defendants'

---

[121] Motion to Dismiss at 16.

keeping all bankruptcy participants (other than themselves) in the dark about the influential Freeman-Jones relationship and punishing anyone who stood in the way of the Jones-Freeman-Jackson Walker-Kirkland' fee mill. But for Defendants' fraud in hiding the Jones-Freeman relationship for purposes of accumulating massive fees, and exacting retribution on anyone who stood in the way, Bouchard would not have incurred legal expenses in defending the adversary proceeding or appeal from the ruling on exculpation, nor suffered business reputational harm or mental anguish. Consequently, the causation element of RICO standing has been plausibly alleged. *See Khurana v. Innovative Health Care Sys.*, 130 F.3d 143, 147, 150–51 (5th Cir. 1997) (plaintiff showed proximate cause for reputational damages as injury to business or property for purposes of RICO); *In re Cement Lock v. Gas Technology Institute*, 2005 U.S. Dist. LEXIS 22058, *43 (N.D. Ill. Sept. 30, 2005) ("Although an injury to one's personal reputation generally is not an injury to "business or  property" under RICO, § 1964(c), an injury to a plaintiff's business reputation, resulting in concrete economic, contractual, or business losses, is compensable under RICO.") (emphasis in the original).

Plaintiff's damages are not based *solely* on the diminished bankruptcy estate. Plaintiff suffered as a direct and inevitable result of Defendants' fraud, including having to incur legal fees and expenses and suffering business reputational damages in defense of an adversary proceeding and appeal of Jones' ruling on exculpation brought after Bouchard challenged their professional fees, as well as nominal damages. Plaintiff also alleged facts plausibly demonstrating some injury to his due process rights and the bankruptcy process in which he took part. These injuries, at a minimum, entitle him to nominal damages. *See Potomac Electric Power Company v. Electric Motor and Supply, Inc.,* 262 F.3d 260, 265–66 (4th Cir. 2001); *Rosario v. Livaditis,* 962 F.2d 1013, 1021 (7th Cir. 1992) (remanding for a new

trial on damages in RICO case because the jury found liability but "did not award even nominal damages on the RICO counts").

It is at least plausible that these expenditures and expenses form a recoverable pecuniary loss that is not derivative of any injury sustained by the BTC bankruptcy estate. *See Standardbred Owners Ass'n v. Roosevelt Raceway Assocs. LLP,* 985 F.2d 102 (2d Cir.1993) (plaintiff horse breeders, who purchased equipment and trained horses – under assurances from defendant that horse racing would continue after defendant purchased facility, had standing to bring a RICO action to recover financial expenditures and expenses).

Kirkland ignores the plain language of the Complaint when it claims "Plaintiff has not even attempted to plead facts showing Kirkland did not squarely earn the fees it was awarded."[122] In fact, Bouchard repeatedly described the award of attorneys' fees to Kirkland as "improper" and procured through fraud, and clearly alleged that Defendants, and Kirkland specifically, did not earn and are not entitled to *any* attorneys' fees.[123] Kirkland nitpicks that Plaintiff has not offered a breakdown as to what billing by what attorneys was improper. Since all of Kirkland's fees were procured through fraud in the concealment of the Jones-Freeman relationship, "all orders awarding fees and expenses are tainted."[124]

Plaintiff's "allegations are clearly sufficient for notice purposes, and at the pleadings stage, this is enough." *Warranty Gold, Ltd. v. KPMG, LLP*, 2006 U.S. Dist. LEXIS 94382, *48 (W.D. Tex. Jul. 25,

---

[122] Motion to Dismiss at 15 (citing Complaint ¶¶ 48, 49).
[123] *See e.g.,* Complaint ¶ 131 ("Kirkland … secur[ed] favorable bankruptcy court appointments and rulings – including millions of dollars, if not tens of millions of dollars, awarded to … Kirkland & Ellis as attorneys' fees - that were influenced by intimate relationships and self-interest and not based exclusively on the merits"); ¶ 132(m) (Defendants carried out the Enterprise through improper and unlawful acts including … securing large awards of attorneys' fees that directly benefitted Jackson Walker, Freeman, and Kirkland & Ellis indirectly benefitted Judge Jones himself without disclosing the Jones-Freeman relationship"); *see also id.* ¶¶ 6, 166, 173, 184, 204, 209, 228 (seeking forfeiture of attorneys' fees)
[124] *Id.* ¶ 107.

2006); *see also Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim'); *In re United States OPM Data Sec. Breach Litig.*, 928 F.3d 42, 60–61 (D.C. Cir. 2019) (lack of specificity on causation did not render fraud pleadings inadequate) (quoting *Lujan*, 504 U.S. at 561).

In challenging the specificity of Bouchard's allegations of causation and damages, Kirkland invites the same error the district court made in dismissing RICO allegations in *Alix v. McKinsey & Co.*, 23 4th 196, 204 (2d Cir. 2022) (reversing granting of Rule 12(b)(6) dismissal). Like the district court in *Alix*, Kirkland demands "*proof* of causation and *proof* of damages" and does precisely the opposite of "draw[ing] all reasonable inferences in [the plaintiff's] favor." *Id.* (emphasis added). The Second Circuit recognized this approach as improper, particularly in the context of a case where the "misconduct targeted the federal judiciary." *Id.*

Kirkland argues intervening factors,[125] including BTC's financial status and the notion that attorneys' fees would be paid to some law firm regardless, render the relationship between the alleged fraud and injury too indirect and remote. None of those arguments, which pertain more to the merits of causation and damages, "renders causation implausible here." *In re United States OPM Data Sec. Breach Litig.*, 928 F.3d at 60–61. BTC's financial status does not interrupt the chain of causation in Defendants' conspiracy to secure huge fee awards and boost prestige, which they accomplished through fraud. Nor does it interrupt the chain of causation in Bouchard's incurring considerable legal expenses in defending an adversary proceeding initiated against him, or the damage to his business reputation, which occurred after he complained about the fees and without his knowledge that the

---

[125] Motion to Dismiss at 17.

judge was in cahoots with the antagonizing law firms. To the extent Kirkland is able to "ultimately prove the existence of intervening factors," "that showing must await summary judgment or trial." *Alix*, 23 F.4th at 205.

Kirkland also gives "insufficient consideration to the fact that [Plaintiff's] alleged misconduct targeted the federal judiciary[,]" which "means that its proximate cause analysis differs somewhat[.]" *Id.* "The fact that this case invokes [this Court's] supervisory responsibilities makes … resolution of it *sui generis* and of little, if any, application to 'ordinary' RICO cases where the responsibilities are not front and center." *Id.* at 204. Because Kirkland's "conduct has corrupted" the bankruptcy, "as [Bouchard] plausibly alleges, then the unsuccessful participants in that process are directly harmed." *Id.*

And even if the estate would have to pay fees from another firm regardless, it can be reasonably inferred that Judge Jones would be more generous to his live-in girlfriend and her consortium than a firm outside the conspiracy. Not to mention, Plaintiff alleged breach of fiduciary duty and has sought disgorgement, which does not require proof that Kirkland "caused actual damage — proof of a breach is enough[.]" *Arce v. Burrow*, 958 S.W.2d 239, 245 (Tex. App. 1997), *aff'd as modified*, 997 S.W.2d 229, 42 Tex. Sup. Ct. J. 932 (Tex. 1999); *see Jacobs v. Tapscott*, 2006 U.S. Dist. LEXIS 68619, *23 (N.D. Tex. Sept. 25, 2006) ("in the context of the attorney-client relationship, proof of damages is not required with a request for fee forfeiture in a breach of duty claim").

Finally, on the topic of fees, Kirkland maintains Bouchard failed to show his financial recovery "as an individual shareholder" was reduced.[126] Here, Kirkland misleads the court because not only was Bouchard a shareholder, but he was also a creditor, having "loaned more than $40 million to BTC

---

[126] Motion to Dismiss at 16 (citing Complaint at ¶ 137).

pursuant to two promissory notes to help supports its operating expenses, including payroll, insurance, fuel and oil, and port and pilot costs, and to safeguard, support and maintain its fleet of vessels to the highest standards in the industry."[127] "These loans were listed as outstanding debts of BTC in sworn declarations filed by Ray and in BTC's tax returns signed by Ray under penalty of perjury."[128]

Thus, the argument made in the Van Deelen litigation—that returned attorneys' fees could not be distributed to the plaintiff under the confirmation plan (which was in any event has been refuted by the U.S. Trustee)[129]—does not apply here. Plaintiff plausibly alleged causation.

## IV.    Plaintiff Alleged Materially False Statements by Kirkland.

Bouchard's Complaint asserts that Kirkland, as lead counsel for debtor-in-possession, had an affirmative duty to disclose to the court and those interested in the bankruptcy that its local counsel, which e-filed documents on Kirkland's behalf, had a connection with Judge Jones requiring disqualification.[130] As Bouchard observed, Kirkland should have done so in its application for appointment, declaration of disinterestedness, motion for attorneys' fees, and motion for final decree, most of which Jackson Walker e-filed on Kirkland's behalf.[131] But Kirkland never disclosed the relationship, despite the firm's knowledge of it by March 2021, and actually well beforehand. In fact, it has still not updated its declaration of disinterestedness to acknowledge the disqualifying relationship between a key partner of its local counsel and the now-resigned judge who presided over the bankruptcy and awarded Kirkland millions in fees.

### A. Plaintiff identified Kirkland's fraudulent omissions with particularity.

---

[127] Complaint ¶ 65.
[128] *Id.*
[129] *In re 4E Brands Northamerica, LLC*, Case No. 22-50009, United States Bankruptcy Court, Southern District of Texas, Docket No. 600 at 4-5 (Jan. 9, 2024) (footnote omitted).
[130] Complaint ¶ 6, 42, 46, 54, 176–77.
[131] *Id.* ¶¶ 46, 49, 147.

Kirkland believes the allegations of fraud fail because Plaintiff cannot identify a "single actual statement by Kirkland."[132] That is precisely the point. Kirkland never disclosed.

A plaintiff may rely on nondisclosure as "proof of a scheme to defraud … where the defendant is under a duty to disclose." *United States v. Harris*, 821 F.3d 589, 600 (5th Cir. 2016). As described *supra*, the Bankruptcy Code and Rules, not to mention the rules of ethics, placed a duty on Kirkland to disclose the connection between the judge and its local counsel responsible for all of Kirkland's filings. Fed. R. Bankr. P. 2014(a); Fed. R. Bankr. P. 5002(b) & Notes from the Advisory Committee (1985); *CF Holding*, 164 B.R. at 807–08; *see also* 28 U.S.C. § 455(a).

When a plaintiff asserts fraud by omission, "Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the misrepresentations misleading." *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006). Plaintiff did so. He described the facts omitted—that Kirkland's local counsel had a connection with Judge Jones that required disqualification. He described the places where the omissions should have appeared—Kirkland's application for appointment, the declaration of disinterestedness, the motion for attorneys' fees, and in the motion for final decree, most of which were e-filed on Kirkland's behalf by Jackson Walker.[133] Additionally, the omission should have been made in filings correcting its local counsels' declaration of disinterestedness.[134]

Plaintiff also outlined how failing to disclose the connection made these documents misleading. In particular, Plaintiff and other participants reasonably expected that there was no undisclosed disqualifying connection between the judge and counsel for debtor-in possession.[135]

---

[132] Motion to Dismiss at 18
[133] Complaint ¶¶ 46, 49, 147.
[134] *Id.* ¶ 136, 179–80, 224(c),
[135] *Id.* ¶¶ 177–78, 191, 234.

43

**B.      The Complaint referenced the bankruptcy rules to describe Kirkland's duty to disclose; It alleged fraud in Kirkland concealing material facts about the Jones-Freeman relationship.**

Since fraud by omission requires a duty to disclose, Plaintiff's Original Complaint referred to bankruptcy rules requiring disclosure of the connection between Jones and Kirkland's local counsel who e-filed on its behalf.[136] Plaintiff made clear he was not asserting mere rule or ethical violations.[137]

Indeed, Kirkland repeatedly failed to disclose a disqualifying connection between the judge and its local counsel, even while referencing a search for conflicts involving bankruptcy judges.[138] Meanwhile, Kirkland collected $6.6 million in the BTC bankruptcy and more than $160 million with "in cases in which Jackson Walker served as co-counsel before Judge Jones."[139]

Kirkland simply misstates the record when it claims Plaintiff "explicitly" "alleges Kirkland's statements were fraudulent *because* Kirkland supposedly violated Rule 2014."[140] None of the paragraphs support that assertion and it is belied by the whole of Plaintiff's complaint.[141] Plaintiff references the rules and other authorities to show Kirkland's duty to disclose, not to establish fraud.

---

[136] *Id.* ¶ 213 ("Under the rules governing bankruptcy proceedings, for a firm to be employed by a debtor or debtor-in-possession, it must show that it is *disinterested* and must disclose all "connections[.]" 11 U.S.C. § 101(14), 327; Fed. R. Bankr. P. 2014 (requiring "a verified statement of the person to be employed setting forth the person's connections with the debtor, creditor, or any other party of interest"); ¶ 216 ("Cavenaugh also e-filed the application for Kirkland & Ellis to serve as lead counsel for BTC, including a declaration of disinterestedness, completed by Kirkland & Ellis partner Bennett, that did not identify the relationship between Judge Jones and Freeman"); ¶ 54 (""The Fifth Circuit has uniformly held that under Rule 2014(a), full disclosure is a continuing responsibility, and an attorney is under a duty to promptly notify the court if any potential for conflict arises.' *Beirne, Maynard & Parson, L.L.P. v. Cypresswood Land Partners*, 2010 U.S. Dist. LEXIS 146549, *25-26 (citing *In re W. Delta Oil Co.*, 432 F.3d 347, 355 (5th Cir. 2005)). The BTC bankruptcy remained pending for more than five months after Jackson Walker's claimed discovery of the relationship, yet neither it, nor Freeman, nor Kirkland & Ellis ever disclosed the intimate relationship between Freeman and Judge Jones."); ¶ 119 (discussing rules requiring Judge Jones' disqualification).

[137] *Id.* ¶ 6

[138] *McDermott*, 20-30336, Dkt. 428-1 ¶ 26.

[139] Complaint ¶ 151(e), (f).

[140] Motion to Dismiss at 19.

[141] *See* Complaint ¶ 147(g), 179-180.

The *Alix v. McKinsey & Co.* opinion on remand does not support Kirkland's position as it says.[142] 2023 U.S. Dist. LEXIS 145872, *5 (S.D.N.Y. Aug. 18, 2023). Kirkland clings to a hyper-technical interpretation of Rule 2014 to say it need not disclose a disqualifying connection between its local counsel who filed Kirkland's papers and the judge. However, *Alix* reminded that this rule "requires bankruptcy professionals to disclose all connections, even those that would not necessarily be disqualifying[,]" and further that "[t]he scope of disclosure is much broader than the question of disqualification." 2023 U.S. Dist. LEXIS 145872, at *5 (quotation omitted). Even if Kirkland is correct and it was not required to disclose under Rule 2014 (it was, and was also required to disclose under other rules),[143] *Alix* recognizes that "the relevant question is whether [the defendant] knowingly concealed connections[,]" and "not whether [the defendant] complied with Rule 2014." *Id.* at *54 n. 13. As described in the Complaint, Kirkland knowingly concealed the Jones-Freeman connection repeatedly—not only in its declaration of disinterestedness, but also in its failure to amend its declaration, its motions, and its argument on the motion to recuse. Further, it knowingly concealed the Jones-Freeman relationship by failing to correct its local counsel's misleading filings as well.

Simply because Bouchard does not accept Kirkland's troublingly narrow view of its disclosure obligations does not mean he is "confused about the meaning of a declaration of disinterestedness[.]" Rule 2014 requires disclosure of "connections" in the bankruptcy. Fed. R. Bankr. P. 2014(a). Rule 5002(b) and the Notes from the Advisory Committee indicate that a disqualifying connection involving the judge "must" be disclosed "before accepting appointment" and that it should be done as part of the application under Rule 2014. Fed. R. Bankr. P. 5002 & the Notes of the Advisory

---

[142] Motion to Dismiss at 19.
[143] *See* Fed. R. Bankr. P. 5002(b) & Notes of the Advisory Committee on Rules (1985 Amendment); 11 U.S.C. § 1327; *CF Holding*, 164 B.R. at 807–08; *see also* 28 U.S.C. § 455(a).

Committee on Rules (1985 Amendment). This has been interpreted prophylactically to require lead counsel to disclose connections involving other professionals. *See CF Holding*, 164 B.R. at 807–08. "The rule of law of no responsibility proposed by [Kirkland] … cannot be consonant with the fiduciary responsibilities imposed on bankruptcy estate professionals." *Id.* at 808. Kirkland's position is made worse by the fact that it affirmatively listed Judge Jones in its declaration as among the individuals for whom a conflicts search was conducted; yet no conflict or connection was disclosed.[144]

Kirkland may have "erred on the side of disclosure" with respect to its own attorneys, but it covered up the elephant in the room by omitting the disqualifying connection it knew about between its local counsel responsible for Kirkland's filings and Judge Jones. Whether this is a violation of Rule 2014, Rule 5002(b), and the rules of ethics (it is), it is clearly a fraudulent omission.

That Plaintiff cannot show, without discovery, Kirkland partner and declarant Ryan Bennett's individual knowledge when he signed his declaration of disinterestedness is not controlling. Bouchard plausibly alleged facts that Kirkland partners did know, and their "[k]nowledge and actions are said to be imputed to all members of [the] firm." *In re Bradley*, 495 B.R. 747, 791 (Bankr. S.D. Tex. 2013) (citing *In re Depugh*, 409 B.R. 125, 141 (Bankr. S.D. Tex. 2009). Even disregarding Bouchard's well-pleaded allegations that Kirkland partners were aware of the Jones-Freeman relationship before the filing of the BTC bankruptcy, at the very least Kirkland learned of romantic relationship no later than March 2021, and has still failed to amend Bennett's declaration more than three years later.

### C. Case law and other authority supports Plaintiff's argument that, as lead counsel for debtor-in-possession, Kirkland was required to disclose.

Kirkland claims "courts" have rejected the notion of liability for failing to disclose another law firm's conflict of interest. Although stated in the plural, Kirkland means a single, unpublished, four-

---

[144] Complaint ¶ 46.

paragraph, nonprecedential memorandum opinion that cannot be cited in the circuit where it was authored and has never been cited by any court. *See Eon*, 1995 U.S. App. LEXIS 17140, at *3; 9th Cir. R. 36-3. Meanwhile, Kirkland ignores *CF Holding*, which refutes its position—reading the disclosure requirement broadly to require lead counsel to disclose a connection involving another professional in the bankruptcy. 164 B.R. at 807–08. Kirkland also ignores Bankruptcy Rule 5002(b) and the Notes of the Advisory Committee that indicate disclosure of a disqualifying connection with the judge "must" be made. Fed. R. Bankr. P. 5002 & the Notes of the Advisory Committee on Rules (1985 Amendment).

That professionals are required to submit separate disclosures says nothing about lead debtor-in-possession's counsel's obligations to disclose a known connection involving its local counsel.[145] Plaintiff is not attempting to hold Kirkland to "a higher disclosure standard than the federal judiciary." Jones was required to disclose his relationship with Freeman. Kirkland was too.

### D.     Kirkland's fraudulent omissions were material.

It defies logic that Kirkland's failure to disclose an intimate, live-in relationship between the judge presiding over the bankruptcy and its local counsel could be considered anything less than patently material. Yet, Kirkland somehow makes the argument that it is not. According to Kirkland, its non-disclosure of the Jones-Freeman relationship "could not have impacted Kirkland's ongoing representation of BTC."[146] Wrong. Had Kirkland disclosed, Bouchard would have had the "opportunity to object to Jackson Walker and Kirkland & Ellis' representation of BTC and/or to seek the disqualification of Judge Jones."[147] And Judge Jones would have been disqualified. *See* 28 U.S.C. §

---

[145] *See* Motion to Dismiss at 21.
[146] *Id.* at 22.
[147] Complaint ¶ 232.

455(a) ("[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned).[148] Further, based on Kirkland's pattern of deceit in concealing the relationship in *BTC* and numerous other bankruptcies, Kirkland likely would not have been appointed or recovered fees. Further, any Kirkland's fees would be reduced or forfeited under *CF Holding*. With the consortium of Jones, Freeman, Jackson Walker, and Kirkland removed from the case, Bouchard also would not have had to incur the considerable legal expense or mental anguish suffered in defending the adversary suit brought by the firms as retribution for his protesting professional fees. Kirkland's non-disclosure undoubtedly impacted the outcome.

Kirkland's fraud in concealing the Jones-Freeman relationship is not material because disclosure was required under the bankruptcy rules. It was material because it eliminated informed decision-making on whether interested parties to the bankruptcy should object to the firms' participation. And it is material because it would have resulted in the disqualification of Jones.

This is not a matter of Kirkland making a typo on a tax return or forgetting to list a prior residence. Kirkland concealed an intimate, live-in relationship between its longtime local counsel and the judge who presided over countless bankruptcies involving the two firms and awarded them gargantuan attorneys' fees. Any reasonable person would find this fraudulent omission material.

## V.   Kirkland's "Independent" Grounds for Dismissal Should Each Be Denied.

### A.   Plaintiff has properly alleged RICO claims.

#### 1.   Plaintiff has standing to bring a RICO claim.

The Fifth Circuit has held that RICO "does not impose much of a standing requirement[.]" *Whalen v. Carter,* 954 F.2d 1087, 1090 (5th Cir.1992). The RICO standing provision simply provides

---

[148] *See also* Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones, at 3.

that "[a]ny person **injured in his business or property** by reason of a violation of section 1962 of this chapter may sue therefor…" 18 U.S.C. § 1964(c) (emphasis added). A plaintiff must plead (1) damage to business or property and (2) that the damage was caused by the defendants' RICO violation. *Potomac,* 262 F.3d at 264. Plaintiff has alleged facts satisfying each element.

### a. Plaintiff has plausibly alleged an injury to his business or property by reason of Defendants' RICO violations.

Kirkland misinterprets Plaintiff's property damages as *solely* a diminished bankruptcy estate from which Plaintiff hopes to be paid. But Plaintiff suffered additional injuries that were a direct and inevitable result of Defendants' RICO violations. Plaintiff's damages include, but are not limited to: (1) the costs[149] incurred in filing motions and attending hearings in a bankruptcy proceeding that he did not realize were futile because the playing field was tilted against him from the outset, (2) the costs[150] incurred in defending an adversary proceeding brought by the RICO Defendants after Bouchard demanded to review professional invoices at a time when Bouchard did not realize such defense was futile because the playing field was tilted against him from the outset, (3) damages to Bouchard's business reputation[151] based on false allegations made by the RICO Defendants in the adversary suit, after he demanded to review professional invoices, that Bouchard's lifestyle was responsible for tanking BTC, made at a time when Bouchard was unaware that defense of such suit and allegations was futile because there was no level playing field, (4) costs in having to appeal Judge

---

[149] *Id.* ¶ 166 (alleging costs as damages for RICO claim); ¶ 173 (same for RICO conspiracy claim). To the extent Kirkland argues a factual deficiency in Plaintiff's allegations for costs as damages, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan,* 504 U.S. at 561; *Ctr. for Inquiry, Inc. v. Warren,* 845 Fed. Appx. 325, 328 (5th Cir. 2021). Alternatively, Plaintiff requests leave to amend his complaint to include these allegations. *See infra* § VI(J).

[150] *Id.*

[151] *Id.* ¶ 9 ("Mr. Bouchard suffered reputational harm and has been unable to obtain new employment as a result of Defendants' misconduct"); ¶ 121 (same); ¶ 137 (same in context of Count I RICO claim); ¶ 171 (same in the context of Count II RICO conspiracy claim).

Jones' overruling of his objection to an exculpation provision purporting to effectively immunize Portage Point for its misconduct, which he would not have had to incur if Kirkland had disclosed the Jones-Freeman relationship and Jones would have been removed from the case, (5) the loss of his due process rights and harm to the bankruptcy process in which he took part which, at a minimum, entitled Plaintiff to nominal damages,[152] and (6) mental anguish damages based on the false allegations lodged against him by the RICO Defendants and the harsh treatment he received from the judge and attorneys who were at risk of being exposed by him, and based on the distress of learning the bankruptcy process he invested substantial time, effort and resources participating in was tainted by corruption. None of these injuries to Plaintiff are derivative of the injury to the bankruptcy estate.

Kirkland challenges Bouchard's allegation of business reputational harm, which has prevented him from obtaining new employment. But the Fifth Circuit specifically upheld reputational damages as injury to business or property for purposes of RICO in *Khurana v. Innovative Health Care Sys.*, 130 F.3d 143, 147, 150–51 (5th Cir. 1997). Bouchard's reputational damages are not amorphous or speculative as in *Blacks in Tech. Int'l v. Blacks in Tech. LLC*, where the plaintiff merely claimed harm, without explanation, to his "personal reputation and in his business endeavors incorporating, founding, leading, growing, and administering[.]" 2022 U.S. Dist. LEXIS 94538, *16 (N.D. Tex. May 26, 2022). In contrast, Bouchard specifically explained that he has been unable to obtain new employment due to the reputational harm inflicted by Kirkland and the rest of the defendants. "Although an injury to one's personal reputation generally is not an injury to 'business or property' under RICO, § 1964(c), an injury to a plaintiff's business reputation, resulting in concrete economic, contractual, or business losses, is compensable under RICO." *In re Cement Lock v. Gas Technology Institute*,

---

[152] *Id.* ¶ 166 (alleging nominal damages in Count I RICO claim); ¶ 121 (describing Defendants' corruption of the bankruptcy system); ¶ 173 (alleging nominal damages in Count II RICO claim); *see also* ¶¶ 256, 266 (due process violation).

2005 U.S. Dist. LEXIS 22058, *43 (N.D. Ill. Sept. 30, 2005). Thus, contrary to Kirkland's snippet from a single opinion from the Northern District of Texas, Bouchard's allegations of reputational damages to his business confer RICO standing. *See Khurana*, 130 F.3d 143, 147, 150–51.

Because Kirkland and the remaining Defendants never disclosed the Jones-Freeman relationship, Bouchard operated under the mistaken belief that all participants in the BTC bankruptcy were on level footing as disinterested parties. As a result of Defendants' fraud in failing to disclose the relationship that so inured to their benefit, Bouchard incurred considerable costs in defending an adversary proceeding and objecting to the improper exculpation provision in the BTC bankruptcy,[153] never suspecting the futility of advocating against positions maintained by the judge's girlfriend and associated firms. It is at least plausible that such expenditures, made by Plaintiff in reliance on false representations by Enterprise members that they were disinterested and conflict-free parties, form a recoverable economic loss not derivative of any injury sustained by the BTC bankruptcy estate. *See Standardbred Owners*, 985 F.2d 102. These expenses were incurred directly by Bouchard and are not derivative of any injury to BTC.

The injury visited upon the bankruptcy system and process by Defendants' acts also represents a direct harm to Plaintiff. In the context of RICO, "[i]f [a Defendant's] conduct has corrupted the process of engaging bankruptcy advisors, as [Plaintiff] plausibly alleges, then the unsuccessful participants in that process are directly harmed." *Alix*, 23 F.4th at 204 (emphasis added). Defendants' wrongful acts corrupted the bankruptcy process and inflicted direct harm on Plaintiff as a participant in that bankruptcy process.

---

[153] *Id.* ¶¶ 97–100

Plaintiff also alleged facts plausibly demonstrating an injury to his due process rights and the bankruptcy process in which he took part. These injuries, at a minimum, entitle Plaintiff to nominal damages. *Potomac,* 262 F.3d at 265-266; *Rosario,* 962 F.2d at 1021. A finding of nominal damages would also trigger an award of attorneys' fees. Thus, if some damage has been alleged to exist, even if it is not readily quantifiable, Plaintiff has asserted a plausible claim for nominal damages that is adequate to establish standing. *See Potomac,* 262 F.3d at 8.

Moreover, as a creditor, Bouchard has a financial interest and suffered damages from the fees that were wrongfully paid to Kirkland, Jackson Walker and Freeman and may be ordered disgorged.[154]

That some direct injuries may be difficult to quantify does not preclude a showing of causation sufficient to confer standing. The Fifth Circuit has emphasized that it is the fact of injury, and not the amount, which must be established for standing purposes:

> The best reading of § 1964(c)'s injury to business or property requirement is that it refers to the fact of injury and not the amount…. Even if the precise amount of its injury is not susceptible of ready proof, it is clear that a reasonable finder of fact could infer that some injury has occurred…

*Potomac,* 262 F.3d at 265. Plaintiff plausibly alleged an injury to his business or property.

To the extent this Court is inclined to dismiss any claim based on a determination that it is derivative of the estate's claims, Plaintiff respectfully requests that the Court do so without prejudice so that he may request leave for derivative standing. See *Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233, 247 (5th Cir. 1988); *In re Nat'l Forge Co.,* 326 B.R. 532, 545–46 (W.D. Pa. May 26, 2005); *In re Jones,* 37 B.R. 969, 974 (N.D. Tex. Bankr. 1984).[155]

---

[154] *Id.* ¶ 138.

[155] Kirkland asserts in a footnote that claims belonging to the debtor have been released in an omnibus release as part of the Confirmation Plan—release language both drafted and approved by Defendants as attorneys and judge. To the extent Plaintiff's claims are not derivative of the estate, the purported debtor release is inapplicable. To the extent the Court finds

**b.    Plaintiff plausibly alleged that his injuries were caused by Defendants' RICO violations.**

The second standing question – whether Plaintiff's injury was proximately caused by Kirkland's conduct – can also be answered in the affirmative. The purpose of the Enterprise was to secure reputational and financial benefits for the Enterprise members based on the relationship between Freeman and Jones. Defendants furthered the goals of the Enterprise by denying other bankruptcy participants' information that would have caused them to scrutinize, reveal and object to Defendants' involvement. Where the goal was to prevent Plaintiff (and other shareholders and creditors) from being on an equal playing field in proceedings before Judge Jones, Defendants ought not be heard to disavow that Plaintiff was injured in the very way they intended: by making futile expenditures, incurring unnecessary legal fees, and suffering adverse rulings.

Simply stated, the injuries to Plaintiff resulted from Defendants' scheme to keep all bankruptcy participants other than the Enterprise members in the dark about the influential Freeman-Jones relationship. Consequently, the causation element of RICO standing has been plausibly alleged.[156]

**2.    Plaintiff has properly alleged a RICO Enterprise.**

Kirkland erroneously argues that Plaintiff has failed to allege a RICO enterprise because it believes Plaintiff failed to show (1) a decision-making structure or that the enterprise functioned as a continuing unit, and (2) that Kirkland operated or managed the enterprise. Kirkland is wrong on both counts.

**a.    Kirkland does not dispute that Plaintiff alleged a purpose for the Enterprise that is separate from its predicate acts of racketeering.**

---

any of Plaintiff's alleged claims would be derivative, Plaintiff purports Kirkland's argument is premature and should be addressed upon Plaintiff's request for leave to pursue derivative standing.
[156] *Id.* ¶¶ 121, 165, 225, 232.

53

One point that is not dispute—Bouchard satisfied the requirement of a purpose separate from the predicate acts of racketeering. Bouchard pleaded that "the purpose of the Jones-Freeman-Jackson Walker-Kirkland Enterprise was to increase the prestige and influence of each actor in bankruptcy practice, while enriching the respective law firms and attorney Freeman. This purpose was accomplished through multiple predicate acts, and without disclosing the Jones-Freeman intimate relationship to affected parties and creditors."[157] Kirkland does not dispute that Plaintiff adequately alleged a purpose separate from the predicate acts.

### b. Plaintiff adequately alleged the Enterprise's structure by describing the purpose, relationships, and continuing acts of the Enterprise.

Bouchard plainly satisfied the structural requirements for a RICO Enterprise. Bouchard alleged an association-in-fact enterprise. The Supreme Court has made crystal clear that an association-in-fact enterprise "need not have a hierarchical structure or a 'chain of command.'" *Boyle v. U.S.,* 556 U.S. 938, 948 (2009). Further, "[m]embers of the group need not have fixed roles[.]" *Id.* Instead, an association-in-fact enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. U.S.,* 556 U.S. 938, 946 (2009). Plaintiff's Original Complaint satisfies each element. Plaintiff has alleged that between 2017 or 2018[158] and 2023,[159] the members of the Enterprise worked together to provide legitimate legal services to third parties while also increasing the demand, prestige and compensation received for those services through acts of racketeering.[160] Kirkland routinely involved Jackson Walker and Freeman in mega-bankruptcy cases filed in the

---

[157] *Id.* ¶ 126.
[158] *Id.* ¶ 124 & n. 128.
[159] *Id.* ¶ 134.
[160] *Id.* ¶¶ 124–36.

Southern District of Texas—at least 46 large cases since 2018.[161] In fact, Kirkland selected Jackson Walker in nearly every mega-bankruptcy it filed in the Southern District.

The Complaint describes the relationship between the members of the Enterprise in detail. Jones and Freeman were in an intimate relationship which they kept secret from members outside the Enterprise. Once Freeman left her clerkship, she became partner at Jackson Walker and the firm's mega-bankruptcy filings skyrocketed. In the vast majority of cases, Kirkland served as lead counsel with Jackson Walker as local even though Kirkland maintained a sizeable restructuring office itself in Houston.[162] Filing in Houston meant the firms would either land before the judge in an intimate, live-in relationship with their key restructuring partner, Freeman, or his long-time mentor and friend, Judge Isgur.[163] Consequently, Judge Jones presided over at least 26 cases in which he awarded Jackson Walker more than $12 million in attorneys' fees and expenses while Freeman was a partner at Jackson Walker and while Freeman and Jones were living together and having an intimate relationship.[164] This includes approximately $1 million in fees billed directly by Freeman herself.[165] Meanwhile, Kirkland was awarded over $162 million in which Jackson Walker served as co-counsel before Judge Jones.[166]

Since Plaintiff has not yet had discovery, he pleaded on information and belief that considering the extent to which they worked together and the amount of money involved, not to mention the intimate, live-in relationship between Jones and Freeman, that Judge Jones, Jackson Walker, Freeman and Kirkland, were of course in regular contact with one another via email, phone and in-person communications for the purposes of securing appointments in and making decisions regarding

---

[161] *Id.* ¶ 37.
[162] *Id.* ¶ 38.
[163] *Id.* ¶ 28. Even in cases before Judge Isgur, Judge Jones served as mediator with Jackson Walker and Kirkland & Ellis as debtor's counsel. *Id.* ¶¶ 57–58.
[164] *Id.* ¶ 40.
[165] *Id.*
[166] *Id.*

bankruptcy cases, getting cases filed in the "friendly" court of Judge Jones, and obtaining favorable decisions and lucrative fee awards from Judge Jones in those cases.[167] Further, since Judge Jones was the one who ultimately awarded fees to his live-in girlfriend and the associated firms, the enterprise was organized in a manner amenable to consensual decision-making between the Defendants and hierarchical decisions handed down by Judge Jones to the other members of the Enterprise.[168] Further, the Enterprise members followed a uniform course of conduct for concealing the Jones-Freeman relationship in legal filings, legal proceedings,[169] and even when directly raised by Plaintiff (e.g., Van Deelen's motion to recuse) in court.

These facts more than plausibly allege the existence of a continuing association-in-fact enterprise and Kirkland's suggestion to the contrary is preposterous. They describe the decision-making structure between Jones, his girlfriend, her firm, and the lead counsel that associated with her firm in nearly every mega-bankruptcy, and how this group functioned as a continuing unit for at least six years until Judge Jones resigned in disgrace.

None of Kirkland's cases are at all supportive. For example, the plaintiff in *Stevenson v. Thornburg* did not even "explain how or why the supposed enterprise members worked together." 2024 U.S. Dist. LEXIS 26313, *40 (S.D.N.Y. Feb. 14, 2024). As described *supra*, Plaintiff did so in painstaking detail over the span of many paragraphs and pages.[170] In *Shannon v. Ham*, the plaintiff alleged RICO based on a single insurance transaction. 2015 U.S. Dist. LEXIS 190760, *5-6 (N.D. Tex. May 5, 2015). The plaintiff also tried to allege the defendants engaged in the same activity with respect to others but failed to offer any facts linking the conduct. *Id.* Shannon illustrates the absurdity of

---

[167] *Id.* ¶ 128.
[168] *Id.*
[169] *Id.* ¶¶ 134, 147.
[170] *Id.* ¶¶ 28, 37–38, 40, 124–36.

Kirkland's argument that Plaintiff's allegations about the Jones-Freeman-Jackson Walker-Kirkland Enterprise are, in any respect, conclusory. Plaintiff detailed the specifics of the Enterprise's numerous mega-bankruptcy filings in the Southern District, and before Judge Jones, the multitude of opportunities they had to disclose the relationship, but did not, and the enormous sums of money they hauled in through their association-in-fact.

<strong>c.     Plaintiff properly alleged that Kirkland operated and managed the Enterprise.</strong>

A defendant participates in the conduct of an enterprise's affairs when it has some part in directing those affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). It is not necessary that the defendant have "primary" responsibility for the enterprise's affairs. *Id.* Nor is RICO liability limited to those with a formal position in the enterprise. *Id.* It is only necessary that the defendant have taken some part in directing the enterprise's affairs. *Id.*

Here, Kirkland made numerous decisions exhibiting participation in the Enterprise including: deciding to file cases in the Southern District of Texas, seeking appointment as lead counsel while associating Jackson Walker and Freeman on cases filed before Judge Jones,[171] deciding to file or allow to be filed pleadings and documents (with Jackson Walker e-filing on its behalf) in Judge Jones's court, and recouping millions of dollars in attorneys' fees through the Jones-Freeman relationship without ever disclosing it.[172] These acts, taken in furtherance of the Enterprise's purpose, extend far beyond the minimal involvement of defendants that courts have deemed insufficient to meet the participation test. *Compare with Reves v. Ernst & Young*, 507 U.S. 170, 176 (1993) (participation requirement not met where accountant defendants only reviewed a series of completed transactions and certified the

---

[171] *Id.* ¶¶ 36–39.
[172] *Id.* ¶¶ 43–51, 135–36, 147, 151.

records as fairly portraying the defendants' financial status). The only way Kirkland is able to even suggest to the contrary is by referencing a single phrase in a sentence discussing operation of the Enterprise while completely ignoring the multitude of paragraphs in the complaint describing the factual details of Kirkland's role in it.[173] Kirkland did not just have "a business relationship with" the RICO enterprise.[174] It was a main cog in the wheel and profited more than any of the participants in the Jones-Freeman-Jackson Walker-Kirkland, recouping more than $162 million from Judge Jones in cases where it (inevitably) selected Freeman and Jackson Walker.[175]

### 3. Plaintiff adequately alleged predicate acts.

Plaintiff properly alleged that Defendants filed numerous misleading and dishonest federal court papers without disclosing the Jones-Freeman relationship, amounting to bankruptcy fraud, honest services fraud, mail and wire fraud, and obstruction of justice—each actionable under RICO.

Violations of 18 U.S.C. § 1503 Obstruction of Justice:  18 U.S.C. § 1503(a) prohibits any person from influencing, obstructing, impeding, or intimidating any officer of a federal court in the discharge of his duty. Kirkland takes an inappropriately narrow view of Plaintiff's obstruction of justice allegations: saying Plaintiff includes no "specific instance" of Kirkland influencing Jones.[176] While it may be true that, lacking discovery at this early stage of proceedings, Plaintiff cannot speak to the details of specific communications between Kirkland and Jones, Plaintiff can (and does) allege patterns of behavior suggesting a scheme and intent to influence. Most tellingly, *after Freeman joined Jackson Walker in 2018*, Kirkland hired Jackson Walker as local counsel in 42 of the 46 mega-

---

[173] Motion to Dismiss at 28 (citing Complaint ¶ 127).
[174] *Id.*
[175] Complaint ¶ 135.
[176] Motion to Dismiss at 28.

bankruptcies it filed in the Southern District of Texas since 2019.[177] This was an abrupt switch after Kirkland had filed no mega-bankruptcy cases at all with Jackson Walker as local counsel from 2006 to 2016. It is reasonable to infer that Kirkland made such a dramatic and rapid change in practices because it had determined that employing and aligning itself with the Judge's girlfriend was influential with Judge Jones.[178] Kirkland influenced Jones by bringing myriad mega-bankruptcy cases to his court and almost uniformly pairing with his intimate partner and her law firm. This allowed Jones to award her and her firm millions of dollars, boost her prestige, all of which inured to his benefit considering Freeman shared at least one home.

Moreover, the scheme to influence Judge Jones worked to the extent that Judge Jones approved Kirkland's application for appointment, approved 100% of Kirkland's requested fees, adopted Defendants' proposed fee orders verbatim, and issued other rulings favorable to Kirkland's position.[179] These facts sufficiently state a plausible claim that Kirkland concealed and leveraged the Jones-Freeman relationship to influence bankruptcy proceedings in Jones' court, and sufficient to allege a predicate act of obstruction of justice warranting further investigation through discovery.

<u>Violations of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), § 152 (bankruptcy fraud) and § 1346 (honest services fraud).</u> Plaintiff has alleged actionable false representations by Kirkland and the other Defendants, including misrepresentations as to Defendants' disinterested status and misrepresentations regarding the existence of the Jones-Freeman relationship.[180]

**Because Plaintiff alleges a scheme of corruption, Kirkland's fraudulent filings may serve as a predicate act.** That is, in the context of Plaintiff's allegations of corruption, the fact that

---

[177] Complaint ¶ 37.
[178] *Id.* ¶ 142(b).
[179] *Id.* ¶¶ 50, 147(f).
[180] *Id.* ¶¶ 46, 49, 147(b),(e),(h).

these misrepresentations were sometimes made in court filings does not immunize them from constituting predicate acts of fraud. *See Alix*, 23 F.4th at 200–01 (reversing dismissal of RICO claims that were based on fraudulent Rule 2014 disclosures). Plaintiff is not alleging the filing of baseless lawsuits; rather, Kirkland and the RICO Defendants corrupted the bankruptcy system by filing fraudulent disclosures and concealing a disqualifying relationship between a key partner in the Enterprise and the judge that awarded them millions. *See Alix*, 23 F4.th at 204; *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016) (recognizing corruption as an exception to litigation activity not supporting a predicate offense); *see also Feld Entm't, Inc. v. ASPCA*, 873 F. Supp. 2d 288, 307 (D.C. Jul. 9, 2012) (*Noerr-Pennington* "does not apply to bribery or to deliberate misrepresentations to the Court").

In *CSX Transp., Inc. v. Gilkison*, lawyers and a doctor conspired to file fraudulent asbestos claims. 2012 U.S. Dist. LEXIS 61719 (N.D. W. Va. May 3, 2012). A civil RICO claim was brought against them, and like Kirkland, they argued that the filing of pleadings and court documents cannot "cannot be predicate acts of mail or wire fraud that support RICO claims." *Id.* at *10. The court disagreed, noting that courts recognize that the filing of fraudulent documents in a lawsuit can serve as predicate acts so long as they form part of a larger scheme. *Id.* at 32–33 (citing *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 443 (5th Cir. 2000) ("Among the predicate acts alleged to form a pattern of racketeering activity were instances of conduct directly connected to the filing of the state tort suit, including the filing of that suit."); *Warnock v. State Farm Mut. Auto. Ins. Co.*, No. 5:08cv01, 2008 U.S. Dist. LEXIS 81507, 2008 WL 4594129, at *7 (S.D. Miss. Oct. 14, 2008) (finding that because the plaintiff alleged more than the mere filing of false litigation documents, the plaintiff adequately pled a pattern of racketeering activity); *State Farm Mut. Auto. Ins. Co. v. Makris*, No. 01-5351, 2003 U.S.

Dist. LEXIS 3374, 2003 WL 924615, at *10 (E.D. Pa. Mar. 4, 2003) (holding that the filing of fraudulent lawsuits against State Farm's insureds to recover monetary damages from State Farm was an essential element of the scheme to defraud State Farm); *but see Daddona v. Gaudio*, 156 F. Supp. 2d 153, 163 (D. Conn. 2000) (rejecting the plaintiff's claims for mail and wire RICO fraud because plaintiff failed to claim that the underlying litigation was part of a larger scheme to deprive the plaintiff of his property)).

Like *CSX*, this case involves "a more complex scheme" beyond the filing of fraudulent court documents. 2012 U.S. Dist. LEXIS 61719, at *32. Bouchard has alleged Kirkland and the RICO Defendants used the Jones-Freeman relationship, which they kept secret from interested parties like him, "to bolster prestige and collect tens of millions of dollars or more in fees at the expense of those affected by the bankruptcies."[181] They are not immunized because they used the federal bankruptcy system to accomplish their fraud.

Kirkland inexplicably contends that plaintiff has not alleged Kirkland had knowledge of the Jones-Freeman relationship and concealed that information "to secure large awards of attorneys' fees." In truth, those two allegations are made repeatedly throughout Plaintiff's Original Complaint.[182] These allegations of intent are supported by factual inferences arising from Kirkland's rapid increase in filings in the Southern District of Texas and consistent use of Jackson Walker as local counsel for those filings – two changes that happened to occur after Judge Jones' girlfriend became available for hire as local counsel.

---

[181] *Id.* ¶ 2.
[182] *Id.* ¶ 5 ("Both firms knew of the relationship and used it to profit"); ¶ 110( "Although both firms then knew the allegations concerning the intimate relationship between Jones and Freeman were true, at least in the past, neither firm disclosed the relationship in the BTC bankruptcy"); ¶ 114 ("although partners at Kirkland & Ellis long knew of the relationship as well, Kirkland & Ellis also continued not to disclose it"); ¶ 118 ("Freeman, Jackson Walker, Kirkland & Ellis and Judge Jones all profited from their secret"); *Id.* ¶ 178 ("…Kirkland & Ellis knew about the relationship between Judge Jones and Freeman, but nevertheless falsely represented that there was no conflict involving Judge Jones").

As described *supra*, Plaintiff most certainly has plausibly alleged Kirkland's specific intent to defraud,[183] including its knowledge of the Jones-Freeman relationship.

Kirkland's reliance on Judge Isgur's March 2021 ruling that Jones need not be recused, later upheld by the district court, only strengthens Bouchard's allegations concerning Kirkland's fraudulent intent.[184] According to Jackson Walker, it had already disclosed the Freeman relationship to Kirkland at this point. Nevertheless, Kirkland affirmatively advocated against Jones' recusal and attempted to keep the anonymous letter out of evidence. The Chief Judge of the Fifth Circuit opined that had the relationship been disclosed, "[t]here is a reasonable probability … the motion to recuse would have been granted."[185]

### Mail and Wire Fraud

With respect to mail fraud, Kirkland again reads a sentence of the Complaint in isolation to claim Plaintiff merely alleges "unspecified matters" were sent via mail.[186] The paragraphs that follow, however, describe the materials as including: declarations of disinterestedness, applications for appointment as counsel, applications for attorneys' fees, orders awarding fees, a motion for a final decree, and a final decree.[187] Kirkland misstates the record by claiming Plaintiff does not allege these filings "were sent by mail." Paragraph 147 plainly alleges these filings were "passed by mail[.]"[188]

In addition to these specific filings sent via mail and wire, Plaintiff alleged that the mails and wires were used for co-conspirators to communicate with one another regarding the Enterprise, to communicate with clients and potential clients about the opportunities presented by appearing in

---

[183] *Id.* ¶ 178–79.
[184] Motion to Dismiss at 30.
[185] Complaint, Ex. 1 at 3.
[186] Motion to Dismiss at 30 (citing Complaint ¶ 146).
[187] Original Complaint ¶ 147.
[188] *Id.* ¶ 147.

Judge Jones' courtroom with Freeman as counsel, to make misrepresentations regarding the existence of the Jones-Freeman relationship, and to send invoices or bills reflecting improperly influenced fee awards.[189]

Kirkland's case, *Marriott Bros v. Gage*, 704 F. Supp. 731, 740 (N.D. Tex. Oct. 7, 1988), did not involve deficient pleadings on the use of mails as they claim.[190] Rather, *summary judgment evidence* established that the mailings were not part of the execution of fraud or incidental thereto. *Id.* To the extent Kirkland believes it can controvert Plaintiff's allegations, the 12(b)(6) motion is not the place for it.

**Honest Services Fraud**

Kirkland argues Plaintiff has not alleged a bribery or kickback scheme" or any such "quid pro quo" to support his honest services fraud claim.[191] *United States v. Teel*, 691 F.3d 578, 582 (5th Cir. 2012). In fact, Plaintiff alleged a kickback in that the lucrative fees awarded by Jones to Kirkland also went to Freeman, which flowed back into the Freeman-Jones household.[192] In short, Kirkland provided Judge Jones' girlfriend with employment opportunities for her and her firm and received approval of their employment and fee applications. Meanwhile Jones knew that a portion of the fees he awarded Freeman would indirectly benefit him as they were available for the support of his domestic household. Plaintiff adequately alleged the kickback or quid pro quo supporting honest service fraud, and Kirkland makes no further challenge to this claim.

**Bankruptcy Fraud**

---

[189] *Id.* ¶¶ 146, 150.
[190] Motion to Dismiss at 30.
[191] *Id.*
[192] *Id.* ¶ 154; *see also* ¶¶ 132(m), 142(c).

63

Bouchard alleged three separate statutory bases for bankruptcy fraud: 18 U.S.C. §§ 152(2), 152(3), and 152(6), each of which constitute predicate acts.[193] Kirkland's motion to dismiss only challenges one— Section 152(6).[194] Thus, even if Kirkland is right (it isn't), this Court should only dismiss this single allegation of bankruptcy fraud under Section 152(6) and retain the other two under Section 152(2) (where defendant "knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11) and Section 152(3) (where defendant "knowingly and fraudulently makes a false declaration, certificate, verification or statement under penalty of perjury…in or in relation to any case under Title 11").[195] Plaintiff clearly alleged sufficient facts to support those predicate acts, and Kirkland does not contend otherwise.

As to the single Section challenged by Kirkland, Plaintiff adequately alleged bankruptcy fraud under Section 152(6). In full, this section provides that a defendant commits bankruptcy fraud if it "knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11[.]" 18 U.S.C. § 152(6). Kirkland misunderstands this section as requiring money, property, advantage, or promise to flow in one certain direction. But as noted in the honest services fraud section *supra*, there was a mutual exchange between Kirkland and Jones. Jones gave lucrative attorneys' fees to Kirkland in exchange for the firm's selection of his live-in girlfriend and her law firm as local counsel in valuable mega-bankruptcies.[196] Jones received the advantage of his live-in girlfriend becoming the premiere local counsel for mega-bankruptcies as well as funds that flowed into the

---

[193] *Id.* ¶¶ 158–59, 162, 164.
[194] Motion to Dismiss at 31.
[195] *See* Complaint ¶¶ 159–63.
[196] *Id.* ¶ 36–37, 154, 164.

Jones-Freeman household.[197] Kirkland gave Jones this benefit by selecting Freeman and Jackson Walker as its local counsel in nearly every mega-bankruptcy it filed in Houston.

### B.     Plaintiff adequately alleged Kirkland's agreement to the RICO conspiracy.

Plaintiff alleged that Defendants agreed to exploit the Jones-Freeman relationship while concealing the relationship from others:

> Defendants had a meeting of the mind on the object of the conspiracy, unlawfully collecting millions in attorneys' fees and securing lucrative appointments—and on the course of action—failing to disclose the Jones-Freeman intimate relationship and affirmatively representing disinterestedness.[198]

Kirkland erroneously claims that "the only support" for this is the allegation that the Defendants were "in regular contact with one another via email, phone and in-person communications for the purposes of securing appointments in and making decision regarding bankruptcy cases, getting cases filed in the 'friendly' court of Judge Jones, and obtaining favorable decisions and lucrative fee awards from Judge Jones in those cases."[199] Here, Kirkland complains that Bouchard fails to identify the specific communications evidencing this agreement.

But the law recognizes agreements to commit illegal acts are rarely proclaimed from the rooftops. For that reason, direct evidence of agreement is unnecessary. *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir. 1978). Instead, "proof of such an agreement may rest upon inferences drawn from relevant and competent circumstantial evidence...." *Id.* The existence of an agreement, a defendant's guilty knowledge, and the defendant's participation in the RICO conspiracy may each be inferred from

---

[197] *Id.* 154; *see also* ¶¶ 132(m), 142(c).
[198] *Id.* ¶ 241.
[199] Motion to Dismiss at 32 (citing Complaint ¶ 170).

65

the circumstances. *U.S. v. Jones,* 873 F.3d 482, 489 (5th Cir. 2017); *Brickley for CryptoMetrics, Inc. Creditors'*

*Tr. v. ScanTech Identification Beams Sys.*, LLC, 566 B.R. 815, 857 (W.D. Tex. 2017).

      Plaintiff alleged ample facts showing or at least *allowing for the inference* that Kirkland's agreed to

participate in a scheme to leverage the Jones-Freeman relationship for financial and reputational

benefits. Not the least of those facts is the allegation that it was informed of the relationship by Jackson

Walker in March 2021.[200] While evidence suggests Kirkland knew of the relationship earlier, at a

minimum, Jackson Walker has stated that Kirkland knew of the Jones-Freeman relationship two

months before filing Kirkland filed its second interim motion for attorneys fees on May 12, 2021,[201]

more than six months before it filed the motion for final decree in the BTC bankruptcy on September

24, 2021,[202] more than a year and a half before filing the adversary proceeding against Bouchard on

September 27, 2022,[203] and for well over two years before the relationship became publicly known and

the Fifth Circuit issued an order on October 13, 2023, finding probable misconduct.[204] Kirkland and

the other RICO Defendants never disclosed the relationship in any bankruptcy despite this

longstanding knowledge. Yet, Kirkland would have us believe that, as the self-proclaimed "dominant

US debtor law firm" and "world's leading law firm," that it exercised its legal judgment and expertise

to *independently* arrive at the decision that the existence of an intimate relationship between the presiding

judge and a lawyer for the debtor did not need to be disclosed. It stretches incredulity even further to

think that Jackson Walker, one of the largest and most established firms in Texas, independently

arrived at the same decision. It is implausible that four sophisticated legal defendants (including two

---

[200] Complaint ¶¶ 52–53, 108.
[201] *Id.* ¶ 147(e).
[202] *Id.* ¶ 147(h).
[203] *In re Tug Robert J. Bouchard*, 20-03276, Dkt. 1.
[204]  Original Complaint ¶ 102 & Ex. 1.

large firms and a federal judge) all arrived at, and adhered for years to, the same wrong, self-serving conclusion that the Jones-Freeman relationship did not have to be disclosed without ever consulting one another and agreeing on a course of action. The more plausible explanation, and an inference supported by the alleged facts, is that Defendants did agree among themselves not to disclose it.

There is other circumstantial evidence from which one can reasonably draw an inference that Kirkland knew of, but agreed not to reveal, the Jones-Freeman relationship because of its potential benefits to Defendants. For instance, Kirkland did not file any mega-bankruptcy cases with Jackson Walker as local counsel from 2006 to 2016. Yet, after Freeman joined Jackson Walker in 2018, Kirkland hired Jackson Walker as local counsel in 42 of the 46 mega-bankruptcies it filed in the Southern District of Texas since 2019.[205] This was done despite Kirkland having a sizeable restructuring practice in Houston. The dramatic shift and proliferation of Kirkland's mega-bankruptcy filings in the Southern District of Texas (with Jackson Walker and Freeman on board as local counsel) suggests Kirkland was aware of the Jones-Freeman relationship and agreed to partake in the opportunity it presented for financial and reputational benefits.

It is also odd that Kirkland hired Jackson Walker as local counsel but accepted (supposedly without inquiry or question) that Freeman, a former clerk for Judge Jones, would not perform one of the primary tasks local counsel are hired to perform: appearing in the local courtroom.[206] It is reasonable to infer that Kirkland accepted this abnormality in local counsel behavior (and did not investigate it further) because Kirkland was aware of the Jones-Freeman relationship and agreed to conceal it for Kirkland's own benefit.

---

[205] *Id.* ¶ 37.
[206] *Id.* ¶ 101.

Ultimately, questions regarding the extent of Kirkland's knowledge, its motives, and its agreement to participate in the Enterprise are uniquely within Kirkland's control and will be a subject of discovery. At this point, it is sufficient that Plaintiff has alleged Kirkland's agreement with to the conspiracy and alleged facts from which it can be inferred that Kirkland agreed with the other RICO Defendants to conceal and benefit from the Jones-Freeman relationship.

### C.    Plaintiff has properly alleged a *Bivens* conspiracy.

In *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970), the Supreme Court recognized that willful participation in a conspiracy with a state actor may subject a private actor to liability in a § 1983 action. Since then, multiple courts have found the same to be true for *Bivens* conspiracy claims. *See Zografidis v. Richards*, 2022 U.S. Dist. LEXIS 247061, *28 (D. Conn. Jul. 5, 2022) (to establish liability under a *Bivens* conspiracy, "a plaintiff must demonstrate that the private actor was a 'willful participant in joint activity with the state or agents); *Taggart v. DOJ*, 2018 U.S. Dist. LEXIS 130088, *22 (S.D.N.Y. Aug. 1, 2018) ("[t]o state a conspiracy claim under § 1983 or *Bivens*, a plaintiff must allege (1) an agreement between two or more state or federal actors or between a state or federal actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."); *Boyd v. Angelica Textile Servs.*, 2012 U.S. Dist. LEXIS 90831, *11-14 (S.C. May 18, 2012) (same). It is thus no defense that Kirkland is a private actor that worked in concert with a federal judge to violate Bouchard's due process rights. Kirkland and the remaining defendants committed several overt acts in furtherance of that goal, including but not limited to filing multiple fraudulent papers omitting the disqualifying Jones-Freeman relationship that would have allowed Bouchard and others to make informed decisions about the bankruptcy and to object to the defendants' participation and filing an adversary proceeding to punish Bouchard for questioning professional fees.

68

The victim of a constitutional violation by a federal agent has a right to recover damages against the agent in federal court pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971); *Bush v. Lucas*, 647 F.2d 573, 575 (5th Cir. 1981), *aff'd*, 462 U.S. 367 (1983). When a *Bivens* claim is asserted in a context other than what has been recognized by the Supreme Court in three previous *Bivens* cases, as Plaintiff does here, the right to recover may be recognized where the Defendant has established no "special factors" counselling hesitation. That condition is met here.

Kirkland fails to establish a "special factor" precluding a *Biven's* conspiracy claim under the facts of this case. Kirkland first asserts the circular logic that recognition of a new cause of action is itself a special factor that should preclude recognition of a new cause of action. If the law were as Kirkland suggests, there would be no need for a new context test at all; every new context would present a disqualifying special factor simply by virtue of being new. The Supreme Court's caution about "uncertainty" of new cases as a special factor is better understood as applying to cases likely to have unpredictable and widespread consequences; not as an obstacle to recognition of narrow and egregious misconduct such as exists here. *See Egbert v. Boule*, 596 U.S. 482, 493 (2022) (cautioning that uncertainty as to "'systemwide' consequences" of recognizing a new *Bivens* action may be a special factor).

Nor do the U.S. Trustee's powers provide an alternative remedy barring recognition of a *Bivens* claim. The U.S. Trustee's duties are focused on protecting the integrity of the bankruptcy system, not remedying violations of individuals' constitutional rights.

The facts of this case are unprecedented and extraordinary. The hesitancy to extend *Bivens* to new contexts is rooted in considerations of separation of powers, leading courts to evaluate who should decide a damages remedy—Congress or the courts. *See Bivens,* 403 U.S. at 443. The egregious

conduct at issue here took place within the judicial branch, and thus it seems logical that same branch should address the conduct and the remedy under *Bivens*. Notably, Kirkland has not cited a case that expressly states a *Bivens* claim cannot be brought in a case with facts like these.

### D. Plaintiff adequately alleged reliance in connection with his state law claims.

Kirkland is alleged to have repeatedly misrepresented, both affirmatively and by omission, that there were no undisclosed connections or conflicts of interest, that Kirkland was a disinterested persons within the definition of Section 101(14) of the Bankruptcy Code, and that the judge had no disqualifying connections under Rules 5002 and 2014.[207] By claiming to be a "disinterested person," Kirkland falsely represented that it "[did] not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason[.]" 11 U.S.C. § 101(14); *see also* Fed. R. Bankr. P. 5002(b) & Notes of the Advisory Committee on Rules (1985 Amendment); 11 U.S.C. § 1327; *CF Holding*, 164 B.R. at 807–08; *see also* 28 U.S.C. § 455(a). In particular, Kirkland misrepresented that it knew of no potential connections with the bankruptcy judges in the Southern District of Texas, including Judge Jones.[208] Plaintiff properly alleges that he relied on such misrepresentations by Kirkland and the other Defendants.[209]

"A plaintiff establishes reliance by showing the defendant's acts and representations induced him to either act or refrain from acting, to his detriment." *Worldwide Asset Purchasing, L.L.C. v. Rent–A–Center E., Inc.,* 290 S.W.3d 554, 566 (Tex. App.—Dallas 2009, no pet.). Here, Plaintiff alleges with specificity that he relied on the misrepresentations of Kirkland (and the other Defendants) that there

---

[207] *Id.* ¶¶ 5, 42, 46, 53–54, 114, 136, 147(b), (e), (h), 177.
[208] *Id.* ¶¶ 42, 147(b), 186.
[209] *Id.* ¶¶ 5, 178, 180, 188, 190–91, 225, 232.

were no conflicts or undisclosed information bearing on the fair and impartial handling of the bankruptcy estate and resolution of bankruptcy proceedings.[210] In reliance on Defendants' misrepresentations, Plaintiff did not challenge the appointment of the judge's live-in girlfriend (and her associated firms) as counsel for the debtor.[211] Nor did Plaintiff challenge the fees paid from the bankruptcy estate as being an inappropriate product of an undisclosed intimate relationship between one of the debtor's attorneys and the judge awarding the fees.[212] Plaintiff also did not seek the recusal of Judge Jones due to his intimate relationship with debtor's attorney.

Kirkland contends Plaintiff's allegations of reliance are lacking because Plaintiff did not expressly state that he read Kirkland's misleading court filings. Plaintiff alleges repeatedly that he relied on the false representations contained in Defendants' applications for appointments.[213] The obvious inference from Plaintiff's allegations of reliance on statements set forth in legal documents filed with the Court is that Plaintiff (and/or Plaintiff's attorney) read those documents.

Kirkland's authorities for finding reliance lacking where a misrepresentation was not read each arose in a summary judgment context (not in a motion to dismiss) and involved admissions by the plaintiff that the misrepresentation was not read. *See Allgood v. R.J. Reynolds Tobacco Co.,* 80 F.3d 168, 171 (5th Cir. 1996); *Lafrentz v. Lockheed Martin Corp.,* No. 4:18-CV-4229, 2021 WL 4350175, at *4 (S.D. Tex. Sept. 10, 2021). Read as a whole and indulging all inferences in Plaintiff's favor, the Complaint plausibly shows that Plaintiff relied upon, and acted in reliance upon, Defendants' misrepresentations that they were disinterested parties.

### E.    Plaintiff's state law claims are not preempted.

---

[210] *Id.*
[211] *Id.* ¶ 180.
[212] *Id.*; *see also id.* ¶ 191.
[213] *Id.* ¶¶ 5, 178, 180, 188, 190–91, 225, 232.

The sole Texas case, *In re Brentwood Lexford Partners, LLC*, merely stands for the proposition that a court will not entertain a claim based on a bankruptcy code violation when the bankruptcy code specifically provides a remedy for that violation. 292 B.R. 255, 275 (Bankr. N.D. Tex. 2003). But Kirkland does not contend that Rule 2014 provides a cause of action to Plaintiff to address Kirkland's misrepresentations. Thus, Kirkland has not (and cannot) make the baseline showings necessary to support its argument that Plaintiff's state law claims are preempted by the Bankruptcy Code.

Nor does Kirkland explain how any of Plaintiff's state law causes of action conflict with Bankruptcy Code requirements. *In re Perry*, 425 B.R. 323, 397 (Bankr. S.D. Tex. 2010) (provisions of the Bankruptcy Code may preempt state laws *when they conflict*). Cases where bankruptcy preemption has applied typically involve parallel tort actions in state courts against a debtor or creditor based on conduct that risks subverting the Bankruptcy Court's authority to adjudicate matters relating to the debtor's estate. Thus, a significant component of a preemption analysis in the bankruptcy context should be the degree to which the state law claims interfere with administration of the debtor's estate.

Kirkland contends that Plaintiff's state law claims are preempted by Rule 2014. Kirkland does not cite, and Plaintiff has not found, any case finding Rule 2014 preempts state law claims. The case Kirkland cites in this regard, *In re Shirley,* merely holds that a state law claim for fees brought by an attorney representing the debtor-in-possession is precluded when the same fee request was denied by the bankruptcy court 134 B.R. 940, 945 (Bankr. App. 9th Cir. 1992). It says nothing about precluding a state law claim for damages against a non-debtor that does not draw upon the assets of the bankruptcy estate or interfere with administration of the bankruptcy estate. Plaintiff's state law claims – asserted against defendants who were *__not__* debtors in the bankruptcy proceedings – are peripheral to, and do not impugn, the bankruptcy process. Simply stated, Plaintiff's state court claims do not impact

the Bankruptcy Court's control over bankruptcy proceedings or the bankruptcy estate and are not preempted.

**F.      Plaintiff's state law claims are not barred by Texas's "attorney immunity" or "judicial-proceedings privilege."**

**1.   The judicial proceedings privilege does not bar Plaintiff's state law claims.**

Kirkland distorts the purpose of Texas's judicial proceedings privilege, which provides that "[c]ommunications in the due course of a judicial proceeding will not serve as the basis of a civil action for libel or slander…" *James v. Brown,* 637 S.W.2d 914, 916 (Tex. 1982). The policy behind the judicial proceedings privilege is to protect the integrity of the adversarial litigation process and ensure that a court or jury is able to get the information it needs without witnesses and litigants fearing retaliatory suits for defamation. *James v. Brown*, 637 S.W.2d 914, 917 (Tex. 1982). Consistent with this purpose, Texas courts generally discuss and apply the privilege in relation to defamatory statements.  The Texas Supreme Court declined to expand the privilege beyond libel and slander. *James,* 637 S.W.2d at 918; *Bird v. W.C.W.,* 868 S.W.2d 767, 771 (Tex. 1994). Kirkland's own cited cases are consistent with this approach. *See e.g. Wilkinson v. USAA Fed. Sav. Bank Tr. Services,* No. 14-13-00111-CV, 2014 WL 3002400, at *7 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (applying privilege to statement about quality of lawyer's services); *Collins v. Zolnier,* No. 09-17-00418-CV, 2019 WL 2292333, at *1 (Tex. App.—Beaumont May 30, 2019) (applying privilege to statement about drug use and criminal activity).

Kirkland's false representations in failing to disclose the Jones-Freeman relationship are not defamatory statements invoking the judicial proceedings privilege. Even if they were, they would only be protected from slander or libel actions.

73

In a different context, the Texas Supreme Court held that the mere fact that a doctor communicated his misdiagnosis to the Court during a legal proceeding did not immunize him from liability for medical malpractice. *James*, 637 S.W.2d at 917-918. While the doctor's communication to the court "cannot serve as the basis for a defamation action, the diagnoses themselves may be actionable on other grounds." *Id.* at 917. Ultimately, while an in-court statement may not form the basis of a defamation action, "the unavailability of a defamation action does not preclude a plaintiff from pursuing other remedies at law." *Id.* at 917-918. The judicial proceedings privilege simply has no application here.

## 2. Attorney immunity does not bar Plaintiff's state law claims.

Texas' attorney immunity defense provides that a lawyer is immune from prosecution by a non-client for conduct committed in the course of representing the lawyer's client. *Taylor v. Tolbert*, 644 S.W.3d 637, 642 (Tex. 2022) Attorney immunity exists to encourage aggressive representation and advocacy by attorneys that might be hindered if attorneys feared being subjected to lawsuits by third parties. *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). Attorney immunity is not unlimited, however. Immunity attaches to "the kind of conduct" attorneys engage in when discharging their professional duties; therefore, if an attorney engages in conduct that is not "lawyerly work" or is "entirely foreign to the duties of a lawyer" or falls outside the scope of client representation, the attorney-immunity defense is inapplicable. *Taylor*, 644 S.W.3d at 646; *Alpert v. Crain, Caton & James, P.C.,* 178 S.W.3d 398, 405 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). As the party seeking to apply the attorney immunity defense, Kirkland bears the burden of showing its actions were the type of conduct involving a "uniquely lawyerly capacity" and calling upon the attorney's "skills as an

attorney." *Taylor*, 644 S.W.3d at 645-46 (movant bears burden of conclusively proving affirmative defense of attorney immunity applies). That showing has not been made.

Plaintiff's claims arise from Defendants' scheme to employ the live-in girlfriend of a federal judge and to secretly leverage that intimate relationship to garner increased employment opportunities, fees, and professional standing. That is neither an act of advocacy nor one requiring lawyerly skill. "An attorney is not immune from suit for participating in criminal or 'independently fraudulent activities' that fall outside the scope of the attorney's representation of a client." *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.,* 595 S.W.3d 651, 657 (Tex. 2020).

Even to the extent that Defendants' scheme led Kirkland to omit and conceal the obvious conflict in court filings, disclosing an obvious conflict of interest is not a uniquely lawyerly task. The duty to disclose conflicts is something required of _all_ participants in a bankruptcy proceeding. *See, e.g.,* 11 U.S.C. § 101(14), 327; Fed. R. Bankr. P. 2014(a) (imposing disclosure requirements on "attorneys, accountants, appraisers, auctioneers, agents or other professionals"). The Texas Supreme court affirmed this logic noting that a lawyer who made statements to the press on a client's behalf is not partaking of the office, training and skill of an attorney "because anyone – including press agents, spokespersons, or someone with no particular training or authority at all – can publicize a client's allegations to the media." *Taylor*, 644 S.W.3d at 646. The same is true here. Attorney immunity does not attach to the administrative act of identifying one's connections with other participants in a bankruptcy case because doing so is not an act of legal advocacy and does not require any particular "lawyerly" skill. Going a step farther, knowingly misrepresenting and concealing one's conflict status also requires no legal skill and is not a lawyerly act either.

The Texas Supreme Court has had several occasions to consider the scope of the attorney immunity defense. Its comments on the types of conduct that are not protected by attorney immunity are instructive. For instance, while declining to recognize a categorical exception for conduct alleged to be criminal, the court noted that "there is a wide range of criminal conduct that is not within the 'scope of client representations'" and therefore not subject to attorney immunity. *Bethel,* 595 at 657. Nor does immunity apply to acts that do not involve the provision of legal services. For example, an attorney who participates in a fraudulent business scheme with a client is unprotected by attorney immunity, as such acts are "entirely foreign to the duties of an attorney." *Cantey Hanger,* 467 S.W.3d at 482 (citing *Poole v. Houston & TC Ry. Co.,* 58 Tex. 134, 137 (1882)).

Here, Kirkland and the other defendants are alleged to have conspired to use the secret Jones-Freeman relationship to secure professional and financial benefits for themselves. This scheme existed separate and apart from Defendants' representation of its bankruptcy clients. Likewise, Kirkland's concealment of the Jones-Freeman relationship also was not an act of legal representation; but, rather a ministerial or administrative matter required of lawyers and non-lawyers alike in a bankruptcy proceeding. Because Kirkland's misrepresentation and concealment of the Jones-Freeman relationship was (1) outside the scope of the legal representation it provided to BTC and (2) not a lawyerly act in that it was required of lawyers and non-lawyers alike, attorney immunity does not apply.

### G. Plaintiff's claims for negligent misrepresentation, professional negligence, unjust enrichment and *Bivens* conspiracy are not time-barred.

The parties disagree as to the date Plaintiff's claims accrued. Kirkland contends that any injury Plaintiff suffered accrued greater than two years prior to filing the instant action. Kirkland offers no explanation of a date the claims might have accrued other than to refer to Plaintiff's factual recitations that the affiliate Chapter 11 cases were closed September 28, 2021, Kirkland was awarded fees March

15, 2021, and June 10, 2021, and that Bouchard was removed as CEO on February 26, 2021. While Plaintiff did suffer harms on these dates, they cannot establish accrual because there was no way for Plaintiff to know at those times that the harm resulted from Defendants' tortious acts and were not merely adverse (but fair and uninfluenced) rulings. Throughout the intervening time between these dates and October 2023, Defendants continued, individually and in concert with the other Defendants, to fraudulently conceal the relationship and their scheme to benefit from it. Until Jones acknowledged the relationship with Freeman publicly in October 2023, Plaintiff lacked knowledge of the cause of his injury – as was necessary for accrual. *Kingham v. Pham,* 753 F. App'x 336, 337 (5th Cir. 2019) (per curiam) ("an action accrues when a plaintiff knows both the existence of an injury and the cause of the injury."). Limitations accrued no earlier than October 7, 2023, when Jones admitted the relationship and Plaintiff became aware that there was an improperly concealed relationship at the heart of the BTC bankruptcy proceedings.

This case presents a textbook scenario for tolling of a statute of limitations: Defendants who are alleged to have knowingly conspired to commit wrongful acts, committed the wrongful acts in fact, and then made repeated misrepresentations and deceptions to conceal the wrongful acts from a plaintiff who reasonably relied on their deception. Fortunately, Texas's equitable tolling principles are available to address situations, such as this, where strict application of the statute of limitations would be inequitable and include both tolling based on fraudulent concealment and a discovery rule.[214] *Valdez v. Hollenbeck,* 465 S.W.3d 217, 229 (Tex. 2015) ("We have recognized two doctrines that may delay accrual or toll limitations: (1) the discovery rule and (2) fraudulent concealment."); *Shell Oil Co. v. Ross,* 356 S.W.3d 924, 927, 929-30 (Tex. 2011). Both doctrines apply here.

---

[214] *Rotella v. Pederson,* 144 F.3d 892, 897 (5th Cir. 1998) ("Because the Texas statute of limitations is borrowed in § 1983 cases, Texas' equitable tolling principles also control.")

Fraudulent concealment tolls limitations until the claimant, using reasonable diligence, discovered or should have discovered the injury. *Thompson v. Deutsche Bank Nat'l Tr. Co.,* 775 F.3d 298, 307 (5th Cir. 2014). The Fifth Circuit "applies a four-prong test for fraudulent concealment under which the plaintiff must demonstrate: '(1) the existence of the underlying tort; (2) the defendant's knowledge of the tort; (3) the defendant's use of deception to conceal the tort; and (4) the plaintiff's reasonable reliance on the deception.'" *Thompson v. Deutsche Bank Nat'l Tr. Co.,* 775 F.3d 298, 307 (5th Cir. 2014). The estoppel effect of fraudulent concealment continues until a party learns of facts or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action. Here, Defendants (including Kirkland) were previously presented with suspicions regarding the Jones-Freeman relationship in another case before Jones in which Kirkland and other Defendants were representing the debtor and, rather than coming clean about the relationship, doubled-down on their efforts to conceal the relationship. When that relationship was alleged in March 2021 and confirmed in March 2022—and at all times since— Kirkland made no efforts to correct any of its misleading or fraudulent representations in this case. In far less egregious circumstances than those present here, the Fifth Circuit found an entitlement to equitable tolling. *See, e.g., Green v. Doe*, 260 Fed. Appx. 717, *2-3 (5th Cir. 2007).

The discovery rule provides another exception to application of the statutory time bar. The Texas discovery rule standard is similar to the federal accrual standard. *McGowan v. S. Methodist U.*, No. 3:18-CV-00141-N, 2024 WL 455340, at *8 (N.D. Tex. Feb. 5, 2024). Kirkland argues that Plaintiff cannot avoid the limitations bar because his injury was not "inherently discoverable." To be "inherently undiscoverable", an injury need not be absolutely impossible to discover. *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997). An "injury is inherently undiscoverable if it is by nature

unlikely to be discovered within the prescribed limitations period despite due diligence." *Id.* That is the case here. A creditor and shareholder in a bankruptcy case is unlikely to know that the presiding judge is involved in a romantic relationship with the debtor's lawyer, let alone that the debtor's legal counsel conspired with the judge to keep the relationship secret because doing so provides them financial and reputational benefits. *See, e.g., Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex.1988) (finding legal malpractice is inherently undiscoverable because it is unrealistic to expect a layman client to have sufficient legal acumen to perceive an injury at the time of the negligent act or omission of his attorney.).

Where a plaintiff's complaint "plausibly sets out facts where the discovery rule might apply, the Court cannot resolve that issue in the context of a Motion to Dismiss." *Cypress/ Spanish Ft. I, L.P. v. Prof'l Serv. Indus., Inc.,* 814 F.Supp.2d 698, 707–08 (N.D. Tex. 2011). Because that standard is amply satisfied in the case at bar, Kirkland's motion to dismiss on limitations grounds should be denied.

### H. Plaintiff withdraws his claim against Kirkland for professional negligence and breach of fiduciary duty.

Plaintiff hereby withdraws his claim against Kirkland for professional negligence and breach of fiduciary duty.[215]

### I. Plaintiff has alleged facts stating a basis for finding Kirkland liable for its participation in the breach of fiduciary duties and under a theory of respondeat superior.

While the Texas Supreme Court may not have weighed in on whether Texas recognizes a cause of action for aiding and abetting a breach of fiduciary duty, numerous Texas trial and appellate courts

---

[215] If the Court is inclined to rule on Plaintiff's withdrawn claims for professional negligence and breach of fiduciary duty, Plaintiff requests that any dismissal of these claims be without prejudice to allow Plaintiff opportunity to request leave for derivative standing to pursue these claims. *See Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233, 247 (5th Cir. 1988); *In re Nat'l Forge Co.,* 326 B.R. 532, 545–46 (W.D. Pa. May 26, 2005); *In re Jones,* 37 B.R. 969, 974 (N.D. Tex. Bankr. 1984).

recognize the claim. *See Hendricks v. Thornton,* 973 S.W.2d 348 (Tex. App.—Beaumont 1998, pet. denied); *Floyd v. Hefner,* 556 F.Supp.2d 617 (S.D. Tex. 2008). Moreover, even if a claim for aiding and abetting has not been officially recognized by the Texas Supreme Court, Texas has long recognized a similar claim for knowing participation in a breach of fiduciary duty. *See Kinzbach Tool Co. v. Corbett-Wallace Corp.,* 160 S.W.2d 509, 514 (Tex. 1942). Recent decisions in state and federal courts recognize its continuing vitality. *See Meadows v. Hartford Life Ins. Co.,* 492 F.3d 634, 639 (5th Cir. 2007); *D'Onofrio v. Vacation Publ'ns., Inc.,* 888 F.3d 197, 215 (5th Cir. 2018); *Hunter Bldgs. & Mfg., L.P. v. MBI Global LLC,* 436 S.W.3d 9, 15 (Tex. App. — Houston [14th Dist.] 2014, pet. denied).

While labeled as a claim for aiding and abetting a breach of fiduciary duty, Plaintiff's complaint alleges each of the elements of a claim for knowing participation in a breach of fiduciary duty, including (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship. *See Meadows,* 492 F.3d at 639 (stating elements of claim for knowing participation). When a complaint contains sufficient factual allegations to state a claim, a court should not grant a motion to dismiss based on an imperfect statement of the legal theory. *Young Innovations, Inc. v. Dental Health Products, Inc.,* No. CV 4:18-01726, 2019 WL 13211665, at *3 (S.D. Tex. Aug. 8, 2019). Instead, the complaint should be examined to determine if they provided a basis for relief on any theory. *Id., citing, Shaikh v. Texas A&M Univ. Coll. of Med.*, 739 F. App'x 215, 221 n.7 (5th Cir. 2018) (per curiam). Thus, Courts have been willing to re recognize the aiding and abetting allegations as stating a claim for "knowing participation" in a breach of fiduciary duty. *Young Innovations*, 2019 WL 13211665, at *3 (construing claim for aiding and abetting as claim for knowing participation in a breach of fiduciary

80

duty); *In re Schlotzsky's Inc.*, 351 B.R. 430, 439 (Bankr. W.D. Tex. 2006) (declining to dismiss a knowing participation claim that was labeled as an aiding and abetting claim). The same should be done here.

Kirkland also contends that there is no independent cause of action for respondeat superior. To the extent Kirkland is arguing that the Complaint's respondeat superior allegations are better viewed as a theory of liability than as a freestanding cause of action, the title is irrelevant. The point of Plaintiff's allegation is to alert Defendants that Plaintiff is seeking to hold them liable under facts that, if proven, would establish respondeat superior. Whether labeled as a cause of action or a theory of liability, the allegations in Plaintiff's Complaint are sufficient to establish respondeat superior. Kirkland does not contend otherwise. *See Seitzman v Hudson Riv. Assoc.*, 143 Misc 2d 1068, 1070 (Sup Ct 1989) (recognizing analogous circumstance where independent cause of action for punitive damages does not exist but deeming the complaint to demand punitive damages on the underlying causes of action).

### J.     If Kirkland's motion to dismiss is not denied outright, Plaintiff requests leave to amend.

Should this Court find Plaintiff's Complaint deficient in any regard, Plaintiff respectfully requests leave to amend or supplement his Complaint. "The court should freely give a complainant … leave to amend defective allegations in a pleading. … Thus, the appropriate remedy when granting a motion based on nonconforming or deficient pleadings is to grant the complainant time within which to amend the complaint." *McClellon v. Lone Star Gas Co.*, 66 F.3d 98, 103 (5th Cir. 1995). Giving Plaintiff leave to amend his Complaint would not prejudice Defendants, who are already on notice of the claims Plaintiff brings.

Additionally, To the extent this Court is inclined to dismiss any claim based on a determination that it is derivative of the estate's claims, Plaintiff respectfully requests that the Court do so without

prejudice so that he may request leave for derivative standing. See *Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988); *In re Nat'l Forge Co.*, 326 B.R. 532, 545–46 (W.D. Pa. May 26, 2005); *In re Jones*, 37 B.R. 969, 974 (N.D. Tex. Bankr. 1984).

CONCLUSION AND PRAYER

Plaintiff Morton S. Bouchard, III, individually and as co-trustee for The Morton S. Bouchard, III Family Trust respectfully requests that the Court deny Defendant Kirkland's Motion to Dismiss. Plaintiff further requests that the Court grant him all other and further relief to which he is justly entitled.

**Dated July 1, 2024**

Respectfully submitted,

By:  /s/ Mikell A. West
Mikell A. West
Texas State Bar No. 24070832
S.D. Tex. Bar No. 1563058
Robert W. Clore
Texas State Bar No. 24012426
S.D. Tex. Bar No. 2032287
BANDAS LAW FIRM, P.C.
802 Carancahua Street, Suite 1400
Corpus Christi, Texas 78401
Telephone: (361) 698-5200
Facsimile: (361) 698-5222
mwest@bandaslawfirm.com

*Attorneys for Plaintiff*

## **Certificate of Service**

I hereby certify that on July 1, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via electronic mail to all counsel of record.

*/s/ Mikell A. West*