56IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Morton S. Bouchard, III, Individually and as Co-Trustee for The Morton S. Bouchard, III Family Trust;<br><br>     Plaintiff,<br><br>v.<br><br>David R. Jones, Elizabeth Carol Freeman, Jackson Walker, LLP, Kirkland & Ellis, LLP, and Kirkland & Ellis International, LLP, Portage Point Partners, LLC and Matthew Ray,<br><br>     Defendants. | 1.  Civil Action File No. 4:24-cv-693<br><br><br>Jury Trial Demanded<br><br><br><br><br><br><br><br>To the Honorable Alia Moses, Chief United States District Judge: |

## PLAINTIFF'S RESPONSE TO MOTION TO DISMISS BY DEFENDANTS PORTAGE POINT PARTNERS, LLC AND MATTHEW RAY

Plaintiff Morton S. Bouchard, III, individually and as co-trustee, (collectively, the "Bouchard Parties"), files this response to Motion to Dismiss by Defendants Portage Point Partners, LLC and Matthew Ray pursuant to Fed. R. Civ. P. 12(b)(6) and would respectfully show the Court the following:

### INTRODUCTION

Morton S. Bouchard was forced to watch as the New York-based ocean-going petroleum tugboat and company his great grandfather, grandfather, and father built more than 100 years ago and which he ran since 1992, Bouchard Transportation Company ("BTC"), was systematically dismantled by Defendants.

BTC only ended up before Defendant Judge Jones because Kirkland[1] partner Ryan Bennett advised Bouchard to file Chapter 11 in the Southern District of Texas where they had a "friendly" judge. But Jones was only friendly so long as Bouchard played "nicely" within the sandbox of the Jones-Freeman-Jackson Walker-Kirkland Enterprise. When Bouchard began questioning professional billing in the bankruptcy, Defendants began advocating for his removal and Judge Jones quickly—and without so much as a motion—removed him as CEO on February 26, 2021. The fact that Bouchard's removal was entered sua sponte as alleged in Plaintiff's Complaint meant only that no party filed a motion to remove Bouchard, not that Judge Jones acted alone. As alleged in Plaintiff's Complaint, Portage Point Parties helped orchestrate Bouchard's removal and replacement.[2] Bouchard was then replaced with Kirkland's chosen financial adviser, Portage Point Partners, and its founder Matthew Ray (hereinafter, "Portage Point Parties"). Portage Point Parties knew that it was protected regardless.

---

[1] Defendants Kirkland & Ellis LLP and Kirkland & Ellis International LLP are collectively referenced herein as "Kirkland."

[2] *Id.* at ¶ 8.

1

During the hearing in which he sua sponte removed Bouchard, Jones made clear he was willing to go to great lengths to encase [Ray] within the judicial immunity from which [Jones] benefit[s]."[3]

Portage Point Parties were not innocent bystanders. Kirkland and the other Defendants handpicked them to carry out many of the Enterprise's objectives. For playing their part in the scheme, Portage Point Parties collected more than $8 million in fees and positioned themselves to benefit financially from self-dealing in the bankruptcy. Ray even leveraged his position to get a vacation house from Kirkland partner Bennett after Bouchard's removal.[4]

After selling of BTC's assets at a fraction of their value, Portage Point Parties were immediately hired by one of the asset purchasers, JMB Capital Partners Lending, LLC, as a consultant to assist in running the purchased business and, potentially, selling off the very vessels and other assets JMB had newly acquired from BTC during the Chapter 11 Cases. Because JMB was a secured creditor in the Chapter 11 Cases and ultimate purchaser of BTC's assets, this put Ray in the position of serving competing masters with conflicting interests.[5]

While Portage Point Parties were profiting to the tune of millions of dollars, their involvement in the bankruptcy was catastrophic for BTC and ultimately Bouchard. As a 2019 MPI[6] assessment predicted, Bouchard's removal was seriously detrimental for BTC. At the time of the filing of

---

[3] *In re Bouchard Transp. Co., Inc., et al.*, 20-34682, Dkt. 591 at 13. While Portage Point Parties left open the possibility that they might provide "transition services" for JMB after the Sale (which was stated in perfunctory fashion in the Plan and orders approving the Sale), the Portage Point Parties failed to file any disclosures regarding the details of such. In fact, Portage Point was engaged by JMB in a role well beyond "transition services," without full disclosure or transparency and without regard for any inherent conflicts of interest. Further, while the Portage Point Parties generally advised that they may be employed by JMB, the disclosures were wholly deficient where the Portage Point Parties did not provide any details of the employment, including the terms, consideration, etc., or otherwise obtain authorization to act with conflicting interests for the benefit of JMB at the expense of other interested parties, including the Bouchard Parties.
[4] Plaintiff's Original Complaint ¶ 89.
[5] *Id.* ¶ 85.
[6] MPI is a prestigious national consulting firm that specializes in business valuation. *See* https://mpival.com/about-us/.

bankruptcy in September 2020, 85–90% of BTC's fleet was chartered out.[7] Under the control of the Portage Point Parties, BTC's operations abruptly halted, and liquidation commenced. By August 2021, just five months after Bouchard's removal, BTC's assets were sold for pennies on the dollar. As described in Plaintiff's Original Complaint, Portage Point engaged in self-dealing with the sale of BTC's once considerable assets.[8]

In their representative capacity, Portage Point Parties entered into a settlement agreement with the Bouchard Parties in which their claims were to be allowed in full in the Chapter 11 Cases along with a partial payment; but this action was a mere ploy to delay and hold Bouchard at bay, as illustrated by Ray's failure to appear at the hearing for the court to approve the settlement, which Portage Point Parties now admit was deliberate on advice of counsel.[9]

Additionally, Portage Point Parties, as representatives of BTC, necessarily authorized the adversary proceeding initiated against Bouchard, which they used as leverage against his claims. There, Portage Point Parties, through Kirkland and Jackson Walker, smeared him in the adversary proceeding by claiming he was living high on the hog and that he tanked his generational company. This caused Bouchard to incur considerable costs and fees as well as "reputational harm" of business and prevented him from "obtain[ing] new employment…."[10] These actions also caused him mental anguish.

Meanwhile, despite the well-publicized improprieties of Judge Jones awarding millions of dollars to his intimate, live-in partner, Elizabeth Freeman, her law firm, Jackson Walker, and the lead counsel that appeared in nearly every mega-bankruptcy with them, Kirkland & Ellis, Portage Point

---

[7] Complaint ¶ 73.
[8] *See* id. ¶¶ 80–89.
[9] Motion to Dismiss at 14.
[10] Complaint ¶ 137.

3

Parties have taken no efforts to have the firms removed in the ongoing matters, including in the adversary proceeding against Bouchard.

Portage Point Parties' motion to dismiss largely deflects Plaintiff's allegations by improperly interjecting their version of events from their own extraneous declarations and pleadings.

Portage Point Parties have not shown themselves entitled to dismissal on the pleadings. First, they rely on the exculpation provisions as an affirmative defense, which should not be considered because they are not established on the face of Plaintiff's Original Complaint. Moreover, the actual fraud/willful misconduct/gross negligence exception is clearly implicated, and the purported exculpation provisions ultimately have no impact on Plaintiff's claims here. Second, the statute of limitations does not entitle Portage Point Parties to dismissal because Plaintiff filed suit within the period of limitations based on the actual dates of accrual and in light of applicable tolling doctrines. Third, Plaintiff plausibly pleaded multiple theories of wrongdoing by Portage Point Parties. Fourth, Plaintiff's claims are not barred by the *Barton* doctrine. Fifth, Plaintiff has standing to bring claims of professional negligence and unjust enrichment. Sixth, Plaintiff has adequately and properly pled a *Bivens* conspiracy claim. Seventh, Plaintiff has properly alleged claims for retaliation/wrongful termination and tortious interference with employment. Eighth, the Portage Point Parties exercised bad faith and committed tortious conduct in reneging on the terms of the settlement agreement and failing to use the contractually required best efforts to seek approval. Ninth, Plaintiff adequately pled respondeat superior. Tenth, Plaintiff has shown an accounting is necessary and proper. Eleventh, this is the proper forum for Plaintiff's claims, which seek recovery of individual damages inflicted on the Bouchard Parties by Portage Point Parties.

The motion to dismiss should be denied.

4

## FACTUAL BACKGROUND

Morton Bouchard served as President of BTC since 1992, successfully growing it into one of the largest independently owned ocean-going petroleum barge companies in the United States, with over 50 vessels.[11] Because of Bouchard's extensive experience and understanding of the highly regulated petroleum barge industry and BTC's operations, a 2019 MPI appraisal noted that he was a key figure at BTC, and critically, that the company would suffer significant adverse impacts if he were to leave.[12]

In 2020, COVID negatively impacted the industry and BTC was faced with recovering from an explosion in Texas.[13] But, Bouchard did not just simply watch as his family business struggled. He attempted to salvage it by securing more than $40 million in loans, using his own life insurance policies, among other assets, as collateral.[14] This money went to fund BTC's operations—including covering payroll.[15] Thus, while BTC was facing financial difficulties, it at least had a state-of-the-art fleet and positioned itself to capitalize on the subsequent and inevitable uptick in demand.[16] In 2020, Bouchard approached Kirkland about BTC's financial concerns, during the height of the Jones-Freeman-Jackson Walker-Kirkland Enterprise.[17]

In 2020, Bouchard approached Kirland about BTC's financial concerns, during the height of the Jones-Freeman-Jackson Walker-Kirland Enterprise.[18] Kirkland partner, Ryan Bennett, told

---

[11] Complaint ¶¶63, 64.
[12] *Id.* ¶64.
[13] Portage Point Parties weave a tale of laments seeking to place the blame for BTC's financial situation solely at Plaintiff's feet based on allegations and self-serving declarations made by the Portage Point Parties in filings before the Bankruptcy Court. These allegations are outside the scope of Plaintiff's complaint and are not a legitimate basis for a 12(b)(6) motion to dismiss. To the extent these extraneous and misleading allegations are considered, Plaintiff requests leave to amend his complaint to address them.
[14] Complaint ¶¶ 9, 65.
[15] *Id.* ¶¶ 65.
[16] *Id.* ¶75.
[17] *Id.*
[18] *Id.*

Bouchard to file Chapter 11 in Houston because they had a "friendly" judge.[19] Bennett also told him he needed Jackson Walker and the Portage Point Parties. What Kirkland did not tell him was that a key restructuring partner, Elizabeth Freeman, was in a long-standing intimate relationship and living with the bankruptcy court judge – making the judge "friendly" to the firms aligned with her.[20] It is undisputed that Ray submitted a declaration of disinterestedness without disclosing the relationship.

With Chapter 11 underway, Bouchard prepared a detailed business plan, working with his relationships, to position the fleet to be fully operational—the surest way to preserve and enhance BTC's value.[21] However, costs began mounting at a troubling pace, and Bouchard sought to compel the Portage Point Parties and other professionals to submit supporting invoices for his review prior to payment to manage costs.[22] Bouchard also insisted that vessel employees and office employees (excluding himself) be paid first, before any professional fees as part of the operational plan. Bouchard's requests were adamantly rejected by Bennett of Kirkland.[23]

When Bouchard began questioning professional billing in the bankruptcy, Defendants advocated for his removal as CEO and Jones quickly—and without so much as a motion— accommodated their desire on February 26, 2021, replacing Bouchard with Kirkland's chosen financial advisor, Portage Point Partners, and its founder Matthew Ray.[24] During the hearing in which

---

[19] *Id.* ¶ 62.
[20] The Portage Point Parties allude to the fact that Plaintiff does not currently allege that the Portage Point Parties knew of the relationship, Plaintiff has specifically withheld making such an allegation at this time subject to amendment should discovery reveal otherwise. *Id.* p. 5, note 6.
[21] *Id.* ¶ 75.
[22] *Id.* ¶68.
[23] *Id.* ¶ 74
[24] *Id.* ¶ 283

he *sua sponte*[25] removed Bouchard, Jones told Ray he was "willing to go to great lengths to encase [Ray] within the judicial immunity from which [Jones] benefit[s]."[26]

The Portage Point Parties go outside the allegations of the Complaint to claim Bouchard's removal was caused by Bouchard becoming an impediment to the Chapter 11 proceedings. Undoubtedly, it was anticipated by Defendants, who orchestrated it. But it was not by Bouchard. During a February 2021 hearing in which Kirkland and Ray repeatedly reminded the court of unpaid professional fees (with $6.7 million already supposedly accumulated),[27] Ray made unsworn statements blaming Bouchard's past book-keeping as delaying his understanding of the company's financial situation.[28] But during the same hearing, a lender for the debtor complained that Ray had not shared projections or financial models.[29] Ray had also not filed monthly operating reports.[30] Ray claimed he filed an extension when he had not, and in fact only spoke with the U.S. Trustee about it.[31] In fact, Ray had no experience in how the accounting system worked.[32]

Bouchard was given no notice of the removal. Judge Jones simply removed him sua sponte during a hearing on an unrelated matter.[33]

A written order followed with no findings other than a reference to hearings, neither of which were on a motion for removal. Bouchard vigorously protested his removal with Kirkland afterwards, but Kirkland simply ignored his complaints and Bennett told Bouchard he could no longer speak

---

[25] The Portage Point Parties play semantic games asserting that the *sua sponte* removal of Bouchard absolves them of any liability for involvement in effectuating that decision. To the contrary, Plaintiff specifically alleges that the Portage Point Parties took part in his removal and their subsequent installment. *Id.*, at

[26] *In re Bouchard Transp. Co., Inc., et al.*, 20-34682, Dkt. 591 at 13.

[27] *Bouchard*, 20-34682, Dkt. 557 at 10, 13, 30.

[28] *Id.* Dkt. 557 at 8.

[29] *Id.* at 16.

[30] *Id.* at 16–17.

[31] *Id.* at 18–19.

[32] Complaint ¶ 8.

[33] *Id.* ¶ 71 (citing *BTC*, 20-34682, Dkt. 569; Dkt. 591 at 7).

7

with him because he was representing BTC and the Portage Point Parties. Shortly thereafter, Kirkland partner Ryan Bennett sold Ray his vacation home in Michigan.[34] BTC's operations under the control of the Portage Point Parties were abruptly halted, and liquidation commenced. By August 2021, just months after Bouchard's removal, BTC's assets were sold for pennies on the dollar. The Portage Point Parties were then hired by the purchaser as consultants immediately after the sale.[35] As described in Plaintiff's Original Complaint, Portage Point engaged in self-dealing with the sale of BTC's once considerable assets.[36]

Again, relying on matters outside Plaintiff's Original Complaint, the Portage Point Parties attempt to interject their own false—and very much self-congratulatory—narrative to allege that Plaintiff's lifestyle, including the use of a private jet, and accusations of ineptitude led to the company's failure. This extraneous argument should not be considered.[37] Even if it is, the Portage Point Parties' argument is undermined by Plaintiff's well-pleaded facts.

The Portage Point Parties also seek to challenge Plaintiff's well-pleaded facts concerning the sale of BTC assets by counter-narrative despite the requirement that the well-pleaded facts be accepted for purposes of the motion to dismiss. For example, as described in detail in Plaintiff's complaint, the sale divided BTC's fleet and business among two separate purchasers, JMB Capital Partners Lending LLC, the DIP lender in the Chapter 11 Cases, and a group led by Rose Cay and funded by Wells Fargo, the pre-petition lender on the balance of the fleet. In this regard, JMB credit bid its secured

---

[34] *In re Bouchard,* No. 20-34682, Dkt. 778 at ¶10.

[35] Complaint ¶ 83.  While the Portage Point Parties left open the possibility that they may provide "transition services" for JMB after the Sale (which was stated in the Plan and orders approving the Sale), they failed to file any disclosures regarding the details of such. Further, upon information and belief, Portage Point was engaged by JMB in a role well beyond "transition services," without full disclosure or transparency and without regard for any inherent conflicts of interest.

[36] *See* Complaint ¶¶ 80–89.

[37] To the extent it is, Plaintiff requests leave to supply facts correcting the false allegations.

claim, together with approximately $20.8 million cash. Notably, as the DIP Lender, JMB was intimately involved in the Chapter 11 Cases and worked closely with the Portage Point Parties.

Plaintiff further pleaded, upon information and belief, prior to approval or closing on the Sale, a non-debtor third party listed certain of the vessels owned by BTC (and property of its estates in the Chapter 11 Cases) for sale though a broker, Macron International. The subject vessels included tugs Robert J. Bouchard, J. George Betz, Ralph Bouchard, Marion C. Bouchard, and Buster Bouchard. While it is unclear the extent to which the Portage Point Parties and/or JMB played a role in such unauthorized sale efforts outside of the approved Chapter 11 process, it is hard to imagine how or why the Portage Point Parties would not have knowledge of such transgressions or why such actions were left unabated.

The Portage Point Parties' factual disagreements with Plaintiff's well-pleaded allegations are fodder for discovery and not a motion to dismiss. Perhaps most glaringly, however, is the Portage Point Parties' failure—in light of their litany of deflections—to deny or challenge Plaintiff's factual assertions that they were self-dealing and performing conflicting services to the purchasers of BTC's assets. This pattern of behavior continued after confirmation of the plan and the Portage Point Parties' appointment as Plan Administrator.[38]

The Portage Point Parties similarly deflect rather than deny or challenge Plaintiff's allegations concerning the settlement of Plaintiff's creditor claims in the bankruptcy. The only response to the unconsummated settlement agreement regarding Plaintiff's loans to BTC is that the agreement was never approved by Jones—which was acknowledged by Plaintiff's original complaint. The basis of Plaintiff's allegation with respect to this claim, of course, was the Portage Point Parties' unjustifiable

---

[38] Complaint, ¶¶ 84-88

refusal to cooperate with seeking approval of the agreement. Cryptically, the Portage Point Parties allege that "on the advice of counsel, Mr. Ray was not present in the courtroom."[39] Left to the imagination is whose counsel and the basis for refusing to appear before Jones, or more importantly, the basis for Ray believing he could fail to appear at such a material hearing and not fear suffering any adverse consequence from the court or liability for failing to follow through in good faith with seeking approval of the settlement agreement.

Despite the Portage Point Parties' efforts to spin a counter-narrative and to deflect and distract from Plaintiff's well-pleaded factual allegations, this counter-narrative in no way justifies dismissal of Plaintiff's complaint on 12(b)(6) grounds.

## LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss "is viewed with disfavor and is rarely granted." *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). To survive a 12(b)(6) motion to dismiss, a plaintiff must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face under *Bell Atlantic v. Twombly* and *Ashcroft v. Iqbal*." *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 683 (5th Cir. 2014) (internal citations omitted). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Escobar v. City of Del Rio*, No. DR-20-CV-0031, 2023 U.S. Dist. LEXIS 176745, *6 (W.D. Tex. Oct. 2, 2023). The complaint must be liberally construed in the plaintiff's favor, all reasonable inferences must be drawn in favor of the plaintiff's claims, and the factual allegations of the complaint must be taken as true. *See Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986). Beyond the ordinary pleading standard, a party alleging fraud

---

[39] Motion at 14.

"must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Allegations about conditions of the mind, such as defendant's knowledge of the truth and intent to deceive, however, may be pleaded generally." *Rodriguez-Meza v. Venegas*, No. DR-17-CV-54, 2018 U.S. Dist. LEXIS 226744, *50 (W.D. Tex. Sept. 27, 2018) (Moses, J.) (quoting *Tel—Tel-Phonic Services, Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1138 (5th Cir.1992) (citing Fed. R. Civ. P. 9(b)). The Court's task is to determine whether a plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Id.* (citing *Lone Star Fund V (US), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)).

ARGUMENT

## I.    The purported exculpation provisions have no impact on Plaintiff's claims here.

Portage Point Parties are not entitled to dismissal based on their claim that orders entered by Judge Jones exculpate them from suit by Plaintiff.

First, the contention that an exculpatory clause relieves Defendants from liability is an affirmative defense on which they have the burden of proof at trial. *Shakeri v. ADT Sec. Servs.*, 2016 U.S. Dist. LEXIS 153159, *10-12 (N.D. Tex. Nov. 4, 2016). A Rule 12b(6) motion may only be granted on an affirmative defense if it "appears on the face of the complaint." *Am. Precision Ammunition, L.L.C v. City of Min. Wells*, 90 F.4th 820, 824 (5th 2024) (cleaned up). "[T]he pleadings must 'reveal beyond doubt that the plaintiffs can prove no set of facts' that would overcome the defense or otherwise entitle them to relief." *Id.* (quotation omitted). Stated another way, Portage Point Parties are "not entitled to dismissal under Rule 12(b)(6) unless plaintiffs 'ha[ve] pleaded [themselves] out of court by admitting to all of the elements of the defense.'" *Shakeri*, 2016 U.S. Dist. LEXIS 153159, at *10.

The facts of Defendants' exculpation defense do not appear anywhere in the complaint. As such, dismissal under Rule 12(b)(6) is improper. *See id.* at *11-12 (denying motion to dismiss where

allegations of complaint did not address affirmative defense involving exculpatory provisions); *Stanissis v. DynCorp Int'l LLC*, 2015 U.S. Dist. LEXIS 55911, *7-10 (N.D. Tex. Apr. 29, 2015) ("The court holds that DynCorp is not entitled to dismissal of plaintiffs' RICO or Texas state-law claims based on the affirmative defense of release, because it does not appear from the face of the amended complaint that these claims have been released"); *see In re Tower Air*, 416 F.3d 229, 242 (3d Cir. 2005) ("[T]he protection of an exculpatory charter provision appears to be in the nature of an affirmative defense. As we have said, affirmative defenses generally will not form the basis for dismissal under Rule 12(b)(6)").

Second, even if this Court considers this affirmative defense at the 12(b)(6) stage, Portage Point Parties seek the benefit of exculpatory provisions from void orders. That is, Judge Jones entered the orders at a time when he had a mandatory duty to disqualify himself because of his relationship with Freeman. *See* 28 U.S.C. § 455. Because these orders are void, the provisions are unenforceable. *See e.g., Howell v. Supreme Court of Texas*, 885 F.2d 308, 313 (5th Cir. 1989) ("It is well established, at least in Texas, that the judgment of a disqualified judge is wholly void, of no effect and subject to collateral attack"); *In re Marriage Dickey*, No. 06-23-00004-CV, 2023 Tex. App. LEXIS 6860, *3 (Tex. App.—Texarkana 2023, no pet.) ("[I]f a judge is disqualified, the judge is without jurisdiction to hear the case; therefore, any judgment rendered is void and a nullity").

Third, regardless, the provisions do not exculpate Portage or Ray here. The removal order and the supplement to it cited by Defendants allow claims "related to any act or omission" determined "to have constituted actual fraud, willful misconduct, or gross negligence[.]" Plaintiff clearly alleged claims related to all the above. As Bouchard's Complaint explains, "Freeman, Jackson Walker and Kirkland & Ellis used [the] secret relationship [between Jones and Freeman] to bolster prestige and collect tens

of millions of dollars or more in fees at the expense of those affected by the bankruptcies. In this case, the Jones-Freeman-Jackson Walker-Kirkland Ellis Enterprise, working together with restructuring advisory Portage Point Partners and its founder Matthew Ray, dismantled Bouchard Transportation Company … for pennies on the dollar."[40] Indeed, "[w]ith the presiding judge working in concert," these defendants "orchestrated a coup to remove BTC's longtime CEO, Mr. Bouchard, when he began scrutinizing professional fees[,]" which culminated in "a fire sale of the company's assets."[41]

"Additionally, the RICO Defendants in this case worked in concert with Defendants Portage … and … Ray, … to accomplish their illicit ends…. Portage Point and Ray, through their acts and omissions at various points during and subsequent to the Chapter 11 BTC bankruptcy cases, engaged in a course of reckless, intentional, and/or grossly negligent conduct by, among other things, acting with self-serving and competing interests and compromised loyalties in various conflicting roles, whereby the took actions beneficial to themselves rather than those they served, including the Bouchard Parties, without sufficient disclosure of such compromised interests and/or conflicts, all to the serious detriment of the Bouchard Parties."[42] Thus, Plaintiff plainly alleged claims relating to fraud, willful misconduct, and gross negligence.[43]

Portage Point Parties complain that Judge Jones did not make a determination of fraud, willful misconduct, or gross negligence.[44] While Jones' order removing Bouchard as CEO and installing Portage Point Parties required a final determination of fraud, misconduct, or gross negligence "by

---

[40] Complaint ¶ 2.
[41] *Id.* ¶ 3.
[42] *Id.* ¶ 7.
[43] Aside from the fact that Plaintiff's allegations against Portage Point Parties are related to actual fraud, willful misconduct, and gross negligence, Plaintiff's causes of action against Portage Point Parties directly include willful misconduct such as breach of fiduciary duty (Count IV), unjust enrichment (Count IX), retaliation and wrongful termination (Count XII), tortious interference with employment (Count XIII).
[44] Motion to Dismiss at 20.

final order of this Court[,]"[45] he modified that language in a Supplemental Order to allow for a determination by a "court of competent jurisdiction."[46] In light of the Southern District's referral of lawsuits involving Judge Jones, this is a Court of competent jurisdiction capable of recognizing that Plaintiff's claims relate to fraud, willful misconduct, and gross negligence.[47]

Otherwise, the exculpation provision in the bankruptcy plan is inapplicable. Article VII.C of the First Amended Joint Plan purports to exculpate Portage and/or Ray for liabilities and obligations "of the Debtors."[48] Plaintiff's claims against Portage Point Parties are not for liabilities and obligations of the debtor, but rather claims against Portage Point Parties for their own misconduct and self-dealing.[49] Such misconduct includes removing Bouchard from all meaningful roles at BTC despite his importance to BTC's operations and continued value so as to avoid scrutiny of Defendants' schemes and billing, misrepresenting facts and issues to the Bankruptcy Court to effectuate Bouchard's removal as CEO of BTC, engaging in self-dealing, manipulating Bouchard into foregoing opportunities to protect and assert his rights through promises of a sham settlement that the Portage Point Parties did not intend to have approved, and the mismanagement of BTC's operations.

Of course, the exculpation provision in the bankruptcy plan also provides an exception for fraud, willful misconduct, and gross negligence (without requiring any court determination), which as noted is clearly implicated by Plaintiff's pleading.

Finally, to the extent Portage Point Parties believe Plaintiff's successful appeal of the exculpatory provision dealing with third parties somehow inures to their benefit, they are mistaken.

---

[45] *In re BTC*, 20-34682, Dkt. 569 at ¶ 4.
[46] *Id.* Dkt. 608 at ¶ 4.
[47] Of course, since Judge was a key participant in the fraud, willful misconduct, and gross negligence, he was never going to make the required determination.
[48] *Id.* Dkt. 1293 at 36.
[49] Complaint ¶¶ 8, 248, 287.

The district court was clear that "[t]he Fifth Circuit [has] held that the exculpation provision could cover only (1) the debtor and related entities, (2) the unsecured creditors committee and its members, and (3) the independent directors."[50] Consistent with Fifth Circuit authority, the court reversed the confirmation order "to the extent that it approved the exculpation provision releasing a broad range of third parties and entered the related injunction provision."[51]

On remand, consistent with that holding, the confirmation order then specifically eliminated "the Plan Administrator" as an exculpated party.[52] Defendants are simply wrong that it had no impact on administrator exculpation. In fact, the order explicitly stated that "[f]or avoidance of doubt, the term 'exculpated party' shall not include "Matthew Ray, or Portage Point or its agents or employees."[53]

Quite simply, Portage Point Parties are not entitled to dismissal based on their not yet alleged affirmative defense of exculpation, which is not established through Plaintiff's complaint, and which relies on misinterpretation of orders that are now void.

## II. Plaintiff's claims for professional negligence, unjust enrichment, *Bivens* conspiracy, retaliation/wrongful discharge, and tortious interference with employment are not barred by limitations.

Portage Point Parties seek dismissal based on the statute of limitations as to some, but not all Plaintiff's claims. They do not challenge breach of fiduciary duty (Count IV), breach of contract (Count XIV), or accounting (XV), all of which are subject to a four-year statute of limitations. Tex. Bus. & Com. Code Ann. §§ 15.25(a), 16.004, .051; *see Little v. Smith*, 943 S.W.2d 414 (Tex. 1997) (applying a four year statute of limitations to a claim for accounting); *Pollard v. Hanschen*, 315 S.W.3d

---

[50] *In re BTC*, No. 21-02937, Dkt. 52 at 5 (citing *NexPoint Advisors, L.P. v. Highland Capital Management*, 48 F.4th 419, 436 (5th Cir. 2022), petition for cert. filed No. 22-631 (U.S. Jan 5, 2023)).
[51] *Id.* at 6.
[52] *Compare In re BTC*, No. 20-34682, Dkt. 1293 at 6 with *In re Tug Robert J. Bouchard*, Corp., No. 20-34758, Dkt. 417 at 2.
[53] *In re Tug*, No. 20-34758, Dkt. 417 at 2.

636, 641 (Tex. App.—Dallas 2010, no pet.) (holding a four-year statute of limitations applied to breach of fiduciary duty claims); *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002) (four-year statute of limitations for a breach of contract claim).

Instead, they target Plaintiff's claims subject to a two-year statute of limitations—professional negligence, unjust enrichment, *Bivens* conspiracy, wrongful termination, and tortious interference with employment.[54] Their arguments on accrual dates ignore significant portions of Plaintiff's factual allegations. For example, Portage Point Parties focus entirely on Plaintiff's allegations regarding the sale of assets in August 2021 for professional negligence, unjust enrichment, and *Bivens* conspiracy.[55] However, they disregard allegations about the settlement agreement Portage Point Parties reached with Bouchard on his claims, which limited his ability to take other actions, and which they reneged on when Ray failed to appear at the March 28, 2023 hearing.[56] This tortious conduct resulted in millions of dollars lost for Bouchard plus hundreds of thousands in legal fees. Portage Point Parties billed for this work even while breaching the agreement. Plaintiff's claims for negligence, unjust enrichment and Bivens conspiracy on these facts accrued no sooner than March 28, 2023, meaning Plaintiff's complaint filed on February 26, 2024, was within limitations.

Portage Point Parties also ignore Plaintiff's factual allegation that they acted "with conflicting loyalty by entering an agreement with the ultimate purchaser of BTC's assets which compromised" their interests.[57] As alleged, Portage Point Parties "used their control and power to engage in self-dealing and generally improper conduct, and were enriched by such conduct through exorbitant

---

[54] Motion to Dismiss at 21.
[55] Motion to Dismiss at 21–22.
[56] Complaint ¶¶ 8 (general factual allegations incorporated into all counts), 233(f) (professional negligence), 248 (unjust enrichment), 268(i) (Bivens conspiracy).
[57] *Id.* ¶¶ 8(iii), (iv) (general allegations incorporated into all counts), 248 (unjust enrichment).

professional fees that largely benefitted only" themselves.[58] Portage Point Parties also, to date, have failed to give complete disclosures on their relationship with JMB.[59]

Additionally, as CRO and CEO, Portage Point Parties necessarily authorized Jackson Walker and Kirkland & Ellis to bring the September 22, 2022 adversary proceeding against Bouchard, lodging false and damaging accusations against him, as retribution for Bouchard protesting professional fees.[60] That is, after Bouchard stepped out of line and "dared [to] question professional fees[,]"[61] not only did the Defendants have him removed, but Freeman, Jackson Walker, Kirkland, and Portage Point Parties smeared him in the adversary proceeding by claiming he was living high on the hog at the cost of tanking his generational company. Bouchard incurred considerable legal costs and fees defending this action and sustained "reputational harm" of business and prevented him from "obtain[ing] new employment…."[62] These actions also caused him mental anguish. Plaintiff's causes of action for this misconduct accrued no sooner than the date of the filing of the adversary complaint on September 22, 2022, making the filing of Plaintiff's Original Complaint on February 26, 2024 within the two-year limitations period.

Otherwise, while Plaintiff did suffer harms on August 5, 2021 when Defendants conducted a fire sale of BTC's assets and February 26, 2021, when Bouchard was removed as CEO, they cannot establish accrual because there was no way for Plaintiff to know at those times that the harm resulted from Defendants' tortious acts and were not merely adverse (but fair and uninfluenced) rulings. Throughout the intervening time between these dates and October 2023, Portage Point Parties' co-

---

[58] *Id.* ¶ 248.
[59] *Id.* ¶¶ 83, 86-88.
[60] To the extent this has not been alleged in Plaintiff's Original Complaint, Plaintiff seeks leave to amend his Complaint to include these allegations.
[61] *Id.* ¶ 121.
[62] *Id.* ¶ 137.

conspirators fraudulently concealed the relationship and their scheme to benefit from it. Until Jones acknowledged the relationship with Freeman publicly in October 2023, Plaintiff lacked knowledge of the cause of his injury – as was necessary for accrual. *Kingham v. Pham,* 753 F. App'x 336, 337 (5th Cir. 2019) (per curiam) ("an action accrues when a plaintiff knows both the existence of an injury and the cause of the injury").

Portage Point Parties claim that this cannot be the tolling date because Plaintiff has not yet uncovered evidence that they knew about the Jones-Freeman relationship before it was publicly disclosed. But despite Portage Point Parties' assertion to the contrary, Plaintiff alleged they acted as co-conspirators with Jones, Freeman, Jackson Walker, and Kirkland in dismantling BTC and removing Bouchard as CEO for purposes of, among other things, reaping huge professional fees.[63]

Of course, generally, fraudulent concealment by a person other than the defendant will not toll the statute of limitations. *Nichols v. Smith*, 507 S.W.2d 518, 519 (Tex. 1974). However, "[s]everal courts have held that 'affirmative acts of concealment by one or more of the conspirators can be imputed to their co-conspirators for purposes of tolling the statute of limitations." *CFTC v. Worldwide Mkts., Ltd*, 675 F. Supp. 3d 496, 507 (D. N.J. Jun. 5, 2023) (quoting *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1493, 275 U.S. App. D.C. 362 (D.C. Cir. 1989); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 538 (6th Cir. 2008); *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1084 (2d Cir. 1988)). The reason behind this conclusion is readily apparent: the cover-up benefits all participants of the conspiracy, ensuring that none of them are caught. *Id.*

Fraudulent concealment tolls limitations until the claimant, using reasonable diligence, discovered or should have discovered the injury. *Thompson v. Deutsche Bank Nat'l Tr. Co.*, 775 F.3d 298,

---

[63] Complaint ¶¶ 3, 7, 72, 274.

307 (5th Cir. 2014). The Fifth Circuit "applies a four-prong test for fraudulent concealment under which the plaintiff must demonstrate: '(1) the existence of the underlying tort; (2) the defendant's knowledge of the tort; (3) the defendant's use of deception to conceal the tort; and (4) the plaintiff's reasonable reliance on the deception.'" *Thompson v. Deutsche Bank Nat'l Tr. Co.,* 775 F.3d 298, 307 (5th Cir. 2014). The estoppel effect of fraudulent concealment continues until a party learns of facts or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action.

Here, Portage Point Parties' co-conspirators have actively taken efforts to conceal the Jones-Freeman relationship, knowing that the use of the Jones-Freeman relationship for purposes of dismantling BTC, collecting professional fees, and taking other actions amounted to numerous torts. And Plaintiff relied on the co-conspirators' disclosures and failure to come clean about the relationship. In far less egregious circumstances than those present here, the Fifth Circuit found an entitlement to equitable tolling. *See, e.g., Green v. Doe,* 260 Fed. Appx. 717, *2-3 (5th Cir. 2007). Thus, Plaintiff's claims for professional negligence, unjust enrichment, Bivens conspiracy, wrongful termination, and tortious interference with employment are tolled by fraudulent concealment.

The discovery rule provides another exception to application of the statutory time bar. The Texas discovery rule standard is similar to the federal accrual standard. *McGowan v. S. Methodist U.,* No. 3:18-CV-00141-N, 2024 WL 455340, at *8 (N.D. Tex. Feb. 5, 2024). Portage Point Parties argue that Plaintiff cannot avoid the limitations bar because his injury was not "inherently discoverable." To be "inherently undiscoverable", an injury need not be absolutely impossible to discover. *Murphy v. Campbell,* 964 S.W.2d 265, 270 (Tex. 1997).

An "injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence." *Id.* That is the case here. The Bouchard Parties were unlikely to know that the presiding judge was involved in a romantic relationship with the debtor's lawyer, let alone that the debtor's legal counsel conspired with the judge to keep the relationship secret because doing so provides them financial and reputational benefits. *See, e.g., Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex. 1988) (finding legal malpractice is inherently undiscoverable because it is unrealistic to expect a layman client to have sufficient legal acumen to perceive an injury at the time of the negligent act or omission of his attorney.).

Additionally, Plaintiff only learned in October 2023, with Judge Jones' public acknowledgement of the relationship, that the fraud/willful misconduct/gross negligence exception to the exculpation provision in the removal order and supplemental order was applicable and that suit might be brought against Portage Point Parties.

Where a plaintiff's complaint "plausibly sets out facts where the discovery rule might apply, the Court cannot resolve that issue in the context of a Motion to Dismiss." *Cypress/ Spanish Ft. I, L.P. v. Prof'l Serv. Indus., Inc.,* 814 F.Supp.2d 698, 707–08 (N.D. Tex. 2011). Because that standard is amply satisfied in the case at bar, Portage Point Parties' motion to dismiss on limitations grounds should be denied.

## III. Bouchard's Complaint Plausibly States Claims of Wrongdoing by the Portage Point Parties.

Portage Point Parties lodge a generic attack on Plaintiff's Complaint in Section C of their Argument, asserting "Plaintiff simply fails to allege the Portage Point Parties committed any wrongdoing, intentional or negligent, in anything more than conclusory terms."[64]   Despite this

---

[64] Motion to Dismiss at 24.

sweeping language, Section C attacks just three causes of action for a supposed lack of plausibility—breach of fiduciary duty, professional negligence, and unjust enrichment.

Curiously, Portage Point Parties start with the assertion that Plaintiff does not allege they took any action in the furtherance of the conspiracy (even though that is not a required element of any of the three challenged claims). They are mistaken. Plaintiff outlined the factual allegations supporting his causes of action against Portage Point Parties, which he noted "constitutes, among other things, … conspiracy[.]"[65] Plaintiff also pleaded that Portage Point Parties worked in concert with Jones, Freeman, Jackson Walker, and Kirkland and that Portage Point Parties were used as a tool to accomplish the ends of the conspiracy. For example, Plaintiff alleged "the Jones-Freeman-Jackson Walker-Kirkland Enterprise, working together with [Portage Point Parties], dismantled Bouchard Transportation Company … for pennies on the dollar."[66]  Plaintiff further alleged that "[a]fter [he] challenged the professional fees asserted in the Chapter 11 cases and south to put in place additional procedures for review and oversight before such fees were presented to the Court for approval, and to bring any issues to the Court, the Portage Point Parties (in concert with the other professionals) sought to remove Bouchard through actions intended to effectuate his termination from any position of control."[67]

Portage Point Parties take issue with Plaintiff's allegations of duties owed as CEO, CRO, Plan Administrator, claiming (without supporting authority) that "[t]he sole duty of Mr. Ray and Portage Point was to maximize the value of the BTC estate."  To the contrary, Plaintiff alleged the Portage Point Parties owed a duty (1) "to disclose acts of conversion, concealment, or misuse of estate

---

[65] Complaint at ¶ 8
[66] *Id. at* ¶ 2.
[67] Id. at ¶ 273

property," (2) "to reveal matters having an adverse effect on the bankruptcy estate," (3) "to avoid actions that would wrongfully deplete or diminish the value of the business or its assets," (4) to avoid conflicts of interest," and (5) "to avoid intentional wrongs."[68]  *See In re Coram Healthcare Corp.*, 271 B.R. 228, 236 (Del. Bankr. Dec. 21, 2001) (discussing CEO "has a fiduciary duty … which includes the duty of loyalty and an obligation to avoid any direct actual conflict of interest" and that the CEO working as a consultant for one of the debtor's largest creditors was an actual conflict). Portage Point Parties breached these duties by, inter alia, "acting with conflicting loyalty by entering in an agreement with the ultimate purchaser of BTC's assets which compromised the Portage Point Parties' independence … in dereliction of their fiduciary duties" and by "acting for the purchaser, post-sale, to oversee the very assets they were charged with protecting and selling, including, for their own benefit[.]"[69]  Plaintiff most certainly did allege Portage Point Parties failed to perform their duties, and they should not be heard to disavow them  by deferring to other professionals in the case.

Portage Point Parties challenge the plausibility of Plaintiff's pleading that it participated in orchestrating the removal of Bouchard as CEO. Of course, Judge Jones removed Bouchard. As Plaintiff alleged, he did so sua sponte, meaning without any motion pending before the court. Portage Point Parties twist this to mean Judge Jones acted alone; that is clearly not what Plaintiff alleged in his complaint.  To the contrary, he alleged Portage Point Parties acted in concert in orchestrating the removal of Bouchard shortly after he began questioning professional fees.

Portage Parties' argument with regard to the conflict of interest in providing undisclosed services to JMB is simply more deflection and downplaying. Portage Point generally disclosed that they *may* provide transition services generally, but there was no disclosure of the actual services to be

---

[68] Complaint ¶ 198
[69] *Id.* at ¶ 8.

provided. Without even so much as a feign at argument, Portage Parties baldly assert that the conflict could not have affected the sale to JMB, which is simply a denial of the allegations of conflict and self-dealing that are Plaintiff's well-pleaded facts and not the basis of an argument for failure to state a claim.

Remarkably, Portage Point Parties actually claim Plaintiff "fails to identify any negligent acts by Portage Point Parties after his removal." Even the most cursory review of the Complaint exposes this as false. Among other assertions, Plaintiff alleged that after orchestrating the removal, Portage Point Parties "prematurely caus[ed] the wind-down of BTC's business … which ultimately resulted in a 'fire-sale' of BTC's assets well-under the pre-bankruptcy market value[,]" "acted with conflicting loyalty be entering an agreement with the ultimate purchaser of BTC's assets which compromised Portage Point Parties' independence and was in dereliction of their fiduciary duties[,]" "act[ed] for the purchaser, post-sale, to oversee the very assets they were charged with protecting and selling, including, for their own benefit[,]" and "enter[ed] into a Settlement Agreement … with the Bouchard Parties … and then breaching [it] by refusing to properly seek approval by the Bankruptcy Court, as required…."[70] Further, "[t]he Portage Point Parties, who lacked chartering or relevant management experience, could not and would not operate the fleet, and failed to engage appropriate management level employees in this regard."[71] "They did so despite the court and even Portage Point Parties themselves acknowledging the need to keep the fleet in operation to maintain the business and preserve value. The shuttering of operations was particularly damaging given that the vessels needed to be kept operating and properly maintained to preserve value."[72]

---

[70] Complaint ¶ 8.
[71] *Id.* at ¶ 76.
[72] *Id.*

23

Portage Point Parties challenge the plausibility of Plaintiff's complaint surrounding their entry into the settlement agreement in which Plaintiff's claims were to be allowed in full, followed by their reneging by failing to show at the approval hearing as required. According to Portage Point Parties, they cannot be held liable because the estate, and not Ray, was the party to the agreement. But Ray was the sole director, officer, manager, and representative of the estate. And Plaintiff brought claims against him, including negligence, breach of fiduciary duty, and *Bivens* conspiracy, for Ray's misconduct which caused Bouchard to withhold action in pursuit of his claims. Additionally, Plaintiff pleaded Portage Point Parties were unjustly enriched for billing in connection with work on the settlement agreement which they ultimately sabotaged.[73]

Portage Point Parties offer a superficial challenge to Plaintiff's causation allegations by attempting to limit his damages to a failure to maximize estate value. They ignore that Bouchard sustained over $40 million in losses based on their bad faith conduct in connection with the settlement agreement.[74] Plaintiff also sustained costs in defending an adversary proceeding brought by Defendants after Bouchard demanded to review professional invoices at a time when Bouchard did not realize such defense was futile because the playing field was tilted against him from the outset. Bouchard also alleged damages to his business reputation based on false allegations made by the Defendants in the adversary suit, after he demanded to review professional invoices, that Bouchard's lifestyle was responsible for tanking BTC. And Plaintiff pleaded mental anguish damages based on the false allegations asserted against him by Bouchard and the remaining defendants. Each of these damages was a direct and inevitable result of Defendants' wrongdoing and resulted in harm to Plaintiff

---

[73] Complaint ¶ 248.
[74] *Id.* ¶ 121.

directly.[75] Portage Point Parties are not entitled to dismissal based on their challenge to the plausibility of Plaintiff's claims.

## IV. Plaintiff's Claims Are Not Barred by the *Barton* Doctrine.

The *Barton* doctrine, established by the U.S. Supreme Court over a century ago, provides that "before a lawsuit is brought against a receiver[,] leave of the court by which he was appointed must be obtained." *Barton v. Barbour,* 104 U.S. 126, 128 (1881). The Fifth Circuit has recognized the doctrine subject to limiting language and exceptions. *Villegas v. Schmidt,* 788 F.3d 156, 159 (5th Cir. 2015). Most notably, the Fifth Circuit's expression of the *Barton* doctrine is limited to actions taken by a bankruptcy-court-appointed officer "in the actor's official capacity." *Id.* And the doctrine is inapplicable where the "business exception" to the *Barton* doctrine applies. Each of these limitations and exceptions render the *Barton* doctrine inapplicable to bar Plaintiff's claims.

First, the *Barton* doctrine provides that a bankruptcy-court-appointed officer is protected from liability for acts taken in the officer's official capacity. *Id.* An officer acts outside his official capacity if he is alleged to have acted outside the scope of his employment or for his own purposes. *Iraheta v. City of Garrison*, No. 9:21-CV-087, 2021 WL 5822099, at *5 (E.D. Tex. Nov. 19, 2021). Here, much of the conduct from which Plaintiff's claims arise evidence self-dealing and go well-beyond the usual scope of a restructuring advisor, plan administrator or CRO's duties. For instance, the Portage Point Parties are alleged to have deliberately misrepresented facts and issues before the Bankruptcy Court for the purpose of having Bouchard terminated before he could shine a light on Defendants' fraudulent schemes and self-dealing.[76] In another instance, while serving as BTC's restructuring

---

[75] To the extent Defendants argue and this Court determines that any of these damages have not been adequately pleaded, Plaintiff moves for leave to amend to include them. See infra.

[76] Complaint ¶ 282-83

advisors, CEO and CRO, the Portage Point Parties accepted a conflicting position as a consultant to the purchaser of BTC's assets (which were sold for a fraction of their value).[77]  And, in yet another instance, the Portage Point Parties entered a sham settlement agreement with Bouchard (which the Portage Point Parties had no intent to seek approval for for the purpose of preventing and delaying Bouchard from protecting his interests.[78]  None of these activities are official tasks of a restructuring advisor, plan administrator or CRO and each was conducted for the Portage Point Parties own purposes; as such they are not within the scope of the *Barton* doctrine.

Second, Plaintiff has alleged claims against the Portage Point Parties that plausibly fall within the "business exception" to the *Barton* doctrine. The "business exception" is based on 28 U.S.C. § 959(a), which provides in relevant part that "[t]rustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property."

Plaintiff's claims against the Portage Point Parties are based on the Portage Point Parties' mismanagement of BTC's operations once Portage Point Parties was installed as CEO.  The Portage Point Parties attempt to evade this reality by going outside of the complaint to erroneously assert that BTCs operations were shut down prior to its filing for Chapter 11.  The Complaint alleges otherwise. The Complaint alleges that 85%-90% of BTC's fleet was chartered out at the time of the bankruptcy filing.[79]  It was only after the Portage Point Parties took over BTC's operation that BTC's business shut down.[80]

---

[77] Complaint ¶ 83, 84, 86
[78] Complaint ¶ 9
[79] *Id.* at ¶ 73.
[80] *Id.* at ¶ 72.

26

Plaintiff alleges harms caused by the wrongful and self-serving decisions made by the Portage Point Parties while operating BTC, including, but not limited to: (1) removing Bouchard from all meaningful roles at BTC despite Bouchard having close relationships with oil industry executives and chartering departments (which Portage Point Parties lacked) that Bouchard could have leveraged to make the fleet fully operational,[81]  (2) misrepresenting Bouchard's contributions and importance to BTC and blaming Bouchard for BTC's financial difficulties so as to damage Bouchard's reputation and employment opportunities within the fleet chartering industry,[82] (3) loss of the opportunity to protect and assert his rights and interests due to reliance on a sham settlement agreement that the Portage Point Parties did not intend to have approved,[83] (4) failing to engage appropriate management level employees who had knowledge and experience in fleet chartering,[84] (5) entering "bareboat contracts" rather than continuing normal operations,[85] (6) failing to keep the BTC fleet in operation and instead shuttering operations.[86] These acts by Portage Point Parties, causing damage to both BTC and Bouchard directly, relate to the manner in which Portage Point Parties operated BTC's business not its administration of the bankruptcy estate; as such they are not subject to the requirements of the *Barton* doctrine.

The core purpose of the *Barton* Doctrine is to prevent interference with the bankruptcy court's control over the estate.  Understandably, allowing claims that would all be paid from the bankruptcy estate to be initiated outside of the bankruptcy court implicates concerns regarding administration of the estate and equal treatment among stakeholders.  Those concerns are not implicated here.

---

[81] *Id.* at ¶¶ 73, 79.
[82] *Id.* at ¶ 9.
[83] *Id.* at ¶ 233(f).
[84] *Id.* at ¶ 76.
[85] *Id.* at ¶ 77.
[86] *Id.* at ¶ 76.

Plaintiff's claims against the Portage Point Parties arise from their tortious acts directed at Plaintiff and causing harm directly to Plaintiff. If the Portage Point Parties were found liable on these claims, damages would be paid by the Portage Point Parties; not from the BTC bankruptcy estate. Thus, the concerns at the heart of the *Barton* doctrine are not at issue in this case and the *Barton* Doctrine should not apply.

Alternatively, if the Court finds that *Barton* applies, Plaintiff respectfully requests that the matter be stayed while Plaintiff seeks leave from the bankruptcy court to bring this action against the Portage Point Partiess. *In re DMW Marine, LLC*, 509 B.R. 497, 512 (Bankr. E.D. Pa. 2014)(ordering case held in suspense pending determination as to whether leave to bring action would be granted).

## V. Plaintiff Has Standing to Bring Claims for Breach of Fiduciary Duty (Count IV) Professional Negligence (Count VII) and Unjust Enrichment (Count X).

The Portage Point Parties argue that Plaintiff's claims for breach of fiduciary duty, professional negligence and unjust enrichment should be dismissed because they are derivative of claims belonging to the bankruptcy estate rather than claims for direct harms to Plaintiff. Not so. Plaintiff has alleged uniquely personal claims arising from harms he suffered directly. *See Galindo v. City of Del Rio*, 2021 U.S. LEXIS 126766, *9 (W.D. Tex. Mar. 26, 2021) (citations omitted) ("individuals have no standing to secure a personal recovery for an alleged wrong done to the business entity, *unless* they are able to show some direct harm to themselves" (emphasis added)).

Here, Plaintiff has alleged direct harm to himself including, but not limited to:

- Damages to Bouchard's business reputation based on false allegations made by the Portage Point Parties and other defendants,

- Mental anguish damages based on the false allegations lodged against him and the harsh treatment he received in a bankruptcy process tainted by self-dealing and corruption,

- Costs incurred in defending an adversary proceeding brought by Defendants against Bouchard after Bouchard demanded to review professional invoices at a time when Bouchard did not realize such defense was futile because the playing field was tilted against him from the outset,

- Costs in having to appeal Judge Jones' overruling of his objection to an exculpation provision purporting to effectively immunize Portage Point for its misconduct,

- Costs incurred in filing motions, attending hearings, negotiating a settlement and otherwise participating in bankruptcy proceedings that Plaintiff did not realize were futile because the playing field was tilted against him from the outset,

- Loss of the opportunity to protect and assert his rights and interests due to reliance on a sham settlement agreement that the Portage Point Parties did not intend to have approved,

- Loss of his due process rights and harm to the bankruptcy process in which he took part which, at a minimum, entitled Plaintiff to nominal damages.

None of these injuries to Plaintiff are derivative of the injury to the bankruptcy estate. Plaintiff's mental anguish damages reputational damages and damages for costs are independent of injuries to BTC and the bankruptcy estate. *See Oakes Farms Food & Distrib. Servs., LLC v. Sch. Dist. of Lee Cty.*, 541 F. Supp. 3d 1334, 1343 (M.D. Fla. May 28, 2021) ("[t]he harm to Mr. Oakes's First Amendment rights is distinct and personal from the economic harm to Oakes Farms"). That is, Plaintiff does not merely allege that he suffered mental anguish because Defendants diminished the value of BTC, Plaintiff alleges emotional and reputational damages because Defendants (including the Portage Point Parties) wrongfully maligned his leadership of BTC and vitiated his employment opportunities in the fleet chartering industry. Further, Plaintiff's claims did not arise until after commencement of the bankruptcy, and do not belong to the estate. *See* 11 U.S.C. § 541(a)(1) (property

of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case"). In determining whether a claim is derivative, courts look at whether the debtor could have raised the claim at the commencement of the case. *In re Black Elk Energy Offshore Operations, LLC,* No. 15-34287, 2016 WL 4055044, at *2 (Bankr. S.D. Tex. July 26, 2016). If a cause of action belongs solely to a creditor of the estate, then the trustee has no standing to bring the cause of action. *In re Educators Group Health Trust,* 25 F.3d 1281, 1284 (5th Cir. 1994). That is the case here.

Further, conduct that corrupts the process of engaging bankruptcy advisors, as Plaintiff has alleged here, has been recognized as a source of "direct[] harm[]" to unsuccessful participants in that process. *Alix v. McKinsey & Co.,* 23 F.4th 196, 204 (2d Cir. 2022). Under *Alix,* Plaintiff was directly harmed as an unsuccessful participant in the bankruptcy process. *Id.* Further, Plaintiff has alleged facts plausibly demonstrating some injury to his due process rights and the bankruptcy process in which he took part. These injuries, at a minimum, entitle him to nominal damages. *See Potomac Electric Power Company v. Electric Motor and Supply, Inc.,* 262 F.3d 260, 265–66 (4th Cir. 2001); *Rosario v. Livaditis,* 962 F.2d 1013, 1021 (7th Cir. 1992) (remanding for a new trial on damages in RICO case because the jury found liability but "did not award even nominal damages on the RICO counts."). A finding of nominal damages would also trigger an award of attorneys' fees. Thus, if some damage has been alleged to exist, even if not readily quantifiable, Plaintiff maintains a plausible claim for nominal damages that is adequate to establish damages. *Potomac,* 262 F.3d at 265 ("[e]ven if the precise amount of its injury is not susceptible of ready proof, it is clear that a reasonable finder of fact could infer that some injury has occurred"); *Alix,* 23 F.4th at 207 ("uncertainty as to amount of damages in not a reason to deny a plaintiff some recovery"). Furthermore, the Portage Point Parties, as acting CEO and subsequently as Plan Administrator owed a duty to creditors, of which Plaintiff is one. At this

early stage in proceedings, Plaintiff has plausibly alleged non-derivative claims for damages; accordingly, the Portage Point Parties' motion to dismiss Counts IV, VII, and IX should be denied.[87]

## VI. Plaintiff Has Adequately and Properly Pled a *Bivens* Conspiracy Claim.

The victim of a constitutional violation by a government agent has a right to recover damages against that agent in federal court pursuant to *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388 (1971); *Bush v. Lucas*, 647 F.2d 573, 575 (5th Cir. 1981), *aff'd*, 462 U.S. 367 (1983). When a private actor willfully participates in a conspiracy with a government agent to commit a constitutional violation, the private actor may be subject to liability. *Adickes,* 398 U.S. at 152; *Zografidis v. Richards*, 2022 U.S. Dist. LEXIS 247061, *28 (D. Conn. Jul. 5, 2022). Thus, a plaintiff states a conspiracy claim under § 1983 or *Bivens* by alleging (1) an agreement between two or more state or federal actors or between a state or federal actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. *Taggart v. DOJ*, 2018 U.S. Dist. LEXIS 130088, *22 (S.D.N.Y. Aug. 1, 2018); *Boyd v. Angelica Textile Servs.*, 2012 U.S. Dist. LEXIS 90831, *11-14 (S.C. May 18, 2012) (same).

Here, Plaintiff has alleged that, after Plaintiff began asking questions about Defendants' fees, the Portage Point Parties conspired with Judge Jones to remove Plaintiff from his long-held position as CEO of BTC and to install the Portage Point Parties in his place despite their lack of experience

---

[87] The Portage Point Parties' single sentence argument that Plaintiff lacks standing because claims on behalf of the BTC estates were released in the confirmed plan fails for the reasons set forth *supra* at Argument 1. As previously stated, the Confirmation Order does not serve as an absolute bar to Plaintiff's claims. First, by its plain language, the Confirmation Order's exculpation provision does not bar claims arising from fraud, gross negligence, or willful misconduct. Second, the common use of exculpatory provisions is to protect actors from liability while carrying out the plan, but engaging in large-scale fraudulent schemes or acts of self-dealing are not a part of the bankruptcy Plan and cannot reasonably be characterized as an "act in furtherance of" Chapter 11 objectives. Third, a confirmed Plan is only res judicata to issues that could and should have been raised prior to confirmation. Plaintiff should not be expected to have complained about acts and schemes that wer4e fraudulently concealed until well-after the Confirmation Order had been passed.

managing and operating a large ocean-going barge company.[88] Plaintiff had no opportunity to prepare a defense against efforts to remove him as CEO because no motion to remove Plaintiff was ever filed. The surprise removal was effectuated through a sua sponte order issued after a status hearing on a separate matter.  Equally surprising to Plaintiff was Portage Point Parties' decision, approved by the Judge Jones, to sell BTC's state-of-the-art fleet at a fraction of its pre-bankruptcy value.[89]  While the Portage Point Parties' decision to sell BTC assets cheap was damaging to unsecured creditors, it apparently had benefits for the Portage Point Parties who were hired by the purchaser as consultants immediately after the sale.[90]

The extent of the Portage Point Parties' knowledge of the greater Jones-Freeman-Jackson Walker-Kirkland conspiracy is unclear at this time.[91] But such knowledge is not necessary to Plaintiff's *Bivens* claim against the Portage Point Parties.  Plaintiff has alleged that the Portage Point Parties conspired and agreed with Judge Jones (a government actor) to inflict unconstitutional injuries by removing Plaintiff from his position as CEO of BTC and by liquidating BTC's assets at a small fraction of their value.[92] Whether Portage Point Parties engaged in these acts to knowingly protect the greater conspiracy from which it benefited or simply to realize benefits for themselves is immaterial:  the agreement to undertake the damaging actions exists either way.

Moreover, while it has not been presented with the situation yet, it is plausible that the Supreme Court would recognize a *Bivens* claim under the facts of this case.   When a *Bivens* claim is asserted in a context other than what has been recognized by the Supreme Court in three previous

---

[88] Complaint ¶ 267.b.
[89] *Id.* at ¶¶ 78-79.
[90] *Id.* at ¶ 83.
[91] Contrary to Defendants' representation, Plaintiff has not conceded that the PPP were unaware of the Jones-Freeman relationship.  Plaintiff has expressly reserved the right to add the PPP as RICO Defendants if it is determined that they had knowledge of the Jones-Freeman relationship.
[92] Complaint ¶¶ 267.b, 267.g.

*Bivens* cases, as Plaintiff does here, the right to recover may be recognized where the Defendant has established no "special factors" counselling hesitation.  The Portage Point Parties have failed to establish a "special factor" precluding recognition of a *Bivens* conspiracy claim.   The Portage Point Parties first asserts the circular logic that recognition of a new cause of action is itself a special factor that should preclude recognition of a new cause of action. If the law were as Defendants suggest, there would be no need for a new context test at all; every new context would present a disqualifying special factor simply by virtue of being new. The Supreme Court's caution about "uncertainty" of new cases as a special factor is better understood as applying to cases likely to have unpredictable and widespread consequences; not as an obstacle to recognition of narrow and egregious misconduct such as exists here. *See Egbert v. Boule*, 596 U.S. 482, 493 (2022) (cautioning that uncertainty as to "'systemwide' consequences" of recognizing a new *Bivens* action may be a special factor). Nor do the U.S. Trustee's powers provide an alternative remedy barring recognition of a *Bivens* claim.  The U.S. Trustee's duties are focused on protecting the integrity of the bankruptcy system, not remedying violations of individuals' constitutional rights.

The facts of this case are unprecedented and extraordinary. The hesitancy to extend *Bivens* to new contexts is rooted in considerations of separation of powers, leading courts to evaluate who should decide a damages remedy—Congress or the courts. *See Bivens,* 403 U.S.at 443. The egregious conduct at issue here took place within the judicial branch, and thus it seems logical that same branch should address the conduct and the remedy under *Bivens*. Notably, the Portage Point Parties have not cited a case that expressly states a *Bivens* claim cannot be brought in a case with facts like those here.

## VII. Plaintiff Has Properly Alleged Claims for Retaliation/Wrongful Termination (Count XII) and Tortious Interference with Employment (Count XIII).

In Counts XII and XIII, Plaintiff brings claims arising from the termination of his long-standing employment as CEO of BTC.[93]  Plaintiff alleges that the Portage Point Parties, in concert with the other defendants, wrongfully removed Plaintiff from his position as CEO of BTC because he had challenged their professional fees and sought additional review and oversight of their fee requests.[94]

The Portage Point Parties attempt to escape liability for these acts by stating they were not Bouchard's employer.  This distinction is rooted in the language of Title VII of the Civil Rights Act and should not be determinative of Plaintiff's Texas common law claim asserted in a bankruptcy context.  *E.g Grant v. Lone Star Co.,* 21 F.3d 649, 651 (5th Cir. 1994) (holding individual employees could not be held liable under the Civil Right Acts' prohibition against discrimination by "employers"). The Complaint alleges that the Portage Point Parties "directly and/or indirectly controlled BTC in their role as CRO."[95] This is consistent with bankruptcy practices where CROs exercise control over the debtor's financial matters and operations.   Here, the Portage Point Parties are alleged to have advocated and influenced the bankruptcy court to terminate Plaintiff by minimizing Plaintiff's role and importance to BTC's operations and, instead, wrongly suggested that Plaintiff's was at fault for BTC's financial difficulties.[96] This was done because Plaintiff threatened to shine a light on Defendants' illegal conduct, including Defendants' use of fraudulent and self-serving appointments

---

[93] The Texas common law claim asserted in Count XII is labeled a claim for "Retaliation/Wrongful Termination" to reflect that the Portage Point Parties caused the termination of Plaintiff's role as CEO for BTC by means that were retaliatory and wrongful.  Count XII is not intended to assert a claim for retaliation under Title VII of the Civil Rights Act.
[94] Complaint ¶¶ 273, 277, 286.
[95] *Id.* at ¶ 273.
[96] *Id.* at ¶ 282.

34

and invoices.[97] Defendants can point to no alternative reason for Plaintiff's termination reflected in the allegations of the Complaint. These allegations are sufficient to state a plausible claim for wrongful termination.

Plaintiff's claim for tortious interference was also adequately pled. Bouchard had a business relationship with BTC in which Bouchard served as both CEO and a director for BTC.[98] The Portage Point Parties are alleged to have interfered with that business relationship in multiple ways including: misrepresenting facts and issues before the Bankruptcy Court, advocating to the Bankruptcy court that Bouchard be terminated, exerting financial pressure on Bouchard through threats to his employment and his equity interests, acting with self-serving and competing interests, negligently failing to consider how the removal of Bouchard would impact the continued viability of BTC, negligently addressing the ramifications of Bouchard's removal from BTC, advocating to other professionals and employees of BTC that Bouchard be terminated, and entering into a settlement agreement with Bouchard for the purpose of preventing and delaying Bouchard from protecting his interests despite having no intent to have the settlement approved.[99]

Portage Point Parties first try to minimize Plaintiff's tortious interference allegations by claiming they relate to in-court statements by the Portage Point Parties that are privileged. As an initial matter, of the *many* acts of tortious interference alleged in the Complaint (and identified in the preceding paragraph), only two – misrepresenting facts and issues before the bankruptcy court and advocating for Bouchard's termination to the bankruptcy court – involve in-court statements. Moreover, even those two statements are not protected by the judicial proceedings privilege because

---

[97] *Id.* at ¶ 68.
[98] *Id.* at ¶ 282.
[99] *Id.* at ¶¶ 7, 9, 282, 283.

the judicial proceeding privilege encourages litigants and witnesses to give information without fear of facing retaliatory suits for defamation. J*ames v. Brown,* 637 S.W.2d 914, 916 (Tex. 1982). It does not immunize tortfeasors who use the court system to effectuate tortious acts also performed outside of court. In other words, the mere fact that acts performed outside of court are also made in court does not immunize the Portage Point Parties from liability. *Id.* (doctor not immunized from liability for malpractice because misdiagnosis was communicated to the Court during a legal proceeding).

Nor are Plaintiff's tortious interference allegations lacking in specificity. Portage Point Parties say Plaintiff has not identified any specific misrepresentation made to the Bankruptcy Court, but Plaintiff has plainly alleged that the Portage Point Parties "advocat[ed] to the Bankruptcy Court and to other professionals and employees of BTC that Bouchard be terminated from his positions as CEO and director of BTC."[100] The Complaint further alleges that Bouchard's removal was sought despite Bouchard having extensive experience, industry knowledge, and support from BTC employees – with the clear inference being that the Portage Point Parties had misrepresented Plaintiff's significance to BTC's ongoing operations and wrongly criticized Plaintiff's competency.[101] The allegations of the complaint, and the natural inferences flowing therefrom, are sufficient to state a claim for tortious interference with employment.

## VIII. The Portage Point Parties failed or refused in bad faith to effectuate the Settlement Agreement.

As detailed in the Complaint, the Portage Point Parties executed the Settlement Agreement but failed to use their "best efforts" to obtain approval of the Agreement, despite agreeing to do so under the Agreement's terms. In particular, Ray refused to appear and testify at the hearing to approve

---

[100] *Id.* at ¶ 284.
[101] *Id.* at ¶ 69.

the Settlement Agreement or make any other efforts to advance the Settlement Agreement following the Bankruptcy Court's insistence that he do so before it would consider approval.[102] At the same time, Plaintiff fully performed all obligations under the Agreement. Moreover, at a March 28, 2023, hearing on BTC's motion to approve the settlement agreement, Judge Jones raised his concerns with Ray's failure to appear—and ultimately refused to approve the settlement without Ray's testimony.[103] The Portage Point Parties admittedly, "on the advice of counsel," abandoned the agreement, failing to schedule a further hearing on the motion, despite a series of letters from the Bouchard Parties and two emails from Bouchard to Judge Jones requesting that BTC proceed with the motion to obtain approvals.[104]

Defendants argue that the Settlement Agreement is unenforceable because it was never approved by the very court that we now know was riddled with conflicts and corruption, including the RICO Enterprise involving the Portage Point Parties, Judge Jones, Freeman, Kirkland, and Jackson Walker. Moreover the Portage Point Parties torpedoed any attempt to have the agreement presented to the court. However, the language of the paragraph cited by Defendants also states that "Post-Effective Date Debtors" (which would include the Portage Point Parties, particularly Ray) "agree to use best efforts to obtain expeditious approval of the within Settlement Agreement[.]" To satisfy the condition precedent, Defendants, despite being able to contract otherwise, *agreed to use "best efforts."* Logically, the condition precedent (here, court approval) raised by Defendants cannot precede the provision of the Agreement requiring Defendants to use best efforts to obtain court approval.

---

[102] *Id.* at ¶ 291.
[103] *Id.* at ¶¶ 93-94.
[104] *Id.* at ¶ 94.

As detailed above, the Portage Point Parties did not make such efforts, and, accordingly, at the very least, whether the Portage Point Parties efforts (or lack thereof) constitute a breach is a question for the finder of fact at trial and not dismissal. *See Pizza Hut, Inc. v. Lundy Enterprises, LLC*, No. 3:11-CV-0011-N, 2013 WL 12123949 (N.D. Tex. June 11, 2013) (denying movant's motion for summary judgment where opposing party provided evidence that movant failed to make *any* effort where settlement agreement required commercially reasonable efforts, thus leaving breach of contract claim for trial).

Contrary to Defendants' allegations, Plaintiff *has* pleaded damages related to this breach. Specifically, the resulting breach by the Portage Point Parties resulted in the loss of millions of dollars in connection with the unsatisfied Bouchard claims, as identified in the fact section of the Complaint and the Agreement, and hundreds of thousands of dollars in legal costs associated with the Settlement Agreement that the Portage Point Parties have now abandoned.[105]

## IX. Respondeat superior is sufficiently pled.

The Portage Point Parties also contend that there is no independent cause of action for respondeat superior. To the extent Defendants are arguing that the Complaint's respondeat superior allegations are better viewed as a theory of liability than as a freestanding cause of action, the title is irrelevant. The point of Plaintiff's allegation is to alert Defendants that Plaintiff is seeking to hold them liable under facts that, if proven, would establish respondeat superior. Whether labeled as a cause of action or a theory of liability, the allegations in Plaintiff's Complaint are sufficient to establish respondeat superior. *See Walgreens v. McKenzie*, 676 S.W.3d 170, 180 (Tex. App.—Houston [14th Dist.] 2023, pet. filed) (Respondeat superior is a recognition that liability for one person's fault may be

---

[105] *See, e.g.,* Complaint ¶¶ 90, 294.

imputed to another who is himself entirely without fault solely because of the relationship between them.). The Portage Point Parties do not contend otherwise. Because Plaintiff has adequately stated tort claims against Portage Point, Ray, and the other defendants, Plaintiff's claim for damages under a respondeat superior theory of liability also survives. *See id.* at 181 (respondeat superior is connected to the underlying tort and survives or fails alongside it).

## X. Plaintiff has adequately shown that accounting is necessary and proper.

Plaintiff has sufficiently alleged that the Portage Point Parties owed Plaintiff fiduciary duties, which these defendants breached. Thus, contrary to Defendants' assertions, Plaintiff has met this requirement, and Plaintiff is entitled to an accounting.

As detailed in the Complaint,[106] the amount of money received by the Portage Point Parties through their multiple conflicting roles is unknown to Plaintiff and cannot be ascertained without an accounting of the Portage Point Parties' receipts and disbursements (including any interested transactions entered into by Defendants). Given the shocking nature of this scandal and the RICO Enterprise at play here, accounting is warranted to determine the extent of the monetary benefits awarded by Judge Jones to the Portage Point Parties, particularly after the sua sponte removal of Plaintiff as BTC's CEO. *See Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 706 (S.D. Tex. 2002) ("An accounting for profits as an equitable remedy for breach of fiduciary duties forces a defendant to disgorge gains improperly obtained by breach of fiduciary duty and imposes on the defendant the obligation of proving appropriate deductions to determine the profit. … An accounting can also be used to obtain information in aid of obtaining such profits."); *T.F.W. Mgmt., Inc. v. Westwood Shores Prop. Owners Ass'n*, 79 S.W.3d 712, 717 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) ("An

---

[106] Complaint ¶¶ 296-301.

equitable accounting is proper when the facts and accounts presented are so complex adequate relief may not be obtained at law."); *Sw. Livestock & Trucking Co. v. Dooley*, 884 S.W.2d 805, 810 (Tex. App.—San Antonio 1994, writ denied) ("An equitable accounting is within the sound discretion of the trial court.").

To the extent the Portage Point Parties argue that the amounts are readily available on the docket, Defendants should have no problem providing the full accounting to Plaintiff.

## XI. Venue is proper in this Court.

Contrary to Defendants' suggestion, the Complaint is not a continuation of Plaintiff's prior challenge to the bankruptcy plan. It is a suit for damages, including mental anguish, and other remedies based on, *inter alia*, a conspiracy and RICO enterprise. Plaintiff's claims are not derivative of the bankruptcy, nor are they an improper collateral attack on the BTC plan. Plaintiff has uniquely personal and independent claims from which he suffered direct harm.

As a result of Defendants' fraudulent concealment of the romantic, live-in relationship between Jones and Freeman, Plaintiff was the victim of a RICO predicate act of obstruction of justice (18 U.S.C. § 1503). After Bouchard "dared [to] question professional fees[,]" Defendants smeared him in the adversary proceeding by claiming he was living high on the hog while tanking his generational company. Defendants' actions caused Plaintiff to incur legal costs and fees in defending the adversary proceeding. Mr. Bouchard was also removed as CEO, thus losing control of a generational family business he had dedicated his life to—all due to the malfeasance of Defendants. Defendants' conduct caused Plaintiff to sustain reputational harm of business that prevented him from obtaining new employment. The misconduct, sua sponte removal of Mr. Bouchard as CEO, and extensive smear campaign all contributed to Plaintiff's mental anguish damages.

These damages are independent of injuries to BTC and the bankruptcy estate, and are, instead, direct harms to Plaintiff resulting from Defendants' conspiracy to keep the Jones-Freeman Relationship secret from outsiders at any cost. The relief Plaintiff seeks here is not an attack of the bankruptcy plan, but rather relief based on separate and direct injuries to Plaintiff stemming from Defendants' misconduct, which happened to take place in a bankruptcy proceeding. A bankruptcy court's "related to" jurisdiction is not limitless. *See Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995). *See also In re TMT Procurement Corp.*, 764 F.3d 512, 526 (5th Cir. 2014) (an action is "related to" bankruptcy if the outcome could alter, positively or negatively, the debtor's rights, liabilities, options, or freedom of action or could influence the administration of the bankrupt estate. But "related to" jurisdiction cannot be limitless.).

The Portage Point Parties further seek shelter under the Bankruptcy code alleging the confirmed plan precludes parties from raising claims in this Court. But Defendants fail to explain how Plaintiff could have or should have complained about the fraudulently concealed relationship. As a matter of common sense, this argument fails.

Bouchard's claims arise independent from the bankruptcy proceedings due to the specific fraudulent and improper actions of the various defendants. A plaintiff's choice of forum is entitled to great deference and generally should not be disturbed unless the balance of factors strongly favors the moving party, which they do not here. *See Int'l Truck & Engine Corp. v. Quintana*, 259 F. Supp. 2d 553, 558 (N.D. Tex. 2003). In the unlikely event that the Court determines that some of Bouchard's claims are derivative of the bankruptcy proceeding or would ultimately be contemplated in the conspirators' confirmation order language, Plaintiff would request the Court to either grant Plaintiff the approval to pursue his claims despite the release due to the willful misconduct and actual fraud of the

Defendants, or in the further alternative, to allow Plaintiff opportunity to request same from the Bankruptcy Court.

### XII.    If Defendants' motion is not denied in its entirety, Plaintiff should be permitted to file an amended complaint.

Plaintiff's Complaint is not deficient for the reasons outlined above. Should this Court find Plaintiff's Complaint deficient in any regard, Plaintiff respectfully requests leave to amend or supplement his Complaint. "The court should freely give a complainant … leave to amend defective allegations in a pleading. … Thus, the appropriate remedy when granting a motion based on nonconforming or deficient pleadings is to grant the complainant time within which to amend the complaint." *McClellon v. Lone Star Gas Co.*, 66 F.3d 98, 103 (5th Cir. 1995). Giving Plaintiff leave to amend his Complaint would not prejudice Defendants, who are already on notice of the claims Plaintiff brings.

Additionally, to the extent this Court is inclined to dismiss any claim based on a determination that it is derivative of the estate's claims, Plaintiff respectfully requests that the Court do so without prejudice so that he may request leave for derivative standing. *See Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988); *In re Nat'l Forge Co.*, 326 B.R. 532, 545–46 (W.D. Pa. May 26, 2005); *In re Jones*, 37 B.R. 969, 974 (N.D. Tex. Bankr. 1984). Further, because discovery may reveal the Portage Point Parties' knowledge of the Jones-Freeman relationship, Plaintiff requests that, in the unlikely event the Court grant any portion of Defendants' motion to dismiss, it do so without prejudice.

### CONCLUSION AND PRAYER

Plaintiff Morton S. Bouchard, III, individually and as co-trustee for The Morton S. Bouchard, III Family Trust respectfully requests that the Court deny Defendants Portage Point Partners, LLC's

and Matthew Ray's motion to dismiss. Alternatively, Plaintiff requests leave to amend his complaint. Plaintiff further requests that the Court grant him all other and further relief to which he is justly entitled.

**Dated August 5, 2024**

Respectfully submitted,

By:    /s/ Mikell A. West
       Mikell A. West
       Texas State Bar No. 24070832
       S.D. Tex. Bar No. 1563058
       Robert W. Clore
       Texas State Bar No. 24012426
       S.D. Tex. Bar No. 2032287
       BANDAS LAW FIRM, P.C.
       802 Carancahua Street, Suite 1400
       Corpus Christi, Texas 78401
       Telephone: (361) 698-5200
       Facsimile: (361) 698-5222
       mwest@bandaslawfirm.com

       *Attorneys for Plaintiff*

**Certificate of Service**

I hereby certify that on August 5, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via electronic mail to all counsel of record.

/s/ Mikell A. West

43